UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

GARY BURKETT,

                        Petitioner,

          -against-

SUPERINTENDENT,
Five Points Correctional Facility,

                       Respondent.
-------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

13 Civ. 2627 (CS)(JCM)

To the Honorable Cathy Seibel, United States District Judge:

      Petitioner Gary Burkett ("Petitioner"), proceeding *pro se*, filed a petition for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254 by papers dated April 16, 2013.[1] (Docket No. 1).

Petitioner then filed an amended petition ("Amended Petition" or "Am. Petition") by papers

dated May 5, 2013. (Docket No. 4).  Respondent Superintendent, Five Points Correctional

Facility ("Respondent") opposed the Amended Petition by affidavit and memorandum of law

dated September 20, 2013. (Docket Nos. 15, 16).  Although Petitioner was granted two

extensions of time to file a reply, (Docket Nos. 20, 21), he did not submit any reply.  For the

reasons set forth below, it is respectfully recommended that the Amended Petition be denied.

## I.  BACKGROUND

### A.  Crime, Confession and Indictment

      On September 20, 2008, at approximately 5:15 p.m., Petitioner and Whalen Gurley

entered a taxi driven by Kevin Morrison as Mr. Morrison waited outside a train station in

---

[1] A *pro se* prisoner's papers are deemed filed at the time he or she delivers them to prison authorities for forwarding to the court clerk. *Houston v. Lack*, 487 U.S. 266, 276 (1988); *see also Walker v. Jastremski*, 430 F.3d 560, 562-64 (2d Cir. 2005) (analyzing the *Houston* "prison mailbox rule").  Petitioner certified that he delivered his petition to prison authorities for mailing on April 16, 2013. (Docket No. 1 at 16).  Unless otherwise noted, the Court adopts Petitioner's dates for this filing and for all other filings discussed herein.

Peekskill, New York. (Trial Tr.[2] at 515, 520, 525, 528-29).  Mr. Morrison drove away from the

train station, speaking with another taxi driver on his cellular telephone as he drove. (*Id.* at 526).

When the three reached "approximately the 1400 block of Lincoln Terrace," Petitioner told Mr.

Morrison to pull over. (*Id.* at 526-27).  Petitioner then held his left hand up "in a pointing

fashion," with a red sweater wrapped around his left hand, and told Mr. Morrison to "give up the

money." (*Id.* at 526-27, 531, 534).  Mr. Morrison said he did not want any problems and stepped

out of the taxi. (*Id.* at 527).  Petitioner then held his arm out and said "Give up the fucking

money or I'll shoot you in your fucking leg right now." (*Id.* at 527, 535-36).  Mr. Morrison

believed that Petitioner had a gun and retrieved $151 from under the sun visor in his taxi. (*Id.* at

524-25, 527-28, 536-37).  Mr. Morrison handed the money to Petitioner and said "please go."

(*Id.* at 536, 578).  Petitioner ran away and, a few seconds later, Mr. Gurley ran away as well. (*Id.*

at 536).

Mr. Morrison called his taxi dispatcher to report that he had just been robbed, and the

dispatcher told Mr. Morrison that the police were already en route. (Trial Tr. at 537).  Mr.

Morrison began to chase Petitioner and Mr. Gurley in his car, but he stopped and waited when he

saw a police vehicle. (*Id.* at 537).  Several members of the Peekskill Police Department soon

arrived. (*Id.* at 539-40, 591-94).  At the scene, Mr. Morrison gave Officer White and Sergeant

Mignini a description of Petitioner and Mr. Gurley and pointed out the direction in which they

had run. (*Id.* at 588, 595-96).  According to Officer White, Mr. Morrison's description was as

follows: "two black males. . . . One black male had a black T-shirt on, was in his 20's, thin build.

And another black male in his 30's had, carrying a red T-shirt or red sweater of some sort, a little

heavy set." (*Id.* at 595-96).  Officer White and Officer Gonzalez walked up a staircase and saw

Petitioner and Mr. Gurley, whom Officer White described as "two black males. . . . [o]ne heavy

_____

[2] Refers to the transcript of Petitioner's trial, held from January 11, 2010 through January 13, 2010. (Docket No. 46).

2

set, one thin build, T-shirts, black T-shirt on the thin younger male in his 20's." (*Id.* at 598).

Petitioner and Mr. Gurley ran away and Officer White and Officer Gonzalez chased after them.

(*Id.* at 599). Petitioner fell at the bottom of a staircase and was detained by Officer Gonzalez and

Officer Lemp. (*Id.* at 599-601). Mr. Gurley kept running but was detained about a block away

by Officer White and Sergeant Mignini. (*Id.* at 600-01).

      After assisting Officer Gonzalez in handcuffing Petitioner, Officer Lemp searched

Petitioner and found $151 in his right pants pocket. (Trial Tr. at 652-654). Officers drove

Petitioner and Mr. Gurley in separate police vehicles to Mr. Morrison, who identified them as the

individuals who had robbed him. (*Id.* at 541-42, 583, 603-04, 654-57). This identification

occurred approximately ten minutes after the robbery occurred. (*Id.* at 546, 603-04). Officers

then drove Petitioner and Mr. Gurley to Peekskill Police Headquarters. (*Id.* at 604-05, 658).

Officer White stayed behind to search for evidence and found a red sweater "tossed over on the

opposite side of a fence." (*Id.* at 605, 609, 612, 642).

      Petitioner was held in a booking area inside the Peekskill Police Headquarters,

handcuffed to a bench, for approximately 55 minutes. (Trial Tr. at 722-23). Mr. Gurley was held

nearby and Petitioner and Mr. Gurley were "yelling back and forth to each other." (*Id.* at 732).

Around 6:40 p.m., Detective D'Aliso brought Petitioner to an interview room after Petitioner

indicated that he wanted to speak to him. (*Id.* at 683, 685, 722-23, 727-28). Detective D'Aliso

had activated a video-recording device within the interview room. (*Id.* at 684, 686). Detective

D'Aliso advised Petitioner of his *Miranda* rights and Petitioner signed his name on a *Miranda*

rights form. (*Id.* at 698-70). Petitioner then confessed to robbing Mr. Morrison and told

Detective D'Aliso that he wanted to exonerate Mr. Gurley. (*Id.* at 729). During the interview,

Petitioner was cooperative and was not restrained in any way. (*Id.* at 685, 730). Detective

D'Aliso offered Petitioner a drink and a cigarette, and Petitioner accepted both. (*Id.* at 731).  The interview lasted about twenty minutes. (*Id.* at 686).

Petitioner was subsequently indicted for robbery in the second degree,[3] grand larceny in the fourth degree[4] and criminal possession of stolen property in the fifth degree.[5] (Ex.[6] 1).  He pled not guilty. (Am. Petition at 1[7]).

## B.  Pre-Trial Hearing

Petitioner, through counsel, moved for omnibus relief by papers dated September 8, 2009.[8] (*See* Curtis Aff.[9] at 5).  By decision and order dated October 20, 2009, the Honorable Robert A. Neary, Acting Justice of the Supreme Court of the State of New York, County of

---

[3] New York Penal Law ("N.Y. Penal Law") § 160.10(2)(b) provides, in relevant part, that: "A person is guilty of robbery in the second degree when he forcibly steals property and when: . . . [i]n the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime: . . . [d]isplays what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm."

[4] N.Y. Penal Law § 155.30(5) provides, in relevant part, that: "A person is guilty of grand larceny in the fourth degree when he steals property and when: . . . [t]he property, regardless of its nature and value, is taken from the person of another."

[5] N.Y. Penal Law § 165.40 provides, in relevant part, that: "A person is guilty of criminal possession of stolen property in the fifth degree when he knowingly possesses stolen property, with intent to benefit himself or a person other than an owner thereof or to impede the recovery by an owner thereof."

[6] Refers to exhibits attached to Respondent's Memorandum of Law. (Docket No. 16).

[7] The Amended Petition contains inconsistent page numbers.  For ease of reference, page number citations refer to the page number assigned upon electronic filing.

[8] Petitioner's motion for omnibus relief is not part of the record before the Court.

[9] Refers to Celia M. Curtis' Affidavit in Opposition to Petition for a Writ of Habeas Corpus. (Docket No. 15).

Westchester ("Justice Neary"), granted Petitioner's motion to conduct pre-trial *Dunaway*,[10] *Wade*,[11] *Mapp*,[12] *Huntley*,[13] *Ventimiglia*[14] and *Sandoval*[15] hearings. (Ex. 2 at 4-5).

On January 4, 5, and 6, 2010, the Honorable James W. Hubert, Acting Justice of the Supreme Court of the State of New York, County of Westchester ("Justice Hubert") held the *Dunaway*, *Wade*, *Mapp* and *Huntley* hearings in one combined pre-trial proceeding (the "Pre-Trial Hearing"). (Hr'g Tr.[16] at 3). The People called Detective D'Aliso, (*id.* at 5-37), Lieutenant Johansen, (*id.* at 56-70), Officer White, (*id.* at 70-98), Officer Lemp, (*id.* at 102-121), and Sergeant Mignini, (*id.* at 122-140). Petitioner testified on his own behalf. (*Id.* at 162-213).

During the Pre-Trial Hearing, defense counsel indicated that he wanted to call witness Marvin Coles to testify for *Huntley* purposes—*i.e.*, to determine the admissibility of Petitioner's confession. (Hr'g Tr. at 141). Defense counsel made an offer of proof that Mr. Coles would testify that, while Mr. Coles was in custody with Mr. Gurley, he heard Mr. Gurley state that Petitioner had confessed after Mr. Gurley had threatened him. (*Id.* at 142-43). Justice Hubert

---

[10] "[A] *Dunaway* hearing is used to determine whether a statement or other intangible evidence obtained from a person arrested without probable cause should be suppressed at a subsequent trial." *Berry v. Hulihan*, No. 08 CIV. 6557(LBS), 2009 WL 233981, at *7 (S.D.N.Y. Jan. 28, 2009).

[11] "The purpose of a *Wade* hearing is to determine [before] the trial whether pretrial identification procedures have been so improperly suggestive as to taint an in-court identification." *Lynn v. Bliden*, 443 F.3d 238, 248 (2d Cir. 2006), *as amended* (May 19, 2006) (citation omitted) (alteration in original).

[12] "[A] *Mapp* hearing is used to determine whether physical evidence sought to be used against a criminal defendant was obtained illegally by law enforcement officers and thus is inadmissible at the criminal defendant's trial." *Berry*, 2009 WL 233981, at *7.

[13] "A *Huntley* hearing is a pre-trial proceeding to determine the admissibility of a confession or admission." *Acosta v. Artuz*, 575 F.3d 177, 187 n.3 (2d Cir. 2009).

[14] "A *Ventimiglia* hearing is a pretrial hearing where the trial judge determines the admissibility of evidence of uncharged criminal conduct." *Mercer v. Herbert*, 133 F. Supp. 2d 219, 231, n.14 (W.D.N.Y. 2001) (citation omitted).

[15] "In New York, [a] *Sandoval* hearing is held, upon a defendant's request, to determine the extent to which he will be subject to impeachment by cross-examination about prior bad acts if he testifies." *Grayton v. Ercole*, 691 F.3d 165, 173 (2d Cir. 2012) (citation omitted) (alteration in original).

[16] Refers to the transcript of the Pre-Trial Hearing, held from January 4, 2010 through January 6, 2010. (Docket No. 44).

5

asked whether there was any allegation that the police were involved in Mr. Gurley's alleged threat, and defense counsel stated that there was no allegation of police involvement, but that his reading of the statute was that a confession could be considered "involuntary" even without police coercion. (*Id.* at 143-44). Justice Hubert responded that he believed he could only suppress the confession if there was a showing of police coercion, but he reserved ruling on this issue. (*Id.* at 145, 147). Justice Hubert later stated that, after Petitioner testified, he would be in a better position to evaluate whether Mr. Coles' testimony would be "relevant, necessary, material, cumulative or whatever." (*Id.* at 161).

Petitioner took the stand and testified that Mr. Gurley had threatened him while the two were handcuffed alone in the booking area at the Peekskill Police Headquarters. (Hr'g Tr. at 162, 171). According to Petitioner, Mr. Gurley told him that he "better take the rap or he [was] going to have people get to [Petitioner] when [Petitioner got] to the jail." (*Id.* at 169). Petitioner stated that Mr. Gurley was a member of the Bloods gang, and that he interpreted Mr. Gurley's statement as a "threat" that members of the Bloods would attack him in jail if he did not confess to the crime. (*Id.* at 166, 169-170). Petitioner had previously been jumped by members of the Bloods while in jail. (*Id.* at 171-72). Petitioner testified that he thereafter confessed to the crime because he wanted to clear Mr. Gurley's name and prevent any harm to himself. (*Id.* at 172).

After the conclusion of Petitioner's testimony, defense counsel renewed his application to have Mr. Coles testify for *Huntley* purposes. (Hr'g Tr. at 213). Justice Hubert ruled that Mr. Coles' testimony would be hearsay and would not be admissible to prove the central issue in the hearing—*i.e.*, whether Petitioner's confession was coerced. (*Id.* at 213-14). Defense counsel did not object to this ruling. (*Id.* at 214).

On January 6, 2010, Justice Hubert read his decision on the *Dunaway*, *Wade*, *Mapp* and *Huntley* hearings into the record. (Hr'g Tr. at 219-233). As to the *Dunaway* hearing, Justice Hubert found that the police had probable cause to pursue and arrest Petitioner and that the People had "met their burden of going forward." (*Id.* at 221-24). As to the *Wade* hearing, the court found that the show-up identification of Petitioner was not "unduly suggestive." (*Id.* at 223). As to the *Mapp* hearing, Justice Hubert found that the police acted constitutionally in (i) temporarily seizing $151 found in Petitioner's pocket during a pat-down search, and (ii) recovering the red sweater, and he declined to suppress that evidence. (*Id.* at 224-227). As to the *Huntley* hearing, Justice Hubert denied Petitioner's motion to suppress his confession on two grounds. First, Justice Hubert found that Petitioner had knowingly and voluntarily waived his *Miranda* rights before making the confession. (*Id.* at 227). Second, Justice Hubert held that Mr. Gurley "was not acting as an agent of the police" when he allegedly threatened Petitioner, and that there was "no basis to conclude that the police engaged in any coercive activity" that led to Petitioner's confession. (*Id.* at 230-31). Justice Hubert also noted that he need not reach the issue of whether Mr. Gurley had actually threatened Petitioner because it was not relevant to his decision to deny Petitioner's motion to suppress. (*Id.* at 232-33).

## C. Jury Selection and Trial

The court held jury selection on January 6, 7, and 8, 2010. (Jury Sel. Tr.[17] at 1-457). As detailed in Section III(E), *infra*, Petitioner was not present in the courtroom during jury selection. The court then held a jury trial from January 11, 2010 through January 13, 2010. (Trial Tr. at

---

[17] Refers to the transcript of the jury selection held on January 6, 2010 through January 8, 2010, prior to Petitioner's trial. (Docket No. 45).

458-857).  On January 13, 2010, the jury convicted Petitioner of robbery in the second degree

and grand larceny in the fourth degree. (*Id.* at 851-854).[18]

## D.  Motion to Set Aside Guilty Verdict

By papers dated February 22, 2010, Petitioner, through counsel, moved to set aside the

guilty verdict pursuant to New York Criminal Procedure Law ("N.Y. C.P.L.") § 330.30(1).[19]

(Ex. 5 at 97-106[20]).  As described by Justice Hubert, Petitioner's motion raised the following

grounds: (i) "the People improperly failed to disclose [Mr. Morrison's] criminal history;" (ii)

"the People improperly failed to disclose a 911 tape;" (iii) "[Petitioner] was improperly excluded

from the courtroom;" (iv) "his confession was improperly admitted;" (v) "the evidence recovered

by the police and [Petitioner's] identification were illegally obtained;" and (vi) "the evidence at

trial was insufficient to establish the crime of robbery in the second degree." (Ex. 3).

Justice Hubert denied Petitioner's motion in its entirety by Decision and Order dated May

6, 2010. (Ex. 3).  As to (i), the court found that Petitioner's claim was not properly raised in a §

330.30 motion because it was based on facts outside the record, that the People were not required

to disclose Mr. Morrison's criminal history pursuant to N.Y. C.P.L. § 240.45(1)(b)[21] because the

People did not know of Mr. Morrison's criminal history until after the trial, and that any

---

[18] The People withdrew the charge of criminal possession of stolen property in the fifth degree before the jury was charged. (*Id.* at 747-48, 794-95, 827).

[19] N.Y. C.P.L. § 330.30(1) provides that: "At any time after rendition of a verdict of guilty and before sentence, the court may, upon motion of the defendant, set aside or modify the verdict or any part thereof upon . . . [a]ny ground appearing in the record which, if raised upon an appeal from a prospective judgment of conviction, would require a reversal or modification of the judgment as a matter of law by an appellate court."

[20] Exhibit 5 has varied page numbering throughout.  For ease of reference, page number citations refer to the page number assigned upon electronic filing.

[21] Justice Hubert cited N.Y. C.P.L. § 240.45(1)(c), but this appears to be a typographical error.  N.Y. C.P.L. § 240.4(1)(b) provides that: "After the jury has been sworn and before the prosecutor's opening address, or in the case of a single judge trial after commencement and before submission of evidence, the prosecutor shall, subject to a protective order, make available to the defendant: . . . (b) A record of judgment of conviction of a witness the people intend to call at trial if the record of conviction is known by the prosecutor to exist."

production of Mr. Morrison's criminal history would not have created a reasonable probability of a more favorable outcome for Petitioner at trial. (*Id.* at 4-5). As to (ii), the court found that Petitioner failed to preserve any objection at trial regarding the People's failure to produce the 911 tape, that it was insufficient to merely speculate as to whether the 911 tape contained material that should have been produced pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and that Mr. Morrison did not actually call 911 but spoke to the police when they arrived at the scene of the robbery. (*Id.* at 5). As to (iii), the court noted that Petitioner "has a statutory and a constitutional right to be present at all material stages of trial," but found that Petitioner voluntarily waived his right to be present in the courtroom for jury selection on January 8, 2010. (*Id.* at 6). As to (iv), the court concluded that the hearing court properly denied Petitioner's motion to suppress his confession because Petitioner was given *Miranda* warnings and waived his rights prior to making the confession. (*Id.* at 7). As to (v), the court found that the hearing court properly found that the police had probable cause to seize Petitioner and recover money from his clothing, and that the show-up identification was proper. (*Id.* at 7). As to (vi), the court found that Petitioner had failed to raise this specific argument at trial, but that nevertheless the trial evidence was legally sufficient to establish that Petitioner had "displayed what appeared to be a pistol or other firearm" under N.Y. Penal Law § 160.10(2)(b). (*Id.* at 7-8).

**E. Sentence**

On May 6, 2010, Justice Hubert sentenced Petitioner to (i) a determinate sentence of eleven years of incarceration and a five-year term of post-release supervision for the charge of robbery in the second degree, and (ii) an indeterminate sentence of one-and-a-half years to three years (to run concurrently with his eleven-year determinate sentence) for the charge of grand

larceny in the fourth degree. (Sentencing Tr.[22] at 11-13).  Justice Hubert also imposed a $300

mandatory surcharge, a $25 crime victim fee, a $50 DNA fee, and a Permanent Order of

Protection in favor of Mr. Morrison. (*Id.* at 13-15).

**F.  Motion to Vacate Judgment**

Petitioner, proceeding *pro se*, then filed an undated motion to vacate the judgment against

him pursuant to N.Y. C.P.L. § 440.10.[23]  (Ex. 4).  Petitioner raised the following grounds: (i) the

People failed to turn over Mr. Morrison's criminal history sheet and erroneously disclosed the

incorrect information that Mr. Morrison had been convicted of an assault; (ii) the hearing court

erred in not allowing Mr. Coles to testify regarding Mr. Gurley's statement that he forced

Petitioner into confessing, and Petitioner's confession should have been suppressed under the

"classical coercion" rule of the Fifth Amendment; and (iii) Petitioner received ineffective

assistance of counsel because (a) counsel did not tell him until after trial that the People did not

disclose Mr. Morrison's criminal history sheet, and (b) counsel failed to object to Petitioner's

absence on the last day of jury selection. (*Id.* at 2-3).  The People opposed the motion by papers

dated September 7, 2010. (Ex. 5).

Justice Hubert denied Petitioner's motion by Decision and Order dated December 31,

2010. (Ex. 6).  The court first stated that the motion should be denied pursuant to N.Y. C.P.L. §

440.10(2)(b),[24] stating that "most, if not all of these claims can be reviewed on direct appeal."

(*Id.* at 3).  The court then went on to address Petitioner's claims individually.  As to (i), the court

---

[22] Refers to the transcript of Petitioner's sentencing hearing, held on May 6, 2010. (Docket No. 47).

[23] N.Y. C.P.L. § 440.10 provides that "[a]t any time after the entry of a judgment, the court in which it was entered may, upon motion of the defendant, vacate such judgment upon [certain enumerated grounds]."

[24] N.Y. C.P.L. § 440.10(2)(b) provides, in relevant part, that a "court must deny a motion to vacate a judgment when: . . . (b) The judgment is, at the time of the motion, appealable or pending on appeal, and sufficient facts appear on the record with respect to the ground or issue raised upon the motion to permit adequate review thereof upon such an appeal."

noted that Petitioner raised this claim in his § 330.30 motion and stated that the claim was denied

for the same reasons. (*Id.* at 4-5).  As to (ii), the court stated that "this issue is cognizable on . . .

direct appeal and is thus barred from review under CPL § 440.10(2)(b)." (*Id.* at 5).  As to (iii)(a),

the court stated that this claim "also lacks merit" and that even if Petitioner were able to establish

that his counsel had somehow been ineffective in failing to tell Petitioner that the People had not

turned over Mr. Morrison's criminal history sheet, Petitioner had "failed to establish that there is

a reasonable probability that, but for this failure, the proceeding would have resulted differently."

(*Id.* at 5) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)).  As to (iii)(b), the court stated

that this claim is "well-established in the trial record" and that, as it had previously held in its

order denying Petitioner's § 330.30 motion, Petitioner "voluntarily waived his right to be present

in the courtroom" during the last day of jury selection. (*Id.* at 5-6).

## G.  Direct Appeal

### i.  Appeal to the Second Department

By papers dated June 9, 2011, Petitioner, through counsel, directly appealed his

conviction and sentence to the Supreme Court of the State of New York, Appellate Division,

Second Judicial Department ("Second Department"). (Ex. 7).  Petitioner argued that his

conviction should be reversed on the following grounds: (i) Petitioner was not properly

*Mirandized* and his video confession should have been suppressed, (*id.* at 7-8[25]); (ii) the red

sweater should have been suppressed, (*id.* at 9); (iii) the money discovered on Petitioner was

inadmissible because the police officers' pursuit of Petitioner was unlawful, (*id.* at 10); and (iv)

the police did not have probable cause to arrest Petitioner merely because he ran from police, (*id.*

at 10-11).  The People opposed Petitioner's appeal by undated papers. (Ex. 8).

---

[25] Exhibit 7 does not contain page numbers.  For ease of reference, page number citations refer to the page number assigned upon electronic filing.

Petitioner filed a supplemental *pro se* brief by papers dated January 2, 2012. (Ex. 9).  In this brief, Petitioner argued that the hearing court erred in: (i) denying Petitioner's request for reappointment of counsel when counsel had a purported conflict of interest, (*id.* at 6-8); (ii) finding that the police had probable cause to arrest Petitioner (even though Petitioner did not fit the description of the suspects because he was not wearing a red or black t-shirt, the People failed to call as witnesses the taxi dispatcher who made the 911 call or the sending police officer, and the People failed to produce the 911 tape itself), and then failing to exclude all of the evidence obtained pursuant to Petitioner's unlawful arrest as inadmissible "fruit of the poisonous tree," (*id.* at 8-9); (iii) admitting Petitioner's coerced confession into evidence in violation of N.Y. C.P.L. § 60.45[26] and the First, Fifth and Fourteenth Amendments to the United States Constitution, (*id.* at 9-10); (iv) preventing Mr. Coles from testifying at the Pre-Trial Hearing, (*id.* at 11-15); and (v) assuming due to Petitioner's silence that he did not want to be present during the third day of jury selection, in violation of N.Y. C.P.L. § 260.20 and "the equal protection due process clause," (*id.* at 15-16).  Petitioner also argued that his trial counsel was ineffective for failing to object to Petitioner being removed from the courtroom on the third day of jury selection, (*id.* at 16), and for failing to object to the hearing court's ruling that Petitioner's coerced confession was admissible, (*id.* at 10).  The People filed a supplemental opposition brief by undated papers. (Ex. 10).

The Second Department affirmed Petitioner's conviction in an order dated August 29, 2012. (Ex. 11).  First, the Second Department found that the hearing court properly denied Petitioner's motion to suppress his confession, stating that (a) "a finding that a confession was

---

[26] N.Y. C.P.L. § 60.45 provides, in relevant part, that: "A confession, admission or other statement is 'involuntarily made' by a defendant when it is obtained from him: (a) By any person by the use or threatened use of physical force upon the defendant or another person, or by means of any other improper conduct or undue pressure which impaired the defendant's physical or mental condition to the extent of undermining his ability to make a choice whether or not to make a statement."

not made voluntarily must be based on a finding of 'coercive police activity,'" and that "the

defendant presented no evidence that the police were involved in the alleged threat made by his

accomplice," and (b) Mr. Coles' testimony would have been "both immaterial and cumulative"

because he "had nothing to offer regarding police involvement in the alleged threat." (Ex. 11 at

2) (citation omitted).  Second, the Second Department found that the hearing court properly

denied Petitioner's motion to suppress the red sweater because "[w]here [as here] a defendant

abandons property, there is no search or seizure." (*Id.*) (citation omitted) (alteration in original).

Third, the Second Department found that the hearing court properly denied Petitioner's

application for reappointment of counsel. (*Id.*).  Fourth, the Second Department found that

Petitioner waived his right to be present during jury selection. (*Id.* at 2-3).  Fifth, the Second

Department found that Petitioner did not receive ineffective assistance of counsel. (*Id.* at 3)

(citing *People v. Benevento*, 697 N.E.2d 584 (N.Y. 1998) and *People v. Baldi*, 429 N.E.2d 400

(N.Y. 1981)).  Finally, the Second Department stated that Petitioner's remaining contentions

were "unpreserved for appellate review and, in any event, without merit." (*Id.*).

## ii.  Application for Leave to Appeal to the Court of Appeals

Petitioner, proceeding *pro se*, filed an application for leave to appeal the Second

Department's decision to the New York Court of Appeals (the "Court of Appeals") by papers

dated September 6, 2012.  (Ex. 12).  In his application, Petitioner argued that the Second

Department erred on four grounds: (i) holding that "coercive police activity" is necessary to

render a confession involuntary under N.Y. C.P.L. § 60.45(a); (ii) finding that it was proper to

exclude Mr. Coles' testimony, in violation of Defendant's "constitutional rights;" (iii) ruling that

trial counsel was effective; and (iv) holding that Petitioner waived his right to be present at jury

selection. (Ex. 12).

By letter dated September 17, 2012, the Court of Appeals notified Petitioner that his application was incomplete because he failed to attach a copy of the Second Department decision and the briefs filed in the Second Department. (Ex. 13).  This letter also advised Petitioner that counsel was required to file a leave application on his behalf if Petitioner requested it, but that Petitioner could also file the application *pro se*. (*Id.*).  By letter dated September 20, 2012, Petitioner responded stating that he had reached out to counsel two weeks before, requesting that counsel file a leave application, but that counsel had not responded.  He wrote that he would contact counsel again to "request[] his legal services to file a [sic] application." (Ex. 14).

Petitioner's counsel filed a leave application on Petitioner's behalf by letter dated September 19, 2012. (Ex. 15).  The entire substance of the application was as follows: "The grounds [Petitioner] argues come from the 'inadmissibility of incriminating and/or coerced statements as involuntarily made under,' etc., should have been excluded. He further argues that the exclusion of his witness was incorrect." (*Id.*).  The Court of Appeals alerted counsel that the application was incomplete because counsel had failed to file the necessary Second Department briefs, and counsel thereafter "submitted the petitioner's supplemental brief." (Opp.[27] at 14).

The Court of Appeals then assigned the Honorable Eugene F. Pigott, Jr. to review Petitioner's leave application. (Opp. at 14).  Petitioner, proceeding *pro se*, wrote to Judge Pigott by letter dated October 31, 2012, stating that he wanted to preserve "the below reviewable legal issues:" (i) the hearing court should have ruled Petitioner's confession inadmissible pursuant to N.Y. C.P.L. § 60.45(a), and the failure to do so violated his "constitutional rights against self-incriminating himself and rights to a fair trial;" and (ii) the hearing court's ruling that Mr. Coles' testimony was immaterial was "in violation of defendant [sic] State and U.S. Constitutional rights." (Ex. 16).

---

[27] Refers to Respondent's Memorandum of Law. (Docket No. 16).

The People opposed Petitioner's leave application by letter dated November 29, 2012, (Ex. 17), and the Court of Appeals summarily denied Petitioner's leave application in an order dated December 19, 2012, (Ex. 18).

## H. Federal Habeas Corpus Proceedings

Petitioner timely filed a federal habeas petition by papers dated April 16, 2013. (Docket No. 1). Petitioner then timely filed the instant Amended Petition by papers dated May 5, 2013. (Docket No. 4).

## II. APPLICABLE LAW

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, 562 U.S. 86, 97 (2011). "Before a federal district court may review the merits of a state court criminal judgment in a habeas corpus action, the court must first determine whether the petitioner has complied with the procedural requirements set forth in 28 U.S.C. §§ 2244 and 2254." *Visich v. Walsh*, No. 10 Civ. 4160(ER)(PED), 2013 WL 3388953, at *9 (S.D.N.Y. July 3, 2013).[28] The procedural and substantive standards are summarized below.

## A. Timeliness Requirement

Federal habeas corpus petitions are subject to AEDPA's strict, one-year statute of limitations. 28 U.S.C. § 2244(d)(1). The statute allows for four different potential starting points to determine the limitations period and states that the latest of these shall apply. As the statute explains:

---

[28] In accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) and Local Rule 7.2 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York, a copy of this case and other cases, *infra*, that are unpublished or only available by electronic database, accompany this Report and Recommendation and shall be simultaneously delivered to *pro se* Petitioner.

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--
>
>> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>>
>> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>>
>> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>>
>> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(A)-(D).  However, this one-year period will be tolled during the pendency of a properly filed application for post-conviction relief. 28 U.S.C. § 2244(d)(2).  This period may also be subject to equitable tolling, but "only in the rare and exceptional circumstance." *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000) (quotation marks and citation omitted); *see also Holland v. Florida*, 560 U.S. 631, 649 (2010) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)) (setting forth a two-step analysis for equitable tolling).

**B.  Exhaustion as a Procedural Bar**

A habeas petition may not be granted unless the petitioner has exhausted his claims in state court. *See* 28 U.S.C. § 2254(b).  As the statute prescribes:

> (b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that-
>
>> (A) the applicant has exhausted the remedies available in the courts of the State; or
>>
>> (B)(i) there is an absence of available State corrective process; or

16

(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

. . .

(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

28 U.S.C. § 2254(b)-(c).

Exhaustion requires a prisoner to have "fairly presented to an appropriate state court the same federal constitutional claim that he now urges upon the federal courts." *Turner v. Artuz*, 262 F.3d 118, 123 (2d Cir. 2001) (citation omitted).  If a petitioner "cites to specific provisions of the U.S. Constitution in his state court brief, the petitioner has fairly presented his constitutional claim to the state court." *Davis v. Strack,* 270 F.3d 111, 122 (2d Cir. 2001); *see also Reid v. Senkowski*, 961 F.2d 374, 376 (2d Cir. 1992) (even "a minimal reference to the Fourteenth Amendment" presents a federal constitutional claim to the state courts).  However, a petitioner may fairly present his claim even without citing to the U.S. Constitution.  As the Second Circuit has stated:

> the ways in which a state defendant may fairly present to the state courts the constitutional nature of his claim, even without citing chapter and verse of the Constitution, include (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Daye v. Attorney Gen. of State of N.Y.*, 696 F.2d 186, 194 (2d Cir. 1982).  Fair presentation includes petitioning for discretionary review in the state's highest appellate court. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 839-40 (1999) ("a state prisoner must present his claims to a state supreme court in a petition for discretionary review in order to satisfy the exhaustion requirement").

However, "a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred." *Reyes v. Keane*, 118 F.3d 136, 139 (2d Cir. 1997) (citation omitted).  In such cases, although the claim is technically unexhausted, the district court may deem the claim to be exhausted but procedurally barred from habeas review. *See id.* at 140 ("a claim is procedurally defaulted for the purposes of federal habeas review where 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'") (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 (1991)).

Under New York law, defendants are permitted only "one direct appeal." *Lowman v. New York*, No. 09-CV-0058T, 2011 WL 90996, at *9 (W.D.N.Y. Jan. 11, 2011) (citing N.Y. Ct. R. § 500.20[29]); *see also Roa v. Portuondo*, 548 F. Supp. 2d 56, 78 (S.D.N.Y. 2008) ("Any attempt to raise these claims at this stage as part of a direct appeal would be rejected because a criminal defendant is entitled to only one direct appeal and one application for leave to appeal to the Court of Appeals.").  Petitioners must raise record-based claims by direct appeal rather than by a collateral motion in state court. *See, e.g.*, *O'Kane v. Kirkpatrick*, No. 09 Civ. 05167(HB)(THK), 2011 WL 3809945, at *7 (S.D.N.Y. Feb. 15, 2011) ("all claims that are record-based must be raised in a direct appeal. . . . It is only when a defendant's claim hinges upon facts outside the trial record, that he may collaterally attack his conviction by bringing a claim under CPL § 440.10."), *report and recommendation adopted*, No. 09 Civ. 05167(HB)(THK), 2011 WL 3918158 (S.D.N.Y. Aug. 25, 2011); *Lowman*, 2011 WL 90996, at *9 ("Collateral review of this claim—by way of another CPL § 440 motion—is also barred

---

[29] This rule states, in relevant part, that a letter application for leave to appeal "shall indicate . . . (2) that no application for the same relief has been addressed to a justice of the Appellate Division, as *only one application is available*." N.Y. Ct. R. 500.20(a) (emphasis added).

because the claim is a matter of record that could have been raised on direct appeal, but unjustifiably was not.") (citing N.Y. C.P.L. § 440.10(2)(c)[30]). In the context of claims for ineffective assistance of counsel, "[c]laims are record-based when a reviewing court could conclude that defendant's counsel was ineffective simply by reviewing the trial record without the benefit of additional background facts that would need to be developed through a post-conviction motion pursuant to CPL 440.10." *Rodriguez v. Smith*, No. 10-CV-8306 (KMK)(LMS), 2015 WL 6509153, at *14 (S.D.N.Y. Oct. 28, 2015) (citation omitted).

To avoid the procedural default of an unexhausted claim, a petitioner may show "cause for the default and prejudice, or that failure to consider the claim will result in miscarriage of justice, *i.e.*, the petitioner is actually innocent." *Sweet v. Bennett*, 353 F.3d 135, 141 (2d Cir. 2003) (citations omitted).

## C. Adequate and Independent State Grounds as a Procedural Bar

As the Second Circuit has instructed, federal courts "will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that is independent of the federal question and adequate to support the judgment." *Kozlowski v. Hulihan*, 511 F. App'x 21, 23 (2d Cir. 2013) (summary order) (citations omitted). This preclusion applies even if the state court alternatively rules on the merits of the federal claim, so long as there is an adequate and independent state ground that would bar the claim in state court. *See, e.g.*, *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999).

---

[30] N.Y. C.P.L. § 440.10(2)(c) states, in relevant part, that a court must deny a § 440.10 motion to vacate judgment when "[a]lthough sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal during the prescribed period or to his unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him."

A state ground is "independent" if it "'fairly appears' to rest primarily on state law." *Taylor v. Connelly*, 18 F. Supp. 3d 242, 253 (E.D.N.Y. 2014) (quoting *Jimenez v. Walker*, 458 F.3d 130, 138 (2d Cir. 2006)).  In the normal case, a ground is "adequate only if it is based on a rule that is firmly established and regularly followed by the state in question." *Cotto v. Herbert*, 331 F.3d 217, 239 (2d Cir. 2003) (citation omitted).  However, "there are 'exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question.'" *Id.* at 240 (citation omitted).  In determining whether a case is "exceptional" in that the state ground should be held inadequate, the Second Circuit uses the following factors as "guideposts":

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had substantially complied with the rule given the realities of trial, and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

*Id.* (quotation marks and citation omitted).  A decision that a state procedural rule is inadequate should not be made "lightly or without clear support in state law." *Garcia*, 188 F.3d at 77 (citation omitted).

To avoid a procedural default based on independent and adequate state grounds, a petitioner may "show 'cause' for the default and 'prejudice attributable thereto,' or demonstrate that failure to consider the federal claim will result in a 'fundamental miscarriage of justice.'" *Harris*, 489 U.S. at 262 (citations omitted).

## D.  AEDPA Standard of Review

When a federal court reaches the merits of a habeas petition, AEDPA prescribes a "highly deferential" standard for reviewing state court rulings. *Lindh v. Murphy*, 521 U.S. 320, 333 n.7

(1997); *see also Fischer v. Smith*, 780 F.3d 556, 561 (2d Cir. 2015) (quoting *Richter*, 562 U.S. at

98).  An application for a writ of habeas corpus:

> shall not be granted with respect to any claim that was adjudicated on the merits
> in State court proceedings unless the adjudication of the claim--
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable
> > application of, clearly established Federal law, as determined by the
> > Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination
> > of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

Courts have interpreted the phrase "adjudicated on the merits" in AEDPA as meaning

that a state court "(1) dispose[d] of the claim 'on the merits,' and (2) reduce[d] its disposition to

judgment." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001).  Courts examine the "last

reasoned decision" by the state courts in determining whether a federal claim was adjudicated on

the merits. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) (noting the presumption that "[w]here

there has been one reasoned state judgment rejecting a federal claim, later unexplained orders

upholding that judgment or rejecting the same claim rest upon the same ground.").  "[W]hen a

state court issues an order that summarily rejects without discussion *all* the claims raised by a

defendant, including a federal claim that the defendant subsequently presses in a federal habeas

proceeding, the federal habeas court must presume (subject to rebuttal) that the federal claim was

adjudicated on the merits." *Johnson v. Williams*, 133 S. Ct. 1088, 1091 (2013) (citing *Richter*,

562 U.S. at 86) (emphasis in original).  The same presumption applies when "a state court rules

against the defendant and issues an opinion that addresses some issues but does not expressly

address the federal claim in question." *Id.*  This "presumption is a strong one that may be

rebutted only in unusual circumstances." *Id.* at 1096.

If a state court adjudicates a federal claim on the merits, the Court must apply AEDPA deference to that state court ruling.[31] 28 U.S.C. § 2254(d)(1)-(2).  In the context of AEDPA deference, the phrase "clearly established Federal law" means "the holdings, as opposed to the dicta, of [the Supreme Court of the United States'] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 365 (2000).  "A state court decision is contrary to such clearly established federal law if it applies a rule that contradicts the governing law set forth in the Supreme Court's cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from its precedent." *Lewis v. Conn. Comm'r of Corr.*, 790 F.3d 109, 121 (2d Cir. 2015) (quotation marks and citations omitted).

A state court decision involves an "unreasonable application" of Supreme Court precedent if: (1) "the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case," or (2) "the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407.  For a federal court to find a state court's application of Supreme Court precedent unreasonable, the state court's decision must have been more than incorrect or erroneous—it must have been "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  In other words, a state court's decision "that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (citation omitted).  However, "the trial court's decision need not teeter on 'judicial incompetence' to warrant relief

---

[31] If, by contrast, a state court does not adjudicate a federal claim on the merits, "AEDPA deference is not required . . . [and] conclusions of law and mixed findings of fact and conclusions of law are reviewed de novo." *DeBerry v. Portuondo*, 403 F.3d 57, 66-67 (2d Cir. 2005) (citations omitted).

under § 2254(d)." *Alvarez v. Ercole*, 763 F.3d 223, 229 (2d Cir. 2014) (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)).  If a state court decision does not contain reasons for the dismissal of a defendant's federal claim, the Court must consider "'what arguments or theories . . . could have supported[] the state court's decision,' and may grant habeas only if 'fairminded jurists could [not] disagree that those arguments or theories are inconsistent with the holding in a prior decision of' the Supreme Court." *Lynch v. Superintendent Dolce*, 789 F.3d 303, 311 (2d Cir. 2015) (alterations in original) (citation omitted).

## III. DISCUSSION

Petitioner claims that his conviction violated the Constitution in five ways: (i) the hearing court prevented Mr. Coles from testifying at the Pre-Trial Hearing in violation of Petitioner's Fourteenth Amendment "due process rights to a fair trial" and his right to present a defense pursuant to the Compulsory Process Clause of the Sixth Amendment; (ii) Petitioner's confession was coerced in violation of his Fifth Amendment right against self-incrimination; (iii) Petitioner received ineffective assistance of counsel in violation of his due process rights and his right to counsel under the Fifth, Sixth and Fourteenth Amendments; (iv) Petitioner was illegally arrested and evidence was obtained in violation of his Fourth Amendment rights; and (v) the trial court excluded Petitioner from jury selection in violation of his right to be present at trial under the Fifth, Sixth and Fourteenth Amendments. (Am. Petition at 5, 7-8, 10, 16-19).  The Court will address each claim in turn.

## A.  Exclusion of Witness Testimony (Claim One)

Petitioner's first claim ("Claim One") is that the hearing court erred in denying his request to call Mr. Coles to testify as a witness at the Pre-Trial Hearing. (Am. Petition at 5, 16-

17[32]).  According to Petitioner, Mr. Coles would have testified that, while he was in custody with Mr. Gurley, he heard Mr. Gurley state that Petitioner had confessed after Mr. Gurley threatened him. (Hr'g Tr. at 142-43).  Petitioner claims that the exclusion of this witness violated his Fourteenth Amendment due process rights and his right to present a defense pursuant to the Compulsory Process Clause of the Sixth Amendment. (Am. Petition at 17).  Respondent argues that this claim is not cognizable on federal habeas review and that, in the alternative, the claim is barred under the AEDPA standard of review. (Opp. at 2-8).  I recommend finding that Claim One is barred under the AEDPA standard of review.[33]

As an initial matter, I find that Petitioner fairly presented Claim One to the state courts. Petitioner argued in his supplemental *pro se* brief on direct appeal to the Second Department that the hearing court had violated his "constitutional rights to produce witnesses in support of his defense" and asserted that "it is clear that the right to present evidence by witnesses of one's own choosing is a fundamental ingredient of due process." (Ex. 9 at 11, 12) (citing *Jenkins v. McKeithen*, 395 U.S. 411, 429 (1969)).  In his supplemental *pro se* leave application, Petitioner wrote that the state court's denial of his "right to present a defense by way of witness testimony" was a violation of his "State and U.S. constitutional rights." (Ex. 16).  This language "call[ing] to mind a specific right protected by the Constitution" and "reliance on pertinent federal cases employing constitutional analysis" satisfies the "fair presentation" requirement. *Daye*, 696 F.2d at 194. *See, e.g.*, *Williams v. Lord*, 996 F.2d 1481, 1483 (2d Cir. 1993) ("Although she did not cite specific constitutional provisions in her brief to the Appellate Division, . . . [petitioner's] reliance on the constitutional right to present a defense presented her claim by stating it 'in terms

---

[32] The Amended Petition has varied page numbering throughout.  For ease of reference, page number citations refer to the page number assigned upon electronic filing.

[33] Given this recommendation, the Court need not address Respondent's argument that Claim One is not cognizable on federal habeas review.

so particular as to call to mind a specific right protected by the Constitution.'") (citation

omitted).  Therefore, I find that Claim One is exhausted.

I also find that the state court adjudicated Petitioner's federal claim on the merits.  The

Second Department denied Petitioner's claim, stating that:

> Furthermore, contrary to the contention of the defendant in his pro se
> supplemental brief the hearing court properly denied his application to call a
> certain witness who had been incarcerated with his accomplice. At the
> suppression hearing, the defendant's attorney represented that the witness would
> testify that the defendant's accomplice admitted to threatening the defendant.
> ***However, since the witness had nothing to offer regarding police involvement in
> the alleged threat, the testimony would have been both immaterial and
> cumulative*** (*see People v Fowler*, 61 AD3d 698).

(Ex. 11 at 2) (emphasis added).  The Second Department did not expressly state that it was

addressing Petitioner's *federal* right to present a defense, and New York state law also contains

provisions establishing a defendant's right to call witnesses.[34]  Therefore, it is possible that the

Second Department only analyzed Petitioner's state claim and overlooked Petitioner's federal

claim altogether.  However, even under these circumstances, I must presume that the Second

Department adjudicated Petitioner's federal claim on the merits, *Johnson*, 133 S. Ct. at 1096, and

I do not see a sufficient reason to rebut that presumption.  It appears that:

> [t]he state law standard in the present context is at least as protective as the
> federal constitutional standard. The New York Court of Appeals has held that a
> "defendant always has the constitutional right 'to present a complete defense.'"
> *People v. Spencer,* 20 N.Y.3d 954, 956, 959 N.Y.S.2d 112, 982 N.E.2d 1245
> (N.Y.2012); *see also People v. Taylor,* 40 A.D.3d 782, 783–84, 835 N.Y.S.2d 442
> (N.Y.App. Div.2d Dep't 2007) ("Just as an accused has the right to confront the
> prosecution's witnesses for the purpose of challenging their testimony, he has the
> right to present his own witnesses to establish a defense.").

*Robinson v. Heath,* No. 11-CV-03489, 2014 WL 4954660, at *3 (E.D.N.Y. Oct. 2, 2014); *see*

*also People v. Alvarez*, 515 N.E.2d 898, 900 (N.Y. 1987) ("there can be no doubt in New York

---

[34] *See* N.Y. CONST. art. VI ("In any trial in any court whatever the party accused shall be allowed to appear and
defend . . . ."); N.Y. C.P.L. § 60.15 ("in any criminal proceeding involving a defendant in which evidence is or may
be received, both the people and the defendant may as a matter of right call and examine witnesses").

that the fairness of a criminal proceeding is of particular State concern, and New York historically has provided various protections in this area above the Federal constitutional minimum") (citations omitted). Indeed "the fact that [the state and federal] claims are so similar makes it unlikely that the [state court] decided one while overlooking the other." *Johnson*, 133 S. Ct. at 1098. Therefore, I find that the Second Department adjudicated Petitioner's federal constitutional claim on the merits, and I will analyze Claim One under the AEDPA standard of review. *See* 28 U.S.C. § 2254(d)(1)-(2).

It is "clearly established federal law" that criminal defendants have the right to call witnesses at trial. *See Washington v. Schriver*, 255 F.3d 45, 56 (2d Cir. 2001) ("The right to call witnesses in order to present a meaningful defense at a criminal trial is a fundamental constitutional right secured by both the Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment.") (citations omitted). This right is "essentially a trial right, enabling an accused to present his own version of the facts to the trial jury." *People v. Chipp*, 552 N.E.2d 608, 613 (N.Y. 1990). It is unclear whether the right applies to pre-trial suppression hearings. *See Ortiz v. Artuz*, No. 09 Civ 5553(NRB), 2010 WL 3290962, at *7 (S.D.N.Y. Aug. 9, 2010) ("It is axiomatic that a criminal defendant has a Sixth Amendment right to compulsory process to obtain witnesses at trial, but the Supreme Court has not definitively decided whether that right extends to presenting witnesses at a pre-trial suppression hearing."). Even if it does, it is nonetheless clear that "the Sixth Amendment does not by its terms grant to a criminal defendant the right to secure the attendance and testimony of *any and all* witnesses." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982) (emphasis added); *see also, e.g.*, *United States v. Scheffer*, 523 U.S. 303, 308 (1998) ("A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions.")

(citations omitted); *Geders v. United States*, 425 U.S. 80, 87 (1976) (a trial court "may refuse to allow cumulative, repetitive, or irrelevant testimony").

"In considering whether the exclusion of evidence violated a criminal defendant's right to present a complete defense, we start with 'the propriety of the trial court's evidentiary ruling.'" *Hawkins v. Costello*, 460 F.3d 238, 244 (2d Cir. 2006) (citations omitted). If the trial court erroneously excluded potentially exculpatory evidence, the Court "must look to whether the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist." *Id.* (citations and quotation marks omitted) (alteration in original). If, on the other hand, the trial court's "evidentiary ruling was correct pursuant to a state evidentiary rule . . . [the Court must only] consider whether the evidentiary rule is arbitrary or disproportionate to the purposes [it is] designed to serve." *Id.* (quoting *Scheffer*, 523 U.S. at 308) (quotation marks omitted) (first alteration added, second alteration in original). An evidentiary ruling is "unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused." *Id.* (quoting *Scheffer*, 523 U.S. at 308).

Here, Petitioner's counsel proffered that Mr. Coles would testify at the Pre-Trial Hearing that, while the two were in custody together, he heard Mr. Gurley state that Petitioner had confessed after Mr. Gurley had threatened him. (Hr'g Tr. at 142-43). The hearing court excluded Mr. Coles' potential testimony as inadmissible hearsay. (*Id.* at 213-14). In New York courts, hearsay is defined as "a statement not made in the course of the trial in which it is offered . . . if it is offered for the truth of the fact asserted in the statement," and it is inadmissible unless it qualifies as a hearsay exception. *People v. Huertas*, 553 N.E.2d 992, 995 (N.Y. 1990) (citation and quotation marks omitted). Through Mr. Coles' testimony, Petitioner sought to introduce Mr. Gurley's out-of-court statement for the truth of the fact asserted therein—that Mr. Gurley had

coerced Petitioner into confessing.  Hence, it appears that Mr. Coles' proposed testimony constituted hearsay under New York law, and that the hearing court properly excluded the testimony.

Therefore, my analysis turns to whether the hearing court's ruling was "unconstitutionally arbitrary or disproportionate"—*i.e.*, whether it infringed upon a "weighty interest" of Petitioner's. *Scheffer*, 523 U.S. at 308.  In *Scheffer*, the Supreme Court cited three cases as examples in which a ruling "infringed upon a weighty interest of the accused:" *Rock v. Arkansas*, 483 U.S. 44, 62 (1987) (holding that a state law "excluding all posthypnosis testimony infringe[d] impermissibly on the right of a defendant to testify on his own behalf"); *Chambers v. Mississippi*, 410 U.S. 284, 300 (1973) (holding that a defendant was denied a fair trial where the trial court prevented potential witnesses from testifying that another individual had confessed to the crime, and these hearsay confessions were given "under circumstances that provided considerable assurance of their reliability"); *Washington v. Texas*, 388 U.S. 14, 22-23 (1967) (holding that a defendant's right to compulsory process was denied by a state law that prevented alleged accomplices from testifying on behalf of the defendant at trial). *Id.*

Here, I find that the hearing court's exclusion of Mr. Coles' testimony did not infringe upon any of Petitioner's weighty interests.  First, Mr. Gurley's alleged statement was a far cry from the reliable hearsay confessions described in *Chambers*, 410 U.S. at 298.  Second, while the hearing court excluded Mr. Coles' testimony, it allowed Petitioner himself to testify on the same subject. (Hr'g Tr. at 162-72).  Third, Mr. Coles' proffered testimony would not have changed the hearing court's ruling on the admissibility of Petitioner's confession.  The hearing court did not deny Petitioner's motion to suppress his confession because it lacked sufficient evidence that Mr. Gurley had threatened Petitioner, but rather because it found any such evidence irrelevant to its

ruling on whether or not Petitioner's confession was unconstitutionally coerced *by the police*. (*Id.* at 232-33).

Even assuming *arguendo* that the hearing court erred in excluding Mr. Coles' testimony, I still find no constitutional error here because the proposed testimony, "evaluated in the context of the entire record," does not create "a reasonable doubt that did not otherwise exist." *Hawkins*, 460 F.3d at 244 (citations omitted). As an initial matter, Petitioner only attempted to call Mr. Coles as a witness at the Pre-Trial Hearing—not at trial, where Mr. Coles could potentially have created reasonable doubt for the jury. Even if Mr. Coles had testified at trial, his testimony would not have created reasonable doubt. Petitioner matched the general description of one of the suspects and was arrested within minutes of the robbery in a nearby area after fleeing from police. (Trial Tr. at 596-99; Hr'g Tr. at 76, 80). The police found $151—the same amount of money that had been stolen from Mr. Morrison—in Petitioner's pants pocket when they arrested him. (Trial Tr. at 652-654). Mr. Morrison was in close proximity to Petitioner and Mr. Gurley during the robbery and identified both of them approximately ten minutes later. (*Id.* at 546, 603-04). Indeed, even Petitioner's counsel appeared to concede during trial summations that Petitioner had "demanded money" during the robbery, merely arguing that Petitioner should not be found guilty of robbery in the second degree because he "did not have a gun." (*Id.* at 771). Under these circumstances, I find that neither the hearing court's exclusion of Mr. Coles' testimony, nor the Second Department's affirmance of the hearing court's ruling, was "contrary to, or an unreasonable application of, clearly established federal law." *Hawkins*, 460 F.3d at 247.

Accordingly, I respectfully recommend that Claim One be denied.

**B. Coerced Confession (Claim Two)**

Petitioner's second claim ("Claim Two") is that his confession was "illegally obtained" in violation of N.Y. C.P.L. § 60.45[35] and the Fifth Amendment because his co-perpetrator Mr. Gurley threatened him into confessing. (Am. Petition at 7, 16, 19). Respondent argues that this claim is not cognizable on federal habeas review, fails under the AEDPA standard of review and is meritless. (Opp. at 9-11). I recommend finding that Petitioner's claim regarding N.Y. C.P.L. § 60.45 is not cognizable on federal habeas review and his claim regarding the Fifth Amendment is barred under the AEDPA standard of review.[36]

First, to the extent that Petitioner argues that his confession was involuntary and improperly admitted in violation of N.Y. C.P.L. § 60.45, the Court agrees with Respondent that this claim is not cognizable on federal habeas review. A claim that a state court violated state law is not a valid basis for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("federal habeas corpus relief does not lie for errors of state law.") (citations omitted); *Graham v. Leonardo*, 166 F.3d 1200, at *4 (2d Cir. 1998) (unpublished table decision) ("a confession which is involuntary in the eyes of New York is not necessarily involuntary under the United States Constitution."). Therefore, this portion of Petitioner's argument fails.

Second, as to the portion of Claim Two in which Petitioner asserts that his confession was involuntary and admitted in violation of his Fifth Amendment right against self-incrimination, (Am. Petition at 7, 16, 19), the Court finds that this portion fails under the AEDPA standard of review. As an initial matter, Petitioner fairly presented this federal claim to the state courts. Although his main argument on direct appeal to the Second Department was

---

[35] Petitioner does not cite N.Y. C.P.L. § 60.45 in the Amended Petition. However, he does write that he is extending the argument made about his confession in his appellate briefs on direct appeal, (Am. Petition at 19), and in those briefs he argued that his confession was admitted in violation of N.Y. C.P.L. § 60.45, (Exs. 10, 12).

[36] Given these recommendations, the Court need not address Respondent's argument that Claim Two is meritless.

30

that his confession was involuntary under New York state law, (Ex. 9 at 9-10), Petitioner also referenced a violation of his rights under the "First, Fifth, [and] Fourteenth Amendments" of the United States Constitution, and he cited to two federal cases dealing with federal constitutional rights,[37] (*id.* at 10).  Similarly, in his supplemental *pro se* leave application, Petitioner relied heavily on state law but also stated that his "constitutional rights against self-incriminating himself and rights to a fair trial" had been violated "because the statement by defendant entered into evidence influenced the juries [sic] decision of guilt and [there] would have been a different verdict without the confession as evidence." (Ex. 16).  Through his express citations to the United States Constitution, language "call[ing] to mind a specific right protected by the Constitution," and "reliance on pertinent federal cases employing constitutional analysis," Petitioner has "fairly presented" his federal claim to the state courts. *See Strack*, 270 F.3d at 122; *Reid*, 961 F.2d at 376; *Daye*, 696 F.2d at 194.  Therefore, I find that Claim Two is exhausted.

The Second Department adjudicated Petitioner's federal claim on the merits, stating that:

> A confession is "involuntarily made" when it is obtained by a public servant engaged in law enforcement activity by means of any promise or statement of fact which creates a substantial risk that the defendant might falsely incriminate himself" (*People v. Mateo*, 2 N.Y.3d 383, 413, 779 N.Y.S.2d 399, 811 N.E.2d 1053, *cert. denied* 542 U.S. 946, 124 S.Ct. 2929, 159 L.Ed.2d 828). ***Indeed, a finding that a confession was not made voluntarily must be based on a finding of " 'coercive police activity' " (id., quoting Colorado v. Connelly, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473).*** Here, at the suppression hearing, the People met their burden of proving beyond a reasonable doubt that the defendant's confession was made voluntarily, and ***the defendant presented no evidence that the police were involved in the alleged threat made by his accomplice*** (*see People v. Griffin*, 81 A.D.3d 743, 744, 916 N.Y.S.2d 201; *People v. Reyes*, 190 A.D.2d 693, 694, 593 N.Y.S.2d 278; *People v. Wilson*, 143 A.D.2d 786, 787, 533 N.Y.S.2d 313).

---

[37] Petitioner cited to *Garrity v. State of N.J.*, 385 U.S. 493 (1967) (holding that confessions were coerced in violation of petitioner's federal constitutional rights where petitioners were given the choice "either to forfeit their jobs or to incriminate themselves") and *Chapman v. California*, 386 U.S. 18 (1967) (holding "that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt" and noting that "the introduction against a defendant of a coerced confession" cannot be considered harmless error). (Ex. 9 at 10).

31

(Ex. 11 at 2) (emphasis added).  Therefore, I will analyze Claim Two under the AEDPA standard of review. *See* 28 U.S.C. § 2254(d)(1)-(2).

It is "clearly established federal law" that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986) (citations omitted).[38]  In *Connelly*, the state court suppressed a defendant's confession as "involuntary" on the basis of a psychiatrist's testimony that the defendant was hearing voices and that his "psychosis motivated his confession." *Id.* at 162.  The Supreme Court overturned the state court's decision, stating that "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Id.* at 164.  Emphasizing the "state actor" requirement, the Supreme Court stated that even "[t]he most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause." *Id.* at 166.

Here, Petitioner argued at the Pre-Trial Hearing that Mr. Gurley threatened him into confessing but "presented no evidence that the police were involved in the alleged threat made by his accomplice." (Ex. 11).  The Second Department correctly identified *Connelly* as the relevant federal law and it reasonably applied *Connelly* to the facts of Petitioner's case. *See, e.g.*, *Cordera v. Sec'y, Florida Dep't of Corr.*, No. 15-10963, 2016 WL 336036, at *3 (11th Cir. Jan. 28, 2016) ("Because the facts do not indicate that his statements were the product of 'coercive police activity,' the state court's decision that his statements were voluntary was neither contrary to, nor an unreasonable application of, clearly established federal law.") (quoting *Connelly*, 479

---

[38] The Fifth Amendment requires that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V.  The Fifth Amendment right against self-incrimination applies to the states through the Due Process Clause of the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 4 (1964).

32

U.S. at 167); *Elliott v. Williams*, 248 F.3d 1205, 1213 (10th Cir. 2001) (affirming denial of

habeas petition where state court's decision that confession was voluntary "was not an

unreasonable application of *Connelly*").

      The Second Department's decision also was not based on an unreasonable determination

of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. §

2254(d)(2).  Petitioner does not allege that the police coerced or mistreated him in any way, and

the evidence in the record would not support such an assertion.  Instead, the record shows that

Petitioner was held for approximately 55 minutes in a booking room, sat for a twenty-minute

interview during which he was not restrained and was offered a drink and a cigarette, and

willingly confessed to the crime. (Trial Tr. at 685-86, 722-23, 731).

      Accordingly, I respectfully recommend that Claim Two be denied.

## C.  Ineffective Assistance of Counsel (Claim Three)

      Petitioner's third claim ("Claim Three") is that he received ineffective assistance of

counsel because trial counsel: (i) failed to properly argue that Petitioner did not fit the

description of the suspects where Petitioner was wearing a white t-shirt and the suspects were

wearing a red shirt and a black shirt;[39] (ii) did not object to the misidentification on the grounds

that Mr. Morrison's testimony differed from his initial description of the suspects; (iii) failed to

object to a juror pool that was "tainted" in that one potential juror told other potential jurors that

she was a victim of a robbery and was not going to "be fair;" (iv) failed to make a proper defense

to the robbery charge; (v) did not object to the 911 tape not being delivered and did not ask for

the prosecutor to be sanctioned for the missing 911 tape; and (vi) failed to object when Petitioner

---

[39] The suspects had originally been described over a police transmission as two black males, one wearing a black t-shirt and one *wearing* a red t-shirt. (Hr'g Tr. at 89, 97).  Shortly thereafter, Mr. Morrison described the suspects as two black males, one wearing a black t-shirt and one "*carrying* a red T-shirt or red sweater of some sort." (Trial Tr. at 595-96) (emphasis added).

was escorted out of the courtroom before jury selection. (Am. Petition at 8, 18-19).  Respondent

argues that this claim (i) was not fairly presented to the state courts and is therefore unexhausted

and procedurally barred, and (ii) lacks merit. (Opp. at 12-21).  I recommend finding that Claim

Three lacks merit.

First, Respondent argues that Claim Three is unexhausted because it includes certain

factual allegations that were never raised in the state courts. (Opp. at 16-17).[40]  In particular,

Respondent notes that Petitioner never alerted the state courts to the claim that his counsel was

ineffective for failing to object to a tainted juror pool. (*Id.* at 16).  The Court notes that Claim

Three appears to be partially exhausted.[41]  However, the Court need not decide the exhaustion

issue here because the Court has the discretion to deny unexhausted claims on the merits. *See* 28

U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits,

notwithstanding the failure of the applicant to exhaust the remedies in the courts of the State.");

*see also, e.g.*, *Abuzaid v. Mattox*, 726 F.3d 311, 321 (2d Cir. 2013) ("§ 2254(b)(2) authorize[s]

federal courts to deny the petition, regardless of whether the applicant exhausted his state court

remedies."); *Greiner v. Wells*, 417 F.3d 305, 318 n. 14 (2d Cir. 2005) ("By reaching the merits of

the ineffective assistance claim, . . . we need not consider the exhaustion issue.") (citations

omitted); *McCray v. New York*, No. 10 CV 465 RJD, 2013 WL 635950, at *3 (E.D.N.Y. Feb. 20,

2013) ("But the Court need not formally reach the exhaustion question because, as the Court now

---

[40] Respondent also argues that Claim Three is unexhausted because Petitioner failed to fairly present the claim to the Court of Appeals. (Opp. at 13-16).  The Court rejects this argument for the reasons outlined in Section III(E), *infra* (addressing Respondent's identical argument as to Claim Five).

[41] Petitioner clearly raised certain portions of Claim Three on direct appeal—for example, Petitioner argued that counsel was ineffective for failing to object when Petitioner was escorted out of the courtroom before jury selection. (Ex. 9 at 15-16; Am. Petition at 18).  In addition, the Court can construe Petitioner's allegations liberally to find that Petitioner raised other portions of Claim Three on direct appeal—for example, Petitioner argued that counsel was ineffective for failing to properly make a probable cause argument regarding the undisclosed 911 tape, and the Court can construe this argument liberally to include Petitioner's current claim that counsel was ineffective for failing to ask for the prosecutor to be sanctioned for the missing 911 tape. (Ex. 9 at 8-9; Am. Petition at 18).  By contrast, Petitioner clearly did not raise his current claim regarding the tainted juror pool on direct appeal. (Exs. 7, 9; Am. Petition at 18).

addresses, the petition does not present a basis for habeas relief"), *aff'd*, 573 F. App'x 22 (2d Cir. 2014) (summary order).

Turning to the merits, then, I will address Respondent's second argument that Claim Three is meritless. (Opp. at 17-21). In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set out a two-prong test for establishing a claim for ineffective assistance of counsel. Pursuant to this test, Petitioner must show that (i) "counsel's representation fell below an objective standard of reasonableness," and (ii) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694. A reasonable probability is defined as "a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Thus, "[e]ven serious errors by counsel do not warrant granting habeas relief where the conviction is supported by overwhelming evidence of guilt." *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001). A court need not analyze the first prong before moving to the second; indeed, the Supreme Court has instructed that "[if] it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Strickland*, 466 U.S. at 697.

Here, even assuming *arguendo* that Petitioner can establish the first prong of the *Strickland* test, Claim Three fails because Petitioner has not shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. As noted in Section III(A), *supra*, the record is replete with evidence that Petitioner committed the robbery: Petitioner matched the general description of one of the suspects, was in a nearby area, fled from police, was found with the exact amount of money stolen from the victim in his pocket, and was identified by the victim approximately ten minutes after the robbery. (Trial Tr. at 546, 596-99, 603-04, 652-654; Hr'g Tr.

35

at 76, 80).  Therefore, any supposed errors by counsel did not prejudice Petitioner and Petitioner's claim fails under the second prong of the *Strickland* test.

Accordingly, I respectfully recommend that Claim Three be denied.

**D.  Fourth Amendment Claim (Claim Four)**

Petitioner's fourth claim ("Claim Four") is that he was illegally arrested in violation of the Fourth Amendment[42] because he was wearing a white t-shirt and the robbery suspects were described as wearing a red shirt and a black shirt, and that all evidence obtained pursuant to this unlawful arrest was "tainted." (Am. Petition at 10).  Respondent asserts that this claim is not cognizable on federal habeas review. (Opp. at 22-24).  I recommend finding that Claim Four is (i) deemed exhausted but procedurally barred from review and (ii) not cognizable pursuant to the doctrine of *Stone v. Powell*, 428 U.S. 465 (1976).

First, Claim Four should be deemed exhausted but procedurally barred.  Petitioner raised this claim on direct appeal to the Second Department, arguing that "the police lacked probable cause for the arrest" because he "did not fit the description given" and that therefore "the search and seizure of [Petitioner] was tainted and everything deriving from the illegal warrantless arrest is the fruit of a poisonous tree." (Ex. 9 at 8-9).  The Second Department did not explicitly consider this claim, but stated that all remaining unaddressed claims were "unpreserved for appellate review and, in any event, without merit." (Ex. 11).  As Petitioner concedes, he thereafter abandoned this claim—it was not raised in his original *pro se* leave application to the Court of Appeals, his counseled leave application, or his supplemental *pro se* leave application. (Am. Petition at 10; Exs. 12, 15, 16).  Therefore, the claim is technically unexhausted. *See*

---

[42] Although Petitioner does not reference the Fourth Amendment in the Amended Petition, the Court presumes that Petitioner intends to claim a Fourth Amendment violation here.

*O'Sullivan*, 526 U.S. at 839-40.  However, as described below, the claim should be deemed exhausted but procedurally barred from review by this Court. *See Reyes*, 118 F.3d at 140.

New York procedural rules bar Petitioner from raising Claim Four now on direct appeal because Petitioner has already filed the "one direct appeal and one application for leave to appeal to the Court of Appeals" to which he is entitled. *Roa*, 548 F. Supp. 2d at 78.  Collateral review is similarly unavailable because "the claim is a matter of record that could have been raised on direct appeal, but unjustifiably was not." *Lowman*, 2011 WL 90996, at *9 (citation omitted).  Claim Four should therefore be deemed exhausted but procedurally barred from review by this Court. *See, e.g.*, *Kelly v. Griffin*, No. 12 Civ. 3384(BMC), 2012 WL 6569769, at *3 (E.D.N.Y. Dec. 14, 2012) (holding that Fourth Amendment claim was "deemed exhausted but procedurally barred" where petitioner failed to brief Fourth Amendment argument to the Court of Appeals) (citation omitted); *Reeb v. Woods*, 751 F. Supp. 2d 484, 489 (W.D.N.Y. 2010) (holding that Petitioner's Fourth Amendment claim was deemed exhausted but procedurally barred because it was never raised in state court).  Petitioner may overcome this procedural bar only if he can show "cause for the default and prejudice, or that failure to consider the claim will result in miscarriage of justice." *Sweet*, 353 F.3d at 141 (citations omitted).  Petitioner has not attempted to argue cause, prejudice, or miscarriage of justice here and, therefore, his claim must be denied.

Second, Claim Four must be denied as not cognizable on federal habeas review pursuant to the doctrine of *Stone v. Powell*, 428 U.S. 465 (1976).  In *Powell*, the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 482.  The Second Circuit has stated that a federal court can only

37

review Fourth Amendment claims in a habeas petition when (i) "the state has provided no corrective procedures at all to redress the alleged [Fourth Amendment] violations" or (ii) "the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992) (citations omitted).

In New York, Article 710 of the New York Criminal Procedure Law provides a mechanism through which criminal defendants may suppress evidence obtained in violation of the Fourth Amendment. *See* N.Y. C.P.L. § 710.10 *et seq.*  Federal courts have found this law to be a facially adequate corrective procedure. *See Capellan*, 975 F.2d at 70 n.1 ("Indeed, the 'federal courts have approved New York's procedure for litigating Fourth Amendment claims, embodied in [N.Y. C.P.L. § 710.10 *et seq*], as being facially adequate.'") (citations omitted); *Daily v. New York*, 388 F. Supp. 2d 238, 249 (S.D.N.Y. 2005) ("The State of New York clearly has provided defendants . . . with the necessary corrective procedures through Section 710 of the New York Criminal Procedure Law.") (citations omitted).  Thus, Petitioner can only secure relief for his Fourth Amendment claim if he was precluded from availing himself of the protections of Article 710 due to an unconscionable breakdown in the underlying process. *Capellan*, 975 F.2d at 70.

Before trial, Justice Neary granted Petitioner's request for a hearing that would, in relevant part, "address whether any evidence was obtained in violation of the defendant's Fourth Amendment rights." (Ex. 2 at 5) (citation omitted).  Justice Hubert thereafter held the Pre-Trial Hearing on January 4, 5, and 6, 2010. (Hr'g Tr. at 1-253).  During the Pre-Trial Hearing, five law enforcement officers who were involved in Petitioner's arrest and/or booking testified and were subject to cross-examination.  At the conclusion of the hearing, Justice Hubert found that the

police had probable cause to pursue and arrest Petitioner based on, *inter alia*, the initial police contact resulting in a foot chase, Petitioner and Mr. Gurley fitting the generalized descriptions of the suspects that police had received, Petitioner and Mr. Gurley's flight from police and failure to obey police commands to stop, and Mr. Morrison's show-up identification of Petitioner and Mr. Gurley. (*Id.* at 221-24).

After trial, Petitioner filed a motion to set aside the guilty verdict that included his Fourth Amendment claim. (Ex. 5 at 97-106). The court considered and denied his motion, concluding in relevant part that the hearing court "properly found that the police had probable cause to seize the defendant." (Ex. 3 at 7). Petitioner then advanced his Fourth Amendment claim to the Second Department on direct appeal. (Ex. 9 at 8-9). The Second Department did not explicitly address this claim but stated that all remaining claims were "unpreserved for appellate review and, in any event, without merit." (Ex. 11). Petitioner thereafter abandoned his claim in his application for leave to the Court of Appeals. (Exs. 12, 15, 16).

Based on the above, it is clear that Petitioner did not experience an unconscionable breakdown of the protections offered by Article 710. To the contrary, the New York state courts afforded Petitioner a full and fair opportunity to litigate his Fourth Amendment claim. Therefore, Claim Four must be denied. *See, e.g.*, *Graham v. Costello*, 299 F.3d 129, 134 (2d Cir. 2002) ("the bar to federal habeas review of Fourth Amendment claims is permanent and incurable absent a showing that the state failed to provide a full and fair opportunity to litigate the claim"); *Moreno v. Kelly*, No. 95 Civ. 1546(JGK), 1997 WL 109526 at *8 (S.D.N.Y. Mar. 11, 1997) (denying petitioner's claim that his arrest was not based on probable cause and "that all post-arrest identifications should therefore be suppressed as the fruits of an unconstitutional

arrest" because "the trial court held a combined identification, suppression and probable cause hearing" and petitioner's Fourth Amendment claim was reviewed on direct appeal).

Accordingly, I respectfully recommend that Claim Four be denied.

## E. Right to Be Present (Claim Five)

Petitioner's fifth claim ("Claim Five") is that his right to be present at a material stage of the trial was violated because the trial court improperly inferred from his silence that he did not want to be present during the third day of jury selection on January 8, 2010. (Am. Petition at 17-18). Respondent argues that this claim (i) was not fairly presented to the state courts and is therefore unexhausted and procedurally barred, and (ii) is barred under the AEDPA standard of review. (Opp. at 25-30). I recommend finding that Claim Five is barred under the AEDPA standard of review.

First, I will address Respondent's argument that Claim Five is unexhausted. As an initial matter, Respondent does not dispute that Petitioner fairly presented Claim Five to the Second Department. In his supplemental *pro se* brief on direct appeal, Petitioner argued that he "has a constitutional right to be present during all critical stages in his own defense of a criminal proceeding under the State of New York's Criminal Procedure Law section 260.20"[43] and that the court erred in "denying defendant of his right to be present under the equal protection due process clause." (Ex. 9. at 15-16).[44] While Petitioner somewhat conflated his statutory and constitutional arguments in his brief to the Second Department, I find that he fairly presented his

---

[43] N.Y. C.P.L. § 260.20 provides that: "A defendant must be personally present during the trial of an indictment; provided, however, that a defendant who conducts himself in so disorderly and disruptive a manner that his trial cannot be carried on with him in the courtroom may be removed from the courtroom if, after he has been warned by the court that he will be removed if he continues such conduct, he continues to engage in such conduct."

[44] Petitioner also raised this claim in his motion to set aside the guilty verdict, stating that "the verdict should be set aside because he was denied his constitutional rights to be present through every stage of trial, including jury selection." (Ex. 5 at 101). The court noted that Petitioner "has a statutory and a constitutional right to be present at all material stages of trial," but found that Petitioner voluntarily waived his right to be present in the courtroom for jury selection on January 8, 2010. (Ex. 3 at 6).

40

federal claim by invoking the "right to be present." *See, e.g., Illinois v. Allen,* 397 U.S. 337, 338 (1970) (identifying the "right to be present" as "[o]ne of the most basic rights guaranteed by the Confrontation Clause" of the Sixth Amendment); *Ellsworth v. Levenhagen,* 248 F.3d 634, 639 (7th Cir. 2001) (petitioner's "claim, that the judge's *ex parte* communication violated '[his] right to be present at every stage of the proceedings,' calls to mind his Sixth Amendment right."). *Cf. Levine v. Comm'r of Corr. Servs.,* 44 F.3d 121, 126 (2d Cir. 1995) (holding that a similar claim was not fairly presented where petitioner "challenged his absence from the resentencing proceedings solely on state statutory grounds. . . . [and] never claimed that his absence violated his federal constitutional rights").

However, Respondent claims that Petitioner did not fairly present Claim Five to the Court of Appeals, essentially arguing that Petitioner asserted Claim Five and then withdrew it. As noted in Section I(G)(ii), *supra*, Petitioner submitted a *pro se* leave application with four claims, including the claim that he "didn't waive his right" to be present during jury selection. (Ex. 12 at 5). Petitioner's counsel subsequently submitted a leave application on Petitioner's behalf with only two claims, (Ex. 15), and Petitioner sent a follow-up letter to Judge Pigott giving further detail on those two claims, (Ex. 16). Neither the counseled leave application nor the *pro se* follow-up letter mentioned Petitioner's right to be present during jury selection. (Exs. 15, 16). Respondent argues that the Court of Appeals must have *only* considered the two claims asserted in these two submissions—and ignored Petitioner's original *pro se* leave application—because Petitioner was represented by counsel throughout the appeals process and only had the right to submit one leave application under N.Y. Ct. R. 500.20(a). (Opp. at 15). In support of its position, Respondent attempts to distinguish *Morgan v. Bennett,* 204 F.3d 360 (2d Cir. 2000) and *Bumpus v. Warden Clinton Corr. Facility,* 311 F.App'x 400 (2d Cir. 2009) (summary order), two

cases in which the Second Circuit found that a follow-up letter merely supplemented, rather than

supplanted, a defendant's original leave application. *Morgan*, 204 F.3d at 369-370; *Bumpus*, 311

F.App'x at 401.  Respondent argues that the instant case is distinguishable because both

Petitioner and his counsel sent letters *before* a judge was assigned and that, therefore, the Court

of Appeals must have prioritized counsel's letter and overlooked Petitioner's letter. (Opp. at 15).

The Court disagrees.  As the Second Circuit has stated, "we do not think it appropriate to

infer that the New York Court of Appeals would construe counsel's second letter as eliminating

issues as to which review had been expressly requested." *Morgan*, 204 F.3d at 371; *accord*

*Bumpus*, 311 F.App'x at 401.  In this case, as in *Bumpus*, nothing in the counseled leave

application or in Petitioner's follow-up letter "affirmatively directed the Court of Appeal's [sic]

attention *away* from claims contained in [Petitioner's original *pro se* leave application]."

*Bumpus*, 311 F.App'x at 402 (emphasis in original).  I therefore assume that the Court of

Appeals "would have liberally read" these two submissions as supplementing rather than

supplanting Petitioner's original *pro se* leave application, *id.*, and I find that Claim Five is

exhausted.

Second, I will address Respondent's argument that Claim Five fails under the AEDPA

standard of review.  As an initial matter, I find that the state courts adjudicated Petitioner's

federal claim "on the merits" and that therefore the AEDPA standard of review is applicable

here.  The Second Department dismissed Petitioner's claim by stating that Petitioner had

"waived his right to be present during jury selection." (Ex. 11 at 2).  Although the Second

Department did not clarify that it was addressing Petitioner's *federal* claim (and may have been

referencing the New York state law "right to be present" at trial), I must presume that the court

adjudicated Petitioner's federal claim on the merits. *Johnson*, 133 S. Ct. at 1096.  I see no reason

to rebut the *Johnson* presumption especially where, as here, it appears that New York's standard for the right to be present is "at least as protective" as the federal standard. *Id.* at 1091. *Cf. Hogan v. West*, 448 F. Supp. 2d 496, 508 (W.D.N.Y. 2006) ("federal standards regarding a defendant's right to be present at a sidebars during jury *voir dire* are less stringent than New York's standards.") (citations and quotation marks omitted).  Therefore, I will analyze Claim Five under the AEDPA standard of review.

It is "clearly established federal law" that a criminal defendant has the right "to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings," *Faretta v. California*, 422 U.S. 806, 819 n. 15 (1975), and it is "well-established that the impaneling of the jury is one such stage," *Tankleff v. Senkowski*, 135 F.3d 235, 246 (2d Cir. 1998).  A defendant, however, may waive his right to be present. *See Cuoco v. United States*, 208 F.3d 27, 30 (2d Cir. 2000) ("No constitutional error results if a defendant knowingly and voluntarily waives his right to be present at trial.").  In certain circumstances, a defendant may waive the right to be present by failing to assert it. *See United States v. Gagnon*, 470 U.S. 522, 529 (1985) (per curiam) ("respondents' total failure to assert their rights to attend the conference with the juror sufficed to waive their rights" to be present under Federal Rule of Criminal Procedure 43[45]); *Cohen v. Senkowski*, 290 F.3d 485, 492 (2d Cir. 2002) ("when a defendant is fully apprised of the nature of the . . . procedure, makes no objection to the procedure, and has counsel present for the duration of the [procedure], a knowing waiver of the right to be present occurs.").

Here, Petitioner knowingly waived his right to be present during all three days of jury selection.  Petitioner repeatedly refused to participate in portions of the Pre-Trial Hearing and the

---

[45] Fed. R. Crim. P. 43 provides, in relevant part, that "[a] defendant who was initially present at trial . . . waives the right to be present . . . when the defendant is voluntarily absent after the trial has begun, regardless of whether the court informed the defendant of an obligation to remain during trial."

trial.  For example, during the Pre-Trial Hearing, Petitioner refused to come back to the
courtroom while "protesting loudly" and "kicking the cell door," and Officer Lemp and Sergeant
Mignini therefore testified in his absence. (Hr'g Tr. at 148-49).  The court then had Petitioner
brought into the courtroom, advised him of his rights to be present and to participate in the trial,
and told him that if he chose not to be present that he was going to "waive those rights." (*Id.* at
149-157).  Petitioner stated that he understood. (*Id.* at 157).  The court then advised and even
urged Petitioner to participate in the trial. (*Id.* at 157-59).  At the conclusion of the Pre-Trial
Hearing, the court specifically informed Petitioner of his right to be present during jury selection.
(*Id.* at 214-18).

Nevertheless, when jury selection began on January 6, 2010 (which was the same day the
Pre-Trial Hearing ended), Petitioner told the court that he did not wish to be present in the
courtroom. (Jury Sel. Tr. at 1-3).  The court advised Petitioner of the nature and purpose of the
proceedings that would take place during his absence, and Petitioner maintained that he wanted
to waive his right to be present. (*Id.* at 4, 7).  The court then granted Petitioner's application and
allowed him to exit the courtroom. (*Id.* at 7).  On January 7, 2010, the court updated Petitioner as
to the status of jury selection and stated that he wanted to give Petitioner the opportunity to
participate in the proceedings. (*Id.* at 163-65).  Petitioner replied that he wanted to go *pro se* but
that he did not want to put up a defense and that he was just "going to be silent" during the trial.
(*Id.* at 170-71).  The court denied Petitioner's application to represent himself but granted his
application to exit the courtroom, stating that it was the court's obligation to bring Petitioner to
the courtroom every day but that he would not force Petitioner to remain. (*Id.* at 173-74).
Petitioner responded:

> I don't want to come here.  I don't want to come here period.  I didn't ask to be
> here.  I didn't do nothing to be here.  I'm not trying to be here.  I'll write a letter

for you or whatever you want to justify what you are doing. I don't want to be here. I don't want to come here every day. I don't want to be here.

(*Id.* at 174). Petitioner was then escorted out of the courtroom. (*Id.* at 175). On January 8, 2010, the court again updated Petitioner as to the status of jury selection and asked Petitioner whether he wished to remain in the courtroom that day. (*Id.* at 365). Petitioner remained silent. (*Id.* at 366). The court said:

> Alright. I will assume from his silence that he does not. Okay, Mr. Burkett, I will return you at this time. And if at any time you want to communicate something differently, certainly before you have been transported, please just tell one of the court officers and they will bring you back up.

(*Id.* at 366-67). Defense counsel did not object and Petitioner exited the courtroom. (*Id.* at 367). The court noted for the record that he waited approximately 10 to 15 seconds for Petitioner to speak before allowing Petitioner to exit the courtroom. (*Id.* at 367).

Under these circumstances, I find that Petitioner knowingly waived his right to be present during jury selection on January 8, 2010. Therefore, the Second Department's decision denying Petitioner's claim was not contrary to, or an unreasonable application of, clearly established federal law. *See, e.g.*, *Wright v. Smith*, No. 9:03-CV806, 2007 WL 2412248, at *15 (N.D.N.Y. Aug. 21, 2007) (state court decision was not contrary to, or an unreasonable application of, clearly established federal law where "[t]he silence of both [petitioner's attorney] and petitioner . . . resulted in an implicit waiver of any right to be present."), *aff'd*, 348 F. App'x 612 (2d Cir. 2009) (summary order); *Pellington v. Greiner*, 132 F. App'x 868, 869 (2d Cir. 2005) (summary order) (state court decision did not contradict or unreasonably apply clearly established federal law in finding a waiver where "neither [petitioner] nor his counsel raised any objection.").

Therefore, I respectfully recommend that Claim Five be denied.

45

## IV.  CONCLUSION

For the foregoing reasons, I conclude and respectfully recommend that this habeas petition be denied in its entirety.

## V.  NOTICE

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts, the parties shall have fourteen (14) days from the receipt of this Report and Recommendation to serve and file written objections.  If copies of this Report and Recommendation are served upon the parties by mail, the parties shall have seventeen (17) days from receipt of the same to file and serve written objections. *See* Fed. R. Civ. P. 6(d).  Objections and responses to objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Cathy Seibel at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York 10601, and to the chambers of the undersigned at the same address.

Requests for extensions of time to file objections must be made to the Honorable Cathy Seibel and not to the undersigned.  Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be rendered. *See* 28 U.S.C. § 636(b)(1); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008).

Dated:  April 29, 2016
        White Plains, New York

RESPECTFULLY SUBMITTED,

JUDITH C. McCARTHY
United States Magistrate Judge

2009 WL 233981
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Dejuan BERRY, Petitioner,
v.
William HULIHAN, Respondent.

No. 08 Civ. 6557(LBS).
|
Jan. 28, 2009.

### MEMORANDUM & ORDER

SAND, District Judge.

**\*1** Petitioner Dejuan Berry brings this pro se habeas corpus application pursuant to 28 U.S.C. § 2254, alleging that he is being held in state custody in violation of his federal constitutional rights. Petitioner's claim arises from a judgment of conviction entered on April 1, 2004 in New York State Supreme Court, New York County, following his guilty plea to Criminal Possession of a Controlled Substance in the Fifth Degree. The Appellate Division, First Department, unanimously affirmed Petitioner's conviction. *People v. Berry,* 27 A.D.3d 201, 809 N.Y.S.2d 456 (App.Div.2006). Leave to appeal to the New York State Court of Appeals was denied. *People v. Berry,* 7 N.Y.3d 809, 822 N.Y.S.2d 484, 855 N.E.2d 800 (2006). Petitioner asserts a Fourth Amendment claim arguing that the police lacked probable cause to arrest and search him, as well as claims under the Sixth Amendment that he received ineffective assistance from both his trial and appellate counsel. For the following reasons, Petitioner's application is denied.

### I. Background

At approximately 7:20 p.m. on August 1, 2003, an undercover police officer, Officer David Camacho, saw Petitioner hand a small object to a woman in exchange for money in front of 1305 Amsterdam Avenue in Manhattan. (Suppress. Hr'g Tr. at 10–11, 51–52, 57–58.) Believing that this was a drug transaction, Officer Camacho communicated a physical description of Petitioner and the alleged female buyer, via radio, to two police officers, Officers Morgan Jones and Jeffery Cabanillas, who were posted in a nearby, unmarked van. Shortly after receiving the communication, the two

officers got out of the van and approached Petitioner and the alleged buyer. Under good lighting conditions, the officers recognized both Petitioner and the alleged buyer. Petitioner was fifteen feet away from the officers and was wearing clothes matching Officer Camacho's description. The alleged buyer also matched Officer Camacho's description. (Suppress. Hr'g Tr. at 16–17, 19–20, 24–25, 33–34, 36–37, 45, 67, 70–71, 74–75.) The officers approached Petitioner, identified themselves, and informed Petitioner that he was under arrest. [1] Upon apprehending Petitioner, Officer Jones made eye contact with Officer Camacho, who nodded to confirm that Officer Jones had apprehended the person who Officer Camacho had observed engaging in the alleged drug transaction. (Suppress. Hr'g Tr. at 17, 23.) Petitioner was found to be in possession of twenty-three vials of cocaine and $408 in cash. (Suppress. Hr'g Tr. at 17–18, 21–22, 40–41, 53–54, 67, 74.)

A New York County grand jury charged Petitioner with Criminal Possession of a Controlled Substance in the Third Degree and Criminal Possession of a Controlled Substance in the Fifth Degree. Before trial, Petitioner's trial counsel moved to suppress both the confirmatory identification and the evidence recovered after Petitioner's apprehension. Petitioner was granted a *Mapp/Wade* hearing on February 17, 2004 to determine whether the evidence at issue was obtained illegally by law enforcement officers. In an oral ruling, Justice Uviller credited the testimony of all three officers and found that probable cause existed for Petitioner's arrest. Accordingly, the court denied Petitioner's motion to suppress the confirmatory identification, as well as the cocaine and currency recovered by the arresting officers. (Suppress. Hr'g Tr. 100–102.)

**\*2** On February 18, 2004, Petitioner pled guilty to Criminal Possession of a Controlled Substance in the Fifth Degree. At his sentencing on April 1, 2004, Petitioner made an oral, pro se motion challenging the suppression ruling. The motion was denied. Petitioner then appealed the suppression issue to the Appellate Division, First Department. Petitioner's appellate counsel argued that under the Fourth Amendment the physical evidence and confirmatory identification should have been suppressed because the police officers lacked probable cause to arrest and search Petitioner.

On March 2, 2006, the Appellate Division unanimously affirmed the conviction, holding that the trial court properly denied Petitioner's suppression motion. In letters dated March 7 and March 22, 2006, Petitioner applied to the New York

Court of Appeals for leave to appeal. The People opposed the application. On August 11, 2006, the Court of Appeals denied Petitioner's leave to appeal.

On March 20, 2007, Petitioner filed a pro se petition for writ of error coram nobis with the Appellate Division, First Department, claiming that his appellate counsel erred by failing to assert a claim on direct appeal of ineffective assistance of trial counsel. Petitioner asserted that trial counsel failed to take the following actions in connection with the suppression hearing: (1) impeach Officers Jones and Camacho on the basis of prior grand jury testimony; (2) interview Officer Camacho prior to calling him as a witness; (3) call as a witness the assistant district attorney who presented Petitioner's case to the grand jury; (4) consult with Petitioner prior to the hearing; (5) call Petitioner as a witness at the hearing; (6) seek out and obtain a copy of certain video surveillance tapes of the area where Petitioner had been arrested; and (7) cite sufficient case law at the hearing in support of the suppression motion.

The Appellate Division summarily denied the petition. *People v. Berry,* 2007 N.Y.App. Div. LEXIS 8522 (App.Div. July 12, 2007). On September 23, 2007, Petitioner applied to the New York Court of Appeals for leave to appeal. The Court of Appeals denied leave on December 20, 2007. *People v. Berry,* 9 N.Y.3d 1004, 850 N.Y.S.2d 392, 880 N.E.2d 878 (2007). Petitioner raises the same arguments made in his petition for writ of error coram nobis in this petition. In addition, Petitioner asserts that trial counsel erred in challenging suppression via a *Mapp* hearing instead of a *Dunaway* hearing.

## II. Discussion:

### a. Standard of Review

A petitioner may not raise a claim in a Section 2254 habeas proceeding unless the claim has been fairly presented to the highest state court from which a decision can be had. 28 U.S.C. § 2254(b) (1)(A); *Picard v. O'Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Daye v. Attorney Gen. of the State of New York,* 696 F.2d 186, 191 (2d Cir.1982) (en banc). To meet this exhaustion requirement, a petitioner must "fairly present to the state courts the substance of [the] claim" in a way that is "likely to alert the court to the claim's federal nature." *O'Sullivan v. Boerckel,* 526 U.S. 838, 848, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *accord Cox v. Miller,* 296 F.3d 89, 99 (2d Cir.2002).

**\*3** For claims adjudicated on the merits by a state court, a deferential standard of review codified in the Anti–Terrorism and Effective Death Penalty Act of 1996 applies. Under this standard, a petitioner can only obtain habeas corpus relief by showing that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or resulted in a decision that was based on an unreasonable determination of the facts presented to the state court. 28 U.S.C. § 2254(d)(1)-(2).

A writ may issue because a decision is contrary to clearly established Federal law if either the state court decision is contrary to Supreme Court precedent on a question of law or if the state decision is based on a set of facts materially indistinguishable from a relevant Supreme Court case and arrives at a result opposite to the decision reached by the Supreme Court. *Williams v. Taylor,* 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Alternatively, a state court decision will be deemed an unreasonable application of Supreme Court precedent when the state court either "identifies the correct governing legal rule" from a relevant Supreme Court case but "unreasonably applies it to the facts" or "unreasonably extends a legal principle from [the Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407. The unreasonable application clause requires the state court decision to be more than "incorrect or erroneous.... The state court's application of clearly established law must be objectively unreasonable." *Lockyer v. Andrade,* 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).

### b. Fourth Amendment Claim

Petitioner claims that the police lacked probable cause to arrest and search him. Petitioner has exhausted this claim by raising it in federal constitutional terms on direct appeal to the Appellate Division and then seeking leave to appeal to the New York Court of Appeals. Nevertheless, Petitioner's claim is not available to him on habeas review because Petitioner received a full and fair opportunity to litigate his Fourth Amendment claim before the state courts.

It is settled law that "[w]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim," federal habeas corpus relief will not lie for a contention that evidence recovered through an illegal search and seizure was introduced at trial. *Stone v. Powell,* 428 U.S. 465, 482, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *Graham*

Berry v. Hulihan, Not Reported in F.Supp.2d (2009)
Case 7:13-cv-02627-CS   Document 50   Filed 04/29/16   Page 49 of 181
2009 WL 233981

*v. Costello,* 299 F.3d 129, 133–34 (2d Cir.2002). Thus, in order to receive habeas review of a Fourth Amendment claim a petitioner must demonstrate either: (1) that the state failed to provide any "corrective procedures" by which Fourth Amendment claims could be litigated; or (2) that the State had such procedures in place, but that the petitioner was unable to avail himself of those procedures "because of an unconscionable breakdown in the underlying process." *Capellan v. Riley,* 975 F.2d 67, 70 (2d Cir.1992).

**\*4** Petitioner does not contend that New York's state courts failed to provide appropriate corrective procedures to address his Fourth Amendment claim. Such a contention would be of questionable merit given that "the federal courts have approved New York's procedure for litigating Fourth Amendment claims," embodied in Article 710 of the New York Criminal Procedure Law. *Id.* at 70 n. 1 (internal quotation omitted).

Moreover, Petitioner has not demonstrated that he was unable to avail himself of New York's procedures because of an unconscionable breakdown in the process.[2] *Id.* at 71. Petitioner availed himself of New York's corrective procedures by moving to suppress all physical and identification evidence. As a result, Petitioner was granted a suppression hearing. Petitioner thus clearly received a full and fair opportunity to litigate his Fourth Amendment claim in the state courts and is now barred from further review in this habeas proceeding. *See, e.g., Plunkett v. Johnson,* 828 F.2d 954, 956 (2d Cir.1987).

### c. Ineffective Assistance of Trial Counsel

Petitioner's ineffective trial counsel claim is also dismissed.[3] Petitioner's claim is denied on the merits based on two defects. First, Petitioner's claim is barred by his guilty plea. Second, Petitioner's claim is plainly meritless under the standard for an ineffectiveness assistance of counsel claim set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

### 1. Effect of Guilty Plea on Ineffective Assistance Claim

Petitioner's ineffective assistance of trial counsel claim fails first as a result of his unconditional guilty plea while represented by counsel. "A defendant who pleads guilty unconditionally while represented by counsel may not assert independent claims relating to events occurring prior to the entry of the guilty plea. 'He may only attack the voluntary

and intelligent character of the guilty plea by showing that the advice he received from counsel was not within [acceptable] standards.' " *United States v. Coffin,* 76 F.3d 494, 497 (2d Cir.1996) (quoting *Tollett v. Henderson,* 411 U.S. 258, 267, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973) (alteration in original)).

As explained by the Second Circuit, "claims of ineffective assistance of counsel relating to events prior to the plea that do not impact the voluntariness of the plea do not survive a guilty plea." *Vasquez v. Parrot,* 397 F.Supp.2d 452, 463 n. 5 (S.D.N.Y.2005). Petitioner's ineffective trial counsel claim alleges solely that counsel committed errors relating to the suppression hearing.[4] Because the claim does not relate in any way to the voluntariness of the plea, the claim is barred.

### 2. Petitioner's Ineffective Assistance Claim

#### a. *Strickland Standard*

Additionally, Petitioner's ineffective assistance of trial counsel claim fails because he has not met the standard set forth in *Strickland v. Washington. Strickland* sets forth a two-part test to determine if counsel's assistance is ineffective: "First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed ... by the Sixth Amendment." 466 U.S. at 687; *accord Henry v. Poole,* 409 F.3d 48, 62–63 (2d Cir.2005). This performance is to be judged by an objective standard of reasonableness and judicial scrutiny is to be "highly deferential." *Strickland,* 466 U.S. at 688–89. The Court noted that "[i]t is all too tempting ... to second-guess counsel's assistance after conviction.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

**\*5** Second, a petitioner "must show that there is a reasonable probability that but for counsel's unprofessional errors the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. The performance of counsel must be considered in the aggregate, with a view of the totality of the evidence before the judge or jury. *Lindstadt v. Keane,* 239 F.3d 191, 199 (2d Cir.2001) (quoting *Strickland,* 466 U.S. at 695–96). The inquiry should focus on the fundamental fairness of the trial and whether, despite

a strong presumption of reliability, the result is unreliable because of a breakdown of the adversarial process. *Id.*

**b. Effectiveness of Trial Counsel's Assistance**

Petitioner's trial counsel provided effective assistance when viewed in the aggregate. Petitioner's trial counsel effectively advocated for suppression of the contested evidence. Counsel elicited that the police officers had no way of knowing whether the unidentified female had, in fact, purchased drugs. (Suppress. Hr'g Tr. at 38–40.) Counsel also challenged Officer Jones on the consistency of his testimony by establishing that, contrary to his hearing testimony, the officer testified to the grand jury that when he exited the unmarked police van he followed the unidentified female buyer rather than Petitioner. (Suppress. Hr'g Tr. at 31–35.) Trial counsel also elicited testimony from Officer Camacho that although he allegedly saw a "small object" pass in exchange for money, he was unable to give any further details about the transaction. (Suppress. Hr'g Tr. at 87–88.) Counsel also established that Officer Camacho could not remember the precise contents of his radio report to the arresting officers. (Suppress. Hr'g Tr. at 88.)

In arguing the motion, counsel cogently challenged the basis for the search and arrest of Petitioner. Counsel noted that no drugs were recovered from the unidentified buyer, as they could not reach her before she entered into a livery cab, and that the identifying officer only saw Petitioner exchange a small, unknown object for currency, which could have been a perfectly innocent transaction. Moreover, counsel pointed out that there was no evidence that the location where Petitioner was arrested was drug-prone or that Petitioner was in a particular location for a long period of time interacting with a number of people. In her argument, counsel also stressed that there was no arrest of the alleged buyer of the drugs.

Petitioner raises a number of specific grounds to support his claim for ineffective assistance. Petitioner first asserts that there were inconsistencies in the police testimony that counsel did not pursue. This claim is without merit as counsel did raise inconsistencies in testimony, both on cross-examination and during the argument on the motion.

Moreover, the specific "inconsistencies" raised by Petitioner either are not inconsistent or are trivial. Petitioner's chief argument is that arresting officer Jones testified before the grand jury that he saw Officer Cabanillas recover the cocaine from Petitioner but that at the suppression hearing Officer Jones testified that he did not actually see Officer Cabanillas

pull the cocaine from Petitioner's pocket. This inconsistency is trivial in nature; it is not reasonably probable that contesting this inconsistency would have altered the result of the suppression hearing. *E.g., United States v. Monteleone,* 257 F.3d 210, 219 (2d Cir.2001). Petitioner also faults counsel for failure to highlight that the judge at the suppression hearing instructed Officer Jones to restrict his testimony to a description of the circumstances and to avoid testifying as to his own conclusions concerning what the identifying officer observed. Neglecting to highlight this "inconsistency" clearly does not support an ineffective assistance claim.

**\*6** Petitioner's second claim is that counsel erred by failing to interview the identifying officer prior to calling him as a witness. Although failing to interview a witness can amount to ineffective assistance of counsel, by failing to identify any shortcomings in his counsel's cross-examination, Petitioner has not established how a failure to interview in his case amounted to ineffective assistance. *See Matura v. United States,* 875 F.Supp. 235, 238 (S.D.N.Y.1995).

Petitioner's third argument is that counsel should have introduced into evidence the prosecutor's "Data Information" form and should have called the assistant district attorney who presented the case to the grand jury as a witness. However, Petitioner does not establish what about the Data Information form is inconsistent with police testimony. Petitioner similarly offers nothing more than speculation about what relevant or discoverable information the prosecutor would have had to offer.[5]

Petitioner's fourth claim is that his counsel failed to consult with him prior to the suppression hearing. Yet, "[p]etitioner's claims cannot ... rest on a bare allegation that his counsel did not consult with him sufficiently.... Rather, petitioner has the burden of proving that the alleged lack of communication with and preparation by counsel prejudiced his defense." *Jones v. Conway,* 442 F.Supp.2d 113, 126 (S.D.N.Y.2006). Petitioner fails to provide such support for his claim.

Petitioner's fifth claim is that counsel's assistance was ineffective because counsel discouraged Petitioner from testifying at the hearing. Petitioner claims that he wished to testify that was set up by the police and that the drugs were planted on his person. Petitioner does not, however, allege that counsel refused to let him testify on his own behalf. Petitioner only claims that he was discouraged from doing so because his testimony might be used against him at trial. This advice was based on a sound understanding of

the law. *United States v. Jaswal,* 47 F.3d 539, 543–44 (2d Cir.1995). Moreover, given the facts of Petitioner's case the Court finds that counsel could have reasonably concluded that, as a tactical matter, Petitioner's proposed testimony was of so little value to his case that it would weaken his chances of success to testify on his own behalf.

Petitioner's sixth argument is that trial counsel erred in challenging suppression via a *Mapp* hearing, *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), instead of a *Dunaway* hearing, *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), because a *Dunaway* hearing would have required the government to satisfy the *Aguilar–Spinelli* test for probable cause. This argument is clearly without merit. As an initial matter, Petitioner cites no case law supporting the argument that a *Dunaway* hearing requires a more stringent burden of proof for probable cause than a *Mapp* hearing. Moreover, Petitioner's brief does not establish that invocation of the *Aguilar–Spinelli* test would have altered the result such that but for counsel's alleged error the outcome of the hearing would have been different.

 *7  Moreover, Petitioner's argument misstates the relevant difference between a *Mapp* hearing and a *Dunaway* hearing. The distinction between these types of hearings is not whether the *Aguilar–Spinelli* test for probable cause is triggered, but rather what type of evidence is being called into question by the criminal defendant. *Dunaway v. New York* addressed the "legality of custodial questioning on less than probable cause for a full-fledged arrest." 442 U.S. at 202 (citation omitted). Accordingly, a *Dunaway* hearing is used to determine whether a statement or other intangible evidence obtained from a person arrested without probable cause should be suppressed at a subsequent trial. *Edwards v. Mazzuca,* No. 00 Civ. 2290, 2007 U.S. Dist. LEXIS 18542, at *29 n. 9 (S.D.N.Y. Oct. 15, 2007). In contrast, a *Mapp* hearing is used to determine whether physical evidence sought to be used against a criminal defendant was obtained illegally by law enforcement officers and thus is inadmissible at the criminal defendant's trial. *Id.* at *7 n. 4.

Petitioner finally concludes with two undeveloped claims: (I) counsel erred by failing to seek out and obtain a copy of certain surveillance tapes of the area where Petitioner was arrested and (2) counsel failed to cite authority to support her legal arguments. Petitioner does not, however, explain what evidence from this videotape would have exonerated him, and a review of the record yields that trial counsel was certainly not deficient with respect to the legal arguments

made at the suppression hearing. There is no basis to assert that either of these actions would have affected the outcome of the suppression hearing in any way.

A review of trial counsel's conduct at the suppression hearing results in the conclusion that counsel's performance was effective and that it is not reasonably probable that but for counsel's alleged errors the result of the suppression hearing would have changed. Petitioner's ineffective assistance of trial counsel claim is dismissed on the merits.

### d. Ineffective Assistance of Appellate Counsel Claim

Petitioner also brings a claim that he was denied effective assistance of appellate counsel because his appellate counsel failed to assert an ineffective trial counsel claim on direct appeal. Petitioner has exhausted this claim by raising it in federal constitutional terms in his coram nobis petition to the Appellate Division and then seeking leave to appeal to the Court of Appeals. Petitioner's claim is denied because the state court decision denying his coram nobis petition were neither contrary to, nor based upon, an unreasonable application of *Strickland v. Washington,* [6] 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). [7]

Petitioner has the burden of establishing that appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Clark v. Stinson,* 214 F.3d 315, 322 (2d Cir.2000). It is not enough for Petitioner to show that appellate counsel omitted a colorable argument, as counsel is not required to raise all colorable, nonfrivolous claims on appeal. *Smith v. Robbins,* 528 U.S. 259, 285, 288, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000). For reasons already addressed, Petitioner's ineffective assistance of trial counsel claim is without merit. Accordingly, appellate counsel's "failure to include a meritless argument does not fall outside of the wide range of professionally competent assistance to which Petitioner was entitled." *Aparicio v. Artuz,* 269 F.3d 78, 99 (2d Cir.2001) (quotation omitted). Petitioner also fails the second *Strickland* prong, as he cannot establish a reasonable probability that the appeal would have been successful. *Strickland,* 466 U.S. at 694. Petitioner's ineffective appellate counsel claim is thus dismissed.

 *8  The Court finds that Petitioner has not made a substantial showing of a violation of his constitutional rights and, therefore, a Certificate of Appealability will not issue. The Clerk of the Court is directed to close this case.

Berry v. Hulihan, Not Reported in F.Supp.2d (2009)
Case 7:13-cv-02627-CS   Document 50   Filed 04/29/16   Page 52 of 181
2009 WL 233981

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 233981

Footnotes

1    The alleged female buyer got into a livery cab before the officers could reach her to ascertain whether she was in possession of any drugs.

2    In his most recent briefing to the Court, Petitioner argues that the alleged ineffective assistance of his trial counsel created an unconscionable breakdown in the underlying process. As is addressed in a subsequent section of this memorandum, the Court finds that trial counsel's assistance was indeed effective. Accordingly, Petitioner's attempt to establish an unconscionable breakdown in the underlying process through his ineffective assistance of counsel claim is without merit. *Cf. Jackson v. Scully,* 781 F.2d 291, 297 (2d Cir.1986).

3    It should be noted that Petitioner's ineffective assistance of trial counsel claim is not exhausted. Petitioner only raised his ineffective assistance of trial counsel claim as a predicate to his ineffective assistance of appellate counsel claim in his coram nobis petition. A coram nobis challenge to appellate counsel's failure to raise a claim does not exhaust the underlying claim. *Turner v. Artuz,* 262 F.3d 118, 123 (2d Cir.2001). Petitioner recognized this defect and requested that his petition be held in abeyance until he had the opportunity to exhaust his state remedies. This Court denied that request in an order on January 5, 2009 on the grounds that the Court may deny a petitioner's claim on the merits pursuant to 28 U.S.C. § 2254(b)(2) even though a petitioner has not exhausted his claims. *See Rhines v. Weber,* 544 U.S. 269, 277, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005). Accordingly, the Court's order of January 5, 2009 ordered Petitioner to respond to the merits of the Government's reply brief. The Court finds the claim to be without merit upon reviewing his submission. For the reasons discussed above, the Court thus denies Petitioner's claim.

4    In his most recent briefing to the Court, Petitioner alleges that his plea was not voluntary because he was not aware of his trial counsel's ineffective assistance. As a subsequent section of this memorandum establishes, trial counsel's assistance was indeed effective. Accordingly, Petitioner's attempt to undermine the voluntariness of his plea through his ineffective assistance of counsel claim is without merit. *E.g., United States v. Torres,* 129 F.3d 710, 715–16 (2d Cir.1997); *Vasquez v. Parrot,* 397 F.Supp.2d 452, 463–4 (S.D.N.Y.2005).

5    Moreover, the judge effectively denied counsel's ability to call the prosecutor during a verbal exchange between Petitioner's counsel and the judge at the suppression hearing. (Suppress. Hr'g Tr. at 47–49.)

6    The Second Circuit has held that "[n]othing in the phrase 'adjudicated on the merits' requires the state court to have explained its reasoning process." *Sellan v. Kuhlman,* 261 F.3d 303, 311 (2d Cir.2001).

7    It is well-accepted that the *Strickland* standard satisfies the "clearly established Federal law" requirement of § 2254(d)(1). *Id.* at 309.

**End of Document**                                   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

311 Fed.Appx. 400
This case was not selected for
publication in the Federal Reporter.
United States Court of Appeals,
Second Circuit.

James BUMPUS, Petitioner-Appellant,

v.

WARDEN CLINTON CORRECTIONAL
FACILITY, Respondent-Appellee.

No. 07-4044-pr.
|
Feb. 20, 2009.

**Synopsis**

**Background:** Following affirmance of his conviction for
murder in the second degree, 163 A.D.2d 484, 558 N.Y.S.2d
587, petitioner petitioned for a writ of habeas corpus. The
United States District Court for the Eastern District of New
York, Eric N. Vitaliano, J., 507 F.Supp.2d 246, denied
petition. Petitioner appealed.

**Holding:** The Court of Appeals held that petitioner exhausted
his administrative remedies.

Affirmed in part, vacated in part, and remanded.

**\*401** Appeal from the United States District Court for the
Eastern District of New York (Eric N. Vitaliano, Judge).
UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED that the
judgment of the district court, entered on September 7, 2007,
is AFFIRMED in part, VACATED in part, and REMANDED
for further proceedings consistent with this order.

**Attorneys and Law Firms**

Lawrence F. Ruggiero, New York, NY, for Appellant.

Amy Appelbaum, Assistant District Attorney, (Leonard
Joblove, and Victor Barall, Assistant District Attorneys, on
the brief) for Charles J. Hynes, District Attorney, Kings
County, Brooklyn, NY, for Appellee.

Present RALPH K. WINTER, REENA RAGGI, PETER W.
HALL, Circuit Judges.

**SUMMARY ORDER**

**\*\*1** James Bumpus, who is currently incarcerated for a term
of 25 years to life on his New York State conviction for
second degree murder, petitions for review of the denial of
his petition for habeas corpus pursuant to 28 U.S.C. § 2254.
See *Bumpus v. Superintendent of Clinton Corr. Facility,* 507
F.Supp.2d 246 (E.D.N.Y.2007). To the extent the challenged
denial was based on a determination that Bumpus had failed
to exhaust certain of his habeas claims before the New York
Court of Appeals, the district court granted a Certificate of
Appealability as to that ruling. See *id.* at 266-67; *see also* 28
U.S.C. § 2253(c). We review the legal issue of exhaustion
*de novo. See Dolphy v. Mantello,* 552 F.3d 236, 238 (2d
Cir.2009). We assume the parties' familiarity with the facts
and procedural history, which we reference only as necessary
to explain our decision to affirm.

In dismissing Bumpus's § 2254 petition on exhaustion
grounds, the district court acknowledged that Bumpus
fairly presented his habeas claims to the New York Court
of Appeals through an August 1, 1990 letter from his
appellate counsel, with attached copies of Bumpus's brief
on direct appeal to the Appellate Division. *See Bumpus
v. Superintendent of Clinton Corr. Facility,* 507 F.Supp.2d
at 260 (citing *Galdamez v. Keane,* 394 F.3d 68, 76 (2d
Cir.2005)); *see also Galdamez v. Keane,* 394 F.3d at 73-74
(holding that Court of Appeals would construe "terse letter
requesting leave to appeal" as "a request for review of *all* of
the issues outlined in [accompanying] briefs"). Nevertheless,
the district court concluded that Bumpus effectively withdrew
all those claims save one when, on August 8, 1990, he
submitted a *pro se* letter to the Chief Judge of the Court of
Appeals requesting leave to appeal and briefly arguing only
his courtroom closure claim. *See id.* at 261.

This conclusion is at odds with *Morgan v. Bennett,* 204 F.3d
360 (2d Cir.2000), wherein we held that, where a defendant's
first letter to the Court of Appeals seeks leave to appeal
all arguments raised in attached Appellate Division briefs, a
follow up letter addressing only some of those arguments in
more detail does not serve to narrow the scope of the claims
"fairly presented" by the first letter. *Id.* at 370; *see also Davis
v. Strack,* 270 F.3d 111, 122-23 (2d Cir.2001) (observing that
first letter to Court of Appeals fairly presented arguments,
and subsequent letter did not narrow scope of claims raised).
As we explained in *Morgan v. Bennett,* in general, "we do

not think it appropriate to infer that the New York Court of Appeals would construe [a defendant's] second letter as eliminating issues as to which review had been expressly requested." *204 F.3d at 371; see Galdamez v. Keane, 394 F.3d at 75* (same). That conclusion is particularly **\*402** warranted in this case where the attorney who filed the first letter did not withdraw from the case and the second letter was a *pro se* submission by the defendant. Contrary to the district court's suggestion, *see Bumpus v. Superintendent of Clinton Corr. Facility, 507 F.Supp.2d at 261,* nothing in Bumpus's August 8 letter "affirmatively directed the Court of Appeal's attention *away* from claims contained in the attached briefs," *Galdamez v. Keane, 394 F.3d at 76* (emphasis in original). Consequently, absent some statement from the Court of Appeals to the contrary-which is noticeably lacking in the record of this case-we assume that court would have liberally read Bumpus's *pro se* letter to supplement, not supplant or repudiate, his counsel's earlier letter seeking leave to appeal all grounds raised in the Appellate Division briefs.

 **\*\*2** *Jordan v. Lefevre, 206 F.3d 196 (2000)* is not to the contrary. In that case, a defendant's first and only letter to the Court of Appeals "forcefully" argued a single point before making a seemingly *pro forma* request to appeal for "all of these reasons and the reasons set forth in his Appellate Division briefs." *Id. at 198.* We held that, in such circumstances, a passing reference to Appellate Division briefs was insufficient to present fairly the arguments contained therein to the Court of Appeals. *Id. at 199.* We need not decide here whether Bumpus's *pro se* letter would, alone, be subject to the *Jordan v. Lefevre* rule. This case is plainly distinguishable from *Jordan v. Lefevre* in that the first letter Bumpus submitted-through counsel-to the Court of Appeals is correctly understood in light of *Galdamez v. Keane, 394 F.3d at 76,* to have alerted that court that review was being sought of all issues raised in the Appellate Division briefs. In these circumstances, *Morgan v. Bennett, 204 F.3d 360,* rather than *Jordan v. Lefevre, 206 F.3d 196,* controls this case.

Nothing in the Court of Appeals' rulings supports a different conclusion. Nowhere did the Court indicate that it construed Bumpus's *pro se* letter to have withdrawn from his review application all issues except courtroom closure. Indeed, in both its denial of review and its denial of Bumpus's motion for reconsideration, the Court of Appeals employed language sufficiently broad to reach the whole of Bumpus's

submissions: "there is no question of law presented which ought to be reviewed by the Court of Appeals." *People v. Bumpus,* 76 N.Y.2d 891, 561 N.Y.S.2d 553, 562 N.E.2d 878 (1990); *People v. Bumpus,* 80 N.Y.2d 829, 587 N.Y.S.2d 913, 600 N.E.2d 640 (1992).

On this record, a federal court may not conclude that the Court of Appeals was deprived of an opportunity to review the claims that Bumpus raises in his § 2254 petition when that conclusion is grounded only on the determination that Bumpus's *pro se* letter affirmatively withdrew from the Court of Appeals all claims contained in the Appellate Division briefs attached to counsel's request for leave to appeal. Accordingly, we vacate the district court's judgment denying § 2254 relief to the extent it was based on a determination that Bumpus's habeas claims had not been fairly presented to the New York Court of Appeals.

In so ruling, we express no opinion as to the merits of the claims presented in Bumpus's petition or whether individually they have been otherwise exhausted. Further, to the extent the state argues on appeal that Bumpus did not exhaust his challenge to the admission of grand jury testimony in his brief to the Appellate Division, an issue not considered by the district court, we do not foreclose consideration of that argument on remand. Finally, we note that the district court rejected Bumpus's courtroom closure argument on the merits. **\*403** *See Bumpus v. Superintendent of Clinton Corr. Facility,* 507 F.Supp.2d at 263-66. That ruling is beyond the scope of the district court's Certificate of Appealability. For that reason, and because Bumpus has not applied to this court for leave to appeal the point, we affirm the district court judgment denying § 2254 relief on the ground of courtroom closure. *See generally Valverde v. Stinson,* 224 F.3d 129, 136 (2d Cir.2000) (holding that only claims included in certificate of appealability may be addressed on appeal).

 **\*\*3** For the foregoing reasons, the judgment of the district court is AFFIRMED in part, VACATED in part, and REMANDED for further proceedings consistent with this order.

### All Citations

311 Fed.Appx. 400, 2009 WL 424156

---

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 336036
Only the Westlaw citation is currently available.
United States Court of Appeals,
Eleventh Circuit.

Tony CORDERA, Petitioner–Appellant,

v.

SECRETARY, FLORIDA DEPARTMENT
OF CORRECTIONS, Attorney General,
State of Florida, Respondents–Appellees.

No. 15–10963
|
Non–Argument Calendar.
|
Jan. 28, 2016.

**Attorneys and Law Firms**

Terrence Edward Kehoe, Law Office of Terrence E. Kehoe, Orlando, FL, for Petitioner–Appellant.

Pam Bondi, Pamela J. Koller, Attorney General's Office, Daytona Beach, FL, for Respondents–Appellees.

Appeal from the United States District Court for the Middle District of Florida. D.C. Docket No. 6:13–cv–00788–ACC–DAB.

Before ED CARNES, Chief Judge, HULL and MARCUS, Circuit Judges.

**Opinion**

PER CURIAM:

**\*1** Tony Cordera, a Florida prisoner serving a life sentence, appeals the district court's denial of his habeas corpus petition. We granted a certificate of appealability on the following issue: whether the state court erred in denying Cordera's motion to suppress *un-Mirandized* statements made to the police while he was hospitalized.

Cordera was taken to the hospital after the police found him in his bedroom lying next to a dead woman. He was holding a knife, his body was bloody, and he was not moving. An officer rode with him in the ambulance to the hospital, where an emergency room doctor treated him for extensive self-inflicted lacerations on both wrists. Cordera was responding to commands and did not appear to be in shock. Tests were negative for ingestion of alcohol or medication. The only medication he received was a tetanus shot (which would not have affected his mental abilities).

Two detectives interviewed Cordera in the emergency room that day. Although he appeared to be unconscious before the interview, he became alert when a nurse placed smelling salts under his nose. He was not given *Miranda* [1] warnings. One of the detectives told Cordera that he was a homicide detective and that they were trying to figure out what happened to his wrists (they also told him that they had a search warrant for his home). They began asking him about his relationship with the victim and what had happened at his home that morning. Cordera was alert and able to answer their questions, but repeatedly maintained that he could not remember anything that happened after the victim arrived at his home that morning. He was never handcuffed or placed under arrest during the interview, which was recorded and lasted about 41 minutes.

Cordera was arrested several hours after the interview. He was indicted for first degree murder with a weapon, in violation of Fla. Stat. §§ 782.04(1) and 775.087(1). He moved to suppress the statements he made at the hospital, contending that he was entitled to *Miranda* warnings because he was in custody and that his statements were involuntary. The state circuit court denied his motion.

A jury found Cordera guilty and he was sentenced to life in prison without the possibility of parole. He appealed his conviction and the Florida Fifth District Court of Appeal affirmed without opinion (and denied his motion for rehearing and a written opinion). He then filed a petition for habeas corpus under 28 U.S.C. § 2254 in federal district court, contending that the state court erred in denying his motion to suppress. The district court denied his petition.

We review *de novo* a district court's denial of a habeas petition, and its factual findings for clear error. *Ward v. Hall,* 592 F.3d 1144, 1155 (11th Cir.2010). 28 U.S.C. § 2254(d) prohibits federal courts from granting habeas relief for claims previously adjudicated on the merits in state court, unless the state court decision: (1) "was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

**\*2** "Clearly established federal law" refers "to the holdings ... of the Supreme Court's decisions as of the time of the relevant state-court decision." *Ward,* 592 F.3d at 1155 (alteration in original) (quotation marks omitted). For a state court decision to be contrary to clearly established federal law, it "must either (1) apply a rule that contradicts the governing law set forth by Supreme Court case law, or (2) reach a different result from the Supreme Court when faced with materially indistinguishable facts." *Id.* (quotation marks omitted). A state court decision is an "unreasonable application" of clearly established federal law where the court "unreasonably extends or fails to extend a clearly established legal principle to a new context." *Id.* (quotation marks omitted). A state court makes an unreasonable determination of the facts only where the petitioner rebuts "the presumption of correctness of a state court's factual findings by clear and convincing evidence." *Id.* (quoting 28 U.S.C. § 2254(e)(1)).

Cordera first contends that the state court's determination that he was not under the influence of alcohol or medication was unreasonable. That contention is meritless. Although he claims that he had taken medication earlier that day, hospital tests were negative for alcohol or drugs. Because Cordera has not provided "clear and convincing evidence" to rebut the "presumption of correctness" of the state court's factfinding, he cannot show that it was unreasonable. *See id.* at 1155–56.

Cordera's second contention is that his statements should have been suppressed because he was "in custody" when the detectives interviewed him and he therefore should have received *Miranda* warnings. *"Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' " *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714 (1977). To determine whether someone is "in custody," we first look at the "circumstances surrounding the interrogation." *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 465 (1995). "Given those circumstances," we then consider whether a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* The "ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520 (1983) (quotation marks omitted).

Some facts do suggest that Cordera was in custody. For example, the detectives never told him that he was free to leave and he was brought to the hospital by an ambulance (instead of arriving on his own). *See Yarborough v. Alvarado,*

541 U.S. 652, 665, 124 S.Ct. 2140, 2150 (2004) (noting that those or similar facts "weigh in favor of the view" that a suspect is in custody). But other facts "weigh against a finding that [Cordera] was in custody." *See id* . at 664, 124 S.Ct. at 2149. The police did not take him to the hospital (although an officer accompanied him in the ambulance), the detectives who interviewed him did not place him under arrest or threaten to do so, the interview lasted only 41 minutes, and he was not arrested until several hours after the interview. *See id.* at 664–65, 124 S.Ct. at 2149–50; *see also Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714 (noting the fact that an interview lasted only 30 minutes in deciding that a suspect was not in custody).

**\*3** Because there are enough facts going either way on the issue, "fairminded jurists could disagree over whether [Cordera] was in custody." *Yarborough,* 541 U.S. at 664, 124 S.Ct. at 2149. The state court's decision was not contrary to, nor an unreasonable application of, clearly established federal law. *See id.* at 665, 124 S.Ct. at 2150 ("We cannot grant relief [under § 2254(d)(1) ] ... by conducting our own independent inquiry into whether the state court was correct as a *de novo* matter.").

Cordera's final contention is that his statements were involuntary. For a statement to be involuntary there must be "coercive police activity." *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 522 (1986). We gauge voluntariness "in light of the totality of the circumstances" to determine whether the statements were "the product of an essentially free and unconstrained choice." *Hubbard v. Haley,* 317 F.3d 1245, 1252–53 (11th Cir.2003) (quotation marks omitted).

Cordera relies on the Supreme Court's decisions in *Beecher v. Alabama,* 389 U.S. 35, 88 S.Ct. 189 (1967), and *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408 (1978), to argue that his statements were involuntary. In the *Beecher* case, the police obtained a confession from the defendant only after he was shot in the leg, two officers each pointed loaded guns toward his head, one of the officers threatened to kill him, and the other officer fired his rifle next to his ear. *Beecher,* 389 U.S. at 36–37, 88 S.Ct. at 190. The defendant reaffirmed his confession in the prison hospital while in intense pain and heavily sedated from frequent morphine injections. *Id.* The police obtained a confession from the defendant in the *Mincey* case while he was in the hospital with a gunshot wound, hooked up to various tubes to help him breath, receiving intravenous drugs, and unable to talk because of the tubes (he wrote down his responses). *Mincey,* 437 U.S. at 396, 398–

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

401, 98 S.Ct. at 2415–18. The defendant confessed only after the officer had interviewed him for four hours, even though he repeatedly asked the officer to stop the interrogation until he could get a lawyer. *Id.*

The facts surrounding Cordera's interview differ significantly from the facts of those cases. The detectives' conduct does not even begin to approach that of the officers in the *Beecher* case. The *Mincey* case is also not on point. Cordera was alert and able to speak, he never asked for the interview to stop, and he never asked for a lawyer. The fact that he was depressed at the time of the interview is not enough, without more, to render his statements involuntary. *See Connelly,* 479 U.S. at 162–67, 107 S.Ct. at 519–22. Because the facts do not indicate that his statements were the product of "coercive police activity," *id.* at 167, 107 S.Ct. at 522, the state court's decision that his statements were voluntary was neither contrary to, nor an unreasonable application of, clearly established federal law.

**\*4 AFFIRMED.**

**All Citations**

--- Fed.Appx. ----, 2016 WL 336036

Footnotes

1      *Miranda v. Arizona,* 384 U.S. 436, 444–45, 86 S.Ct. 1602, 1612 (1966).

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

479 Fed.Appx. 363
This case was not selected for
publication in the Federal Reporter.
United States Court of Appeals,
Second Circuit.

Isaac EUBANKS, Petitioner–Appellant,

v.

John LEMPKE, Superintendent, Five Points
Correctional Facility, Respondent–Appellee.

No. 11–1205–pr.
|
May 1, 2012.
|
Amended May 18, 2012.

**Synopsis**

**Background:** Following affirmance of his convictions for robbery and criminal possession of stolen property, 41 A.D.3d 241, 839 N.Y.S.2d 26, state inmate filed petition for writ of habeas corpus. The United States District Court for the Southern District of New York, Duffy, J., 2011 WL 744770, denied petition, and petitioner appealed.

**Holdings:** The Court of Appeals held that:

[1] determination that petitioner waived his right to be present for jury's verdict was reasonable, and

[2] trial court did not coerce petitioner into waiving his right to be present.

Affirmed.

**\*364**  Appeal from the United States District Court for the Southern District of New York (Duffy, J.).

ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment of the district court is **AFFIRMED.**

**Attorneys and Law Firms**

Steven Berko, The Legal Aid Society, Criminal Appeals Bureau, New York, N.Y., for Petitioner–Appellant.

Hannah Stith Long, Assistant Attorney General (Barbara D. Underwood, Solicitor General, Roseann B. MacKechnie, Deputy Solicitor General, Alyson J. Gill, Lea La Ferlita, Assistant Attorney Generals, on the brief), for Eric T. Schneiderman, Attorney General of the State of New York, New York, N.Y., for Respondent–Appellee.

Present: JOSEPH M. McLAUGHLIN and ROBERT A. KATZMANN, Circuit Judges, and JOHN F. KEENAN, District Judge. [*]

**SUMMARY ORDER**

**\*\*1**  Petitioner–Appellant Isaac Eubanks appeals from a final judgment entered on March 1, 2011 by the United States District Court for the Southern District of New York (Duffy, *J.*), following a February 22, 2011 Opinion and Order, denying Eubanks's petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. The district court issued a certificate of appealability on the question of whether petitioner's waiver of his right to be present for the jury's verdict was knowing and voluntary. We assume the parties' familiarity with the facts and the record of prior proceedings, which we reference only as necessary to explain our decision to affirm.

We review a district court's denial of a petition for a writ of *habeas corpus de novo. Hawkins v. Costello,* 460 F.3d 238, 242 (2d Cir.2006). Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), when a federal claim **\*365** has been adjudicated on the merits in state court, a federal court may overrule the state court only where its decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) & (2). "[C]learly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [Supreme Court] decisions as of the time of the relevant state-court decision." *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (internal quotation marks omitted). In order to prevail under the "unreasonable application" clause, petitioner must demonstrate that while the state court identified the correct governing legal principle from Supreme Court precedent, it "unreasonably applie[d] that principle to the facts" of his case. *Id.* at 413, 120 S.Ct. 1495.

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right to be present at all stages of trial, *Illinois v. Allen,* 397 U.S. 337, 338, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), including the return of the verdict, *Diaz v. United States,* 223 U.S. 442, 456, 32 S.Ct. 250, 56 L.Ed. 500 (1912) ("It is the right of the defendant in cases of felony ... to be present at all stages of the trial, [ ] especially at the rendition of the verdict...." (internal quotation marks omitted)). The Due Process Clause of the Fourteenth Amendment also guarantees defendants the right to be present for trial proceedings "to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *Snyder v. Massachusetts,* 291 U.S. 97, 108, 54 S.Ct. 330, 78 L.Ed. 674 (1934). "Thus, a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer,* 482 U.S. 730, 745, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987). A criminal defendant, however, may waive his right to be present. *See, e.g., Cuoco v. United States,* 208 F.3d 27, 30 (2d Cir.2000) ( "No constitutional error results if a defendant knowingly and voluntarily waives his right to be present at trial."). Waiver can be implied from the defendant's conduct, *see Taylor v. United States,* 414 U.S. 17, 20, 94 S.Ct. 194, 38 L.Ed.2d 174 (1973) (per curiam) (holding that defendant's failure to return to court after lunch recess implied waiver of right to be present); *Allen,* 397 U.S. at 342–43, 90 S.Ct. 1057 ("[A] defendant can lose his right to be present at trial if ... he ... insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom."), and, in certain circumstances, a defendant may waive his right to be present by failing to assert it, *see United States v. Gagnon,* 470 U.S. 522, 529, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) (per curiam) ("[R]espondents' total failure to assert their rights to attend the conference with the juror sufficed to waive their rights under [Fed.R.Crim.P.] 43."); *Cohen v. Senkowski,* 290 F.3d 485, 492 (2d Cir.2002) ("[W]hen a defendant is fully apprised of the nature of the pre-screening [*voir dire* ] procedure, makes no objection to the procedure, and has counsel present for the duration of the pre-screening, a knowing waiver of the right to be present occurs.").

**\*\*2** In a federal *habeas* proceeding, the petitioner bears the burden of proving the absence of a knowing and voluntary waiver. *Polizzi v. United States,* 926 F.2d 1311, 1321 (2d Cir.1991). Additionally, "[w]hether or not the state trial court **\*366** properly balanced the defendant's interest in being present at his trial against the state's interest in proceeding without him is not a matter of constitutional dimension and thus is not cognizable in [a] *habeas corpus* proceeding." *Smith v. Mann,* 173 F.3d 73, 77 (2d Cir.1999).

Here, while there is no dispute that the verdict was read in petitioner's absence, Eubanks contends that the Appellate Division erred in concluding that Eubanks "waived his presence for all purposes, including a possible verdict, for the entire day and that defendant knew that the trial would proceed if he chose to be absent." *People v. Eubanks,* 41 A.D.3d 241, 242, 839 N.Y.S.2d 26 (N.Y.App.Div.1st Dep't 2007) (internal citation omitted). In reaching its decision, the Appellate Division noted that after the jury began deliberations on Thursday, the trial court "inquired as to [petitioner's] wishes in the event that deliberations continued into Friday," and, in response, petitioner's counsel said that petitioner "ha[d] decided that he is going to exercise his religion tomorrow,' " but that he elected to remain "on the list of inmates to be produced for trial" so that he would have the option of coming to court. *Id.* at 241, 839 N.Y.S.2d 26. On Friday, petitioner "was absent, and the court placed on the record a communication from the Department of Correction stating that [petitioner] did not wish to be produced." *Id.* The Appellate Division concluded that "[u]nder all the circumstances of the case, there was no need for the court to make [further] inquiry" about defendant's absence because "[t]he reason for defendant's absence was obvious from the chain of events, and was not a matter of 'conjecture.' " *Id.* at 242, 839 N.Y.S.2d 26.

**[1]**   While petitioner maintains that the trial court erred in failing to place on the record the reason for petitioner's absence, he cannot demonstrate that the Appellate Division's decision is contrary to, or an unreasonable application of, clearly established Supreme Court precedent. The trial court made it clear that it would proceed with trial the next day and that it would put petitioner's name on the trial list so that petitioner could choose whether to attend. While the trial court did not place into the record a written statement from the warden's office regarding petitioner's absence, it nonetheless made a clear finding that "someone from the warden['s] office ... has confirmed from Mr. Eubanks that Mr. Eubanks does not want to be here." Pet'r's Br. 32 (quoting Tr. 767). This finding was also consistent with petitioner's counsel's previous statement that petitioner intended "to exercise his religion" on Friday rather than be present in court. *See Eubanks,* 41 A.D.3d at 241, 839 N.Y.S.2d 26. Thus, viewing the record in context, the Appellate Division did not

contradict or misapply clearly established law in concluding that petitioner waived his right to be present.

**\*\*3**  **[2]**  Petitioner next argues that even if he did waive his right to be present during the reading of the verdict, the trial court coerced his waiver by forcing him to choose between attending religious services and appearing at trial. "The First Amendment, applicable to the States by reason of the Fourteenth Amendment, prohibits government from making a law 'prohibiting the free exercise (of religion).' " *Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (per curiam) (internal citation omitted). "[R]easonable op[p]ortunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendments without fear of  **\*367**  penalty." *Id.* at 322 n. 2, 92 S.Ct. 1079. However, under the Free Exercise Clause, "[n]ot all burdens on religion are unconstitutional.... The state may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest." *Bob Jones Univ. v. United States,* 461 U.S. 574, 603, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983) (internal quotation marks omitted). The governmental interest must be

"compelling" and there must be no "less restrictive means ... available to achieve" it. *Id.* at 604, 103 S.Ct. 2017 (internal citations and quotation marks omitted). While Eubanks's coercion argument presents a somewhat closer issue, in this particular case, we need not decide the weighty question, whether, as a general matter, a trial court is obligated to make an effort to accommodate a criminal defendant's religious obligations during a trial. Because Eubanks never objected to the trial court's decision to proceed with trial on Friday and never even requested an adjournment or other accommodation, we cannot conclude that the trial court "coerced" him into waiving his right to be present at the reading of the verdict.

We have considered Eubanks's remaining arguments and find them to be without merit. Accordingly, for the foregoing reasons, the judgment of the district court is **AFFIRMED.**

**All Citations**

479 Fed.Appx. 363, 2012 WL 1506041

Footnotes

\*  The Honorable John F. Keenan, of the United States District Court for the Southern District of New York, sitting by designation.

**End of Document**  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

166 F.3d 1200
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.
(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing in
the Federal Reporter. See Federal Rule of Appellate
Procedure 32.1 and this court's local Rule 32.1.1. for
rules regarding the citation of unpublished opinions.)
United States Court of Appeals, Second Circuit.

Patrick GRAHAM, Petitioner-Appellant,

v.

Arthur A. LEONARDO,
Superintendent, Respondent-Appellee.

No. 98-2042.
|
Dec. 1, 1998.

**Attorneys and Law Firms**

Mark Diamond, New York, N.Y., for Appellant.

Roseann B. MacKechnie, Assistant District Attorney, Kings
County, New York (Charles J. Hynes, District Attorney;
Victor Barall, Ann Bordley, Assistant District Attorneys, *of
counsel* ), for Appellee.

CALABRESI, SACK, and SOTOMAYOR, C.J.

**Opinion**

.

 **\*1**  UPON CONSIDERATION of this appeal from a
judgment of the United States District Court for the Eastern
District of New York (Reena Raggi, *J.*), it is hereby

ORDERED, ADJUDGED, AND DECREED that the
judgment be and it hereby is AFFIRMED.

Patrick Graham appeals from the denial of his petition for
habeas corpus. He raises three claims. First, he alleges that a
conflict of interest rendered his trial counsel constitutionally
ineffective. Second, he argues that he was denied his
constitutional right to confront a witness against him.
Third, he claims that the trial court erred by permitting
the prosecution to use his confession for purposes of
impeachment. The United States District Court for the
Eastern District of New York (Raggi, *J.*) considered these

arguments and denied relief. We affirm for substantially the
reasons stated by the district court.

BACKGROUND

On June 28, 1983, a jury in the Supreme Court of Kings
County, New York, convicted petitioner Graham of second-
degree murder in the death of Henry Parrish. Blue 5, Red 2.
Graham killed Parrish in the presence of Donald Ingram, who
testified against Graham at trial. A-208. Police questioned
both Ingram and Graham shortly after the murder, and
Graham confessed to the crime. A-216; A-220.

At a suppression hearing on June 20, 1983, the state trial
court decided that Graham's confession had been improperly
obtained. Graham alleged, and the trial judge believed, that
officers interrogating Graham had refused to let him speak
to his attorney, even though he had made a direct request for
such contact. She therefore ruled that the confession could not
be used as part of the prosecution's case-in-chief. A-221. Her
ruling did, however, permit the confession to be introduced on
cross-examination of Graham's credibility. A-222.
Graham did not testify in his own defense at trial, and the jury
never heard about the confession.

Graham's trial counsel mounted a defense based in large part
on the cross-examination of Ingram. This defense strategy
was complicated by the fact that Graham's counsel, Joseph
Giovanniello, had previously defended Ingram in a number
of criminal cases. A-224. During the course of the trial, the
court several times prevented Giovanniello from pursuing
particular lines of cross-examination on the grounds that
Giovanniello must not utilize knowledge of Ingram's past,
gained while Ingram's lawyer, to discredit Ingram in open
court. A-227-229.

The jury found Graham guilty, and the appellate division
affirmed the conviction. A230. On March 9, 1987, Graham
filed a *pro se* motion seeking to vacate his conviction through
a writ of *coram nobis* pursuant to N.Y.Crim. Pro. L. § 440.10.
A-231. He raised several issues in this petition, but ineffective
assistance of counsel was not among them. A232. The motion
was denied on October 26, 1987. A-232. On October 13,
1989, Graham filed a second § 440.10 motion, again *pro se,*
and this time he did raise the ineffective assistance claim.
A-233. The motion was denied on April 13, 1990. A-233.

**\*2** On July 2, 1992, Graham filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of New York. A-233. He raised several claims, including the three that are now before us on appeal. On October 7, 1997, Judge Raggi ruled against Graham on all claims but one. It was possible, Judge Raggi believed, that the trial court should have suppressed Graham's confession altogether rather than permitting the prosecution to bring it in for purposes of impeachment if Graham elected to take the witness stand. Whether or not the trial court erred on this issue was not clear from the fragmented record available. To supplement that record, and to enable her to decide for what purposes the confession should have been suppressed, Judge Raggi ordered an evidentiary hearing. A264. The hearing was held on December 4, 1997. A-7. On the basis of that hearing, Judge Raggi decided that the final issue should, like the others, be resolved against Graham. On December 15, 1997, she denied his habeas petition.

Graham now appeals.

DISCUSSION

I. *Ineffective assistance of counsel*

Graham argues that his attorney's conflict of interest arising from his previous representation of Ingram made it impossible for Graham to have effective assistance of counsel. Blue 14. We do not reach the merits of this issue. In his first motion for a writ of *coram nobis*-New York's equivalent of state habeas-Graham did not raise a claim of ineffective assistance. A-244. When he raised the claim in his second *coram nobis* petition, six years after conviction, the state court ruled the claim procedurally defaulted as a matter of state law. A-244. Federal review of this ineffective assistance claim is therefore barred unless Graham can demonstrate either (1) a fundamental miscarriage of justice, *see Murray v. Carrier,* 477 U.S. 478, 495-96 (1986), or (2) good cause for his not having raised the issue in his first state petition and prejudice resulting therefrom, *see Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

The fundamental miscarriage of justice prong is not at issue here, because Graham conceded at his habeas hearing that he is guilty of the crime charged. He therefore cannot show the "actual innocence" required to show a fundamental miscarriage under *Murray. See Murray,* 477 U.S. at 496. With regard to the cause-and-prejudice prong, Graham cannot

show cause for not having raised this claim in his first petition. He argues that this court should excuse his procedural default because his attorney failed to raise the claim on direct appeal and he was *pro se* and inexpert in the law when that petition was filed. Blue 21. We have held, however, that ignorance does not constitute good cause excusing procedural default in these kinds of circumstances. *See Washington v. James,* 996 F.2d 1442, 1447 (2d Cir.1993) (*TJM,* JLO, ALK). Graham does not urge any other basis for cause, nor is any apparent from the record. He is therefore barred from raising this issue in a federal habeas petition.

II. *Confrontation*

**\*3** This issue, like the previous one, arises from the fact that Graham's trial counsel had previously represented Ingram. But the district court nonetheless found, based on the state court's decision, that this claim was not procedurally barred. A 252. Graham correctly points out that his lawyer's previous relationship to Ingram prompted the trial judge to prohibit certain lines of cross-examination. Graham further argues that the restrictions on Giovanniello's cross-examination of Ingram denied Graham his right to confront a witness against him. Blue 28. Of the greatest importance, Graham argues, was the court's refusal to let counsel examine Ingram about his history of violent crimes and his prior conviction for possession of a gun. Blue 34.

We do not quarrel with Graham's contention that impeaching Ingram was critical to Graham's defense. Blue 34. We do not believe, however, that the trial judge's circumscription of Giovanniello's cross-examination prevented an adequate impeachment of Ingram. The court permitted Giovanniello to elicit the information that Ingram had been convicted of six different crimes. These included crimes of violence such as assault and disorderly conduct as well as crimes of deception such as shoplifting and tampering with a witness. A-253-254. Indeed, although Ingram had never been convicted of perjury, his testimony in response to Giovanniello's cross-examination showed him necessarily to have lied under oath, because he denied having committed crimes to which he had earlier pled guilty. A-253-254. If his testimony at Graham's trial was to be believed, it follows that he must have lied at his previous plea allocutions; conversely, if he had been truthful on those earlier occasions, he must have been lying at Graham's trial. Either way, Ingram was shown to be a perjurer. We think it clear that the jury had before it sufficient information to gauge Ingram's credibility. Under the circumstances, a trial judge could have excluded additional evidence tending to impeach Ingram's character as cumulative. *See* Fed.R.Evid. 403.

The information would also have been either cummulative, irrelevant, or inadmissible for the other purposes submitted by appellant. It follows that not permitting the introduction of yet more evidence of Ingram's untrustworthiness did not deny Graham the right to confront a witness against him.

### III. *Graham's Confession*

The state court found, and the federal district court did not dispute, that the police violated Graham's rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), by refusing to allow him to consult with counsel while under interrogation. A-220-221. The crux of this issue is whether the methods that the police used to obtain Graham's confession were not only *Miranda*-defective but also unconstitutional as a violation of due process. If the former, then it was proper to permit the prosecution to introduce the confession as impeachment evidence if Graham chose to testify. *See Oregon v. Hass,* 420 U.S. 714, 722-23, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975). If the latter, then it would be error to allow the prosecution to use the confession for any purpose whatsoever. *See Mincey v. Arizona,* 437 U.S. 385, 397-98, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

**\*4** Whether the circumstances of Graham's confession violated his constitutional due process rights as well as *Miranda* depends upon whether the confession was given voluntarily. *See id.* at 398. Graham points out that the record of the trial judge's suppression hearing suggested that she found some involuntariness in his confession. She said that the "initial confession to the police was involuntarily made," acknowledged the existence of "coercive acts," and was troubled by the fact that five minutes were missing from the video tape of appellant's confession, right between his exculpatory and inculpatory statements. As Judge Raggi noted, however, federal courts have an obligation to determine independently whether the totality of the circumstances in a given case are sufficient to constitute constitutional involuntariness, and the trial court made few, if any, specific factual findings concerning these circumstances. Moreover, the trial judge's use of the terms "involuntarily" and "coercive" are not reliable indications that she believed the confession to be constitutionally involuntary. The trial

judge was operating within the framework of New York state law, and a confession which is involuntary in the eyes of New York is not necessarily involuntary under the United States Constitution. In New York law, confessions obtained in violation of the federal Constitution are only one of several categories of confessions deemed involuntary. *See* N.Y.Crim. Pro. L. § 60.45(2)(b)(ii)(McKinney 1992).

The federal habeas court had the responsibility to decide independently of the judgment of the state court whether Graham's confession was unconstitutionally obtained. In doing so, the federal court affords deference to the state court's findings of fact. *See Whitaker v. Meachum,* 123 F.3d 714, 716 (2d Cir.1997) (RJM, JMcL, JAC) (per curiam). And it is Graham who bears the burden of showing that his confession was involuntary. *See id.* Judge Raggi found that the state record was incomplete and not sufficient to enable her to decide whether Graham's confession was voluntary or not. A-263. As such, the district court might well have held that Graham had failed to meet his burden and, hence, ruled against him without more. In an admirable abundance of caution, however, the district court chose instead to hold a hearing on the question of voluntariness. A 263-64.

The purpose of that hearing was to reconstruct the factual record that the state proceedings did not supply. In such an enterprise, determinations about the credibility of witnesses are critically important, and the views of the judge who actually heard the testimony of the witnesses are entitled to substantial deference. Judge Raggi was entitled to disbelieve Graham's version of events. She did so in relevant part and concluded that his confession was voluntary one. Hearing transcript, 85-91. We have no reason to disturb that finding.

### CONCLUSION

**\*5** The decision of the district court is affirmed.

### All Citations

166 F.3d 1200, 1998 WL 852942 (Table)

---

**End of Document**          © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 6569769
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Robert KELLY, Petitioner,
v.
Patrick GRIFFIN, Respondent.

No. 12 Civ. 3384(BMC).
|
Dec. 14, 2012.

**Attorneys and Law Firms**

Robert Kelly, Auburn, NY, pro se.

Kings County District Attorneys Office—Generic, New York State Attorney Generals Office—Generic, for Respondent.

### *MEMORANDUM DECISION AND ORDER*

COGAN, District Judge.

 **\*1**  Petitioner brings this proceeding pursuant to 28 U.S.C. § 2254 to challenge his conviction for first degree robbery and first degree burglary, for which he was sentenced, as a persistent violent felony offender under New York law, to concurrent prison terms of twenty-five years to life.

The facts shown at trial can be simply stated: this was a push-in robbery in which petitioner and several much younger accomplices (petitioner was in his thirties or forties; his accomplices were teenagers, some as young as 14), including one named Jawanza White, forced the victim, Alfred Wang, into the stairwell of his building as he returned to his apartment. One of the accomplices held a gun to Wang's face and petitioner rifled through Wang's pockets, taking his cell phone, keys, and wallet. Petitioner demanded Wang's PIN number for the ATM card in his wallet, striking Wang in the process, at which point Wang provided the PIN number. Petitioner then left Wang with his accomplices while he twice unsuccessfully attempted to loot Wang's bank account using the ATM card, returning to confront Wang between the two attempts because the PIN number was not working. After about an hour, petitioner and his accomplices freed Wang, who flagged down a police car and reported the crime. Petitioner's accomplice, White, was later arrested in connection with an unrelated robbery. White confessed to that robbery as well as the Wang robbery and identified petitioner as having participated in the Wang robbery. White, pursuant to a cooperation agreement, and Wang both testified against petitioner at trial. Additional facts will be set forth below as necessary to discuss each of petitioner's points of error raised in this proceeding.

The petition raises three points: (1) although the pretrial suppression hearing court properly suppressed Wang's lineup identification of petitioner, it erroneously found that Wang had an independent source for identifying petitioner at trial, and thus violated petitioner's rights under the Fourth Amendment; (2) the trial court violated petitioner's right to due process and a jury trial when, during deliberations, it questioned a juror about a child care problem outside the presence of the other jurors without instructing the other jurors to refrain from deliberating until the questioned juror returned; and (3) petitioner's sentencing as a persistent violent felony offender pursuant to N.Y. Penal Law § 70.08 violated the holding of *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). In addition, the petition alludes to the fact that petitioner intended to file a collateral challenge to his conviction. The record that respondent has subsequently submitted to the Court includes the papers on petitioner's motion to vacate his conviction pursuant to N.Y.Crim. Proc. Law § 440.10 for ineffective assistance of counsel, including the § 440 court's denial of that claim, and I will deem the petition amended to include that point as well.

 **\*2**  Petitioner's points appear to be either non-cognizable on federal habeas corpus, procedurally barred, or without merit. Petitioner will be given the opportunity to show cause why the petition should not be denied.

### I. Fourth Amendment/Independent Source Ruling

Prior to petitioner's arrest, during the police investigation, Wang was shown a photo array that included a picture of petitioner. Wang said that both petitioner and another person in the photo array looked like the older robber, but he could not identify the robber with certainty from the photographs and wanted to see a lineup. Based on Wang's response to the photo array, the prosecutor submitted an affirmation in support of a "take out order" whereby petitioner, who was in jail on an unrelated charge, was made to appear in a lineup before Wang. In that supporting affidavit, the prosecutor overstated Wang's identification of petitioner in the photo array—she averred that Wang had tentatively picked petitioner by name out of the photo array—and

overstated White's confession in support of her probable cause argument. The state court, based on the allegations in the affirmation, found probable cause to require petitioner to appear in a lineup. Once petitioner was produced for the lineup, Wang identified him.

The suppression court held that because the prosecutor had exaggerated the probable cause for obtaining petitioner's presence in the lineup, the results of the lineup had to be suppressed. The ruling was essentially a sanction for the prosecutor's misconduct; it did not find any infirmity with the lineup itself or a lack of probable cause, noting that "both the composition and the conduct of the lineup are without legal infirmity." In essence, the suppression court held that although there was sufficient probable cause to have petitioner appear in the lineup, the prosecutor's overstatements meant there had been no "valid" showing of probable cause.

However, after a subsequent independent source hearing (which petitioner did not attend, presumably so that Wang could not identify him from his presence at the hearing), the suppression court held that notwithstanding the suppression of the lineup identification, Wang would be permitted to identify petitioner at trial, pursuant to the independent source rule, because Wang's identification of petitioner was not "tainted" by the lineup. The suppression court noted that the robbery of Wang lasted approximately an hour; that petitioner was with Wang for between 12 and 23 minutes of that hour and petitioner had directly confronted Wang during that time; and that it was unlikely that Wang was confusing petitioner with his other assailants, who were much younger than petitioner (some were 14 years old). It concluded that Wang "had a fair and adequate opportunity and prolonged opportunity to view" petitioner during the attack. Thus, the suppression court held that the Fourth Amendment did not preclude Wang from identifying petitioner at trial as "fruit of the poisonous tree" under the test set forth in *Manson v. Braithwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). The Appellate Division, on direct appeal, sustained the suppression court's ruling on the merits. *People v. Kelly,* 68 A.D.3d 895, 889 N.Y.S.2d 491 (2d Dep't 2009), *aff'd on other grounds,* 16 N.Y.3d 803, 921 N.Y.S.2d 640, 946 N.E.2d 738 (2011).

**\*3** It appears that petitioner's challenge to the suppression court's rulings is not cognizable on federal habeas corpus review for two reasons.

First, the claim is unexhausted. "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State[.]" 28 U.S.C. § 2254(b)(1)(A). An applicant has not exhausted all state court remedies "if he has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c). The Second Circuit has adopted a two-part test to determine if the requisite exhaustion has occurred: petitioner must have (1) "fairly presented to an appropriate state court the same federal constitutional claim that he now urges upon the federal courts[;]" and (2) "utilized all available mechanisms to secure appellate review of the denial of that claim." *Klein v. Harris,* 667 F.2d 274, 282 (2d Cir.1981).

Although petitioner sought, and obtained, leave to appeal the Appellate Division's decision on all of his issues to the New York Court Appeals, the record discloses that this issue was not briefed in the Court of Appeals and thus the Court of Appeals never had the opportunity to consider it. This means that the claim is unexhausted, as petitioner did not "utilize all available mechanisms" to obtain review. *Id. See also O'Sullivan v. Boerckel,* 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Smith v. Duncan,* 411 F.3d 340 (2d Cir.2005); *Gray v. Hoke,* 933 F.2d 117 (2d Cir.1991). Moreover, because proceedings on his direct appeal are completed and there is no procedure under state law for petitioner to reassert this claim, the claim is deemed exhausted but procedurally barred. *See Acosta v. Artuz,* 575 F.3d 177 (2d Cir.2009).

In addition to being procedurally barred, federal habeas corpus review of petitioner's Fourth Amendment claim appears to be subject to the rule of *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). There, the Supreme Court held that federal habeas corpus review is unavailable for Fourth Amendment claims where the petitioner has had the opportunity to fully litigate the claim in state court: "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 494, 96 S.Ct. at 3052. The Supreme Court reasoned that, in the habeas context, "the contribution of the exclusionary rule, if any, to the effectuation of the Fourth Amendment is minimal, and the substantial societal costs of application of the rule persist with special force." *Id .* at 494–95, 96 S.Ct. at 3052–53.

Based upon *Stone,* the Second Circuit has held that habeas review of decisions implicating the exclusionary rule is limited to situations in which "the state provides no corrective procedures at all to redress Fourth Amendment violations," or where there is a corrective procedure "but in fact the defendant is precluded from utilizing it by reason of an unconscionable breakdown in that process." *Gates v. Henderson,* 568 F.2d 830, 840 (2d Cir.1977) (en banc). Courts have repeatedly recognized that New York provides an adequate corrective procedure for Fourth Amendment claims. *See, e.g., Capellan v. Riley,* 975 F.2d 67 (2d Cir.1992); *Guzman v. Greene,* 425 F.Supp.2d 298 (E.D.N.Y.2006); *Crispino v. Allard,* 378 F.Supp.2d 393 (S.D.N.Y.2005). For this reason, courts within this Circuit have almost uniformly held that challenges to a state court's independent source determinations are not reviewable under *Stone v. Powell. See, e.g., Philbert v. Brown,* No. 11–cv–1805, 2012 WL 4849011 (E.D.N.Y. Oct.11, 2012); *Garcia–Lopez v. Fischer,* No. 05 Civ. 10340, 2007 WL 1459253 (S.D.N.Y. May 17, 2007); *Crispino,* 378 F.Supp.2d 393. [1]

**\*4** Here, petitioner has not demonstrated any infirmity with the suppression court's determination of his Fourth Amendment claim except his disagreement with its result. He clearly had a full and fair opportunity to litigate the claim and in fact did so, all the way through the Appellate Division, until he abandoned it in the New York Court of Appeals. It thus appears that *Stone v. Powell* precludes review of his claims.

However, because petitioner has not had the opportunity to address his failure to exhaust his Fourth Amendment claim in the New York Court of Appeals or the application of *Stone v. Powell,* he will be given the opportunity to do so, as described below.

## II. Jury Deliberations Issue

Following five hours of jury deliberations, a court officer informed the trial court that juror number two had expressed concern about a child care issue if the jury deliberated too late in the day. The trial court conferred with the parties. Initially, both sides suggested that the trial court advise the juror that deliberations would suspend at 5 p.m. if they had not reached a verdict. The trial court expressed the concern that giving a specific time of adjournment might influence the jury to reach a verdict by that time, which might be sooner than it would otherwise reach a verdict. The trial court suggested, instead, that it would have the court officer take juror number two

aside and ask her if she needed him to make a call on her behalf to let the person who was caring for her children know that she might be late. Both sides affirmatively consented to that procedure.

The record shows that their consent occurred at 4:34 p.m., and the court officer was dispatched to deliver the message. The record further shows that less than six minutes later, the court officer returned and advised the trial court and parties that the person who the juror had to call only spoke Arabic, and thus she needed to make the call herself. Both parties then agreed to dismiss the jury for the day at that point. The trial court called the jurors into the courtroom and dismissed them for the day, advising them that they could not resume deliberations until all of them were present the next day. The next day's deliberations did not yield a verdict, and the trial court again dismissed the jury for the day, and again admonished them that they could not start deliberations the next morning unless all were present. The jury returned its guilty verdict the following day.

On direct appeal, petitioner contended that the court officer's conversation with the juror to make a call on her behalf, outside the presence of the jury, and without a specific instruction to the jury that it must cease deliberations while the court officer conferred with juror number two, violated his statutory and constitutional right to have the jury deliberate only when they were all together. Both the Appellate Division and the New York Court of Appeals held that by consenting to the procedure suggested by the trial court without requesting an instruction to the whole jury, petitioner had failed to preserve this point of error, and that, in any event, it was without merit. *Kelly,* 68 A.D.3d at 896, 889 N.Y.S.2d at 492, *aff'd,* 16 N.Y.3d at 804, 921 N.Y.S.2d at 641, 946 N.E.2d 738.

**\*5** A federal court should not address the merits of a petitioner's habeas claim if a state court has rejected the claim on "a state law ground that is *independent* of the federal question raised and *adequate* to support the judgment." *Lee v. Kemna,* 534 U.S. 362, 375, 122 S.Ct. 877, 885, 151 L.Ed.2d 820 (2002) (quoting *Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640(1991)). When a state court rejects a petitioner's claim because he "failed to meet a state procedural requirement[,]" the procedural bar may constitute an adequate and independent ground for the state court's decision. *Coleman,* 501 U.S. at 729–30, 111 S. Ct at 2554. *See also Murden v. Artuz,* 497 F.3d 178 (2d Cir.2007). State procedural grounds are only adequate to support the judgment and foreclose federal review if they are "firmly established

and regularly followed" in the state. *Lee,* 534 U.S. at 376, 122 S.Ct. at 885 (quoting *James v. Kentucky,* 466 U.S. 341, 104 S.Ct. 1830, 80 L.Ed.2d 346 (1984)). If a state court rejects a specific claim on an adequate and independent state law ground, then a federal court should not review the merits of the claim, even if, as in this case, the state court addressed the merits of the claim in the alternative. *See Harris v. Reed,* 489 U.S. 255, 264 n. 10, 109 S.Ct. 1038, 1044 n. 10, 103 L.Ed.2d 308 (1989) ("[A] state court need not fear reaching the merits of a federal claim in an *alternative* holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law."); *Velasquez v. Leonardo,* 898 F.2d 7 (2d Cir.1990).

It is well settled that New York's contemporaneous objection rule, codified at N.Y.Crim. Proc. Law § 470.05(2), is an independent and adequate state law ground that ordinarily precludes federal habeas corpus review. *See, e.g., Downs v. Lape,* 657 F.3d 97 (2d Cir.2011). Here, because petitioner's trial counsel failed to object to the procedure outlined by the trial court or to request an instruction to the jury concerning it, the Appellate Division and the Court of Appeals properly invoked a state procedural bar.

Since the state courts properly relied on a procedural bar, the issue becomes whether any ground exists for reaching the merits notwithstanding that procedural bar. Procedural default on state law grounds may be overcome by a petitioner who either demonstrates " 'cause' for the default and 'prejudice attributable thereto,' or ... that [ ] failure to consider the federal claim will result in a 'fundamental miscarriage of justice.' " *Harris,* 489 U.S. at 262, 109 S.Ct. at 1043 (citations omitted). Although, in some circumstances, ineffective assistance of counsel can constitute "cause" sufficient to avoid a procedural default, *see Murray v. Carrier,* 477 U.S. 478, 488–89, 106 S.Ct. 2639, 2645–46, 91 L.Ed.2d 397 (1989), the ineffective assistance claim must itself have been exhausted in the state court. *Edwards v. Carpenter,* 529 U.S. 446, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000). A fundamental miscarriage of justice is characterized as "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent[ .]" *Murray,* 477 U.S. at 496, 106 S.Ct. at 2649.

**\*6** In the instant case, it does not appear that any of the requirements for avoiding the state courts' procedural bar can be met. On direct appeal, petitioner acknowledged the lack of preservation of the claim, yet did not even assert ineffective assistance of counsel, [2] perhaps recognizing that there was nothing objectively unreasonable nor prejudicial, *see Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), about his counsel's not asking for a "cease deliberations" instruction during a five minute conversation between the court officer and juror number two, especially since the jury deliberations ended up going over three days.

Instead, petitioner argued on appeal that the need to cease jury deliberations when one juror is not present, even for a moment, is part of the "fundamental mode" of trial proceedings and petitioner implies that any violation requires a reversal *per se,* even where the claim was not preserved. This equates most closely to a "fundamental miscarriage of justice" argument, but the state courts did not accept it and I cannot either. First, a "fundamental miscarriage of justice" exists only when one who is actually innocent is wrongly convicted. *See Sawyer v. Whitney,* 505 U.S. 333, 339–40, 112 S.Ct. 2514, 2518–19, 120 L.Ed.2d 269 (1992). There is nothing in this record to suggest actual innocence. Second, the importance of this issue has been grossly inflated in an attempt to create some reversible error, but it does not seem to come near to a fundamental miscarriage of justice. A few minutes of absence from a three day period of deliberations to discuss a child care issue is not of constitutional magnitude.

It therefore appears that petitioner's claim is procedurally barred. However, because petitioner has not had an opportunity to argue that the claim is not procedurally barred, he will be given such an opportunity, as described below.

### III. Apprendi and Crim. Proc. Law § 70.08

Petitioner admitted to his prior convictions at sentencing and was therefore sentenced as a persistent violent felony offender under N.Y.Crim. Proc. Law § 70.08. On direct appeal, petitioner contended for the first time that this statute is unconstitutional because it requires the trial court to make findings concerning petitioner's criminal history instead of requiring those findings by a jury. Petitioner relied on *Apprendi* in making this argument. Both the Appellate Division and the Court of Appeals rejected the claim as unpreserved. *Kelly,* 68 A.D.3d at 896, 889 N.Y.S.2d at 492, *aff'd,* 16 N.Y.3d at 804, 921 N.Y.S.2d at 641, 946 N.E.2d 738.

For the same reasons as set forth above, the claim is procedurally defaulted. Moreover, the Second Circuit has

2012 WL 6569769

specifically upheld N.Y.Crim. Proc. Law § 70.08 against an *Apprendi* challenge. *See Portalatin v. Graham,* 624 F.3d 69 (2d Cir.2010). I therefore reject this claim.

## IV. Ineffective Assistance of Counsel

Petitioner filed a collateral challenge to his conviction under N .Y.Crim. Proc. Law § 440.10 alleging ineffective assistance of trial counsel in that trial counsel failed to: (a) adequately cross-examine Wang; (b) ask for a further inquiry regarding a juror who had, allegedly, been sleeping; (c) hire an expert on cross-racial identifications; and (d) investigate defendant's alibi that he had been home with his wife at the time of the crime. On October 1, 2012, the § 440 court rejected these claims on the merits. It did not recite each of petitioner's points, holding that "there is no necessity for the court to examine each of the specific inconsistencies the defendant raises as examples of ineffective assistance of counsel[,]" because "the defendant's motion is devoid of any factors which would demonstrate that counsel lacked any strategic o[r] legitimate basis for what defendant claims he failed to do." Petitioner failed to seek leave to appeal this decision from the Appellate Division.

**\*7** For the same reasons set forth in Point I, *supra,* it appears that this claim is unexhausted. Since, however, the time to appeal has passed, the claim is deemed exhausted but procedurally barred. Just as with claims left unexhausted on direct appeal, it is well settled that failure to seek leave to appeal the denial of § 440.10 motion constitutes a failure to exhaust, and if the 30–day time period to seek leave to appeal has passed, as it has here, *see* N .Y. C.P.L. § 460.10(4)(a) ("Within thirty days after service upon the defendant of a copy of the order sought to be appealed, the defendant must make application pursuant to section 460.15 for a certificate granting leave to appeal to the intermediate appellate court"), then the claim is deemed exhausted but procedurally barred. *See Thomas v. Greiner,* 111 F.Supp.2d 271, 277–78 (S.D.N.Y.2000).

Since the petitioner did not expressly include the ineffective assistance claims in his petition, he will be provided with an opportunity to demonstrate whether there is a basis to hear these claims despite what appears to be a procedural bar.

### CONCLUSION

Because petitioner has not had the opportunity to address some of the points contained in this Memorandum Decision and Order, he is granted twenty days from the date of this Order to submit a response limited to the following issues: (1) why his Fourth Amendment/independent source claim is not unexhausted and procedurally barred (for not pursuing it in the New York Court of Appeals), and cognizable in light of *Stone v. Powell;* (2) why his jury deliberation claim is not procedurally barred; and (3) why his ineffective assistance of counsel claim is not procedurally barred. Petitioner's *Apprendi* claim is denied. Respondent need not respond to the remaining claims at this time; the Court will not grant the petition without allowing time for respondent to make a submission in opposition to the remainder of the petition. [3]

The Clerk of the Court is directed not to enter judgment at this time. A certificate of appealability shall not issue. *See* 28 U .S.C. § 2253(c). Further, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21. 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 6569769

## Footnotes

1    In *Young v. Conway,* 698 F.3d 69 (2d Cir.2012), the Second Circuit exercised its discretion to decline application of *Stone v. Powell* and undertook a review of the merits of an independent source determination where the State had failed to raise *Stone v. Powell* in the district court. The Circuit held that *Stone v. Powell* is a prudential and equitable, not jurisdictional, doctrine that can therefore be waived.

In support of its holding of the non-jurisdictional nature of *Stone v. Powell,* the Circuit cited *Davis v. Blackburn,* 803 F.2d 1371 (5th Cir.1986) (per curiam). *See Young,* 698 F.3d at 86 n. 10. *Davis,* like all other cases that have considered the issue, also held that a federal court, in the exercise of discretion, may raise *Stone v. Powell* sua sponte. See, e.g., *United States. v. Ishmael,* 343 F.3d 741 (5th Cir.2003); *Herrera v. Lemaster,* 225 F.3d 1176 (10th Cir.2000); *Tart*

*v. Massachusetts,* 949 F.2d 490 (1st Cir.1991); *cf. Woolery v. Arave,* 8 F.3d 1325 (9th Cir.1993) (contrary to *Young v. Conway,* holding that district court must raise *Stone v. Powell sua sponte* if the State does not). Because I have identified the *Stone v. Powell* issue *sua sponte* as a matter of discretion prior to any submission by respondent, there is no issue of waiver.

2   Petitioner asserted a conclusory ineffective assistance claim as an alternative argument before the Second Department but did not present the argument to the Court of Appeals. In addition, in petitioner's § 440.10 motion, he raised various claims of ineffective assistance of counsel, but he did not contend that counsel was ineffective for failing to preserve this claim. *See* Point IV *infra.*

3   There is a timeliness issue that the Court has not addressed. Petitioner's conviction became final on June 24, 2011. He sent a letter to this Court eight days before the expiration of his one-year time period under AEDPA, on June 16, 2012, asking for an extension of time to file his § 2254 petition because he intended to challenge his conviction in a § 440 motion in state court (which, as reflected above, he ultimately did). (Petitioner apparently did not realize that if he had filed his § 440 motion within the one-year period, that one-year period would have been tolled). The Clerk responded on or about July 2, 2012 (about a week after expiration of the one-year period) that petitioner could not obtain an extension because no proceeding was pending in which to grant it. Petitioner did not commence his § 440 proceeding until July 5, 2012, about two weeks after the expiration of the one-year period. If respondent wishes to assert that this proceeding is time-barred under these circumstances, he shall submit a letter brief limited to that issue within 20 days of entry of this Memorandum Decision and Order.

---

511 Fed.Appx. 21
This case was not selected for
publication in the Federal Reporter.
United States Court of Appeals,
Second Circuit.

L. Dennis KOZLOWSKI, Petitioner–Appellant,
v.
William HULIHAN, Respondent–Appellee.
Mark H. Swartz, Petitioner–Appellant,
v.
Superintendent Paul Annetts,
Respondent–Appellee.

Nos. 12–0764–pr(L), 12–0776–pr(CON).
|
Feb. 4, 2013.

**Synopsis**

**Background:** After their convictions for grand larceny, falsifying business records, conspiracy, and violations of New York's Martin Act were affirmed, 11 N.Y.3d 223, 869 N.Y.S.2d 848, 898 N.E.2d 891, petitioners filed for federal habeas relief. The United States District Court for the Southern District of New York, Richard J. Holwell, J., 2012 WL 383667, adopted the opinion of Gabriel W. Gorenstein, United States Magistrate Judge, 2011 WL 43493, and denied the petitions. Petitioners appealed.

**[Holding:]** The Court of Appeals held that New York's contemporaneous objection rule constituted an independent and adequate state-law ground for foreclosing federal habeas review.

Affirmed.

**\*22** Appeal from a February 8, 2012 judgment entered by the United States District Court for the Southern District of New York (Richard J. Holwell, Judge).

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the February 8, 2012 judgment of the District Court be **AFFIRMED.**

**Attorneys and Law Firms**

Alan S. Lewis (Michael Shapiro, Jeffrey L. Loop, Michael H. Bauscher, Laura A. Zaccone, on the brief), Carter Ledyard & Milburn LLP, New York, NY, for L. Dennis Kozlowski, Petitioners–Appellants.

Nathaniel Z. Marmur, Stillman & Friedman, P.C., New York, NY, for Mark H. Swartz, Petitioners–Appellants.

Amyjane Rettew, Assistant District Attorney (Gina Mignola, Assistant District Attorney, on the brief), for Cyrus R. Vance, Jr., District Attorney for New York County, for Respondents–Appellees.

PRESENT: JOSÉ A. CABRANES, RICHARD C. WESLEY, Circuit Judges, JESSE M. FURMAN, District Judge. [*]

**SUMMARY ORDER**

**\*\*1** L. Dennis Kozlowski and Mark H. Swartz appeal from a judgment of the District Court denying their petitions for writs of habeas corpus. They argue that the District Court erred in holding that an independent and adequate state-law ground bars federal habeas review. "We review a district court's ruling on a petition for a writ of habeas corpus *de novo.*" *Corby v. Artus,* 699 F.3d 159, 166 (2d Cir.2012). We assume familiarity with the underlying facts and procedural history of this case.

**BACKGROUND**

Although the factual and procedural history of this case is lengthy, only a brief recitation is necessary here. On June 17, 2005, petitioners, former executives of Tyco International ("Tyco"), were convicted **\*23** in New York Supreme Court, after trial by jury, of twelve counts of Grand Larceny in the First Degree, eight counts of Falsifying Business Records in the First Degree, Conspiracy in the Fourth Degree, and a violation of the Martin Act, which is "New York's counterpart to the Securities and Exchange Acts of 1933 and 1934," *Highland Capital Management LP v. Schneider,* 460 F.3d 308, 317 (2d Cir.2006). In simple terms, they stole more than $100 million from Tyco.

Prior to trial, petitioners served a subpoena [1] on Boies, Schiller & Flexner LLP, requesting materials created during

its internal investigation on behalf of Tyco. The trial court granted Tyco's motion to quash the subpoena, holding that the documents constituted trial preparation materials and were not discoverable under New York Civil Practice Law and Rule § 3101(d)(2) ("CPLR § 3101(d)(2)").[2] That ruling was affirmed by both the First Department and the New York Court of Appeals. Critically, the Court of Appeals noted that Kozlowski and Swartz "did not raise a constitutional argument in support of their subpoena below, and we therefore address none." *People v. Kozlowski,* 11 N.Y.3d 223, 242 n. 11, 869 N.Y.S.2d 848, 898 N.E.2d 891 (2008).

Petitioners then sought a writ of habeas corpus in the United States District Court for the Southern District of New York, contending that their constitutional right to present a defense was violated by the quashing of the subpoena. On January 6, 2011, Magistrate Judge Gabriel W. Gorenstein issued a report and recommendation, in which he concluded that the petitions for writs of habeas corpus should be denied because "the New York Court of Appeals' refusal to address petitioners' federal constitutional argument—based on their failure to raise the argument in the trial court—was an adequate and independent state ground for the state court's decision." After holding oral argument, and upon consideration of petitioners' objections to the Report and Recommendation, the District Court adopted the Report and Recommendation in full, and denied the petitions.

## DISCUSSION

**\*\*2** We " 'will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that is independent of the federal question and adequate to support the judgment.' " *Downs v. Lape,* 657 F.3d 97, 101 (2d Cir.2011) (quoting *Cone v. Bell,* 556 U.S. 449, 465, 129 S.Ct. 1769, 173 L.Ed.2d 701 (2009)).[3] The District Court **\*24** held that the New York Court of Appeals' reliance on petitioners' failure to raise their constitutional claim before the trial court, in violation of New York's so-called contemporaneous objection rule, constitutes an independent and adequate state-law ground. Under the contemporaneous objection rule, a party fails to preserve an issue for appeal if he or she does not "object to what he or she believes is a legal error in a trial court's ruling or instruction 'at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same.' "[4] *Gutierrez v. Smith,* 702 F.3d 103, 110 (2d

Cir.2012). Kozlowski and Swartz now argue, as they did before the District Court, that the New York Court of Appeals' application of the contemporaneous objection rule provides neither an independent nor an adequate state-law ground for foreclosure of their habeas claims. For the reasons set out below, we find no error with the District Court's reasoning and affirm its judgment.

### A. Independence

**[1]** Petitioners argue that the New York Court of Appeals' decision on the contemporaneous objection rule is not an "independent" state-law ground within the meaning of federal habeas jurisprudence because the Court of Appeals "interwove" federal law with its analysis of their state-law claims. Petitioners observe that the Court of Appeals referred to Supreme Court cases in the course of its discussion on New York state-law rules regarding enforcement of third-party subpoenas. *See Kozlowski,* 11 N.Y.3d at 242, 869 N.Y.S.2d 848, 898 N.E.2d 891. They contend **\*25** that, because the Court of Appeals' discussion of New York's third party-subpoena rules invoked federal case law, the state-law ground for barring their federal habeas claims is not independent of federal law.

However, the state-law ground that forecloses their federal habeas claims is not the Court of Appeals' decision on its third-party subpoena rules. Rather, it is the Court of Appeals' application of the contemporaneous objection rule. Hence, as the District Court pointed out, the real question here is whether the Court of Appeals' finding of procedural default under the contemporaneous objection rule implicated federal law. *Cf. Green v. Travis,* 414 F.3d 288, 295–96 (2d Cir.2005) (holding that the contemporaneous objection rule did not constitute an independent state-law ground because the state court's determination that the defendant had failed to argue the proper elements of a challenge under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), depended on its analysis of *Batson*). On this issue, there is no doubt—the Court of Appeals relied on no federal law in finding that Kozlowski and Swartz had failed to contemporaneously assert a constitutional claim. Indeed, the Court of Appeals stated plainly that it was not addressing any constitutional claim because Kozlowski and Swartz "did not raise a constitutional argument in support of their subpoena below."[5] *Id.* at 242 n. 11, 869 N.Y.S.2d 848, 898 N.E.2d 891; *see Jimenez v. Walker,* 458 F.3d 130, 137–38 (2d Cir.2006). In short, the contemporaneous objection rule provides an

independent state-law ground for barring federal habeas review.

## B. Adequacy

**3 **[2]** We have previously held that New York's contemporaneous objection rule is "firmly established and regularly followed," and, therefore, its application ordinarily constitutes an adequate state-law ground for barring federal habeas review. *Downs,* 657 F.3d at 102–04. Nonetheless, we must still consider whether this is an "exceptional case[ ] in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." *Lee v. Kemna,* 534 U.S. 362, 376, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002); *see also Downs,* 657 F.3d at 104. We evaluate whether a case presents such an exception by reference to three useful, but non-exclusive, considerations, or "guideposts," which are: "(1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had substantially complied with the rule given the realities of trial, and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest." *Cotto v. Herbert,* 331 F.3d 217, 240 (2d Cir.2003) (internal quotation marks omitted). As the District Court explained, none of these guideposts favors the petitioners.

As to the first guidepost, petitioners argue that the state trial court would have rejected their constitutional claim, had it *26 been presented, and therefore perfect compliance with the contemporaneous objection rule would not "have changed the trial court's decision." *Id.* In the words of the District Court, however, such a claim "is entirely speculative, particularly in the absence of any showing of substantial compliance." *Kozlowski v. Hulihan,* Nos. 09 Civ. 7583(RJH) (GWG), 10 Civ. 0812(RJH)(GWG), 2012 WL 383667, at *5 (S.D.N.Y. Feb. 7, 2012). Indeed, the very purpose of the contemporaneous objection rule is to permit the parties to submit relevant arguments and for the trial court to make an informed decision at the time. *See Garvey v. Duncan,* 485 F.3d 709, 714 (2d Cir.2007). Inasmuch as the trial court had no opportunity to consider the constitutional claim, we are not now in a position to opine on what that court might have done in the hypothetical circumstance that petitioners had advanced their constitutional argument.

As to the second guidepost, petitioners contend that New York appellate courts do not consistently apply the contemporaneous objection rule to bar constitutional claims on appeal when the substance of a constitutional claim is presented to the trial court but not labeled as such. *See Cotto,* 331 F.3d at 240. To the contrary, we have noted that "New York's highest courts uniformly instruct that to preserve a particular issue for appeal, [a] defendant must specifically focus on the alleged error." *Garvey,* 485 F.3d at 714. Even crediting petitioners' theory, it is simply not true that they placed the substance of their constitutional claim before the trial court. *See Kozlowski,* 2012 WL 383667, at *5. In fact, it is clear from their written opposition to the motion to quash that they argued only that Tyco had waived its privilege and that the documents sought were material in the sense that they constituted a relevant and appropriate subject for discovery. Joint App'x 745–69. Notably, this argument is grounded in state law and does not raise the substance of a right-to-present-a-defense claim, which requires a showing that the documents were constitutionally material and that the application of a discovery rule was " 'arbitrary or disproportionate' to the purpose that the rule is designed to serve." *Jimenez,* 458 F.3d at 146–47 (quoting *Rock v. Arkansas,* 483 U.S. 44, 55–56, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987)). [6]

**4 As to the third guidepost, petitioners argue that they substantially complied with the contemporaneous objection rule. *See Cotto,* 331 F.3d at 240. Again, they contend that they presented the essence of their constitutional claim, in function if not in name, to the trial court. However, as the District Court explained, and as we have confirmed above, petitioners did not argue the substance of a right-to-present-a-defense claim to the trial court.

In sum, none of the three guideposts favors petitioners. We therefore conclude that this is not the "exceptional case[ ]" involving the "exorbitant application of a generally sound rule." *Lee,* 534 U.S. at 376, 122 S.Ct. 877. Accordingly, the decision of the New York Court of Appeals on the question of the contemporaneous objection rule supplies an adequate state-law ground for foreclosing federal habeas review.

## CONCLUSION

For the foregoing reasons, the District Court correctly held that the decision of *27 the New York Court of Appeals on the contemporaneous objection rule provides an independent

and adequate state-law ground for barring federal habeas review. *See Downs,* 657 F.3d at 101. We have reviewed the record and the parties' arguments on appeal, and we **AFFIRM** the February 8, 2012 judgment of the District Court.

**All Citations**

511 Fed.Appx. 21, 2013 WL 406531

Footnotes

\*       The Honorable Jesse M. Furman, of the United States District Court for the Southern District of New York, sitting by designation.

1       In fact, the subpoena was served prior to petitioners' second trial, which ended with a guilty verdict. Their first trial had resulted in a mistrial.

2       CPLR § 3101(d)(2) provides:

        Materials. Subject to the provisions of paragraph one of this subdivision, materials otherwise discoverable under subdivision (a) of this section and prepared in anticipation of litigation or for trial by or for another party, or by or for that other party's representative (including an attorney, consultant, surety, indemnitor, insurer or agent), may be obtained only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the case and is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of the materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions or legal theories of an attorney or other representative of a party concerning the litigation.

3       The Supreme Court has explained the basis for the independent and adequate state ground doctrine as follows:

        When a federal habeas court releases a prisoner held pursuant to a state court judgment that rests on an independent and adequate state ground, it renders ineffective the state rule just as completely as if [the Supreme] Court had reversed the state judgment on direct review.... In such a case, the habeas court ignores the State's legitimate reasons for holding the prisoner.

        In the habeas context, the application of the independent and adequate state ground doctrine is grounded in concerns of comity and federalism. Without the rule, a federal district court would be able to do in habeas what [the Supreme] Court could not do on direct review; habeas would offer state prisoners whose custody was supported by independent and adequate state grounds an end run around the limits of [the Supreme] Court's jurisdiction and a means to undermine the State's interest in enforcing its laws. *Coleman v. Thompson,* 501 U.S. 722, 730–31, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (internal citations omitted); *see also Walker v. Martin,* ––– U.S. ––––, 131 S.Ct. 1120, 1127, 179 L.Ed.2d 62 (2011) (The independent and adequate state ground doctrine "afford[s state] courts the first opportunity to address and correct alleged violations of the prisoner's federal rights" because "without it, habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court." (internal quotation marks, citations, and alterations omitted)).

4       In full, New York's contemporaneous objection rule provides:

        For purposes of appeal, a question of law with respect to a ruling or instruction of a criminal court during a trial or proceeding is presented when a protest thereto was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same. Such protest need not be in the form of an "exception" but is sufficient if the party made his position with respect to the ruling or instruction known to the court, or if in reponse [sic] to a protest by a party, the court expressly decided the question raised on appeal. In addition, a party who without success has either expressly or impliedly sought or requested a particular ruling or instruction, is deemed to have thereby protested the court's ultimate disposition of the matter or failure to rule or instruct accordingly sufficiently to raise a question of law with respect to such disposition or failure regardless of whether any actual protest thereto was registered.

        N.Y.Crim. Proc. L. § 470.05(2) (McKinney 2009).

5       To the extent that petitioners suggest that the Court of Appeals did, in fact, address their constitutional claim by referring to Supreme Court cases on the right to present a defense, such a claim has no merit. The Court of Appeals unambiguously stated that it was resolving the claim of Kozlowski and Swartz under state law only and was not addressing any federal constitutional argument. *Kozlowski,* 11 N.Y.3d at 242 & n. 11, 869 N.Y.S.2d 848, 898 N.E.2d 891.

6       In addition to finding that Tyco did not waive its privilege, the trial court also held that (1) the "at issue" doctrine did not apply; and (2) Kozlowski and Swartz did not have a "substantial need" for the documents pursuant to CPLR § 3101(d)(2). Kozlowski Special App'x 13–16. These alternate theories are also based entirely on state law.

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 90996
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Rodney LOWMAN, Petitioner,
v.
NEW YORK State, Respondent.

No. 09–CV–0058T.
|
Jan. 11, 2011.

**Attorneys and Law Firms**

Rodney Lowman, Moravia, NY, pro se.

Priscilla I. Steward, New York State Attorney General's Office, New York, NY, for Respondent.

**DECISION AND ORDER**

MICHAEL A. TELESCA, District Judge.

## I. Introduction

 **\*1** *Pro se* petitioner Rodney Lowman ("Petitioner") has filed a timely petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging the constitutionality of his custody pursuant to a judgment entered March 28, 2006, in New York State, County Court, Ontario County, convicting him, after a jury trial, of Criminal Sale of a Controlled Substance in the Third Degree (N.Y. Penal Law ("Penal Law") § 220.39[1] ), two counts of Criminal Possession of a Controlled Substance in the Third Degree (Penal Law § 220.16[1] ), and one count of Criminal Possession of a Controlled Substance in the Fifth Degree (Penal Law § 220.06).

For the reasons stated below, habeas relief is denied and the petition is dismissed.

## II. Factual Background and Procedural History

### A. Introduction

On August 10, 2005, Sandra Moracco ("Moracco"), a confidential informant working with the police, called Police Officer Brian Choffin ("Officer Choffin") and told him that she had observed Petitioner sell crack cocaine to an individual and that Petitioner was in possession of an additional quantity of crack cocaine. Moracco told Officer Choffin that she would be driving Petitioner to a McDonald's restaurant and gave Officer Choffin her travel route. Officer Choffin, along with other police officers, pulled over the car and searched Petitioner. Officer Choffin recovered $325 from Petitioner, but no drugs. Petitioner was then taken to the police precinct and a warrant was issued for the search of Petitioner's person. Officer Choffin recovered from Petitioner's rectum 38 small bags of crack cocaine alone with larger chunks of cocaine.

By Ontario County Indictment No. 05–07–089, Petitioner was charged with one count of Criminal Sale of a Controlled Substance in the Third Degree (Penal Law § 220.39[1] ), two counts of Criminal Possession of a Controlled Substance in the Third Degree (Penal Law § 220.16[1] ), and one count of Criminal Possession of a Controlled Substance in the Fifth Degree (Penal Law § 220.06). After a trial, Petitioner was found guilty as charged.

### B. The Pre–Trial Hearing

On January 17, 2006, the Hon. Craig J. Doran conducted a hearing on Petitioner's motion to suppress physical evidence based on a lack of probable cause for arresting him.

### 1. The People's Case

On August 10, 2005, Officer Choffin received a telephone call from a confidential informant that he had been utilizing to investigate Petitioner's drug activities. [1] During the phone conversation, the informant told Officer Choffin that Petitioner was carrying a substantial amount of cocaine in his "crotch area." Hr'g Mins. [H.M.] 15–17, 25. The informant told Officer Choffin that Petitioner would be the front seat passenger of a red vehicle with which Officer Choffin was familiar. The informant stated that the vehicle was driving toward a McDonald's restaurant on Hamilton Street in the City of Geneva. H.M. 17–18. Officer Choffin went to Hamilton Street and observed the vehicle and saw that Petitioner was in the passenger seat. H.M. 18. Officer Choffin and other officers pulled over the vehicle. Officer Choffin asked Petitioner if he had anything illegal on him and Petitioner responded, "I don't have anything illegal, you can go ahead and search my pockets." H.M. 19. Officer Choffin searched Petitioner but did not find anything. H.M. 19, 23. Officer Choffin detained Petitioner at the precinct and obtained a search warrant for Petitioner's person. H.M. 20, 23. Officer Choffin recovered 38 individually packaged bags of crack cocaine as well as approximately 13 grams of cocaine

from Petitioner's anal cavity. H.M. 20. Officer Choffin also recovered $325 from Petitioner's pockets. H.M. 21.

### 2. The Defense's Case

**\*2** Petitioner presented no evidence at the hearing.

### 3. The Hearing Court's Decision

The hearing court credited the testimony of Officer Choffin and made factual findings consistent with Officer Choffin's testimony. H.M. 29. The hearing court denied Petitioner's probable cause challenge, concluding that "there was probable cause for the officer to engage in the initial encounter with the vehicle in which [Petitioner] was a passenger." H.M. 31.

### C. The Trial

On March 27, 2006, Petitioner proceeded to trial before Justice Doran and a jury.

### 1. The People's Case

On April 1, 2005, Moracco, a crack cocaine user, was pulled over in her car by the police. At that time, her driver's license had expired. Trial Trans. [T.T.] 137–138, 140, 161–162. Rather than issue her a ticket, the police worked out an arrangement whereby she would provide them with information about drug activity in the Geneva area. T.T. 141–142.

On July 12, 2005, Moracco worked with Police Investigator Susan Kaduc ("Investigator Kaduc") to purchase drugs from Petitioner. T .T. 145, 173, 245. Moracco called Petitioner and told him that she had $100, and he told her that he would sell her six bags worth $20 each. They agreed to meet at a liquor store. T.T. 146–147, 174. Moracco and Investigator Kudac went to the store and saw Petitioner arrive in his vehicle. As Moracco and Investigator Kudac got out of their vehicle, Petitioner said that he "did not want to meet any of [her] friends," so Investigator Kudac went back to the car. T.T. 148, 175. Moracco gave Petitioner the money and Petitioner gave her a napkin containing six small bags of crack cocaine. After Petitioner drove away, Moracco gave the drugs to Kudac. T.T. 149, 167, 176–178.

On August 10, 2005, Moracco was inside a friend's apartment when Petitioner arrived. At some point, Petitioner sat on a couch next to Moracco, and another person in the apartment

gave Petitioner money for drugs. Moracco saw Petitioner reach into his boxers and pull out "a plastic bag holding numerous baggies and two big chunks of cocaine in the baggie." T.T. 150153. Petitioner gave two baggies to the man that gave him money. Petitioner asked Moracco if she would drive him to McDonald's. When Petitioner went to the bathroom, Moracco called Officer Choffin and told him that Petitioner had "about $1000 worth" of cocaine and that they would be driving toward McDonald' s. Before they left, Moracco saw Petitioner adjust his boxer shorts with his hand. T.T. 155, 168, 238–239.

As Moracco drove, Officer Choffin signaled for her to stop the car. T.T. 157–158, 241. Officer Choffin asked Petitioner if he had anything illegal on him. Petitioner said that he did not and invited Officer Choffin to search his pockets. T.T. 242. Officer Choffin removed Petitioner from the car and searched Petitioner's pockets. Officer Choffin recovered $325, but did not recover any drugs. T.T. 242. Officer Choffin searched Moracco's car for the drugs but did not find them. T.T. 244. Officer Choffin handcuffed Petitioner and directed another officer to drive Petitioner to the precinct. T.T. 194–195. Moracco gave Officer Choffin a signed statement reporting that Petitioner had individual baggies of cocaine in addition to two "rocks" of cocaine. T.T. 159–160.

**\*3** Officer Choffin received permission to search the apartment from where Moracco and Petitioner had come, but no drugs were recovered. T.T. 243. Officer Choffin subsequently obtained a search warrant for Petitioner's person. In executing the search warrant, Officer Choffin had Petitioner remove his clothing and face a wall. When Petitioner did so, Officer Choffin observed bags hanging out of his rectum and recovered them. T.T. 225. In total, Officer Choffin recovered 38 bags of crack cocaine along with additional large chunks of cocaine. T.T. 225–226, 231.

### 2. The Defense's Case

Petitioner presented no witnesses at trial.

### 3. Verdict and Sentence

On March 28, 2006, Petitioner was found guilty as charged. He was sentenced as a second felony drug offender to concurrent, determinate prison terms of four years for each count of third degree sale and drug possession, three years for the fifth degree drug possession count, plus five years post-release supervision. T.T. 359, 365–367.

## D. Petitioner's Direct Appeal

On appeal, through counsel, Petitioner raised the following issues: (1) the police's search of Petitioner's body cavity violated his right against unreasonable searches or seizures because the search exceeded the scope of the search warrant; (2) that the undignified manner in which the body cavity search was conducted warranted suppression of the drugs that were recovered regardless of whether the search was legally permissible; and (3) the trial court improperly permitted the People to introduce evidence of an uncharged drug sale. *See* Resp't Ex. A. Petitioner also filed a *pro se* supplemental brief, arguing that the hearing court improperly denied his motion to suppress physical evidence because the police lacked probable cause to arrest him. *See* Resp't Ex. B.

On March 14, 2008, the Appellate Division, Fourth Department ("Fourth Department") unanimously affirmed the judgment of conviction. *People v. Lowman,* 49 A.D.3d 1262, 856 N.Y.S.2d 342 (4th Dep't 2008) (Resp't Ex. D); *lv. denied,* 10 N.Y.3d 936, 862 N.Y.S.2d 343, 892 N.E.2d 409 (2008) (Resp't Ex. F).

## E. Petitioner's Motion to Vacate the Judgment

On or about May 27, 2008, Petitioner filed a *pro se* motion to vacate the judgment, pursuant to N.Y.Crim. Proc. Law ("CPL") § 440.10, arguing that he was denied effective assistance of trial counsel. *See* Resp't Ex. G. That motion was denied on procedural grounds, and leave to appeal was denied. *See* Resp't Exs. I–M.

## F. The Original Habeas Corpus Petition

On or about January 8, 2009, Petitioner filed a *pro se* habeas corpus petition, seeking relief on the following grounds: (1) the People failed to fulfill its discovery obligations pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *People v. Rosario,* 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881 (1961); (2) the hearing court improperly failed to suppress the drugs recovered from Petitioner as fruit of an unlawful arrest; and (3) Petitioner was denied his right to a fair trial because he had an "all white jury." *See* Pet. ¶ 22, Ex. B. (Dkt.# 1).

## G. The Amended Habeas Corpus Petition

**\*4** On or about April 2, 2009, Petitioner submitted an amended petition. Amended Pet. [Am. Pet.] (Dkt.# 9). This Court construed the amended petition as a motion to amend

the petition. *See* Dkt. # 10. Subsequently, this Court granted Petitioner's motion to amend the habeas corpus petition to include the following claims, in addition to those raised in the original habeas corpus petition: (1) the trial court improperly permitted the People to introduce evidence of an uncharged drug sale; (2) the People failed to disclose information about an alleged drug transaction between Petitioner and an undercover police officer; (3) Petitioner was denied the effective assistance of trial counsel because his attorney failed to raise a timely motion to suppress physical evidence on the ground that there was no probable cause for his arrest; (4) Petitioner was denied the effective assistance of appellate counsel; and (5) his arrest was unlawful because the police failed to read Petitioner his *Miranda* rights and did not first secure a warrant for his arrest. *See* Am. Pet., Grounds One–Six.

## H. Petitioner's Motion to Amend the Petition for a Second Time

By letter dated December 21, 2009, Petitioner seeks to amend the habeas petition again to raise the following additional ineffective assistance of counsel claims: (1) that his trial attorney was ineffective for failing to afford him the opportunity to testify before the grand jury; and (2) that both his trial and appellate attorneys failed to raise claims with regard to laboratory records that were introduced at trial. *See* Dkt. # 34. Respondent opposed Petitioner's request, and, in response, Petitioner filed a Reply. *See* Dkts. # 40, 45–46. Petitioner's request to amend the habeas corpus petition for a second time is currently pending before this Court.

Fed.R.Civ.P. 15(a) provides that leave to amend "shall be freely given when justice so requires." *Littlejohn v. Artuz,* F .3d 360, 362–64 (2d Cir.2001). However, where a proposed amendment is meritless or would be futile, federal courts should deny leave. *Health–Chem Corp. v. Baker,* 915 F.2d 805, 810 (2d Cir.1990). Habeas courts may also deny leave "in order to thwart tactics that are dilatory, unfairly prejudicial or otherwise abusive." *Littlejohn,* 271 F.3d at 363; *see also Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). For the reasons that follow, the Court denies Petitioner's request to amend the habeas petition for a second time to include additional ineffective assistance of counsel claims.

First, Petitioner has offered no legitimate reason for his failure to raise the additional claims in his prior habeas petitions. The claims Petitioner now seeks to raise relate to matters that occurred either prior to or during the trial,

and, thus, the factual basis of these claims was known to Petitioner at the time he filed both the original and amended petitions. To this extent, the Court finds Petitioner's method of piecemeal submission of additional claims to be both unfair to the opposing party—who has responded to the original and amended petitions as well as to various miscellaneous motions Petitioner has filed in association therewith—and also to be a poor use of judicial resources.

**\*5** Second, it is futile to permit Petitioner to amend his petition to add these new claims because they are untimely. As Respondent correctly notes in its papers, Petitioner's conviction became final on September 11, 2008. Because Petitioner's CPL § 440.10 motion was pending at the time his judgment became final, the one year statute of limitations had not begun to run on Petitioner's time to file the habeas petition. *See* 28 U.S.C. § 2244(d)(1), (2). His CPL § 440.10 motion was denied on July 23, 2008 and, on November 26, 2008, the Fourth Department denied Petitioner's leave application. Thus, the filing period was tolled until November 26, 2008. *See Carey v. Saffold,* 536 U.S. 214, 122 S.Ct. 2134, 153 L.Ed.2d 260 (2002); *Bennett v. Artuz,* 199 F.3d 116, 123 (2d Cir.1999). Thereafter, Petitioner had one year to file his habeas petition. While Petitioner's original and his first amended petition are timely, his second amended petition, which Petitioner sought to add on December 21, 2009, is untimely.

Furthermore, Petitioner's claims are new and unrelated to the claims raised in the original habeas petition. Thus, the relation-back doctrine does not apply to render the new claims timely. *See* Fed. R. Civ. Pro. 15(c). The Supreme Court has held that a new habeas claim "does not relate back [and thereby escape AEDPA's one-year time limit] when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Mayle v. Felix,* 545 U.S. 644, 650, 125 S.Ct. 2562, 162 L.Ed.2d 582 (2005). In determining whether claims in an amended petition relate back to the original pleading, the Second Circuit has stated that "the pertinent inquiry ... is whether the original complaint gave the [respondent] fair notice of the newly alleged claims." *Fama v. Comm. of Corr. Servs.,* 235 F.3d 804, 815 (2d Cir.2000), (quoting *Wilson v. Fairchild Republic Co.,* 143 F.3d 733, 738 (2d Cir.1998). At no point in his original or amended petitions did Petitioner claim that he was denied the effective assistance of counsel owing to his trial attorney's failure to secure his grand jury testimony. Nor did Petitioner ever claim that his trial and/or appellate attorneys were ineffective for failing to raise a claim

related to certain laboratory records that were introduced at trial.

Additionally, it would be futile to permit Petitioner to amend his habeas petition to include the new ineffective assistance of trial counsel claims because they are unexhausted. Accordingly, the Court denies Petitioner's December 21, 2009 request to amend his habeas corpus petition for a second time. The Court now turns to an analysis of Petitioner's amended habeas petition, which is the operative petition for purposes of this Decision and Order.

### III. General Principles Applicable to Habeas Review

#### A. The AEDPA Standard of Review

Under the Anti–Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a claim that was "adjudicated on the merits" in state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U .S.C. § 2254(d)(1), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." § 2254(d)(2). A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The phrase, "clearly established Federal law, as determined by the Supreme Court of the United States," limits the law governing a habeas petitioner's claims to the holdings (not *dicta* ) of the Supreme Court existing at the time of the relevant state-court decision. *Williams,* 529 U.S. at 412; *accord Sevencan v. Herbert,* 342 F.3d 69, 73–74 (2d Cir.2002), *cert. denied,* 540 U.S. 1197, 124 S.Ct. 1453, 158 L.Ed.2d 111 (2004).

**\*6** A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identified the governing legal rule, but applied it in an unreasonable manner to the facts of a particular case. *Williams,* 529 U.S. at 413; *see also id.* at 408–10. "[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently ." *Aparicio v. Artuz,* 269 F.3d 78, 94 (2d Cir.2001). Rather, "[t]he state court's application must reflect some additional increment of incorrectness such that

it may be said to be unreasonable." *Id.* This increment "need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000) (internal quotation marks omitted).

Under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Parsad v. Greiner,* 337 F.3d 175, 181 (2d Cir.2003) ( "The presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility."), *cert. denied sub nom. Parsad v. Fischer,* 540 U.S. 1091, 124 S.Ct. 962, 157 L.Ed.2d 798 (2003). A state court's findings "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller–El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).

## B. Exhaustion and Procedural Default

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that ... the applicant has exhausted the remedies available in the courts of the State...." 28 U.S.C. § 2254(b)(1)(A); *see, e.g., O'Sullivan v. Boerckel,* 526 U.S. 838, 843–44, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *accord, e.g., Bossett v. Walker,* 41 F.3d 825, 828 (2d Cir.1994), *cert. denied,* 514 U.S. 1054, 115 S.Ct. 1436, 131 L.Ed.2d 316 (1995). "The exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts." *Daye v. Attorney General,* 696 F.2d 186, 191 (2d Cir.1982) (*en banc* ), *cert. denied,* 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984). The ways in which a state defendant may fairly present to the state courts the constitutional nature of his claim include (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of fact that is well within the mainstream of constitutional litigation. *Daye* 696 F.2d at 194.

However, "[f]or exhaustion purposes, 'a federal habeas court need not require that a federal claim be presented to a state if it is clear that the state court would hold the claim procedurally barred.' " *Grey v. Hoke,* 933 F.2d 117, 120 (2d Cir.1991)

(quoting *Harris v. Reed,* 489 U.S. 255, 263, n. 9, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (other citations omitted). Under such circumstances, a habeas petitioner "no longer has 'remedies available in the courts of the State' within the meaning of 28 U.S.C. Section 2254(b)." *Id.*

**\*7** The procedural bar that gives rise to the finding that the claim should be deemed exhausted works a forfeiture and precludes litigation of the merits of the claim absent a showing of cause for the procedural default and prejudice resulting therefrom or by demonstrating that failure to consider the claim will result in a fundamental miscarriage of justice (i.e., actual innocence). *See Wainwright v. Sykes,* 433 U.S. 72, 87–91, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *see also Sawyer v. Whitley,* 505 U.S. 333, 277–78, ——S.Ct. ——, —— – ——, —— L.Ed.2d ——, —— – —— (1992).

## C. The Adequate and Independent State Ground Doctrine

"It is now axiomatic that 'cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred.' " *Dunham v. Travis,* 313 F.3d 724, 729 (quoting *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)). A habeas corpus petitioner, however, may overcome a procedural default created by the state court's invocation of an "independent and adequate" basis for its decision by (1) showing cause for the default and prejudice attributable thereto, or (2) by demonstrating that a fundamental miscarriage of justice will ensue if the claim is not reviewed by the habeas court. *See Harris,* 489 U.S. at 262 (citing cases). The "fundamental miscarriage of justice" exception requires the petitioner to make a factual showing that he is "actually innocent" of the crime for which he was convicted. *See id.* It bears noting that " 'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States,* 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998).

## IV. Petitioner's Claims

## 1. Petitioner's Fourth Amendment Claim Is Not Cognizable on Federal Habeas Review

Petitioner contends, as he did in his *pro se* supplemental brief on appeal, that the police did not have probable cause to arrest him and, therefore, as a result, the drugs that were recovered from him following his arrest should have been suppressed.

2011 WL 90996

*See* Pet., Ex. B; Am. Pet., Grounds One–Two. The Fourth Department rejected this claim on the merits. *See Lowman,* 49 A.D.3d at 1264, 856 N.Y.S.2d 342. As discussed below, Petitioner's Fourth Amendment claim is barred from habeas review by *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

"Where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone,* 428 U.S. at 494 (footnotes omitted). The Second Circuit has noted that *Stone* requires only that "the state have provided the opportunity to the state prisoner for full and fair litigation of the Fourth Amendment claim." *Gates v. Henderson,* 568 F.2d 830, 839 (2d Cir.1977) (en banc), *cert. denied,* 434 U.S. 1038, 98 S.Ct. 775, 54 L.Ed.2d 787 (1978). A Federal court may undertake habeas review only in one of two instances: (1) "if the state provides no corrective procedures at all to redress Fourth Amendment violations," or (2) if "the state provides the process but in fact the defendant is precluded from utilizing it by reason of an unconscionable breakdown in that process...." *Id.* at 840; *accord Capellan v. Riley,* 975 F.2d 67, 70 (2d Cir.1992).

 **\*8** A petitioner receives a "full and fair opportunity" to litigate his Fourth Amendment claim where the state provides a " 'statutory mechanism' for suppression of evidence tainted by an unlawful search and seizure." *McPhail v. Warden, Attica Corr. Facility,* 707 F.2d 67, 69 (2d Cir.1983). Here, New York clearly affords defendants the requisite corrective procedures. *See* CPL § 710.10 et seq.; *see also Capellan,* 975 F.2d at 70 (noting that federal courts have approved New York's procedure for litigating Fourth Amendment claims, embodied in C.P.L. § 710.10 et seq. as being facially adequate).

Petitioner may not raise his Fourth Amendment claim on habeas review because he was provided with, and indeed took full advantage of, the opportunity to fully adjudicate the issue in state court at a pre-trial suppression hearing. The record reflects that the hearing court engaged in a reasoned inquiry into the relevant issues surrounding Petitioner's arrest. After hearing all of the evidence presented on the issue, the trial court issued a decision denying Petitioner's motion to suppress. The Fourth Department subsequently affirmed the hearing court's ruling on the merits, and leave to appeal from the decision of the Fourth Department was denied by the Court of Appeals.

Moreover, Petitioner has not demonstrated that an "unconscionable breakdown" occurred in the courts below. His dissatisfaction with the determination of the hearing court, which was subsequently affirmed by the Fourth Department, does not constitute the sort of "breakdown" referred to in *Gates.* Rather, an "unconscionable breakdown in the state's process must be one that calls into serious question whether a conviction is obtained pursuant to those fundamental notions of due process that are at the heart of a civilized society." *Cappiello v. Hoke,* 698 F.Supp. 1042, 1050 (E.D.N.Y.1988), *aff'd,* 852 F.2d 59 (2d Cir.1988) (per curiam); *accord, Capellan,* 975 F.2d at 70 (observing that some sort of "disruption or obstruction of a state proceeding" of an egregious nature, *e.g.,* the bribing of a trial judge, typifies an unconscionable breakdown). No such disruption is discernable on the record. And, even if the state court erroneously decided the issue, a petitioner cannot gain federal review of a Fourth Amendment claim simply because a Federal court may reach a different result. *See Capellan,* 975 F.2d at 71.

Thus, this Court is precluded from considering Petitioner's fully litigated Fourth Amendment claim. The claim is dismissed.

## 2. Petitioner's Claim that he was Denied a Fair Trial because he had an "All White Jury" is Unexhausted but Deemed Exhausted and Procedurally Defaulted, and, in any event, Meritless

Petitioner contends that he was denied his right to a fair trial because he had an "all white jury." *See* Pet., Ex. B. Because Petitioner raises this claim for the first time in his habeas petition, the claim is unexhausted for purposes of federal habeas review. Nonetheless, the Court deems the claim exhausted but procedurally defaulted because Petitioner no longer has a state court forum available within which to exhaust the claim. *See Grey,* 933 F.2d at 120.

 **\*9** For exhaustion purposes, 28 U.S.C. § 2254(b)(1)(A) requires a petitioner "[to] give the state courts one full opportunity to resolve constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan,* 526 U.S. at 842. Petitioner failed to do so by raising this issue on direct appeal, nor did he raise this claim in a motion to vacate the judgment.

Petitioner's claim, therefore, is deemed exhausted but procedurally defaulted because state appellate review is no

longer available to him. Petitioner has already used his one direct appeal to which he is entitled under New York law. *See* N.Y. Court Rules § 500.20. Collateral review of this claim—by way of another CPL § 440 motion—is also barred because the claim is a matter of record that could have been raised on direct appeal, but unjustifiably was not. *See* CPL § 440.10(2)(c) (the court must deny a motion to vacate a judgment when sufficient facts appear on the record to have permitted adequate review of the issue on appeal although no such review occurred due to Petitioner's unjustifiable failure to raise the issue on direct review). Thus, Petitioner's claim that he was denied a fair trial because he had an "all white jury" is deemed exhausted, but procedurally barred from habeas review.

A finding of procedural default bars habeas review of the federal claims unless the petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the claims will result in a miscarriage of justice. *Murray,* 477 U.S. at 492; *Wainwright,* 433 U.S. at 87–91. Petitioner has made no showing of the requisite cause and prejudice to overcome the procedural default, nor has he demonstrated that the Court's failure to review the claim will result in a miscarriage of justice. Petitioner's claim is therefore dismissed as procedurally defaulted.

In any event, Petitioner's claim is meritless. While the Sixth and Fourteenth Amendments require that a panel of jurors in a criminal trial must be "drawn from a source fairly representative of the community," the Constitution does not require that "petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population." *Taylor v. Louisiana,* 419 U.S. 522, 538, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). In other words, "[d]efendants are not entitled to a jury of any particular composition." *Id.; see also United States v. Jackman,* 46 F.3d 1240, 1244 (2d Cir.1995); *Crenshaw v. Superintendent,* 372 F.Supp.2d 361, 375 (W.D.N.Y.2005). Here, Petitioner has not demonstrated that there were any minorities who were improperly excluded from the panel of prospective jurors. Nor has Petitioner alleged that the prosecutor violated *Batson v. Kentucky,* 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), by exercising peremptory challenges in a discriminatory manner so as to exclude prospective non-white jurors from service. As such, Petitioner cannot point to any improper practice or procedure that led to the impaneling of an all-white jury for his trial, and his claim is, therefore, meritless.

**3. Petitioner's Claim that the People Failed to Fulfill Its Discovery Obligations is Unexhausted but Deemed Exhausted and Procedurally Defaulted and, in any event, Meritless**

**\*10** Petitioner argues that the People failed to fulfill its discovery obligations under *Brady* and *Rosario* with regard to the identification of the confidential informant (Morocco) working with the police. *See* Pet., Ex. B. Because Petitioner raises this claim for the first time in his habeas petition, it is unexhausted for purposes of federal habeas review. Nonetheless, as discussed above, Petitioner no longer has a state court forum available to him within which to exhaust the claim, and the Court therefore deems it exhausted but procedurally defaulted. *See Grey,* 933 F.2d at 120. Petitioner does not allege cause and prejudice to overcome the procedural default, nor has he demonstrated that this Court's failure to review the claim will result in a miscarriage of justice. Thus, the claim is dismissed as procedurally defaulted.

In any event, Petitioner's claim is meritless. A prosecutor's obligations under *Brady* are well-settled: "[t]o the extent that [a] prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation to disclose that evidence to the defendant." *Disimone v. Phillips,* 461 F.3d 181, 192 (2d Cir.2006) (citations omitted). To establish a *Brady* violation, a petitioner must demonstrate that: (1) the evidence at issue is favorable to the accused, either because it is exculpatory or because of its impeachment value; (2) the evidence was suppressed by the State, either willfully or inadvertently; and (3) prejudice ensued from the failure to disclose the evidence. *See Banks v. Dretke,* 540 U.S. 668, 691, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004) (citing *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)); *Leka v. Portuondo,* 257 F.3d 89, 98 (2d Cir.2001). To establish that the prosecutor suppressed evidence, "petitioner must demonstrate that his attorney did not possess the requested evidence in time for its effective use at trial." *Harris v. Smith,* 04–CV–1268 (LEK/GJD), 2008 U.S. Dist. LEXIS 59507, \*36 (N.D.N.Y. Aug. 4, 2008). Thus, "as long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner." *Id.* (quoting *Lutes v. Ricks,* 02–CV–1043 (TJM/DEP), 2005 U.S. Dist. LEXIS 32391, \*49, n. 19 (2d Cir.2001)); *Shomo v. Zon,* 05 Civ. 10337 (JFK), 2008 U.S. Dist. LEXIS 58459, \*32, 2008 WL 2981555 (S.D.N.Y. Aug. 1, 2008).

In this case, Petitioner's *Brady* claim is meritless because he has failed to demonstrate that the prosecutor suppressed evidence. Petitioner points to no specific item(s) that were withheld. Moracco's identity as the confidential informant was revealed when she testified at trial. Moracco explained her arrangement with the police and testified about her past drug use. Defense counsel cross-examined her with respect to her relationship with the police, and Petitioner does not claim that there existed any additional information that the defense did not receive that could have been used to impeach Moracco at trial. Moreover, Petitioner does not claim that there were facts that he was unable to explore on cross-examination owing to the prosecutor's failure to disclose the information when he asked for it on November 22, 2005. Accordingly, Petitioner has not demonstrated that the information regarding Moracco was suppressed or that an earlier disclosure of it would have resulted in a different outcome at trial. *See Graham v. Ricks,* 02–CV–0303, 2004 U.S. Dist. LEXIS 5803, *23, 2004 WL 768579 (N.D.N.Y. April 7, 2004) (finding no *Brady* violation where no reasonable probability that earlier disclosure of the evidence would have produced different result at trial).

 **\*11** To the extent Petitioner argues that Moracco's identity should have been disclosed for the pre-trial hearing, he cannot demonstrate that the refusal to identify the informant at that time was contrary to, or an unreasonable application of, Supreme Court law. The Supreme Court has noted that it has consistently declined to hold that an informant's identity must be disclosed in a preliminary hearing to determine probable cause for an arrest or search. *See McCray v. Illinois,* 386 U.S. 300, 312, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967).

Finally, insofar as Petitioner presents his claim as a violation of the prosecutor's discovery obligations under *Rosario,* his claim is not cognizable on habeas review. Federal courts in New York have consistently held that a *Rosario* claim, unlike a *Brady* claim, is based entirely upon New York State law and, thus, is not cognizable by a federal court on habeas review. *See Martinez v. Walker,* 380 F.Supp.2d 179, 185–86 (W.D.N.Y.2005); *Green v. Artuz,* 990 F.Supp. 267, 274–75 (S.D.N.Y.1998). Petitioner's claim is meritless and therefore provides no basis for habeas relief.

**4. Petitioner's Claim that the Trial Court Improperly Permitted the People to Introduce Evidence of an Uncharged Drug Sale is Unexhausted But Deemed Exhausted and Procedurally Defaulted**

Petitioner appears to argue, as he did on direct appeal, that the trial court improperly permitted the People to introduce evidence of a prior uncharged drug transaction between Petitioner and Moracco in violation of *People v. Molineux,* 168 N.Y. 264, 61 N.E. 286 (1901).[2] *See* Pet., Ex. B; Am. Pet., Ground Three. The Fourth Department rejected this claim on the merits. *See Lowman,* 49 A.D.3d at 1263, 856 N.Y.S.2d 342. While Petitioner did raise this claim in his appellate brief, he relied only on state law principles and did not base this claim on the deprivation of any federal constitutional rights. *See* Resp't Ex. A, Point III. Petitioner did not cite federal case law or state law employing constitutional analysis. *Id.* Accordingly, because Petitioner failed to alert the state court to the federal constitutional dimension of his claim, it is unexhausted. *See Daye,* 696 F.2d at 192–94. Nonetheless, because Petitioner no longer has a state court forum within which to exhaust the claim, the Court deems it exhausted but procedurally defaulted. *See Grey,* 933 F.2d at 120.

As discussed above, Petitioner has already used his one direct appeal to which he is entitled under New York law. *See* N.Y. Court Rules § 500.20. Collateral review of this claim —by way of another C.P.L. § 440 motion—is also barred because the claim is a matter of record that could have been raised on direct appeal, but unjustifiably was not. *See* CPL § 440.10(2)(c) (the court must deny a motion to vacate a judgment when sufficient facts appear on the record to have permitted adequate review of the issue on appeal although no such review occurred due to Petitioner's unjustifiable failure to raise the issue on direct review).[3]

 **\*12** Moreover, Petitioner has not alleged cause and prejudice to overcome the procedural default or demonstrated that this Court's failure to review the claim will result in a miscarriage of justice. Therefore, the claim is dismissed as procedurally defaulted.

**5. Petitioner's Claim the People Failed to Disclose Information about an Alleged Drug Transaction between Petitioner and an Undercover Police Officer is Unexhausted but Deemed Exhausted and Procedurally Defaulted, and, in any event, Meritless**

Petitioner contends, for the first time in his habeas petition, that the prosecutor withheld information about an alleged drug sale between Petitioner and an undercover police officer. He further argues that the police subsequently "switched their story" and accused Petitioner of selling drugs to confidential informant Moracco, but sealed any records relating to the

original allegation. *See* Am. Pet., Ground Three. Because Petitioner raises this claim for the first time in his habeas corpus petition, it is unexhausted for purposes of federal habeas review. Nonetheless, as discussed above, Petitioner no longer has a state court forum available to him within which to exhaust the claim and the Court therefore deems it exhausted but procedurally defaulted. *See Grey,* 933 F.2d at 120. Petitioner does not allege cause and prejudice to overcome the procedural default, nor has he demonstrated that this Court's failure to review the claim will result in a miscarriage of justice. Thus, the claim is dismissed.

In any event, Petitioner's claim is meritless. A review of the record reveals that the only reference to a drug transaction between Petitioner and an undercover police officer was from a statement made by an Assistant District Attorney during a November 22, 2005 (pre-trial) court appearance. At that time, the ADA stated, "Judge, my understanding is that there was a confidential informant who assisted but this is a direct hand to hand sale to an undercover police officer from the New York State Police CNET team." Trans. of 11/22/05 at 4. Based on this Court's review of the record, it appears that the ADA's understanding of the facts was either mistaken or that the ADA simply misspoke. The evidence at trial established that Morocco was accompanied to the site of the drug sale by Investigator Kudac, but that Investigator Kudac was not with Morocco at the precise moment the transaction occurred because Petitioner did not want Investigator Kudac to approach him. T.T. 148–49, 167, 175–78. There was no evidence presented to the jury that suggested Petitioner had conducted a drug transaction with an undercover police officer. Moreover, defense counsel had the opportunity to cross-examine Morocco with respect to the drug transaction and, in fact, did so. T.T. 167. Additionally, defense counsel could have questioned Investigator Kudac about her role in accompanying Morocco to purchase the drugs from Petitioner, but chose not to do so. T.T. 179–80. Thus, Petitioner's claim is meritless and provides no basis for habeas relief.

**6. Petitioner's Claim that his Arrest was Unlawful because the Police Failed to Secure an Arrest Warrant and because he was not Informed of his Rights Pursuant to *Miranda v. Arizona* is Unexhausted but Deemed Exhausted and Procedurally Defaulted, and, in any event, is Not Cognizable**

**\*13** Petitioner argues, for the first time in the habeas petition, that his arrest was unlawful because the police failed to secure an arrest warrant and because he was not informed

of his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), upon his arrest. *See* Am. Pet, Ground Six. Because Petitioner raises this claim for the first time in his habeas corpus petition, it is unexhausted for purposes of federal habeas review. Nonetheless, as discussed above, Petitioner no longer has a state court forum available to him within which to exhaust the claim and the Court therefore deems it exhausted but procedurally defaulted. *See Grey,* 933 F.2d at 120. Petitioner does not allege cause and prejudice to overcome the procedural default, nor has he demonstrated that this Court's failure to review the claim will result in a miscarriage of justice. Thus, the claim is dismissed as procedurally defaulted.

In any event, Petitioner's claim is not cognizable. As discussed at Section "IV, 1" above, Petitioner is not entitled to habeas relief for a contention that his arrest violated his Fourth Amendment rights. *See Stone,* 428 U.S. at 482.

Accordingly, Petitioner's claim presents no basis for habeas relief.

**7. Petitioner's Ineffective Assistance of Trial Counsel is Procedurally Barred by an Adequate and Independent State Ground**

Petitioner argues, as he did in his CPL § 440.10 motion, that he received ineffective assistance of trial counsel because his attorney failed to file a timely motion to suppress the evidence police recovered from him on the ground that the police lacked probable cause for Petitioner's arrest. *See* Am. Pet., Ground Four. The Ontario County Court denied Petitioner's claim on procedural grounds, pursuant to CPL § 440.10(2)(a), (c). *See* Resp't Ex. I. The state court's reliance on an adequate and independent state law ground to deny the claim renders this claim procedurally barred from review by this Court.

A federal court may not review a question of federal law decided by a state court if the state court's decision rested on a state law ground that is independent of the federal question and adequate to support the judgment. *See Coleman,* 501 U.S. at 729. Here, the Ontario County rejected Petitioner's ineffective assistance of trial counsel claim pursuant to CPL § 440.10(2)(a), (c), finding that the claim was "either affirmatively addressed on appeal ... or sufficient facts appeared in the record underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the instant motion and [Petitioner] failed to raise these grounds upon his appeal ...." *Id.* The Second Circuit has recognized CPL § 440.10(2)(c)

as an adequate and independent state ground sufficient to preclude federal habeas review of a state-court defendant's claims. *See e.g., Sweet v. Bennett,* 353 F.3d 135, 139–40 (2d Cir.2003); *Reyes v. Keane,* 118 F.3d 136, 139 (2d Cir.1997); *Aparicio,* 269 F.3d at 91 (2d Cir.1991). Additionally, denial of a claim pursuant CPL § 440.10(2)(a) has been found to constitute an adequate and independent state ground. *See, e.g., McClarin v. Smith,* 05–CV–2478 (DLI), 2007 U.S. Dist. LEXIS 58717, 2007 WL 2323592 (E.D.N.Y.2007) (finding due process claim procedurally barred by New York Criminal Procedure Law § 440.10(2)(a) because it had been adjudicated on the merits during petitioner's direct appeal); *D'Alessandro v. Fischer,* No. 01 Civ. 2551(LTS)(DF), 2005 U.S. Dist. LEXIS 31381, 2005 WL 3159674 (S.D.N.Y.2005) (finding that the trial court's express reliance on CPL § 440.10(2)(a) indicates that the court rejected Petitioner's ineffective assistance claim on an independent and adequate state procedural ground precluding federal habeas review). Accordingly, the state court's reliance on CPL § 440.10(2) (a), (c) to deny Petitioner's claim bars this Court's review of Petitioner's ineffective assistance of trial counsel claim.

 **\*14** Although Petitioner does not specifically allege cause for the default, he does allege, as a stand-alone claim, ineffective assistance of appellate counsel on these same grounds. *See* Am. Pet., Ground Five. Ineffective assistance of counsel may constitute cause for a petitioner's failure to pursue a constitutional claim, *e.g., Edwards v. Carpenter,* 529 U.S. 446, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000), but in order to constitute cause, counsel's ineffectiveness must itself rise to the level of a constitutional violation. *Id.* Here, Petitioner's underlying contention that his appellate attorney was ineffective is without merit (see Section "IV, 8" below). Thus, Petitioner is unable to make a successful showing of "cause" for purposes of overcoming the procedural default. Petitioner has also not demonstrated that this Court's failure to review the claim will result in a miscarriage of justice. Accordingly, Petitioner's ineffective assistance of counsel claim is dismissed as procedurally defaulted.

### 8. Petitioner's Ineffective Assistance of Appellate Counsel Claim is Meritless

Petitioner argues that his appellate attorney rendered ineffective assistance because appellate counsel failed to argue in his brief that the evidence against Petitioner should have been suppressed because the police improperly arrested Petitioner. *See* Am. Pet., Ground Five. [4] At the time Petitioner filed the instant amended petition, he had not exhausted this claim. Since that time, however, Petitioner filed a coram nobis application in the Fourth Department, which was summarily denied on June 11, 2010. *See* Dkt. # 46. Leave to appeal was denied on September 23, 2010. *Id.* Summary denial of Petitioner's motion constitutes an adjudication on the merits of this claim. *Sellen v. Kuhlman,* 261 F.3d 303, 311–12 (2d Cir.2001).

In order to prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate both that his attorney's representation was unreasonable under "prevailing professional norms," and that there is a reasonable probability that, but for his attorney's errors, "the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This standard applies equally to trial and appellate counsel. *See Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.1994), *cert. denied,* 513 U.S. 820, 115 S.Ct. 81, 130 L.Ed.2d 35 (1994). A petitioner alleging ineffective assistance of appellate counsel must prove both that appellate counsel was objectively unreasonable in failing to raise a particular issue on appeal, and that absent counsel's deficient performance, there was a reasonable probability that defendant's appeal would have been successful. *Id.* at 533–34; *Smith v. Robbins,* 528 U.S. 259, 285, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000). Moreover, counsel is not required to raise all colorable claims on appeal. *See Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). Rather, counsel may winnow out weaker arguments and focus on one or two key claims that present "the most promising issues for review." *Id.* at 751–53. A petitioner may establish constitutionally inadequate performance if he shows that his appellate counsel omitted material and obvious issues while pursuing matters that were patently and significantly weaker. *See Mayo,* 13 F.3d at 533.

 **\*15** Petitioner cannot meet this standard insomuch as the claim he faults counsel for not raising was presented in Petitioner's *pro se* supplemental brief. *See* Resp't Ex. B. Because the Fourth Department considered this claim and rejected it on the merits, appellate counsel could not have been ineffective for failing to assert it. *See United States v. Arena,* 180 F.3d 380, 396 (2d Cir.1999) ("Failure to make a meritless argument does not amount to ineffective assistance.").

Accordingly, the Court cannot find that the state court's adjudication of Petitioner's ineffective assistance of appellate counsel claim contravened or unreasonably applied settled Supreme Court law. The claim is dismissed.

Lowman v. New York, Not Reported in F.Supp.2d (2011)
Case 7:13-cv-02627-CS Document 50 Filed 04/29/16 Page 85 of 181
2011 WL 90996

## V. Conclusion

For the reasons stated above, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. Because Petitioner has failed to make "a substantial showing of a denial of a constitutional right," 28 U.S.C. § 2253(c) (2), the Court declines to issue a certificate of appealability. *See, e.g., Lucidore v. New York State Div. of Parole,* 209 F.3d 107, 111–113 (2d Cir.2000). The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 90996

Footnotes

1    On July 12, 2005, the confidential informant, working with Officer Choffin and other police officers, purchased crack cocaine from Petitioner. H.M. 16–17, 21, 24–25.

2    It is unclear to the Court whether Petitioner specifically challenges the trial court's *Molineux* ruling. His pleadings in this respect are ambiguous. However, because Petitioner brings this action *pro se,* the Court will construe the ambiguity in his favor and address the claim, as he raised it on direct appeal, as a challenge to the trial court's *Molineux* ruling.

3    Additionally, the Court notes that, if raised collaterally, this claim would also be barred by CPL § 440.10(2)(a) to the extent that the issue, as it was framed on direct appeal, was addressed and rejected on the merits. *See Lowman,* 49 A.D.3d at 1263, 856 N.Y.S.2d 342.

4    The Court notes that Petitioner has listed in the habeas petition, as a final stand-alone claim, that he did not "receive[ ] a fair trial with respect to due process." Am. Pet., Ground Seven. He alleges no facts, however, to substantiate this claim. Moreover, although Petitioner has stylized this "issue" as an additional claim, it appears to the Court that this additional ground is simply a concluding paragraph. Nevertheless, to the extent Petitioner alleges a stand-alone "Ground Seven" on the grounds that, generally, he did not receive a fair trial and/or was denied due process, such claim is dismissed.

---

End of Document                  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 635950
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Joseph McCRAY, Petitioner,

v.

State of NEW YORK, Department
of Parole, Respondent.

No. 10 CV 465(RJD).
|
Feb. 20, 2013.

**Attorneys and Law Firms**

Joseph McCray, Niagra Falls, NY, pro se.

Judith C. Aarons, Brooklyn, NY, for Respondent.

### MEMORANDUM & ORDER

DEARIE, District Judge.

 **\*1** Petitioner Joseph McCray moves for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. His sole claim is that his trial counsel was ineffective by failing to seek dismissal of the indictment on the ground that the grand jury consisted of forty jurors rather than the maximum of twenty-three prescribed by state statute. [1]

For the reasons set forth below, the application is denied and the petition is dismissed.

### BACKGROUND

Petitioner was convicted in New York Supreme Court (Kings County), following a jury trial, of grand larceny in the second degree, falsifying business records in the first degree, offering a false instrument for filing in the first degree, criminal mischief in the third degree (two counts), criminal trespass in the second degree (two counts), and criminal possession of a forged instrument in the second degree. Among other things, petitioner filed a fraudulent deed in the City Register purporting to transfer title to a building located at 1053 Flatbush Avenue, Brooklyn, from a deceased woman and her elderly husband to himself; changed the building's locks to

interfere with the building's subsequent lawful transfer; and eventually presented to local police a falsified deed to support his fraudulent claim of ownership.

Petitioner was sentenced to a prison term of four to twelve years on the grand larceny conviction and to lesser, concurrent terms on the other counts. The court also imposed a $4,000 fine and issued a twenty-year order of protection. Online records of the New York State Department of Corrections indicate that petitioner was released in November 2009, after serving three years, and that he remains on parole until November 6, 2017. [2]

### DISCUSSION

#### A. Exhaustion

Relying on largely hairsplitting distinctions that fail to account for petitioner's pro se status during his direct and post-conviction proceedings, respondent argues, at great length, that the petition should be dismissed on exhaustion grounds.

In it undisputed that on his direct appeal, petitioner squarely presented the exact claim he advances here. The Appellate Division, however, did not reach the merits of the claim, holding instead that "[t]he defendant's contention that defense counsel was ineffective because he did not move to dismiss the indictment on the ground that the grand jury proceeding was defective constitutes an off-the-record claim which is unreviewable on direct appeal." *People v. McCray,* 61 A.D.3d 999, 1000, 877 N.Y.S.2d 473 (2d Dep't 2009), *lv. app. denied,* 13 N.Y.3d 747, 886 N.Y.S.2d 101, 914 N.E.2d 1019 (Aug. 12, 2009). Petitioner's appeal also raised the discrete claim "that the grand jury proceeding was defective," which the Appellate Division found to be "unpreserved for appellate review." *Id.* at 1000, 877 N.Y.S.2d 473.

It is also undisputed that petitioner availed himself of the procedural vehicle for presenting "off-the-record" ineffectiveness claims: *i.e.,* he filed a state court motion to vacate pursuant to N.Y. Criminal Procedure Law § 440.10 in which he alleged that counsel was ineffective. Respondent takes issue, however, with the content of petitioner's allegations in the 440 motion; according to respondent, they cannot be read as embracing the exact claim raised here. The relevant passage alleges: "The Grand Jury fail[ed] to conform with CPL 190. There was [sic] more th[a]n 23 Grand Juries ... which create an illegal defective Grand Jury Proceeding. The defense attorney fail[ed] to su [b]mit

the necessary omnibus motion to inspect grand jury minutes and proceedings."

**\*2** In its decision denying this motion, the 440 court read this branch of this claim as asserting that counsel "fail[ed] to make pre-trial motions, including a request to inspect the Grand Jury minutes," and proceeded to specifically "reject[ ] [petitioner's] contention that assigned counsel provided ineffective assistance by failing to file pre-trial motions or move to inspect the Grand Jury minutes." *People v. McCray,* Ind. No. 9478/2005, Decision & Order, June 1, 2007 (Ingram, J.) (ECF # 8–3, Exhibit G at 6, 9). The 440 court further found that petitioner had not "made the required showing that there was no strategic or legitimate explanation for counsel's failure to request a particular hearing," that "court records indicate that the Grand Jury minutes were examined by the Court and deemed to be sufficient in all respects," and that "[d]efense counsel's strategic decisions and trial tactics did not amount to ineffective assistance." *Id.* at 6, 877 N.Y.S.2d 473.

Were it necessary to reach the issue, the Court would conclude that petitioner's 440 allegations were sufficient to exhaust the ineffectiveness claim he raises here. *See generally Carvajal v. Artus,* 633 F.3d 95, 104 (2d Cir.2011) (" '[E]xhaustion of state remedies requires that [a] petitioner fairly present federal claims to the state courts in order to give the [s]tate the opportunity to pass upon and correct alleged violations of its prisoners' federal rights' ") (alterations by Second Circuit, quoting, *Duncan v. Henry,* 513 U.S. 364, 365, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995)), *cert. denied,* 132 S.Ct. 265 (2011); *Daye v. Attorney General,* 696 F.2d 186, 191 (2d Cir.1982) (en banc) ("In order to have fairly presented his federal claim to the state courts the petitioner must have informed the state court of both the factual and the legal premises of the claim he asserts in federal court"). Petitioner's 2254 papers complain that the grand jury consisted (improperly) of 40 members, that the indictment was therefore "jurisdictionally defective," and that counsel "fail[ed] to move to dismiss the indictment." His 440 allegations, to be sure, do not employ identical language: rather than faulting counsel for failing to move to "dismiss" the indictment, as he does in his habeas petition, petitioner in his 440 papers speaks only of his attorney's failure to "su[b]mit the necessary omnibus motion" with respect to the grand jury defect. Taking into consideration the fact that (i) petitioner was representing himself in the 440 proceeding, and (ii) the 440 court's decision refers to "pre-trial motions" generally, the Court believes that, reasonably construed, the 440 allegations did sufficiently inform the state court of "both

the factual and legal premises" (*Daye,* 696 F.2d at 191) of the ineffectiveness claim advanced here—namely, petitioner's belief that the grand jury that indicted him consisted of more than the legally authorized number of jurors and that his attorney failed to seek to redress the alleged defect. The state thus has ample "opportunity" (*Carvajal,* 633 F.3d at 104) to pass upon those claims, which it did in the decisions denying 440 relief and denying leave to appeal from that denial. [3]

**\*3** But the Court need not formally reach the exhaustion question because, as the Court now addresses, the petition does not present a basis for habeas relief. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"). *See, e.g.,* *Greiner v. Wells,* 417 F.3d 305, 318, n. 14 (2d Cir.2005) ("[b]y reaching the merits of [a section 2254 petitioner's] ineffectiveness claim ... [the Court] need not consider the exhaustion issue") (internal quotation and citation omitted), *cert. denied,* 546 U.S. 1184, 126 S.Ct. 1363, 164 L.Ed.2d 72 (2006); *Knight v. Phillips,* 05 CV 2758, 2749(NG), 2012 WL 5955058, \*12 n. 19 (by denying a section 2254 petitioner's ineffectiveness claim on the merits, court "need not reach the issue of exhaustion").

## B. The Merits

The standards governing ineffective assistance of counsel claims are well established. To show that the performance of counsel deprived him of his Sixth Amendment right, petitioner bears the considerable burden of demonstrating that "counsel's representation fell below an objective standard of reasonableness," *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Petitioner alleges, in substance, that a grand jury was first empaneled on November 14, 2005, that the proceedings were adjourned to the following day, and that the first day's panel "was combine[d] with" the second day's panel, so that the panel consisted of 40 jurors at the time it indicted him. Petition, ¶ 13 (ECF # 1). Forty, of course, is seventeen more than New York law authorizes. *See* N.Y.Crim. P. Law 190.05 ("A grand jury is a body consisting of not less than sixteen nor more than twenty-three persons ...").

Petitioner is not seeking habeas relief on the basis of a grand jury defect per se, but, instead, unequivocally fashions his claim as one addressing the conduct of counsel. He asserts that his "attorney was a witness to the defective grand jury," and therefore should have but "fail[ed] to move to dismiss the indictment" on the basis of the alleged defect. Petition, ¶ 13.

The record affords the Court no basis for making a finding with respect to deficient performance under *Strickland* prong one. Petitioner offers no particulars beyond the barebones assertions just quoted, nor any evidence to support the rather unusual allegations, and the portion of the record furnished by respondent fails to offer the Court a basis for assessing the allegations' verity or lack thereof.

Instead the Court turns to *Strickland'* s prejudice prong. As the Supreme Court in *Strickland* explained:

> a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.

**\*4** Assuming arguendo, then, that the grand jury was defective in the manner petitioner alleges and that counsel failed to challenge the indictment on the basis of the alleged defect, the Court concludes that petitioner's claim nevertheless fails because he cannot show that he was prejudiced within the meaning of *Strickland.* Simply put, a petit jury convicted petitioner, after trial, of the crimes for which the allegedly defective grand jury indicted him. Affirming the conviction, the Appellate Division held

both that "the evidence was legally sufficient to establish [petitioner's] guilt beyond a reasonable doubt" and that "the verdict of guilt was not against the weight of the evidence," *McCray,* 61 A.D.3d at 999–1000, 877 N.Y.S.2d 473, and petitioner makes no sufficiency challenge here. These facts entirely dispose of petitioner's ineffectiveness claim and the petition. *See United States v. Mechanik,* 475 U.S. 66, 70, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986) ("measured by the petit jury's [guilty] verdict, ... any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt"); *Dixon v. McGinnis,* 492 F.Supp.2d 343, 348 (S.D.N.Y.2007) (section 2254 petitioner convicted by petit jury cannot show *Strickland* prejudice resulting from counsel's failure to enforce his right to testify before grand jury, citing *Mechanik* ) (collecting additional authorities); *Williams v. Ricks,* 2004 WL 1886028, *6 (S.D.N.Y. Aug.24, 2004)* ("even if Petitioner had a federal right to appear before the grand jury, any error in grand jury proceedings is necessarily rendered harmless by a trial jury's subsequent finding of guilt beyond a reasonable doubt," citing *Mechanik* ).[4]

### CONCLUSION

The Court need not formally reach the question of exhaustion because section 28 U.S.C. § 2254(b)(2) authorizes the Court to deny an application for a writ of habeas corpus on the merits notwithstanding a failure to exhaust, and the Court so denies Joseph McCray's application and dismisses his petition.

Because petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability shall not issue. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). The Clerk of the Court is directed to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 635950

Footnotes

1    The petition alleges that counsel was also ineffective for allegedly failing to file a timely notice of appeal, but petitioner later withdrew that branch of his claim. ECF # 13.

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 635950

**2**   For this reason, and because in any event petitioner is challenging his underlying convictions, the petition is not moot. *See generally* Spencer v. Kemna, 523 U.S. 1, 8, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998).

**3**   Petitioner then sought leave to appeal the denial of his 440 motion, which the Appellate Division denied by Decision and Order dated September 26, 2007. In his leave application, petitioner asserted both that he "was subjected to a defective Grand Jury, which had over 23 Grand Jurors" and that his "defense attorney fail[ed] to move to dismiss the defective indictment" (ECF # 8–3, Exhibit H). Finally, the record indicates the petitioner separately filed a petition for habeas relief in state court in the county of his confinement; the petition is not available, but the decision denying it as moot upon petitioner's parole refers to the grounds advanced as including "defective Grand Jury proceedings." *McCray v. Sup't Corcoran,* Index No. 09–0659, Decision & Judgment (N.Y. Sup.Ct. Cayuga County Dec. 29, 2009) (ECF # 8–3, Exhibit L).

**4**   Were the Court to formally rule on exhaustion and treat the 440 decision (and the denial of leave of to appeal that decision) as a state court adjudication on the merits of the ineffectiveness claim advanced here, the Court would conclude, within the meaning of 28 U.S.C. § 2254(d) and for the reasons discussed in this memorandum, that the state court's rejection of the claim was neither contrary to nor an unreasonable application of *Strickland* or *Mechanik.*

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

573 Fed.Appx. 22
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE
32.1 AND THIS COURT'S LOCAL RULE 32.1.1.
WHEN CITING A SUMMARY ORDER IN A
DOCUMENT FILED WITH THIS COURT, A PARTY
MUST CITE EITHER THE FEDERAL APPENDIX
OR AN ELECTRONIC DATABASE(WITH THE
NOTATION "SUMMARY ORDER"). A PARTY CITING
A SUMMARY ORDER MUST SERVE A COPY OF IT
ON ANY PARTY NOT REPRESENTED BY COUNSEL.

United States Court of Appeals,
Second Circuit.

Joseph McCRAY, Petitioner–Appellant,
v.
State of NEW YORK, Department
of Parole, Respondent–Appellee.

No. 13–1137–pr.
|
July 17, 2014.

**UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED** that the
judgment of the district court is **AFFIRMED.**

**Attorneys and Law Firms**

Sally Wasserman, New York, NY, for Petitioner–Appellant.

Camille O'Hara Gillespie (Leonard Joblove, Ann Bordley,
on the brief), Assistant District Attorneys, for Kenneth P.
Thompson, District Attorney, Kings County, Brooklyn, NY,
for Respondent–Appellee.

PRESENT: BARRINGTON D. PARKER, DEBRA ANN
LIVINGSTON and CHRISTOPHER F. DRONEY, Circuit
Judges.

**SUMMARY ORDER**

Petitioner–Appellant Joseph McCray appeals from a
judgment of the United States District Court for the Eastern
District of New York (Dearie, J.), entered February 21, 2013.
The district court denied McCray's petition for habeas corpus,
which was premised on a claim of ineffective assistance of
trial counsel. McCray contends that his lawyer should have
moved to dismiss the indictment in McCray's underlying
state criminal case due to the allegedly improper size of the
grand jury that issued the indictment. In that case, McCray
was convicted after a jury trial of grand larceny, criminal
possession of a forged instrument, falsifying business records,
offering a false instrument for filing, criminal mischief, and
criminal trespass, and was sentenced in October 2006 to
four to twelve years' imprisonment on the top count, with
lesser sentences on the other counts to run concurrently. His
conviction was affirmed by the Appellate Division, and leave
to appeal to the Court of Appeals was denied. McCray's
motion under New York Criminal Procedure Law § 440.10
was also denied by the state court, and the Appellate Division
denied leave to appeal the decision. McCray was released
from state prison in November 2009 and discharged from
parole in November 2011. We assume **\*23** the parties'
familiarity with the underlying facts, the procedural history
of the case, and the issues on appeal. [1]

I.

The federal habeas corpus statute generally requires a
petitioner for a writ of habeas corpus to show that he has
"exhausted the remedies available in the courts of the State"
in order for the writ to be granted. 28 U.S.C. § 2254(b)(1)
(A). "Exhaustion of state remedies requires that a petitioner
fairly present federal claims to the state courts in order
to give the state the opportunity to pass upon and correct
alleged violations of its prisoners' federal rights." Carvajal
v. Artus, 633 F.3d 95, 104 (2d Cir.2011) (quoting Duncan v.
Henry, 513 U.S. 364, 365, 115 S.Ct. 887, 130 L.Ed.2d 865
(1995) (per curiam)) (brackets and internal quotation marks
omitted). Even if a claim was not exhausted, however, the
habeas statute permits a petition to "be denied on the merits,
notwithstanding the failure of the applicant to exhaust the
remedies available in the courts of the State." 28 U.S.C. §
2254(b)(2); see also Abuzaid v. Mattox, 726 F.3d 311, 321–
22 & n. 8 (2d Cir.2013).

Like the district court, we are inclined to think that
McCray has exhausted his state remedies on his claim of
ineffectiveness due to his counsel's failure to object to the

allegedly oversized grand jury: he attempted to present this claim in his *pro se* motion under New York Criminal Procedure Law § 440.10. But we need not decide this question because, in any event, McCray's petition was properly denied on the merits. *See* 28 U.S.C. § 2254(b)(2).

## II.

To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate both (1) that counsel's performance was "deficient" as measured by an "objective standard of reasonableness," and (2) that "the deficient performance prejudiced the defense." *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). On the first prong, "[a] court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance." *Harrington v. Richter,* 562 U.S. 86, 131 S.Ct. 770, 787, 178 L.Ed.2d 624 (2011) (internal quotation marks omitted). With respect to the second element, "a challenger must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (internal quotation marks omitted). "[A] petitioner cannot show prejudice if the claim or objection that an attorney failed to pursue lacks merit." *Harrington v. United States,* 689 F.3d 124, 130 (2d Cir.2012) (citations omitted).

We conclude that McCray's claim fails on the second prong because he cannot show that prejudice resulted from any error that his counsel may have committed **\*24** by failing to object to a grand jury composed of more members than

are permitted under New York state law. The Supreme Court has never held that state criminal defendants enjoy a federal constitutional right to an indictment. *See Alexander v. Louisiana,* 405 U.S. 625, 633, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972). The right to indictment in a New York state court prosecution stems from the state constitution, and the particulars of New York grand jury practice are laid out in state law. *See* N.Y. Const. art. I, § 6; N.Y.Crim. Proc. Law art. 190. Given the evidence at McCray's trial and his subsequent conviction by a petit jury, there is not a reasonable probability that the result of the proceeding would have been different had his attorney objected to the allegedly oversized grand jury. *See People v. Wiggins,* 89 N.Y.2d 872, 653 N.Y.S.2d 91, 675 N.E.2d 845, 845–46 (1996) (stating that the court would not "elevate the kind of representational lapse" that may have precluded a criminal defendant from testifying in his grand jury proceeding "to an automatic delayed reversal device," given that he had been convicted by jury verdict); *see also United States v. Mechanik,* 475 U.S. 66, 70, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986) (holding that "any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt" where a petit jury had convicted the defendants beyond a reasonable doubt). Accordingly, McCray cannot show prejudice under *Strickland,* and thus his petition for habeas corpus must be denied.

We have considered all of McCray's remaining arguments and find them to be without merit. For the foregoing reasons, the judgment of the district court is hereby **AFFIRMED.**

### All Citations

573 Fed.Appx. 22

## Footnotes

1    As a preliminary matter, we note that McCray has been released from prison and is also no longer serving a term of parole. However, he nonetheless meets the statutory requirement that he was "in custody" at the time of the filing of his petition, 28 U.S.C. § 2254(a), because he was then on state parole, *see Maleng v. Cook,* 490 U.S. 488, 490–91, 109 S.Ct. 1923, 104 L.Ed.2d 540 (1989) (citing *Jones v. Cunningham,* 371 U.S. 236, 242, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963)). Moreover, because McCray challenges his conviction, his petition is not mooted by his release from custody and parole supervision. *See Wilson v. Mazzuca,* 570 F.3d 490, 493 n. 1 (2d Cir.2009) (citing *Sibron v. New York,* 392 U.S. 40, 57, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968)).

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

Moreno v. Kelly, Not Reported in F.Supp. (1997)
1997 WL 109526

1997 WL 109526
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Armando MORENO, Petitioner,
v.
Walter KELLY, Respondent.

No. 95 Civ. 1546(JGK).
|
March 11, 1997.

**Attorneys and Law Firms**

Armando Moreno, Attica, pro se.

Jeanine Pirro, District Attorney of Westchester County by
Andrew R. Kass, Assistant District Attorney, White Plains,
for Respondent.

OPINION AND ORDER

KOELTL, District Judge.

**\*1** Petitioner Armando Moreno ("Moreno"), pro se, seeks
a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The
petitioner challenges his multiple-count conviction in New
York State County Court for attempted murder, assault, rape,
sodomy, sexual abuse, robbery and criminal possession of a
weapon. For the reasons set forth below the petition is denied
in its entirety.

I.

The record in the state court proceedings supports the
following facts:

On the evening of January 11, 1984, Armando Moreno
accompanied Carlos Cespedes ("Cespedes") on a visit to
Modesta Collado ("Collado") at her Yonkers, New York
apartment. Lizette Lopez ("Lopez"), a friend of Collado's,
was also there that evening. Because Collado knew Cespedes
and had seen Moreno with him previously, the two men
were permitted to enter the apartment. (Tr. at 280–281.) [1]
After the two men had been in the apartment for some time,
Moreno and Cespedes threatened the two women with a

gun and demanded money. The men then brutally assaulted,
sodomized, raped, and shot the women. Collado sustained
a gunshot wound to the head and was permanently blinded.
Lopez escaped permanent injury, however, and was able to
provide the police with a detailed description of the two
men, including their facial characteristics, clothing, footwear,
weight, height and ages. (Pre–Tr. Hrg. at 166.) In addition,
she identified Cespedes from a photographic array. (Pre–Tr.
Hrg. at 167–169.) A warrant was subsequently issued for
Cespedes' arrest. Following surveillance of the neighborhood
where he lived, the police spotted Cespedes in a car near the
vicinity of his apartment. Hiding in the rear of the car was a
man (later identified as Moreno) whose appearance matched
Lopez's description of the second assailant. Both men were
arrested and Lopez subsequently identified Moreno from a
six-person line-up as one of the men who had assaulted her.
(Pre–Tr. Hrg. at 170–171.) *See also People v. Cespedes,* 154
A.D.2d 701, 703, 546 N.Y.S.2d 682, 683 (2d Dep't 1989).

Prior to trial, both defendants moved to suppress the
identifications and physical evidence. After conducting a
combined pretrial identification, suppression and probable
cause hearing, the trial court found that neither the photo
array nor the lineup were impermissibly suggestive and
denied the motions. (Pre–Tr. Hrg. at 171–178.) *See Cespedes,*
154 A.D.2d at 703, 546 N.Y.S.2d at 683. Both defendants
were convicted at trial. On March 20, 1985, a jury found
Moreno guilty of two counts of attempted murder in the
second degree, assault in the first degree, two counts of rape
in the first degree, sodomy in the first degree, aggravated
sexual abuse, sexual abuse in the first degree, robbery in
the first degree, and two counts of criminal possession of a
weapon in the second degree. Sentenced as a repeat-felony
offender, Moreno was sentenced to four consecutive terms of
imprisonment of twelve-and-one-half to twenty-five years for
four of his crimes against the two victims. Sentences for the
remaining crimes were ordered to be served concurrently with
those four consecutive sentences. The aggregate maximum
sentence was fifty years. [2]

**\*2** Following his conviction Moreno filed a motion to vacate
his sentence, alleging that the imposition of consecutive
sentences for his crimes violated New York law. The
motion was denied by the County Court, Westchester County
(Cowhey, J.). *See People v. Moreno,* No. 84–0136–02
(Westchester County Ct. July 9, 1986), *appeal denied,* (2d
Dep't November 12, 1986).

Moreno v. Kelly, Not Reported in F.Supp. (1997)

1997 WL 109526

Case 7:13-cv-02627-CS Document 50 Filed 04/29/16 Page 93 of 181

Thereafter, Moreno, represented by counsel, filed his direct appeal, arguing that his warrantless arrest was based on less than probable cause and therefore illegal and that all post-arrest identification should have been suppressed; that the identification procedure was unnecessarily suggestive; that he was denied a fair trial by the Court's refusal to grant his motion for a separate trial; and that his post arrest statement should have been suppressed. In addition, Moreno filed a supplemental pro se brief, in which he asserted that the evidence at trial failed to prove the essential elements of the rape and aggravated sexual abuse crimes; that the prosecutor's characterization of Moreno as a coward and the implication that Cespedes had lied on the stand denied him a fair trial; and that his prison sentence was excessive and should be reduced.

On October 30, 1989, the Appellate Division, Second Department, affirmed Moreno's conviction. The Court found that Moreno's arrest was based on probable cause, that the lineup procedure was not impermissibly suggestive and that the trial court correctly exercised its discretion in denying Moreno's motion for a separate trial. The Court also concluded that in light of the violent nature of the crimes, Moreno's prison sentence was not excessive. Finally, the Court reviewed the claims in Moreno's supplemental brief and found them to be without merit. *See Cespedes,* 154 A.D.2d at 703, 546 N.Y.S.2d at 683–84.

On January 19, 1990, the New York State Court of Appeals denied Moreno's application for leave to appeal. *People v. Moreno,* 75 N.Y.2d 815, 552 N.Y.S.2d 565, 551 N.E.2d 1243 (1990).

In the current habeas petition, Moreno raises the following six claims: (1) that the evidence presented at trial did not establish beyond a reasonable doubt the essential elements of rape and aggravated sexual abuse; (2) that the prosecutor's remarks at trial deprived him of a fair trial; (3) that his sentence was excessive; (4) that his arrest was based on less than probable cause and consequently the post-arrest identification should have been suppressed as the result of an illegal arrest; (5) that his due process rights were violated by an unduly suggestive identification procedure; and (6) that he was denied a fair trial as a result of the trial court's failure to grant his petition for severance.

## II.

As a prerequisite to habeas relief under 28 U.S.C. § 2254, a petitioner must allege that his incarceration is in violation of the Constitution or a federal law or treaty. 28 U.S.C. § 2254(a). Further, a federal district court may consider a state prisoner's motion for federal habeas relief only after the petitioner has exhausted available state court remedies. *See* 28 U.S.C. § 2254(b), (c). *See also Picard v. Connor,* 404 U.S. 270, 275–276, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Ellman v. Davis,* 42 F.3d 144, 147 (2d Cir.1994), *cert. denied,* 515 U.S. 1118, 115 S.Ct. 2269, 132 L.Ed.2d 275 (1995). Moreno has exhausted his state court remedies for each of his current claims and the respondent does not dispute that Moreno has exhausted those remedies. Nevertheless, Moreno's petition must be denied because each of his claims is either without merit, fails to allege a constitutional or federal violation, or is otherwise barred from federal habeas review.

## III.

**\*3** In his first claim Moreno attacks his convictions for aggravated sexual abuse against Collado and two counts of rape in the first degree against Lopez, alleging that the prosecution failed to establish the essential elements of these crimes beyond a reasonable doubt. Specifically, Moreno alleges that his conviction for aggravated sexual abuse against Collado was based upon insufficient evidence because no evidence was presented at trial that Collado suffered substantial pain or other physical impairment when he inserted the barrel of a gun into her rectum. Further, Moreno contends that there was insufficient evidence of the rape charges because the only evidence of rape presented at trial was Lopez's testimony, and Lopez was blindfolded during the two rapes and did not actually see Moreno's penis enter her body. He also questions the prosecution's failure to introduce any medical evidence supporting the occurrence of the rapes.

A claim of insufficiency of the evidence can be a basis for federal habeas relief if "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *See Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Bossett v. Walker,* 41 F.3d 825, 830 (2d Cir.1994), *cert. denied,* 514 U.S. 1054, 115 S.Ct. 1436, 131 L.Ed.2d 316 (1995). The evidence must be weighed in the light most favorable to the prosecution and all permissible inferences drawn in the prosecution's favor. *See Jackson,* 443 U.S. at 326. Under the *Jackson* standard, and after all permissible

Moreno v. Kelly, Not Reported in F.Supp. (1997)
1997 WL 109526

Case 7:13-cv-02627-CS   Document 50   Filed 04/29/16   Page 94 of 181

inferences are drawn in favor of the prosecution, it is clear that Moreno's first claim is without merit.


## A.

State law defines the substantive elements of a crime. *See Jackson,* 443 U.S. at 324 n. 16; *Green v. Abrams,* 984 F.2d 41, 44–45 (2d Cir.1993). Former New York Penal Law § 130.70, which was in effect prior to November 1, 1988, defined aggravated sexual abuse as follows:

1. A person is guilty of aggravated sexual abuse in the first degree when he inserts a foreign object in the vagina, urethra, penis or rectum of another person causing physical injury to such person:

(a) By forcible compulsion; or (b) When the other person is incapable of consent by reason of being physically helpless; or (c) When the person is less than eleven years old.

A foreign object is defined as "any instrument or article which, when inserted in the vagina, urethra, penis, or rectum, is capable of causing physical injury." Penal Law § 130.00[9]. Physical injury means "impairment of physical condition or substantial pain." Penal Law § 10.00[9]. Under New York law, whether substantial pain is proven is generally a question for the jury. *People v. Rojas,* 61 N.Y.2d 726, 727, 472 N.Y.S.2d 615, 616, 460 N.E.2d 1100 (1984). A jury is permitted to infer from the evidence presented that pain was substantial, even though the victim gives no testimony covering the degree of pain that was felt. *See Rojas,* 61 N.Y.2d at 727, 472 N.Y.S.2d at 616, 460 N.E.2d 1100.

Moreno does not dispute the jury's finding that he intentionally inserted a foreign object (the barrel of a gun) into Collado's rectum. (Tr. at 304.) That such insertion was against Collado's will is supported by Collado's testimony at trial that at the time of the abuse Moreno and Cespedes forcibly undressed her, threatened her with a gun and a knife, tied her hands behind her back, verbally abused her, kicked her in the legs, pulled her hair, ran the blade of a knife over her body and "bothered her sexually" in other ways. (Tr. at 300–305.) Finally, under New York law, the jury could reasonably infer from all the circumstances that the forcible insertion of a pistol into the victim's rectum caused her substantial pain.

**\*4** Where the jury's determination meets the *Jackson* standard, the jury's findings are not to be disturbed. *See*

*Underwood v. Kelly,* 692 F.Supp. 146, 150 (E.D.N.Y.1988), *aff'd,* 875 F.2d 857 (2d Cir.), *cert. denied,* 493 U.S. 837, 110 S.Ct. 117, 107 L.Ed.2d 79 (1989) ("... 28 U.S.C. § 2254(d) precludes federal courts in habeas proceedings from reevaluating a witness' credibility ... Once the jury has made its decision, a federal court cannot disturb these findings of fact because it would have drawn different inferences from the evidence ... [T]he court must assume as the jury did that [the witness] was telling the truth").


## B.

Rape in the first degree is defined by New York Penal Law § 130.35, which states:

A male is guilty of rape in the first degree when he engages in sexual intercourse with a female:

1. By forcible compulsion; or 2. Who is incapable of consent by reason of being physically helpless; or 3. Who is less than eleven years old.

Penal Law § 130.35. Sexual intercourse is defined as "having its ordinary meaning and occurs upon any penetration, however slight." Penal Law § 130.00[1]. In New York, the victim's testimony alone is sufficient to establish the crime of rape in the first degree beyond a reasonable doubt. *See People v. Magee,* 208 A.D.2d 977, 978, 617 N.Y.S.2d 227, 228 (3d Dep't 1994). There is no requirement that a claim of rape be corroborated by medical evidence, *see People v. Bacchi,* 186 A.D.2d 663, 664, 588 N.Y.S.2d 619, 620 (2d Dep't 1992), or indeed, under most circumstances, be corroborated at all. *See People v. Fuller,* 50 N.Y.2d 628, 635–636, 431 N.Y.S.2d 357, 360–361, 409 N.E.2d 834 (1980); *Magee,* 208 A.D.2d at 978, 617 N.Y.S.2d at 228.

In the present case, there was ample evidence to convict Moreno of the crime of rape in the first degree. The element of forcible compulsion was proven by Lopez's testimony that Moreno threatened her at gunpoint, forcibly removed her clothes, blindfolded her, tied her hands behind her back and placed a knife to her breasts. (Tr. at 77–78.) Further, Lopez testified that Moreno inserted his penis inside her vagina, (Tr. at 83–84), an act which, under New York law, constitutes sexual intercourse. Moreno's claim that Lopez's testimony of penetration was somehow deficient because she was blindfolded is frivolous. Lopez described observing Moreno before the blindfolding and described his continuous conversation with her during the rape without the intervention

Moreno v. Kelly, Not Reported in F.Supp. (1997)
1997 WL 109526

Case 7:13-cv-02627-CS   Document 50   Filed 04/29/16   Page 95 of 181

of any other person. (Tr. at 79–84.) When asked how she could tell that her rapist was Moreno she replied "[b]ecause he told me that he was going to do that." (Tr. at 84.) The absence of Moreno's semen on Lopez's clothing and inside her vagina does not indicate that no rape occurred. Supporting medical evidence is not required for a rape conviction. Further, the absence of Moreno's semen is understandable in light of Lopez's testimony that Moreno may not have ejaculated during the rape. [3] Ejaculation is not necessary for the crime of rape. *See People v. Counts,* 220 A.D.2d 218, 219, 632 N.Y.S.2d 4, 5 (1st Dep't 1995). Thus, there was more than sufficient evidence, based on the trial testimony, to find that Moreno was guilty of rape in the first degree. [4]

### IV.

**\*5** In his second claim, Moreno alleges that he was denied a fair trial because of allegedly prejudicial remarks made by the prosecutor. Moreno asserts that he was prejudiced by the prosecutor's suggestion, during the cross-examination of co-defendant Cespedes, and during summation, that Cespedes was not telling the truth when he stated that Moreno was not his accomplice in the commission of the crimes. Moreno also challenges the prosecutor's comments during summation about Cespedes' failure to admit to the sex offenses even though Cespedes' admitted to the crime of attempted murder. Moreno alleges that the prosecutor's comment that sex offenses were "crimes of cowardice" and that nobody would admit to being a coward, was an attack on Moreno's refusal to testify and could have been interpreted by the jury as an assertion that the prosecutor knew that Moreno was guilty.

The Supreme Court has held that the relevant test for whether a prosecutor's comments are a basis for habeas relief is whether the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *See Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (citing *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). Federal courts must distinguish between "ordinary trial error" and "that sort of egregious misconduct ... amoun [ting] to a denial of constitutional due process." *See Floyd v. Meachum,* 907 F.2d 347, 353 (2d Cir.1990) (citing *Donnelly,* 416 U.S. at 647–648). The Court of Appeals for the Second Circuit has held that to obtain habeas relief for claims of improper prosecutorial remarks the petitioner bears the burden to "demonstrate that he suffered actual prejudice because the prosecutor's comments ... had a

substantial and injurious effect or influence in determining the jury's verdict." *See Bentley v. Scully,* 41 F.3d 818, 824 (2d Cir.1994), *cert. denied,* 516 U.S. 1152, 116 S.Ct. 1029, 134 L.Ed.2d 107 (1996). *See also Gonzalez v. Sullivan,* 934 F.2d 419, 424 (2d Cir.1991) ("[p]rosecutorial misconduct ... is grounds for reversal only when the remarks caused substantial prejudice' to the defendant" (internal quotations omitted)); *Floyd,* 907 F.2d at 353 ("... the question before a federal appellate court is whether 'the prosecutorial remarks were so prejudicial that they rendered the trial in question fundamentally unfair' "). In evaluating whether the petitioner suffered actual prejudice, the following factors are relevant: (1) the severity of the prosecutor's conduct; (2) what steps, if any, the trial court took to remedy any prejudice; and (3) whether the conviction was certain absent the prejudicial conduct. *See Bentley,* 41 F.3d at 824 (citing *Gonzalez,* 934 F.2d at 424).

The petitioner has failed to show any actual prejudice in this case. The only remarks that the petitioner even challenges were isolated and brief [5], and when viewed in the context in which they were made, *see United States v. LaMorte,* 950 F.2d 80, 83 (2d Cir.1991), *cert. denied,* 504 U.S. 909, 112 S.Ct. 1938, 118 L.Ed.2d 544 (1992), were not unfairly prejudicial to Moreno.

**\*6** The prosecutor's effort during cross-examination to impeach Cespedes' testimony was justified based on Cespedes' contradictory efforts to exculpate Moreno. Moreover, the prosecutor's questioning of Cespedes' credibility during summation was fairly responsive to the same testimony. While Cespedes insisted that his accomplice on the evening of January 11, 1984 was not Moreno but a "friend," he would not give this friend's last name, stating instead that "he did not know." (Tr. at 514.) Later, Cespedes stated, "[y]es, I have to lie because I will not give out his last name." (Tr. at 514.) Still later, Cespedes "remembered" the person's last name, giving the name of Souza, which was also the name of one of the police officers involved in the case. (Tr. at 541–542.) Based upon these contradictions, it was not unfair for the prosecutor to question Cespedes' testimony that it was another man and not Moreno who was with him that night.

Similarly, the comments about which the petitioner complains relating to cowardice were addressed directly to Cespedes' having taken the stand, having admitted to attempted murder, but having refused to admit to the sex offenses. [6] The prosecutor explained that sex offenses are not

Moreno v. Kelly, Not Reported in F.Supp. (1997)

1997 WL 109526

macho crimes but crimes of cowardice. (Tr. at 614–615.) It is true that the prosecutor then improperly swept Moreno up with Cespedes in arguing that Cespedes and Moreno were both cowards because they would not admit to the sex crimes. (Tr. at 615.) Moreno had not testified and it would have been improper to comment on that failure to testify. The comment, however, did not appear to be an appeal to the jury to draw any improper inferences from Moreno's failure to testify. Moreno's counsel did not even object to the comments or ask for any curative instruction and the Court properly instructed the jury in its charge that the jury was to draw no inference against Moreno based on his failure to testify. (Tr. at 628.) The Court also instructed the jury that nothing the prosecutor said in summation was evidence. (Tr. at 612, 639.) Under all the circumstances, it cannot be said that this single comment was substantially prejudicial to the petitioner.

Finally, the petitioner's conviction was certain even without the allegedly prejudicial comments. The evidence against Moreno was overwhelming and included the consistent and unvarying accounts of both victims, as well as his identification by Lopez, based upon an independent pre-trial identification. (Pre–Tr. Hrg. at 172.) Thus, Moreno's second claim is without merit because he has not shown that the prosecutor's remarks caused him actual prejudice at trial. The Court finds, with the requisite degree of certainty, that the prosecutor's comments did not substantially influence the jury's decision. *See Peck v. United States,* 106 F.3d 450, 1997 WL 33947 at *5 (2d Cir.1997).

## V.

In his third claim, Moreno attacks as excessive his sentence to four consecutive terms of imprisonment of twelve-and-one-half to twenty-five years. This claim is without merit.

**\*7** It is well established that, when a sentence falls within the range prescribed by state law, the length of the sentence may not be raised as grounds for federal habeas relief. *See White v. Keane,* 969 F.2d 1381, 1383 (2d Cir.1992) ("[n]o federal constitutional issue is presented where ... a sentence is within the range prescribed by state law"). *See also Diaz v. LeFevre,* 688 F.Supp. 945, 949 (S.D.N.Y.1988) ("... because [petitioner's] sentence did not exceed the maximum sentence permissible for a felony conviction under N.Y. Penal Law ... there is no ground for habeas relief"). In the present case, each term of Moreno's sentence fell within the sentence range prescribed by New York Penal Law.

Nor was the imposition of consecutive sentences by the trial court improper. New York Penal Law authorizes the imposition of consecutive sentences for multiple convictions where the offenses committed constitute separate and distinct acts. *People v. Brathwaite,* 63 N.Y.2d 839, 843, 482 N.Y.S.2d 253, 256, 472 N.E.2d 29 (1984); *People v. Hladky,* 645 N.Y.S.2d 74, 75 (2d Dep't.1996). The attempted murder of Collado was an act "separate and distinct" from the acts of assault and sexual abuse. Similarly, the acts of robbery, rape and assault that Lopez endured were separate from Moreno's attempt to murder her and were separate from the offenses against Collado. Accordingly, the imposition of consecutive sentences by the trial court was an appropriate application of New York law.

Moreover, Moreno has not shown that his sentence violates the Eighth Amendment, which provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." [7] The Amendment is interpreted as prohibiting only sentences that are "grossly disproportionate to the severity of the crime." *Rummel v. Estelle,* 445 U.S. 263, 271, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980). *Rummel* has been interpreted as holding that "federal courts should be reluctant to review legislatively mandated terms of imprisonment and that successful challenges to the proportionality of particular sentences should be exceedingly rare." *United States v. Santos,* 64 F.3d 41, 45 (2d Cir.1995), *vacated on other grounds,* 516 U.S. 1156, 116 S.Ct. 1038, 134 L.Ed.2d 186 (1996) (citing *Hutto v. Davis,* 454 U.S. 370, 374, 102 S.Ct. 703, 70 L.Ed.2d 556 (1982)). *See also Moore v. Irvin,* 908 F.Supp. 200, 206–07 (N.D.N.Y.1995).

In *Harmelin v. Michigan,* 501 U.S. 957, 996, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), the Supreme Court held that a sentence of life without parole for possession of 672 grams of cocaine did not violate the Eighth Amendment. In *Rummel,* 445 U.S. at 285, the Court rejected a claim that a life sentence under the state recidivist statute for obtaining $120.75 by false pretenses, where the two predicate offenses were fraudulent use of a credit card to obtain $80 worth of goods and passing a forged check in the amount of $28.36, was disproportionate.

Moreno presents no reasonable argument that his sentence was at all disproportionate for the crimes for which he was convicted. Contrary to his assertions, Moreno was not "a victim of circumstances." The record shows that Moreno was an active participant in the savage attacks on Lopez and Collado. Moreno pointed a gun at the victims and demanded money. (Tr. at 53, 55–56.) It was Moreno who raped Lopez

Moreno v. Kelly, Not Reported in F.Supp. (1997)

Case 7:13-cv-02627-CS   Document 50   Filed 04/29/16   Page 97 of 181

1997 WL 109526

and then incited Cespedes to do so as well (Tr. at 302.) After the victims were shot in the head, Moreno suggested that they should be shot twice more to ensure that they were dead. (Tr. at 89, 91.) In light of the heinous nature of Moreno's crimes, and recognizing that his sentence was within the statutory mandate, Moreno's sentence was not excessive.

VI

**\*8** In his fourth claim, the petitioner argues that his arrest was based on less than probable cause and that all post-arrest identifications should therefore be suppressed as the fruits of an unconstitutional arrest. This claim is not a basis for federal habeas relief.

The Supreme Court has held that "where [a] State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell,* 428 U.S. 465, 481–482, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). Applying *Powell,* the Court of Appeals for the Second Circuit has held that review of a habeas petitioner's Fourth Amendment claim should be undertaken in only two instances: (a) if the state has provided no corrective procedures at all to redress the alleged Fourth Amendment violations or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using the mechanism because of an unconscionable breakdown in the underlying process. *Capellan v. Riley,* 975 F.2d 67, 70 (2d Cir.1992) (citing *Gates v. Henderson,* 568 F.2d 830 (2d Cir.1977), *cert. denied,* 434 U.S. 1038, 98 S.Ct. 775, 54 L.Ed.2d 787 (1978)).

Not only does New York state provide for such a corrective procedure [8], Moreno received the full benefit of this procedure. Prior to trial, the trial court held a combined identification, suppression and probable cause hearing. During the lengthy hearing, the court received testimony from Lopez and the police officers involved with the case. The court also permitted extensive cross-examination of these individuals by defense counsel. In addition, Moreno's Fourth Amendment claim was reviewed on direct appeal. Thus, Moreno received a "full and fair" opportunity to litigate his Fourth Amendment claim in the state courts and this court has no authority to revisit the issue.... Moreno's contention that the trial court's pre-trial determination was incorrect does

not entitle him to federal habeas review. Under *Powell,* "a petitioner cannot gain federal review of a Fourth Amendment claim simply because the federal court may have reached a different result." *See Capellan,* 975 F.2d at 71 (citing *Gates,* 568 F.2d at 840). *See also Boria v. Keane,* 897 F.Supp. 809, 814–15 (S.D.N.Y.1995), *vacated on other grounds,* 99 F.3d 492 (2d Cir.1996).

VII.

In his fifth claim, Moreno alleges that the lineup procedure used during his pretrial identification by Lopez was so suggestive that it raised a substantial likelihood of misidentification. Accordingly, Moreno contends that the trial judge's failure to suppress the lineup and in-court identifications constituted a denial of his due process rights. Moreno's claim is without merit.

The admission at trial of identification testimony that "was so unnecessarily suggestive and conducive to irreparable misidentification" may be challenged as violating a defendant's due process rights. *See Neil v. Biggers,* 409 U.S. 188, 196, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) (citing *Stovall v. Denno,* 388 U.S. 293, 301–302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967)). Undue suggestiveness alone, however, does not require that identification testimony be excluded. *Neil,* 409 U.S. at 198–199. Rather, a court must conduct a two-step inquiry to evaluate the permissibility of the testimony. *Id.* at 198–199; *Styers v. Smith,* 659 F.2d 293, 297 (2d Cir.1981). *See also Sims v. Sullivan,* 867 F.2d 142, 145 (2d Cir.1989). First, the court must determine whether the circumstances surrounding the out-of-court identification procedure were unduly suggestive of the suspect's guilt. If the identification procedure is found to be unduly suggestive, the suggestiveness must be balanced against factors indicating that the in-court identification was independently reliable. *Neil,* 409 U.S. at 198; *Styers,* 659 F.2d at 297. If, based on these factors, the witness' identification testimony is clearly reliable independent of the improper procedure, the testimony may be admitted even if the identification procedures were improperly suggestive. *Styers,* 659 F.2d at 297.

**\*9** The lineup procedure in this case was not "unduly suggestive." [9] The lineup consisted of six Hispanic males, of approximately similar age, coloring and appearance (Pre–Tr. Hrg. at 70–72.) Moreno's contention that the line-up was suggestive because he was the only individual wearing boots is unconvincing. There is no requirement that a defendant

Moreno v. Kelly, Not Reported in F.Supp. (1997)
1997 WL 109526

Case 7:13-cv-02627-CS Document 50 Filed 04/29/16 Page 98 of 181

in a lineup be surrounded by individuals nearly identical in appearance. *See Tavarez v. LeFevre,* 649 F.Supp. 526, 530 (S.D.N.Y.1986). There is also no merit to Moreno's claim of suggestiveness due to the difference in his height from that of the other men in the lineup. Any height difference was minimized because all of the defendants were initially seated, with Moreno having selected his own seat (Pre–Tr. Hrg. at 111.) *See Tavarez,* 649 F.Supp. at 530. Later, Lopez stood on a stool as she viewed the men through a two-way mirror. Each man was asked to approach and stand within three feet of the mirror. Lopez identified Moreno without needing to view the remaining members of the lineup (Pre–Tr. Hrg. at 94.) The police officers present during the lineup did nothing to focus her attention toward any particular individual or pressure her into making an identification (Pre–Tr. Hrg. at 31–32.) *See United States v. Doran,* 624 F.Supp. 94, 97 (E.D.N.Y.1985). The totality of the circumstances establish that the identification procedure was not unduly suggestive.

In any event, Lopez's identification of Moreno was sufficiently reliable independent of the lineup procedure. Under *Neil,* factors relevant to reliability include: the opportunity of the witness to view the perpetrator at the time of the crime; the witness' degree of attention; the accuracy of the witness' prior description of the accused; the level of certainty demonstrated by the witness at the confrontation; and the length of time between the crime and confrontation. *Neil,* 409 U.S. at 199. These factors are to be considered in light of the totality of the circumstances. *Id.* at 199. In addition, on habeas review, these factors constitute state court findings of historical fact and are governed by a presumption of correctness pursuant to 28 U.S.C. § 2254(d). *Sumner,* 455 U.S. at 597 n. 10.

The record indicates that Lopez observed Moreno in close circumstances and good lighting for approximately forty minutes before she was blindfolded (Pre–Tr. Hrg. at 16–18.) Based on these observations, she was able to give the police a detailed and accurate description of Moreno's appearance, including facial characteristics, clothing, footwear, weight, height and age (PreTr. Hrg. at 166.) She identified Moreno with complete certainty as soon as he approached the mirror during the lineup (Pre–Tr. Hrg. at 94), which took place within two and a half days of the crime.

In sum, the Court agrees with the trial court's conclusion that "there was a complete absence of any overt or covert suggestiveness by any of the police officers ... at the lineup," and further that Lopez's identification of Moreno "was the product of Lopez's independent recollection and was in all respects reliable" (Pre–Tr. Hrg. at 172.)

## VIII.

*10 Moreno's sixth and final claim, that he was denied a fair trial because the trial court refused to grant his motion for a separate trial, is without merit and must be denied. The decision whether to grant a motion to sever is "committed to the sound discretion of the trial court." *See Grant v. Hoke,* 921 F.2d 28, 31 (2d Cir.1990); *Grey v. Henderson,* 788 F.Supp. 683, 695 (E.D.N.Y.1991), *aff'd* 956 F.2d 1161 (2d Cir.1992); *Alejandro v. Scully,* 529 F.Supp. 650, 651 (S.D.N.Y.1982). A petitioner seeking habeas relief will succeed only if he can show that the joint trial was so prejudicial as to render the trial fundamentally unfair and violative of his due process rights. *See Grant,* 921 F.2d at 695; *Alejandro,* 529 F.Supp. at 651.

There is no evidence that the trial court abused its discretion by failing to grant Moreno's motion for severance. On his motion for severance, Moreno asserted only that the majority of the allegations in this case were against Cespedes and that there had been no definite identification of him (Pre–Tr. Hrg. at 162.) In contrast, the circumstances of the case supported a joint trial. Moreno and Cespedes were charged with "aiding and abetting" each other, and the same evidence supported the charges against both defendants. While a joint trial where codefendants present mutually antagonistic defenses may present grounds for severance, *Grant,* 921 F.2d at 31, there was nothing antagonistic about the defense presented by Cespedes that would render the trial of Moreno fundamentally unfair. Indeed, Cespedes attempted to exonerate Moreno, specifically and repeatedly asserting that a "friend" and not Moreno was present with him that evening. Finally, the trial judge instructed the jury to render a separate verdict with respect to each defendant, on each count. (Tr. at 652.) Thus, Moreno has not demonstrated that the failure to grant his motion for a severance violated his right of due process.

## CONCLUSION

Because the court finds that the petitioner's claims are either without merit or barred from federal habeas review, the petitioner's motion for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied in its entirety.

SO ORDERED.

Moreno v. Kelly, Not Reported in F.Supp. (1997)
Case 7:13-cv-02627-CS   Document 50   Filed 04/29/16   Page 99 of 181
1997 WL 109526

All Citations

Not Reported in F.Supp., 1997 WL 109526

Footnotes

1    Citations to the trial transcript are cited as Tr. at _____. Citations to findings of fact made by the trial court following a combined identification, suppression and probable cause pre-trial hearing are cited as Pre–Tr. Hrg. at _____.

2    Moreno's sentence is capped at an aggregate maximum term of fifty years pursuant to *Penal Law § 70.30[1](e)(vi).*

3    direct examination, when asked to describe what occurred, Lopez stated "He went inside me ... he put his penis in my vagina ... he just went inside and came right back out." (Tr. at 83–84.) When asked whether she knew if Mr. Moreno ejaculated in that time, Lopez stated "I don't know." (Tr. at 84.)

4    In addition to the first rape, where Lopez identified Moreno as her assailant, Lopez's testimony established that after Moreno left the room, she was again raped by a second unknown individual—either Moreno or Cespedes. (Tr. at 86–87.) The evidence was sufficient to establish the second crime of rape because Lopez testified that the second individual also forcibly "went inside her." (Tr. at 87.) In its charge to the jury, the Court instructed that Moreno could be convicted for the first rape as well as for aiding and abetting and acting in concert with respect to the second rape. (Tr. at 690–91.) A defendant can be found guilty of aiding and abetting a rape. *See, e.g., People v. Garner,* 190 A.D.2d 994, 995, 593 N.Y.S.2d 620, 621 (4th Dep't 1993). In the present case, apart from the victims, Moreno and Cespedes were the only individuals in the apartment at the time of the rapes. After Lopez's first rape, Moreno incited Cespedes to rape Lopez (Tr. at 302.) Thus, the evidence was sufficient to support Moreno's conviction for both the rapes—the evidence established two separate rapes, Moreno's commission of at least one rape, and his acting in concert with respect to the second rape. The sentence of both rape charges ran concurrently. (Sentence Tr. at 18–19.)

5    In a trial transcript of over 600 pages, the petitioner questions only 3 instances of allegedly improper prosecutorial comments.

6    The prosecutor explained:

"Now Carlos Cespedes denies participation in any sex offenses. He tells a story that is completely without mention of sex offenses. That's on direct examination.

On cross examination, well, it comes out at that point that he was present when Collado was made to take her clothes off and what's his explanation for that? His explanation is because he didn't want her to follow him. Did he have to take her clothes off for that or could he have just tied her? **Why won't Mr. Cespedes admit to the rest?**" (emphasis added) (Tr. at 614.)

7    The Eighth Amendment applies against the States by virtue of the Fourteenth Amendment. *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

8    N.Y.Crim.Proc.Law § 710.10 et. seq. provides a statutory mechanism for the litigation of Fourth Amendment claims.

9    While 28 U.S.C. § 2254(d) requires that this court accord a "presumption of correctness" to state court findings of fact, the ultimate question as to whether the pretrial identification procedure was constitutional is a mixed question of law and fact and subject to review by this court. *Sumner v. Mata,* 455 U.S. 591, 597 n. 10, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982).

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 3809945
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

David O'KANE, Petitioner,
v.
Robert KIRKPATRICK, Respondent.

No. 09 Civ. 05167(HB)(THK).
|
Feb. 15, 2011.

**REPORT AND RECOMMENDATION**

THEODORE H. KATZ, United States Magistrate Judge.

**\*1 TO; HON. HAROLD BAER, JR., UNITED STATES
DISTRICT JUDGE.**

**FROM: THEODORE H. KATZ, UNITED STATES
MAGISTRATE JUDGE.**
Petitioner David O'Kane brings this action for a writ of habeas
corpus, pursuant to 28 U.S.C. § 2254, challenging his July
8, 2004 conviction in New York State Supreme Court, New
York County, upon his guilty plea, of Criminal Possession
of a Controlled Substance in the Fourth Degree (N.Y. Penal
Law § 220.09). Petitioner was sentenced, as a second felony
offender, to an indeterminate prison term of 3 to 6 years. [1]

In a decision dated October 2, 2008, the Appellate Division,
First Department affirmed Petitioner's conviction. *See People
v. O'Kane,* 55 A.D.3d 315, 316, 865 N.Y.S.2d 61 (1st Dep't
2008), *lv. denied,* 11 N.Y.3d 928, 874 N.Y.S.2d 13, 902
N.E.2d 447 (2009). Petitioner is currently incarcerated at the
Upstate Correctional Facility in Malone, New York.

In his undated *pro se* motion for habeas corpus relief, which
was later clarified in an amended Petition, dated January
20, 2010, Petitioner argues that: (1) his indictment was
defective because false statements were made in the felony
complaint and the prosecutor knowingly presented false
evidence to the grand jury; and (2) he received ineffective
assistance of counsel because his attorney: (a) failed to
investigate and impeach purportedly false statements in the
felony complaint and pretrial proceedings; and (b) allowed
Petitioner to plead guilty although the evidence against him
was false. (*See* Petition for Writ of Habeas Corpus, dated Jan,

20, 2010 ("Pet."), at 1–3.) Respondent opposes the Petition,
arguing that Petitioner's claim that the indictment is defective
is procedurally barred and is not cognizable on federal
habeas review. (*See* Respondent's Memorandum of Law in
Opposition to Petition for a Writ of Habeas Corpus, dated
May 28, 2010 ("Resp't Mem."), at 16–23.) Respondent further
contends that Petitioner received meaningful assistance of
counsel. (*See id.* at 23–26, 874 N.Y.S.2d 13, 902 N.E.2d 447.)

The Petition was referred to this Court for a Report and
Recommendation, pursuant to 28 U.S.C. §§ 636(b)(1)(B)
and (C). Having carefully considered the parties' submissions
and the state court record, for the reasons that follow the
Court respectfully recommends that the Petition be denied
and Petitioner's claims be dismissed with prejudice.

**BACKGROUND**

**I. Factual Background.**

**A. *The Crime***
On January 7, 2004, at approximately 3:20 P.M., Detective
Ephrem Deshazo ("Deshazo"), who was working undercover
as part of a field team in a buy-and-bust operation, was sitting
in a car on the corner of 114th Street and Lenox Avenue in
Manhattan. (Pretrial Hearing, dated Apr. 29, 2004 ("H."), at
10–14.) Deshazo observed three people approach Petitioner
and line up in front of him. (*See id.* at 17–21, 874 N.Y.S.2d
13, 902 N.E.2d 447.) Petitioner handed each an object. (*See
id.*)Deshazo could not see what the objects were, and could
not see whether the three individuals gave Petitioner anything
in exchange. (*See id.* at 18–19, 874 N.Y.S.2d 13, 902 N.E.2d
447.)

**\*2** Petitioner then headed north on Lenox Avenue and
entered a supermarket on 116th Street and Lenox Avenue.
(*See id.* at 21–22, 24, 874 N.Y.S.2d 13, 902 N.E.2d 447.)
Deshazo followed Petitioner into the store. As he entered,
Deshazo removed his police shield from his vest pocket
so that it was visible to Petitioner. (*See id.* at 24–25, 874
N.Y.S.2d 13, 902 N.E.2d 447.) Petitioner looked at Deshazo
and said, "[O]fficer, this is not my jacket."(*Id.* at 25, 874
N.Y.S.2d 13, 902 N.E.2d 447.) Deshazo searched the jacket
and recovered 50 ziplock bags of crack cocaine from the
*"right* inside jacket pocket." (*Id.* at 25–27, 874 N.Y.S.2d 13,
902 N.E.2d 447.) (emphasis added).

A short time later, Detective Glenn Puppa ("Puppa") arrived at the store. (*See id.* at 53–54, 874 N.Y.S.2d 13, 902 N.E.2d 447.) Deshazo informed Puppa that he had recovered the bags of crack cocaine from Petitioner. (*See id.*)Puppa handcuffed Petitioner, escorted him outside, and searched him, recovering from Petitioner's pockets a wallet, a key, and 71 cents. (*See id.* at 54–58, 874 N.Y.S.2d 13, 902 N.E.2d 447.) In response to Puppa's questions, Petitioner stated that the jacket that he was wearing did not belong to him, but the wallet and keys did. (*See id.* at 58, 60–63.)

**B.** *Pretrial Hearing*
At a *Mapp* /*Huntley* /*Dunaway* hearing on April 29, 2004, Petitioner introduced the jacket worn at the time of his arrest into evidence. Notably, the jacket had a left inside pocket, but no right inside pocket. Petitioner thus argued that Deshazo gave inconsistent testimony, since Deshazo testified at Petitioner's parole revocation proceeding that he recovered the drugs from the left inside jacket pocket, but had testified, both before the grand jury as well as at the instant hearing, that he recovered the drugs from the "right inside jacket pocket." (*Id.* at 78–80, 865 N.Y.S.2d 61.)

The court found that whether Deshazo recovered the drugs from the left or right inside jacket pocket was of no "particular moment," because it was clear that Deshazo recovered drugs from a pocket of the jacket that Petitioner was wearing at the time of his arrest. (*See id.* at 92, 865 N.Y.S.2d 61.)

The court denied Petitioner's motion to suppress the ziplock bags of crack cocaine and the statements made to Deshazo and Puppa. The court further held that Deshazo had probable cause to arrest Petitioner. (*See id.* at 90–92, 865 N.Y.S.2d 61.)

**C.** *Plea Proceedings*
On May 5, 2004, Petitioner appeared before the court with his attorney. After an off-the-record conference with the attorney, the court announced that Petitioner wished to plead guilty. (Plea Hearing, dated May 5, 2004 "P."), at 105–06.) The court informed Petitioner that he would plead guilty to Criminal Possession of a Controlled Substance in the Fourth Degree in exchange for a promised sentence of 3 to 6 years. (*See* P. at 105, 108.) The court also explained the terms of a cooperation condition, reminding Petitioner that there was no guarantee of a reduced sentence, and that the ultimate determination of whether the information provided by Petitioner was of value would be in the sole discretion of the prosecutor. (*See id.* at 108–09, 865 N.Y.S.2d 61.)

Petitioner then admitted to possessing over one ounce of crack cocaine on January 7, 2004. (*See id,* at 109–10, 865 N.Y.S.2d 61.) He confirmed that no one had threatened him, or otherwise compelled him to enter his guilty plea. The court accepted Petitioner's plea and adjudicated him a second felony offender. (*See id.* at 110–13, 865 N.Y.S.2d 61.)

**\*3** Petitioner also plead guilty in an *unrelated* case to Criminal Sale of a Controlled Substance in the Fifth Degree, in exchange for a promised concurrent sentence of 2½ to 5 years, again, with the understanding that his sentence could be reduced on the basis of information provided to the prosecutor. (*See id.* at 111, 113–14, 865 N.Y.S.2d 61 .) Petitioner then admitted that he sold cocaine on April 13, 1999, in New York County. (*See id.* at 114, 865 N.Y.S.2d 61.) The court accepted his plea and adjourned the case for sentencing. (*See id.* at 114–115, 865 N.Y.S.2d 61 .)

**D.** *Sentencing Proceedings*
Prior to the sentencing proceedings, Petitioner filed a *pro se* motion for inspection of the grand jury minutes, new counsel, and withdrawal of his guilty plea to fourth-degree criminal possession. On July 8, 2004, at the sentencing hearing, the court asked Petitioner why he should be allowed to withdraw his plea and be given a new attorney. (Sentencing Hearing, dated July 8, 2004 ("S."), at 2–5.) Petitioner argued that the officers lacked probable cause to stop and search him, and that he thought that if the court were to hear all of the evidence, it would have a "different outlook." (*See* S. at 5–6.)

The court reminded Petitioner that he "already pled guilty" and stated: "I don't have any reason to give you your plea back. You don't have an automatic right. You have to give me some reason. I don't have a reason."(*Id.* at 10, 865 N.Y.S.2d 61.) Petitioner argued, in response, that his attorney coerced him into pleading guilty, stating that;

> I got scared. I got two lawyers telling me, you blow your hearings, you are not going to win the trial, you might as well take the three-to-six, and I got scared and I took the three-to-six.

(*Id.* at 10–11, 865 N.Y.S.2d 61.) The prosecutor objected, arguing that Petitioner wanted "three-to-six so bad," and that the plea itself was the result of "an extended negotiation" in which defense counsel convinced the prosecutor to lower his sentence offer from 4 ½ to 9 years to 3 to 6 years. Petitioner stated that he "didn't want three-to-six," and, again, pointed

to the inconsistency in Deshazo's testimony, contending that the court did not make a credibility finding on that point at the pretrial hearing. (*See id.* at 12–14, 865 N.Y.S.2d 61.) The court disagreed: "I believe that was something that came up during the hearing, but I made my determination."(*Id.* at 15, 865 N.Y.S.2d 61.)

The court denied Petitioner's motion to withdraw his plea. (*See id.* at 16, 865 N.Y.S.2d 61.) Petitioner was sentenced to concurrent, indeterminate prison terms of 3 to 6 years on the fourth-degree 2004 drug possession count and 2½ to 5 years on the fifth-degree 1999 drug sale count.

## II. Procedural History

### A. *Motion to Vacate Judgment of Conviction*
On March 21, 2006, Petitioner filed a *pro se* motion, pursuant to New York Criminal Procedure Law ("CPL") § 440.10, to vacate the judgment of conviction, contending that: (1) the indictment on the 2004 criminal possession charge was defective because it was based on false testimony; (2) the prosecutor knowingly presented false testimony to the grand jury; (3) there was no probable cause for his arrest; and (4) he was denied the effective assistance of counsel because his attorney failed to: (a) impeach Deshazo's pretrial statements and testimony regarding from which pocket he had recovered the drugs; and (b) seek a motion to dismiss the indictment on the ground that Deshazo provided false statements in the felony complaint and testified falsely before the grand jury. (*See* CPL § 440.10 Motion, dated Mar. 21, 2006, attached as Ex. D to Resp't Mem.)

**\*4** On January 4, 2007, the New York County Supreme Court denied Petitioner's CPL § 440.10 motion. (*See* CPL § 440.10 Decision, dated Jan. 4, 2007 ("440 Decision"), attached as Ex. F to Resp't Mem.) Petitioner sought leave to appeal to the Appellate Division, First Department, raising the same claims asserted in his original CPL § 440 motion. On March 28, 2007, the Appellate Division, First Department, denied Petitioner's leave application. (*See* Certificate Denying Leave, dated Mar. 28, 2007, attached as Ex. I to Resp't Mem.) Petitioner thereafter filed a motion for reargument in the Appellate Division, First Department. On June 6, 2007, the Appellate Division, First Department, denied Petitioner's motion. (*See* Order Denying Leave Upon Reargument, dated June 6, 2007, attached as Ex. L to Resp't Mem.)

### B. *Direct Appeal*
In his direct appeal, Petitioner argued that: (1) he was denied his counsel of choice when the court proceeded with the pretrial hearing notwithstanding Petitioner's request for an adjournment so that his family could retain a private attorney; (2) the drugs recovered from Petitioner should have been suppressed because the police lacked probable cause to arrest him; and (3) Petitioner's due process rights and right to effective assistance of counsel were violated when: (a) the court denied Petitioner's application for new counsel following his motion to withdraw his guilty plea; and (b) his counsel provided him with inadequate information concerning his case and "coerced" him into pleading guilty by insisting that the court would find him guilty at his bench trial. (*See* Petitioner's Appellate Brief, dated March, 2008, attached as Ex. M to Resp't Mem.)

On October 2, 2008, the Appellate Division, First Department, unanimously affirmed the judgment of conviction. *See People v. O'Kane,* 55 A.D.3d 315, 865 N.Y.S.2d 61 (1st Dep't 2008). Petitioner sought leave to appeal to the New York Court of Appeals, asking the court to review all of the issues raised in the appellate brief. On January 20, 2009, the New York Court of Appeals denied Petitioner's leave application. *See People v. O'Kane,* 11 N.Y.3d 928, 874 N.Y.S.2d 13, 902 N.E.2d 447 (2009).

## DISCUSSION

Petitioner asserts in the instant Petition that: (1) the indictment was defective because Deshazo made false statements in the felony complaint, and the prosecutor knowingly presented false evidence to the grand jury; and (2) he received ineffective assistance of counsel, because his attorney: (a) failed to investigate and impeach Deshazo's purportedly false statements in the felony complaint and pretrial proceedings regarding the jacket pocket from which the drugs were taken; and (b) allowed Petitioner to plead guilty, even though the evidence against him was false. (*See* Pet. at 1–3.)

## I. AEDPA Standard of Review
Under the Anti–Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a state court conviction "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)

(1), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *Id.* § 2254(d)(2).

**\*5** A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."*Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000); *accord Hoi Man Yuncr v. Walker,* 468 F.3d 169, 176 (2d Cir.2006); *Ernst J. v. Stone,* 452 F.3d 186, 193 (2d Cir.2006). The phrase, "clearly established Federal law," limits the law governing a habeas Petitioner's claims "to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."*Carey v. Musladin,* 549 U.S. 70, 74, 127 S.Ct. 649, 653, 166 L.Ed.2d 482 (2006) (quoting *Williams,* 529 U.S. at 365, 120 S.Ct. at 1499);*accord Hawkins v. Costello,* 460 F.3d 238, 242 (2d Cir.2006).

"The 'unreasonable application' standard is independent of the 'contrary to' standard ... [and] means more than simply an 'erroneous' or 'incorrect' application" of federal law," *Henry v. Poole,* 409 F.3d 48, 68 (2d Cir.2005) (citing *Williams,* 529 U .S. at 410, 120 S.Ct. at 1522). A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identifies the governing legal rule, but applies it in an unreasonable manner to the facts of a particular case. *See Williams,* 529 U.S. at 413, 120 S.Ct. at 1523. The inquiry for a federal habeas court is not whether the state court's application of the governing law was erroneous or incorrect, but, rather, whether it was "objectively unreasonable." *Id.* at 408–10, 120 S.Ct. at 1521–22;*see also Aparicio v. Artuz,* 269 F.3d 78, 94 (2d Cir.2001) ("[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently. The state court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable.").

Moreover, under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct. The [Petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."28 U.S.C. § 2254(e)(1); *see also Parsad v. Greiner,* 337 F.3d 175, 181 (2d Cir.2003) ("This presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility."). A state court's

findings "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."*Miller–El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003).

## II. Defective Indictment

Petitioner argues, as he did in his CPL § 440 motion, that the 2004 indictment was defective and should have been dismissed. In particular, Petitioner contends that Deshazo's statement—that he recovered the drugs from Petitioner's "right inside jacket pocket"—was false, and that the prosecutor knowingly submitted this false evidence to the grand jury. (*See* Pet. at 1–3.) Respondent contends, and this Court agrees, that this claim is procedurally barred by an adequate and independent state law ground and is not cognizable in a federal habeas corpus proceeding. Specifically, Petitioner failed to raise this claim in his direct appeal and can no longer do so. In addition, as Respondent argues, the claim is not cognizable on federal habeas review.

### A. *Procedural Bar*

#### 1. *The Law*
**\*6** Before a federal court may consider a state prisoner's petition for a writ of habeas corpus, all state remedies must be exhausted. *See*28 U.S.C. § 2254(b)(1)(A); *Picard v. Connor,* 404 U.S. 270, 275–76, 92 S.Ct. 509, 512–13, 30 L.Ed.2d 438 (1971); *Jimenez v. Walker,* 458 F.3d 130, 148–49 (2d Cir.2006); *Jones v. Vacco,* 126 F.3d 408, 413 (2d Cir.1997). To satisfy the exhaustion requirement of 28 U.S.C. § 2254, "it is not sufficient merely that the [petitioner] has been through the state courts."*Picard,* 404 U.S. at 275–76, 92 S.Ct. at 512–13. Rather, the claims must be "fairly presented" to the state courts so that the state has an opportunity to correct any alleged constitutional violations. *See Castille v. Peoples,* 489 U.S. 346, 351, 109 S.Ct. 1056, 1060, 103 L.Ed.2d 380 (1989); *Picard,* 404 U.S. at 276, 92 S.Ct. at 513; *Aparicio,* 269 F.3d at 89–90. Moreover, to satisfy this requirement, a petitioner must fairly present his federal claims to the highest state court from which a decision can be had. *See Daye v. Attorney General,* 696 F.2d 186, 190–91 (2d Cir.1982) (en banc); *accord Morgan v. Bennett,* 204 F.3d 360, 369 (2d Cir.2000); *Pesina v. Johnson,* 913 F.2d 53, 54 (2d Cir.1990) (per curiam).

To have his claims heard by a federal habeas court, a petitioner must return to state court if he has not exhausted his state remedies. *See Engle v. Isaac,* 456 U.S. 107, 125–

O'Kane v. Kirkpatrick, Not Reported in F.Supp.2d (2011)
Case 7:13-cv-02627-CS   Document 50   Filed 04/29/16   Page 104 of 181
2011 WL 3809945

126 n. 28, 102 S.Ct. 1558, 1570–71 n. 28, 71 L.Ed.2d 783 (1982); *Grey v. Hoke,* 933 F.2d 117, 120 (2d Cir.1991); *Robertson v. Artuz,* No. 97 Civ. 2561(DC), 2000 WL 10265, at *3–4 (S.D.N.Y. Jan.4, 2000). [2] However, "[f]or exhaustion purposes, 'a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred.' " *Grey,* 933 F.2d at 120 (quoting *Harris v. Reed,* 489 U.S. 255, 263 n. 9, 109 S.Ct. 1038, 1043 n. 9, 103 L.Ed.2d 308 (1989)). If a petitioner has no available state forum in which to pursue a remedy because of a state procedural bar, his claim may be deemed exhausted, yet procedurally barred. *See Teague v. Lane,* 489 U.S. 288, 297–299, 109 S.Ct. 1060, 1068–1069, 103 L.Ed.2d 334 (1989); *Jimenez,* 458 F.3d at 149; *Grey,* 933 F.2d at 120.

Federal habeas review is generally foreclosed when a petitioner's claim is barred by a state procedural rule which is "independent of [a] federal question and adequate to support the judgment."*Coleman v. Thompson,* 501 U.S. 722, 729, 111 S.Ct. 2546, 2553, 115 L.Ed.2d 640 (1991); *accord Brown v. Miller,* 451 F.3d 54, 56 (2d Cir.2006). State procedural bars are independent and adequate when such laws are "firmly established and regularly followed" by the state in question. *James v. Kentucky,* 466 U.S. 341, 348, 104 S.Ct. 1830, 1835, 80 L.Ed.2d 346 (1984); *see also Cotto v. Herbert,* 331 F.3d 217, 239 (2d Cir.2003).

When engaging in an adequacy analysis of the procedural bar, federal courts should give deference to state court decisions and determine if there is a "fair or substantial basis" for the application of the state law to the particular case. *Garcia v. Lewis,* 188 F.3d 71, 78 (2d Cir.1999)."[T]he question is whether application of the procedural rule is 'firmly established and regularly followed' *in the specific circumstances presented in the case,* an inquiry that includes an evaluation of the asserted state interest in applying the procedural rule in such circumstances ."*Cotto,* 331 F.3d at 240 (citing *Lee,* 534 U.S. at 386–87, 122 S.Ct. at 877) (emphasis added).

*7  In *Garvey v. Duncan,* 485 F.3d 709 (2d Cir.2007), the Second Circuit examined the guidelines a habeas court should use to determine the adequacy of a claimed state procedural bar:

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether

perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had 'substantially complied' with the rule given 'the realities of trial,' and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

*Garvey,* 485 F.3d at 714 (quoting *Cotto,* 331 F.3d at 240). While the factors "are not a test for determining adequacy, they are nonetheless used as guides in evaluating 'the state interest in a procedural rule against the circumstances of a particular case.' " *Id.* at 714 (quoting *Lee,* 534 U.S. at 386–87, 122 S.Ct. at 891).

**2. *Application***
In his CPL § 440.10 motion, Petitioner argued that the judgment of conviction should be vacated because the 2004 indictment for criminal possession was procured on the basis of false testimony and was, therefore, defective. The New York County Supreme Court rejected Petitioner's motion, holding that his claims in connection with "alleged discrepancies in the witnesses' testimony at various pretrial stages, including at the grand jury and suppression hearing," were "thoroughly explored on the record before [Petitioner] entered a guilty plea" and were, therefore, "not the proper subject of a CPL [§ ] 440 motion."(440 Decision.) The state court noted that "[t]he grand jury minutes were reviewed by another Court who found them to be legally sufficient" and concluded that "[s]ince sufficient facts appeared on the record to permit review on direct appeal but [Petitioner] failed to make such appeal, [Petitioner's] motion with respect to this evidence is denied."(*Id.*)

Under New York law, all claims that are record-based must be raised in a direct appeal. *See Dunham v. Travis,* 313 F.3d 724, 729 (2d Cir.2002) ("In New York, a criminal defendant may not raise in a § 440 motion a claim that could have been raised on direct appeal."); CPL § 440.10(2)(c) (requiring courts to deny a motion to vacate the judgment where "sufficient facts appear on the record" for the claim to have been raised and decided on direct appeal). Indeed, the denial of a CPL § 440.10 motion for failure to raise a claim on direct appeal represents the application of a "firmly

established and regularly followed" New York rule. *See Arce v. Smith,* 889 F.2d 1271, 1273 (2d Cir.1989); *accord Williams v. Goord,* 277 F.Supp.2d 309, 318–19 (S.D.N.Y.2003). It is only when a defendant's claim hinges upon facts outside the trial record, that he may collaterally attack his conviction by bringing a claim under CPL § 440.10. *See* CPL § 440.10(1); *Aparicio,* 269 F.3d at 91.

**\*8** The New York County Supreme Court invoked this adequate and independent state law ground in denying Petitioner's claim that the indictment was defective. In particular, the state court held that since all the facts relating to the claim appeared on the record, Petitioner had an obligation to raise his claims on direct appeal. Petitioner failed to do so. A defendant is entitled to only one direct appeal. *See Jimenez,* 458 F.3d at 149; *Aparicio,* 269 F.3d at 91 (citing CPL § 450.10(1); N.Y. Ct.App. R. 500.10(a)). Thus, Petitioner's claim is procedurally barred under well-established New York law.

The application of the statutory procedural bar in this case satisfies the three factors identified in *Garvey.* As to the first *Garvey* factor, Petitioner's failure to raise his claim on direct appeal was plainly relied upon by the trial court, as evidenced by its decision. As to the second *Garvey* factor, it is clear, under New York law, that where the factual basis of a claim appears on the record, a defendant can raise that claim only on direct appeal, and relief by way of a CPL § 440.10 motion is precluded. Finally, as to the third *Garvey* factor, Petitioner did not "substantially comply" with the state procedural requirement. As the New York Court of Appeals has recognized, "the purpose of the provision is to prevent CPL [§ ] 440.10 from being employed as a substitute for direct appeal when [a] defendant [is] in a position to raise an issue on appeal (CPL [§ ] 440.10[2][b] ) or could readily have raised it on appeal but failed to do so." *People v. Cooks,* 67 N.Y.2d 100, 103, 500 N.Y.S.2d 503, 491 N.E.2d 676 (1986); *accord Sweet v. Bennett,* 353 F.3d 135, 139 (2d Cir.2003). Here, Petitioner could have, but failed to raise his claim on direct appeal. Had he done so, the Appellate Division could have reviewed his claim, which is now barred from federal habeas review.

**B. *No Cause and Prejudice or Miscarriage of Justice***

If a state court judgment is based on an independent and adequate state procedural rule, federal courts generally cannot review the state court judgment in a habeas corpus proceeding, unless the petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to

consider the claims will result in a fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750, 111 S.Ct. at 2565; *see also Jimenez,* 458 F.3d at 149; *Ramirez v. Attorney Gen. of New York,* 280 F.3d 87, 94 (2d Cir.2001); *Washington v. James,* 996 F.2d 1442, 1447 (2d Cir.1993).

To demonstrate cause for his default, a petitioner must show "that 'some objective factor external to the defense impeded [his] efforts' to raise the claim in state court." *McCleskey v. Zant,* 499 U.S. 467, 493, 111 S.Ct. 1454, 1470, 113 L.Ed.2d 517 (1991) (quoting *Murray v. Carrier,* 477 U.S. 467, 488, 106 S.Ct. 2639, 2645 (1986)); *accord Bloomer v. United States,* 162 F.3d 187, 191 (2d Cir.1998); *Rolling v. Fischer,* 433 F.Supp.2d 336, 346 (S.D.N.Y.2006). Once a petitioner shows cause, the petitioner must also establish prejudice by demonstrating that there is a "reasonable probability" that, but for the constitutional violation that is the subject of the defaulted claim, the outcome of the relevant proceeding would have been different. *See Strickler v. Greene,* 527 U.S. 263, 289, 119 S.Ct. 1936, 1952, 144 L.Ed.2d 286 (1999); *McClesky,* 499 U.S. at 494, 111 S.Ct. at 1471; *accord DiSimone v. Phillips,* 461 F.3d 181, 192 (2d Cir.2006).

**\*9** Here, Petitioner has not argued or demonstrated "cause" for his procedural default; therefore, the Court need not consider the issue of prejudice. *See McCleskey,* 499 U.S. at 502, 111 S.Ct. at 1474; *Stepney v. Lopes,* 760 F.2d 40, 45 (2d Cir.1985); *Dixon v. McGinnis,* 492 F.Supp.2d 343, 352 (S.D.N.Y.2007).

Alternatively, a claim that is barred from habeas review pursuant to independent and adequate state grounds can be considered if a petitioner demonstrates that failure to consider it would result in a miscarriage of justice. A miscarriage of justice occurs "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray,* 477 U.S. at 496, 106 S.Ct. at 2649; *see also Bousley v. United States,* 523 U.S. 614, 623, 118 S.Ct. 1604, 1611, 140 L.Ed.2d 828 (1998); *James,* 996 F.2d at 1447. "Actual innocence means factual innocence, not mere legal insufficiency." *Dunham v. Travis,* 313 F.3d 724, 730 (2d Cir.2002) (quoting *Bousley,* 523 U.S. at 623, 118 S.Ct. at 1611) (internal quotation marks omitted). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence ...." *Schlup v. Delo,* 513 U.S. 298, 324, 115 S.Ct. 851, 865, 130 L.Ed.2d 808 (1995). The doctrine of actual innocence applies only in "extraordinary case[s]" and "credible claims of actual innocence are extremely rare."

*Doe v. Menefee,* 391 F.3d 147, 160–61 (2d Cir.2004) (quoting *Murray,* 477 U.S. at 479, 106 S.Ct. at 2642, and *Schlup,* 513 U.S. at 321, 115 S.Ct. at 864) (internal quotation marks omitted).

There is nothing in the record, however, to suggest that such exceptional circumstances can be demonstrated here. Specifically, without offering new evidence of his innocence, Petitioner cannot establish that a miscarriage of justice has occurred. *See Dunham,* 313 F.3d at 730 ("[Petitioner] presented no new evidence of his innocence and did not make the necessary showing required ... to bypass the procedural bars.").

Accordingly, because Petitioner's claim that the indictment was defective is procedurally barred from further state review, and Petitioner has failed to demonstrate cause and prejudice, or a miscarriage of justice, Petitioner's indictment claim should be dismissed.

**C. *Claim is Not Cognizable on Federal Habeas Review***
In addition to being procedurally barred, Petitioner's claim that his indictment was defective is not, on its substance, cognizable in a federal habeas corpus petition.

There is no federal constitutional right to a grand jury in state criminal proceedings. *See, e.g., Alexander v. Louisiana,* 405 U.S. 625, 633, 92 S.Ct. 1221, 1226–27, 31 L.Ed.2d 536 (1972). Consequently, errors alleged to have occurred at state grand jury hearings are not reviewable by federal habeas courts. *See Alexander,* 405 U.S. at 633, 92 S.Ct. at 1227; *Fields v. Soloff,* 920 F.2d 1114, 1118 (2d Cir.1990) (holding that Fifth Amendment right to indictment by a grand jury is not incorporated by the Due Process Clause of the Fourteenth Amendment and does not apply to the states); *Dunn v. Sears,* 561 F.Supp.2d 444, 453 (S.D.N.Y.2008) ("Federal courts have consistently held that the right to appear before the grand jury is not reviewable by a federal habeas court."). This rule applies to claims of perjury occurring before the grand jury. *See May v. Warden,* No. 07 Civ. 2176(BSJ)(GWG), 2010 WL 1904327, at *3 (S.D.N.Y. May 10, 2010); *Brazeau v. Zon,* No. 04–CV–031 (RJA), 2007 WL 2903617, at *7 (W.D.N.Y. Oct.1, 2007) (finding petitioner's claim that prosecutor knowingly suborned perjury in the grand jury *not* cognizable on habeas review, because it asserts errors that allegedly occurred only at the grand jury proceeding). Thus, Petitioner's claim that his indictment is defective because it was procured on the basis of false testimony is a state law issue and affords no basis for federal habeas relief here.

*10 Moreover, "[g]enerally a knowing and voluntary guilty plea precludes federal habeas corpus review of claims relating to constitutional rights at issue prior to the entry of the plea."*Whitehead v. Senkowski,* 943 F.2d 230, 233 (2d Cir.1991) (citing *Tollett v. Henderson,* 411 U.S. 258, 267, 93 S.Ct. 1602, 1608, 36 L.Ed.2d 235 (1973)). As the Supreme Court explained:

> [A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within [acceptable] standards.

*Tollett,* 411 U.S. at 267;*accord United States v. Randall,* 327 Fed. App'x 255, 256 (2d Cir.2009); *see also United States v. Arango,* 966 F.2d 64, 66 (2d Cir.1992) (holding that "[b]y pleading guilty ... [the defendant] waived his right to object to the constitutionality of the search").

Petitioner's claims regarding deficiencies in the felony complaint, and the manner in which the prosecutor procured the indictment, are clearly independent claims arising out of events that occurred prior to the entry of Petitioner's guilty plea. Under well-settled Supreme Court law, these claims were thus waived when Petitioner entered his guilty plea.

Accordingly, Petitioner's claim that the 2004 indictment was defective is not cognizable in this proceeding and should be dismissed.

**III. Ineffective Assistance of Counsel**
Petitioner contends that he was denied effective assistance of counsel on two grounds: (1) as Petitioner argued in his CPL § 440 motion, counsel failed to investigate and impeach Deshazo's purportedly false statements in the felony complaint and pretrial proceedings; and (2) counsel allowed Petitioner to plead guilty even though the evidence against

him was false, as Petitioner argued on direct appeal. (*See* Pet, at 1–3.)

**A.** *Legal Standard*

To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must establish: (1) that his attorney's performance was so deficient that it "fell below an objective standard of reasonableness," *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); and (2) that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 S.Ct. at 2068;*accord Cox v. Donnelly,* 387 F.3d 193, 197 (2d Cir.2004).

In evaluating the reasonableness requirement, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound ... strategy." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065 (internal quotation marks omitted); *accord Cox,* 387 F.3d at 198. The Second Circuit has defined a "strategic decision" as a "conscious, reasonably informed decision made by an attorney with an eye to benefitting his client." *Cox,* 387 F.3d at 198 (quoting *Pavel v. Hollins,* 261 F.3d 210, 218 (2d Cir.2001)). A court must not use "perfect hindsight to criticize unsuccessful strategies." *Eze v. Senkowski,* 321 F.3d 110, 132 (2d Cir.2003); *see Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065; *Cox,* 387 F.3d at 198.

**\*11** The "reasonable probability" of prejudice prong of *Strickland* is defined as "a probability sufficient to undermine confidence in the outcome" of the state proceedings. *Strickland,* 44 6 U.S. at 694, 104 S.Ct. at 2068;*see also Cox,* 387 F.3d at 199 ("The level of prejudice [a petitioner] need demonstrate lies between prejudice that had 'some conceivable effect' and prejudice that more likely than not altered the outcome in the case.") (quoting *Lindstadt v. Keane,* 239 F.3d 191, 204 (2d Cir.2001)); *United States v. McCloud,* 303 Fed. App'x 916, 920 (2d Cir.2008) (holding that when ineffective assistance of counsel claims are without merit, they are unable to "demonstrate the prejudice required by the second prong of *Strickland*" )."Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland,* 446 U.S. at 700, 104 S.Ct. at 2071.

For the purposes of AEDPA, it is well-settled that the *Strickland* standard constitutes the relevant "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see Aparicio,* 269 F.3d at 95 & n. 8; *Sellan v. Kuhlman,* 261 F.3d 303, 315 (2d Cir.2001). Thus, on habeas review, the question before a court is not whether, as a *de novo* matter, the court finds counsel to have been effective or ineffective; rather, the relevant question is whether the state court decision addressing the issue involved an "unreasonable application" of the *Strickland* standard to the facts of the petitioner's case. *See Sellan,* 261 F.3d at 314–15 & n. 6.

**B.** *Application*

**1.** *Failure to Investigate or Impeach*

Petitioner contends that he was denied effective assistance of counsel because counsel failed to impeach Deshazo's purportedly false statements in the felony complaint and pretrial proceedings.

The New York County Supreme Court rejected Petitioner's ineffective assistance of counsel claim, holding that "the record bears out the fact that [Petitioner] did, in fact, receive meaningful assistance."(440 Decision.) The court found that Petitioner's attorney "filed adequate pretrial motions, represented [Petitioner] appropriately at the suppression hearing and assisted in negotiating a favorable plea bargain for [Petitioner]."(*Id.*)The Appellate Division denied Petitioner's application for leave to appeal. There is no reason to conclude that these state court decisions were contrary to, or an unreasonable application of, clearly established Supreme Court law.

As an initial matter, any claims regarding Petitioner's attorney's performance—other than those relating to his guilty plea—relate to matters preceding his decision to plead guilty and are, therefore, rendered moot by his guilty plea. *See Tollett,* 411 U.S. at 267, 93 S.Ct. at 1608; *United States v. Torres,* 129 F.3d 710, 715 (2d Cir.1997); *Arango,* 966 F.2d at 66.

**\*12** In any event, there is simply no merit to Petitioner's claim that his attorney was ineffective in failing to investigate and impeach Deshazo's purportedly false statements in the felony complaint and at pretrial proceedings. His attorney, for example, thoroughly investigated whether Deshazo had, in fact, proffered conflicting accounts with respect to the location of the jacket pocket from which the police obtained

the crack cocaine. His attorney sent a private investigator to the jail, recovered the jacket, and then introduced it into evidence at the suppression hearing. Although Petitioner's counsel did not cross-examine Deshazo with his inconsistent statement, by introducing the jacket into evidence, his attorney established that the jacket had only a left inside pocket—proving that Deshazo could not have recovered drugs from a "right inside jacket pocket," as he had testified. In other words, by introducing the jacket into evidence and not cross-examining Deshazo, counsel was able to make the important point about Deshazo's testimony, without providing Deshazo an opportunity to explain the inconsistency. This was a legitimate strategic decision. Under *Strickland,* a losing tactic is not necessarily an ineffective one. *See* 466 U.S. at 689, 104 S.Ct. at 2065.

Moreover, even after the inconsistency was drawn to the trial court's attention, the court concluded that it was of no "particular moment to this Court," and that "[Deshazo] was clear that he recovered drugs from the pocket and somebody's left side could be somebody's right side, as far as I am concerned. I don't see the importance of that."(H. at 92.) Indeed, as the court stated on the record, Petitioner already conceded in his grand jury testimony that he did not dispute the fact that Deshazo found crack cocaine in his pocket. (*See id.* at 81.)The key issue in the state court's view was not so much the location of the jacket pocket, but whether the jacket, in fact, belonged to Petitioner. (*See id.*)Hence, even if counsel had cross-examined Deshazo with his prior inconsistent statements about the specific location of the jacket pocket, this would not have altered the outcome of the suppression hearing.

Accordingly, Petitioner fails to satisfy either prong of the *Strickland* test with respect to this claim.

### 2. Decision to Plead Guilty
Petitioner further faults his attorney for allowing him to plead guilty, even though the evidence against him was false. In particular, Petitioner contends that his lawyer provided him with inadequate information concerning his case and "coerced" him to plead guilty by insisting that he would most likely be convicted at a bench trial. The Appellate Division rejected this claim, holding that Petitioner's "arguments concerning his motion to withdraw his plea, including his constitutional claims, are without merit," *O'Kane,* 55 A.D.3d at 316, 865 N.Y.S.2d at 62. The New York Court of Appeals denied Petitioner's leave application. There is no basis to conclude that either decision was contrary to, or

an unreasonable application of, clearly established Supreme Court law.

**\*13** As discussed, Petitioner "may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within [acceptable] standards ..." *Tollett,* 411 U.S. at 267, 93 S.Ct. at 1608;*accord Grant v. United States,* No. 03 Cr. 725(RPP), 2007 WL 2469450, *4 (S.D.N.Y. Aug. 31, 2007); *see also United States v. Cayce,* No. 04 Cr. 506(LAP), 2010 WL 2106174, at *7 (S.D.N.Y. May 19, 2010) (holding that a plea is involuntary "if the defendant made it without the effective assistance of counsel"). There is no indication here that the legal advice received by Petitioner with respect to the decision to plead guilty was not within acceptable standards.

To start, although Petitioner claims that his counsel did not provide him with an opportunity to review the grand jury minutes and police statements prior to trial, as the prosecutor stated on the record, copies of these documents had been provided to Petitioner's attorney, and Petitioner's attorney confirmed that Petitioner had every opportunity to view them with him, and that they "went over everything." (*See* S. at 18, 20.)

In addition, there is no merit to Petitioner's claim that he was "coerced" by his attorney into pleading guilty. Merely being advised of the likely outcome of his trial—conviction—does not constitute coercion. Moreover, given the substantial evidence against him, and the possibility of a lengthy prison sentence, his plea constituted a fair bargain, which was the product of "extended negotiations," and it was entirely reasonable for his attorney to suggest that he plead guilty according to its terms. Indeed, as the 440 court itself noted: "In the context of a guilty plea, a defendant has been afforded meaningful representation when he or she receives an *advantageous plea* and nothing in the record casts doubt on the apparent effectiveness of counsel."(440 Decision) (citation omitted) (emphasis added).

In particular, if convicted, Petitioner—a five-time predicate felon with a 25–year criminal history—faced a sentence of from 8 1/3 to 25 years on the 2004 drug possession charge, as well as the possibility of a consecutive sentence of up to that same amount of time on his pending 1999 drug sale charge. *See*Penal Law §§ 70.00(2), 70.06(3)(b). After extensive discussions with his attorney, however, Petitioner pled guilty to the lesser charge of fourth-degree criminal possession in exchange for a promised sentence of from 3 to

6 years in prison—to be served concurrently with a sentence of from 2½ to 5 years upon his pleading guilty to the 1999 drug sale charge. Petitioner did not waive his right to appeal as a condition of either plea.

Thus, although Petitioner contends that he pled guilty to the 2004 drug possession charge only because his attorney informed him that he would likely be convicted at a bench trial and receive a sentence higher than from 3 to 6 years, in light of his failed suppression motion, as well as the lengthy prison sentence that he risked in proceeding to trial, his lawyer's advice that he accept the guilty plea constitutes, in this Court's view, not coercion, but rational advice.

**\*14** In any event, a review of the record plainly establishes that Petitioner's decision to plead guilty to Criminal Possession of a Controlled Substance in the Fourth Degree was knowing, voluntary, and intelligent, and not the result of coercion on the part of his attorney. Having been convicted of felony drug dealing and possession in the past, it is clear that Petitioner understood the charge to which he pled guilty in the instant case. Moreover, there is no doubt that the court elicited Petitioner's voluntary admission of guilt. Specifically, Petitioner assured the court that no one had threatened, or otherwise compelled him, to plead guilty, and that he was pleading guilty voluntarily, and of his own free will. (*See* P. at 110.) "These statements create a presumption that his plea was knowing and voluntary, a presumption that is not overcome by vague and unsupported assertions that his attorneys failed to properly advise him."*United States v. Tremblay,* No. 08 Civ. 7030(JFK), 2009 WL 1055007, at \*7 (S.D.N.Y. Apr.20, 2009); *see also Blackledge v. Allison,* 431 U.S. 63, 74, 97 S.Ct. 1621, 1629, 52 L.Ed.2d 136 (1977) ("Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible."); *United States v. Hernandez,* 242 F.3d 110, 112–13 (2d Cir.2001) (holding that petitioner's conclusory allegation that he was "misled about the consequences of his guilty plea by his attorney" did not overcome the presumption, created by his sworn statements made in open court, that his guilty plea was knowing, voluntary, and made after extensive discussions with his attorney).

Moreover, throughout the pretrial proceedings, the state court repeatedly reminded Petitioner that the decision to plead guilty was entirely "up to" him and explained to Petitioner that if he did not plead guilty, he would be "tak [ing] a chance" and "roll[ing] the dice," as his sentence could be "at least 4½ to 9 [years]"—if not "higher"—if he were found guilty at trial. (*See* H. at 77–81.) In other words, Petitioner's guilty plea was entered voluntarily, and with a full understanding of the "risks" associated with pleading not guilty. (*See id.* at 82.)

Accordingly, for all the reasons given, Petitioner's claim of ineffective assistance of counsel is meritless and should be dismissed.

### *CONCLUSION*

For the reasons set forth above, this Court respectfully recommends that Petitioner's request for habeas relief be denied and that this action be dismissed with prejudice. Further, because Petitioner has not made a substantial showing of the denial of a federal right, the Court recommends that no certificate of appealability be issued. *See* 28 U.S.C. § 2253(c)(2); *Lucidore v. N.Y. State Div. of Parole,* 209 F.3d 107, 112 (2d Cir.2000). The Court further recommends that the Court certify, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from its order would not be taken in good faith. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 920–21, 8 L.Ed.2d 21 (1962).

**\*15** Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6(a) and (d) (2008). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Harold Baer, Jr., United States District Judge, and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Baer. Failure to file objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn,* 474 U.S. 140, 145, 155, 106 S.Ct. 466, 470, 475, 88 L.Ed.2d 435 (1985); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989).

### All Citations

Not Reported in F.Supp.2d, 2011 WL 3809945

Footnotes

1   This sentence was to run concurrently with an indeterminate prison term of from 2½ to 5 years arising from an *unrelated*
    1999 conviction, upon his guilty plea, of Criminal Sale of a Controlled Substance in the Fifth Degree (N.Y. Penal Law
    § 220.31).

2   Under AEDPA, however, a court may waive exhaustion if it concludes that a claim should be dismissed on its merits.
    *See* 28 U.S.C. § 2254(B)(2).

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

O'Kane v. Kirkpatrick, Not Reported in F.Supp.2d (2011)
Case 7:13-cv-02627-CS Document 50 Filed 04/29/16 Page 111 of 181
2011 WL 3918158

2011 WL 3918158
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

David O'KANE, Petitioner,

v.

Robert KIRKPATRICK, Respondent.

No. 09 Civ. 05167(HB)(THK).
|
Aug. 25, 2011.

### OPINION & ORDER

Hon. HAROLD BAER, JR., District Judge. *

**\*1** Pro se petitioner David O'Kane brings this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his state court conviction and sentence on charges of Criminal Possession of a Controlled Substance in the Fourth Degree (N.Y. Penal Law § 220.09). Magistrate Judge Katz issued a Report and Recommendation ("R & R"), in which he recommends that the petition be denied and that the action be dismissed with prejudice. Petitioner filed timely objections to the R & R on April 15, 2011.

## I. BACKGROUND

### A. Factual and Procedural History
On January 7, 2004, an undercover detective observed Petitioner handing objects to three individuals. The detective followed O'Kane into a store, where he searched petitioner's jacket and recovered 50 ziplock bags of crack cocaine. The detective attested that he recovered the crack cocaine from the right pocket; Petitioner has stressed throughout the proceedings that the jacket had only a left pocket, not a right pocket. On May 5, 2004, Petitioner pleaded guilty to criminal possession of a controlled substance in the fourth degree (N.Y. Penal Law § 220.09) and received a sentence of 3 to 6 years.

On March 21, 2006, O'Kane filed a pro se motion pursuant to New York Criminal Procedure Law ("CPL") § 440.10 to vacate the judgment of conviction, which the New York County Supreme Court denied. The Appellate Division, First

Department, denied Petitioner leave to appeal on March 28, 2007, and denied leave to reargue on June 6, 2007.

Petitioner appealed his conviction directly. On October 2, 2008, the Appellate Division, First Department, unanimously affirmed the judgment of conviction. *People v. O'Kane,* 55 A.D.3d 315, 865 N.Y.S.2d 61 (1st Dep't 2008). Petitioner sought leave to appeal to the New York Court of Appeals, which was denied on January 20, 2009. *People v. O'Kane,* 11 N.Y.3d 928, 874 N.Y.S.2d 13, 902 N.E.2d 447 (2009).

Petitioner commenced this *pro se* action on June 3, 2009. He amended the petition on January 29, 2010, arguing a defective indictment and ineffective assistance of counsel. The petition was referred to Magistrate Judge Katz, who issued a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(C) on February 15, 2011 (the "R & R").

### B. Magistrate Judge Katz's Report & Recommendation
After carefully evaluating the submissions, Magistrate Judge Katz recommended that Petitioner's petition for a writ of habeas corpus be denied. The R & R notes that Petitioner's claims are reiterations of previous arguments made in state court. Petitioner's allegation that false witness testimony was used to convict him was discussed at length. *See* R & R at 10–24. Judge Katz found that the claim is procedurally barred and is not cognizable in a federal habeas corpus proceeding. R & R at 13. Judge Katz also seriously considered petitioner's objection to effectiveness of appellate counsel. *See* R & R at 24–34. He concluded that petitioner's claim is "meritless" under the standard established in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Judge Katz found counsel's performance met the *Strickland* standard, and noted that a strategy is not shown to be bad merely because it ultimately fails. Additionally, given the facts and allegations against Petitioner, Judge Katz noted that Petitioner received a relatively favorable plea deal. This supported his conclusion that Petitioner's counsel met at least an objective standard of reasonableness in representing Petitioner.

### C. O'Kane's Objections
**\*2** Petitioner submitted his Objections to Judge Katz's R & R on April 15, 2011. Petitioner reiterated the arguments that he made in his original petition, including: (A) that the police officers did not have probable cause to search him; (B) that Detective Deshazo's testimony regarding where the drugs were found was false and inadmissible; (C) that Petitioner

never stated that the jacket was his; (D) that Petitioner never cooperated in the trial proceedings; and (E) that his counsel at trial was ineffective. Petitioner also included several exhibits with excerpts from proceedings in the case in support of his arguments.

## II. STANDARD OF REVIEW

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *New York Dist. Council of Carpenters Pension Fund v. Perimeter Interiors, Inc.,* 657 F.Supp.2d 410, 414 (S.D.N.Y.2009). This Court reviews *de novo* those parts of the R & R to which objections are made, and reviews the remainder for clear error. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b)(3); *Perimeter Interiors,* 657 F.Supp.2d at 414. "When a party makes only generalized or conclusory objections, or simply reiterates his original arguments, the Court reviews a magistrate judge's report and recommendation for clear error." *Perimeter Interiors,* 657 F.Supp.2d at 414. "The party filing objections must specifically identify those findings or recommendations to which the objections are being made. The District Court need not consider frivolous, conclusive or general objections." *Dotson v. Zenon,* 549 F.Supp.2d 1291, 1299 (D.Colo.2008) (Citations omitted). Where portions of the R & R are uncontested or not subject to *de novo* review, "a district court need only satisfy itself that there is no clear error on the face of the record." *Reyes v. Mantello,* No. 00–Civ.–8936, 2003 WL 76997, at *1 (S.D.N.Y. Jan.9, 2003).

## III. DISCUSSION

### A. Defective Indictment

Petitioner's objections A through C to the R & R are reiterations of the original arguments he made to support his defective indictment claim in this Court. I therefore review the R & R's findings on the defective indictment claim for clear error. *See Perimeter,* 657 F.Supp.2d at 414.

Petitioner argues that he was subject to a defective indictment, and that because of this his guilty plea should be dismissed. Judge Katz rejected Petitioner's claim because, in general, federal habeas courts may not review the judgment of a state court that rests on a procedural default that is "independent of [a] federal question and adequate to support the judgment." *Coleman v. Thompson,* 501 U.S. 722, 729, 111 S.Ct. 2546,

115 L.Ed.2d 640 (1991). Additionally, because Petitioner failed to show a potential for prejudice or miscarriage of justice, his request for relief cannot be granted with respect to the defective indictment. *See id.* at 750.

### 1. *Procedural Bar/Independent and Adequate Support for the Judgment*

**\*3** When reviewing state criminal proceedings, a federal habeas court must evaluate any procedural errors under the following guidelines: (1) whether the procedural violation was depended on by the trial court; (2) whether state case law demands compliance with the procedure in the instant case; and (3) whether compliance with the rule in the instant case would have served a legitimate governmental interest. *Garvey v. Duncan,* 485 F.3d 709 (2d. Cir.2007) (citing *Lee v. Kemna,* 534 U.S. 362, 381–5, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002)).

Judge Katz properly applied the *Garvey* guidelines. Judge Katz concluded that, when the state 440.10 court rejected Petitioner's defective indictment argument as raised on his CPL 440.10 motion, it plainly relied on Petitioner's error in not previously raising that argument on a direct appeal. Petitioner did not include the defective indictment claim in his subsequent direct appeal, and is therefore barred from bringing it in subsequent appeals. The New York Court of Appeals ruled that the discrepancies in testimony that Petitioner alleges as the basis for his claim were adequately adjudicated by the trial court, and that any objections to the discrepancies should have been raised during the direct appeal process.

With respect to the second prong, state law is clear in New York that claims raised based on issues in the record must be brought on direct appeal. *Dunham v. Travis,* 313 F.3d 724, 729 (2d Cir.2002). Lastly, New York law requires compliance to prevent parties from subverting the appropriate appeals process. *People v. Cooks,* 67 N.Y.2d 100, 103, 500 N.Y.S.2d 503, 491 N.E.2d 676 (1986). As Judge Katz points out, the New York Court of Appeals has established this as a governmental interest, and therefore the third prong of *Garvey* is satisfied.

### 2. *Potential Prejudice*

Judge Katz next evaluated whether there was "actual prejudice as a result of the alleged violation of federal law," or if the Petitioner could "demonstrate that failure to consider the claims [would] result in a fundamental miscarriage of justice" *Coleman,* 501 U.S. at 750. Judge Katz's analysis on this

issue, however, demonstrates that such prejudice or potential miscarriage of justice were not evident in the Petitioner's case.

Additionally, Judge Katz reported that Petitioner's claim of a faulty indictment by grand jury is not a cognizable claim under federal habeas review. There is no federal constitutional right to a grand jury in state criminal proceedings. *See, e.g., Alexander v. Louisiana,* 405 U.S. 625, 633, 92 S.Ct. 1221, 1226–1227, 31 L.Ed.2d 536 (1972). Because Petitioner's claim is based on state law, it is not reviewable in a federal habeas court. *See id.*

Lastly, Judge Katz emphasized the fact that Petitioner's guilty plea precludes him from raising constitutional defenses related to testimony before the plea was entered. Petitioner made his guilty plea in state court without coercion and with an understanding of the importance of making such a plea. A "knowing and voluntary guilty plea precludes federal habeas review of claims relating to constitutional rights at issue prior to the entry of the plea." *Whitehead v. Senkowski,* 943 F.2d 230, 233 (2d Cir.1991). I find no clear error in Judge Katz's findings on the defective indictment claim.

### B. Ineffective Assistance of Trial Counsel

**\*4** Petitioner's arguments related to the ineffectiveness of trial counsel, asserted in objections D and E, merely reiterate what he argued in the petition for habeas corpus. Petitioner did not raise specific objections to Judge Katz's thorough analysis, so that analysis must be reviewed for clear error. *See Perimeter,* 657 F.Supp.2d at 414.

The Antiterrorism and Effective Death Penalty Act (AEDPA) does not allow federal *habeas* relief where a state court has made a decision on the merits, unless the state court's decision is "contrary to or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. §§ 2254(d)(1). In order to prevail on an ineffective assistance of counsel challenge, petitioner must show that counsel's work (1) fell below an objective standard of reasonableness; and (2) there is a "reasonable probability that but for the counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). In evaluating the reasonableness requirement, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be

considered sound ... strategy." *Id.* at 689. Further, the "reasonable probability" of prejudice prong of Strickland is defined as a "probability sufficient to undermine confidence in the outcome" of the state proceedings. *Id.* at 694. For the purpose of the AEDPA, Strickland is recognized as the "clearly established federal law, as determined by the Supreme Court of the United States." *See Arparicio v. Artuz,* 269 F.3d 78, 95 (S.D.N.Y.2001).

Petitioner argues that counsel provided ineffective assistance when he failed to impeach Detective Deshazo for inconsistencies related to whether the crack cocaine was found in the right or the left pocket. However, "[f]ailure to raise a meritless claim does not amount to ineffective assistance." *United States v. Arena* 180 F.3d 380, 396 (2d Cir.1999). As Judge Katz notes, counsel's strategy to enter the jacket into evidence and deny Deshazo the ability to explain the inconsistency in his testimony was an indication of effective legal assistance. R & R at 28. In the end, the state trial court during a pretrial hearing found Deshazo's inconsistency to be of no "particular moment," as the drugs were recovered from Petitioner in the course of the arrest. *Id.* at 29. As Judge Katz notes, a strategy is not shown to be bad merely because it ultimately failed. Judge Katz's analysis is correct and is adopted.

Additionally, Petitioner argues that he received ineffective assistance because his attorney coerced him into the plea agreement. Judge Katz notes that this argument was rejected in the Appellate Division, and that in sum there is "no basis to conclude that [the Appellate Division's] decision was contrary to, or an unreasonable application of, clearly established Supreme Court law." R & R at 30. Further, Judge Katz correctly draws the inference that counsel's advice to Petitioner to take the plea deal rather than face a longer prison sentence, given the realities of the case, was a fair appraisal of the situation and resulted in a good deal for Petitioner. Petitioner has shown no clear error in the R & R.

### C. Motion to Amend Petition

**\*5** Petitioner requested leave that he be allowed to amend his petition to include a claim of ineffective assistance of appellate counsel. Irrespective of any procedural problems this request might face, the requested amendment has no merit. Petitioner's claim is based in the same argument he made with respect to his trial counsel: Petitioner claims that appellate counsel was ineffective because counsel failed to raise arguments regarding inconsistencies in Detective Deshazo's testimony. Appellate counsel are held to the same

standard of effectiveness applicable to trial counsel. *See Aparicio,* 269 F.3d at 95 ("Although it was born in the context of ineffective assistance of trial counsel, *Strickland's* two-prong test applies equally to claims of ineffective assistance of appellate counsel on a defendant's first appeal as of right."). Accordingly, as detailed, *supra,* Petitioner's claim is without merit. Petitioner has the burden to prove that counsel's assistance was ineffective, and fails to meet this burden in either his complaints about appellate counsel or trial counsel. Petitioner's motion to amend is moot because, even if granted, the amendment would provide no grounds for relief The motion is denied.

## IV. CONCLUSION

For the foregoing reasons, Petitioner's objections to Magistrate Judge Katz's February 15, 2011 R & R are unpersuasive. The R & R is adopted in its entirety, and Petitioner's § 2254 application for writ of habeas corpus is DENIED. As the Petition makes no substantial showing of a denial of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253.

The Clerk of Court is directed to close the matter and remove it from my docket.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 3918158

Footnotes

\*      Ernesto Rodriguez, a law student at American University Washington College of Law and a summer 2011 intern in my Chambers, provided substantial research and writing assistance on this Opinion and Order.

                                        © 2016 Thomson Reuters. No claim to original U.S. Government Works.

  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3290962
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
S.D. New York.

Ruben ORTIZ, Petitioner,
v.
Dale ARTUZ, Superintendent, Clinton
Correctional Facility, Respondent.

No. 09 Civ 5553(NRB).
|
Aug. 9, 2010.

**Attorneys and Law Firms**

Ruben Ortiz, Dannemora, NY, pro se.

Karen Schlossberg, Eleanor Ostrow, Assistant District
Attorney, New York, NY, for Respondent.

**MEMORANDUM AND ORDER**

NAOMI REICE BUCHWALD, District Judge.

 **\*1** Petitioner Ruben Ortiz ("petitioner" or "Ortiz"),
currently an inmate at the Clinton Correctional Facility,
brings this *pro se* petition for a writ of habeas corpus pursuant
to 28 U.S.C. § 2254, alleging that he is being held in violation
of his constitutional rights. Specifically, Ortiz challenges a
sentence entered on June 21, 2005, following a guilty plea to
a charge of Attempted Murder in the Second Degree.

Construed liberally, the petition asserts five claims:

(1) that the eleven-year delay between Ortiz's crime and
indictment constituted a violation of the Due Process
Clause of the Fourteenth Amendment;

(2) that the trial court's refusal to grant Ortiz a continuance
at a suppression hearing violated the Compulsory
Process Clause of the Sixth Amendment;

(3) that Ortiz's arrest lacked probable cause, in violation of
the Fourth Amendment;

(4) that the police conducted a custodial interrogation of
Ortiz without apprising him of his rights under *Miranda
v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694
(1966); and

(5) that the failure to provide Ortiz with a lawyer during
the interrogation constituted a violation of the right to
counsel under *Miranda.*

For the reasons set forth below, the petition is denied.

*BACKGROUND* [1]

**I. Arrest and Interrogation**
On April 14, 1993, the petitioner and a drug dealer identified
only as Martin went to the apartment of Leonard Vasquez to
collect an outstanding debt. (Opp.Br., Ex. I.) The petitioner
was carrying a .38 caliber revolver, and Martin was carrying a
9 millimeter pistol. (*Id.*) The petitioner and Martin restrained
Vasquez by tying him up and then robbed his apartment. (*Id.*)
As Ortiz and Martin left, Martin shot and killed Vasquez. (*Id.*)

The police later searched the crime scene and lifted a
fingerprint from a closet door. (Opp.Br., Ex. M.) Two
database searches were performed with the fingerprint, but
the police were unable to match it to Ortiz until October 3,
2004—more than ten years later-by which time fingerprint-
matching technology had improved. (*Id.* at 2.)

On October 12, 2004, at 7:45 p.m., six police officers went
to Ortiz's apartment in the Bronx and asked him to leave with
them to discuss what they described as "an incident." (*Id.*
at 5.) Ortiz was alone in the apartment with his two young
daughters and asked to call his common law wife so that
she could watch the children. (*Id.*) The woman arrived at
approximately 8:45 p.m., and the petitioner went with the
police to the 24th precinct. (*See id.* at 6.)

At the precinct, Ortiz was taken, unrestrained, to an interview
room. (*Id.*) The door to the room was left open, and there was
no police officer posted outside. (*Id.*) After approximately
45 minutes, two detectives spoke with the petitioner and,
after offering him food and a beverage, provided him
with some water at his request. (*Id.* at 7.) The detectives
asked background questions about where Ortiz grew up, his
criminal history, and where he had been incarcerated. (*Id.*)

**\*2** Soon afterward, the detectives led Ortiz to a training room with a window that looked out onto Vasquez's building. The detectives asked Ortiz if he recognized it, and he said he did not. (*Id.* at 8.) The three then returned to the interview room, and the detectives told Ortiz that they knew he had been to the building. Ortiz then stated that he had driven a friend there once. (*Id.*)

At this point, the detectives advised Ortiz of his *Miranda* rights, which he waived orally and in writing. (*Id.; see also* Opp. Br., Ex. E.) The written *Miranda* waiver indicates that this occurred at 10:40 p.m.—approximately three hours after the police showed up at Ortiz's apartment and two hours after Ortiz was transported to the precinct. (Opp.Br., Ex. E.)

A series of interviews followed through the night, and Ortiz provided the police with four increasingly specific and progressively incriminating written statements. (*See* Opp. Br., Ex. F–I.) In the fourth and final statement, the petitioner confessed to his involvement in the robbery and shooting. (Opp.Br., Ex. I.)

At 11:00 a.m. the next morning, the petitioner was interviewed on videotape by an Assistant District Attorney. (Opp.Br., Ex. M.) The ADA advised the petitioner of his *Miranda* rights, pausing after reciting each one, and Ortiz again waived his rights. (*Id.* at 14.) The videotaped statement was more detailed—but similar in content—to the final statement that Ortiz had given the police. (*Id.*)

## II. Motion to Suppress Before the Trial Court

Proceedings commenced in New York Supreme Court, New York County, with an indictment by a grand jury on November 5, 2004. On January 5, 2005, Ortiz filed an omnibus mot ion that included a motion to suppress his statements to the police, a challenge to the propriety of his arrest (which, he alleged, took place when he was transported from his home), and a request that a *Huntley/Dunaway* hearing be held in order to address those issues. (Opp.Br., Ex. B.) [2] On February 2, 2005, the court granted the request for the hearing. (Opp.Br., Ex. D.)

The hearing took place on March 8, 2005. The prosecution presented the testimony of four detectives involved in the arrest and interrogation—Detectives Kenneth Clancy and Miguel Perez, who were part of the arrest team, and Detectives Joseph Litrenta and William Hicks, who conducted the interviews at the precinct.

The only defense witness scheduled to testify was Ortiz's common law wife, but she was apparently sick on the day of the hearing and unable to be present. (Opp.Br., Ex. L.) Ortiz sought a continuance through the next morning, but the request was denied. (*Id.* at 40.)

The court then proceeded to deny the motion to suppress. (Opp. Br ., Ex. M.) The court broadly concluded that the police "acted with proper decorum"; that Ortiz was not in custody for the purposes of *Miranda* until he acknowledged having previously visited Vasquez's building, at which point he was given the requisite warnings; and that the interaction at Ortiz's apartment and the transport to the police precinct did not constitute an arrest for purposes of the Fourth Amendment. (*See* 3/8/05 Tr. at 179.)

## III. Ortiz's Plea

**\*3** On June 2, 2005, Ortiz pled guilty, pursuant to a plea agreement, to Attempted Murder in the Second Degree. (Opp.Br., Ex. K.) Consistent with the plea agreement, Ortiz was sentenced to a term of imprisonment of twelve-and-a-half to twenty-five years. (Opp. Br. at 3–4.)

## IV. Ortiz's 440.20 Motion

On September 12, 2005, Ortiz filed a motion under N.Y.Crim. Proc. Law § 440.20 to vacate his conviction, alleging that he was not present when his sentence was executed. (Opp.Br., Ex. V.) The motion was denied on October 4, 2005.

As the reviewing court explained in its opinion, Ortiz's motion was based on a highly misleading description of the relevant facts. Ortiz's sentence was imposed on June 21, 2005, but at Ortiz's request, the execution of the sentence was stayed until July 26, 2005. He was told by the sentencing court that on July 26th he would be produced in the courthouse but not brought into the courtroom, and that the court would simply state on the record that Ortiz's sentence was executed. Ortiz agreed to this procedure, and on July 26th, that is exactly what happened. The reviewing court concluded that, having consented to this procedure, Ortiz could not complain that he was not afforded his right to be present for the execution of his sentence.

## V. The Direct Appeal and Filing of the Instant Petition

On July 9, 2007, Ortiz filed a direct appeal from his conviction. The appeal raised five claims, three of which

have been raised (in substantially similar form) in the instant petition: (1) that the eleven-year pre-indictment delay was unconstitutional; (2) that the interrogation at the police precinct was conducted in violation of Ortiz's Fourteenth Amendment rights; and (3) that Ortiz's constitutional rights were violated when he was denied a continuance at the *Huntley/Dunaway* hearing.

On March 4, 2008, the First Department of the Appellate Division unanimously denied the appeal. (*Id.* at 5.) On May 28, 2008, Judge Victoria Graffeo of the Court of Appeals issued a certificate denying Ortiz's request for leave to appeal. (*Id.* at 6.)

On July 3, 2008, Ortiz submitted a *pro se* letter to Judge Kaye requesting permission to reappeal his conviction. (Opp.Br., Ex. T.) The request was denied on September 29, 2008, and the instant petition followed on May 21, 2009.

## *DISCUSSION*

The respondent makes three principal arguments in opposition to the petition: (1) that the second and fourth claims in the petition have already been rejected on an independent and adequate state law ground and are therefore not entitled to federal habeas review; (2) that the third and fifth claims in the petition are unexhausted; and (3) that, in any event, all five of the claims are meritless or otherwise uncognizable on habeas review. As we explain in further detail below, we agree. [3]

## I. Standard of Review

In considering petitions for habeas relief, we grant considerable deference to the state courts' prior determinations of both law and fact. *See Uttecht v. Brown,* 551 U.S. 1, 9–10, 127 S.Ct. 2218, 167 L.Ed.2d 1014 (2007). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), when a claim has been adjudicated on the merits in state court, habeas relief may be granted only if the state court decision was either (a) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or (b) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Jones v. West,* 555 F.3d 90, 96 (2d Cir.2009).

*4 A state court decision is "contrary to" clearly established federal law as determined by the Supreme Court if the state court either (a) "applies a rule that contradicts the governing law set forth in [a Supreme Court] case [,]" or (b) "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Lockyer v. Andrade,* 538 U.S. 63, 73, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) (internal citation and quotations omitted). A state court decision involves an "unreasonable application" of clearly established federal law if the state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the particular facts of [a] prisoner's case." *Brown v. Alexander,* 543 F.3d 94, 100 (2d Cir.2008) (quoting *Williams v. Taylor,* 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). In order for habeas relief to be granted on this second ground, the state court's application of clearly established federal law must be "unreasonable," not merely "incorrect or erroneous." *Williams,* 529 U.S. at 410.

When considering factual determinations made by the state court, we apply a presumption of correctness, which petitioner, through "clear and convincing evidence," bears the burden of rebutting. 28 U.S.C. § 2254(e)(1); *see also Drake v. Portuondo,* 553 F.3d 230, 239 (2d Cir.2009).

## II. Analysis of Petitioner's Claims

Once again, Ortiz's petition, construed liberally, presents five claims:

(1) that the eleven-year delay between Ortiz's crime and indictment constituted a violation of the Due Process Clause of the Fourteenth Amendment;

(2) that the trial court's refusal to grant Ortiz a continuance at the *Huntley/Dunaway* hearing violated the Compulsory Process Clause of the Sixth Amendment;

(3) that Ortiz's arrest lacked probable cause, in violation of the Fourth Amendment;

(4) that the police conducted a custodial interrogation of Ortiz without apprising him of his *Miranda* rights; and

(5) that the failure to provide Ortiz with a lawyer during the interrogation constituted a violation of the right to counsel under *Miranda.*

We proceed as follows. First, we explain that the petitioner waived his right to appeal the second and fourth claims in the petition and that, in enforcing the waiver, the Appellate Division adjudicated the claims on an independent and adequate state law ground, which precludes them from being reviewed in a federal habeas proceeding. Second, we explain that Ortiz failed to exhaust the third and fifth claims in the petition and that they have now been procedurally defaulted. Finally, we discuss why each of the petitioner's claims—even setting aside procedural barriers to review—is meritless or otherwise uncognizable in habeas review.

## A. Waiver of Right to Appeal

The respondent argues, and we agree, that the second and fourth claims in the petition are not reviewable in a federal habeas proceeding. Federal habeas review is prohibited where a state court rests its disposition of a claim on an independent and adequate state law ground. *See, e.g., Coleman v. Thompson,* 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Cotto v. Herbert,* 331 F.3d 217, 238 (2d Cir.2003). This "ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases." *Coleman,* 501 U.S. at 732.

 **\*5**  Pursuant to his plea agreement, the petitioner signed a waiver of his right to appeal his conviction. (Opp.Br., Ex. K.) In his direct appeal, Ortiz argued that he did not understand the waiver and that it should therefore not preclude him from appealing (as is relevant here) his claims concerning the failure to grant a continuance at the *Huntley/ Dunaway* hearing (the second claim in the instant petition) and the allegedly unconstitutional custodial interrogation (the fourth claim). The Appellate Division rejected the argument, holding that the waiver was valid and enforceable under New York law and that it "foreclose[d] review of [any] procedural and substantive claims relating to [Ortiz's] suppression motion." (Opp.Br., Ex. O.)

We find that the Appellate Division's refusal to review the second and fourth claims in the instant petition was based on an independent and adequate state law ground and that the decision therefore precludes federal habeas review of those claims. [4]

## B. Exhaustion and Procedural Default

The respondent further contends that federal habeas review of the third and fifth claims in the petition is inappropriate because the petitioner failed to exhaust his state remedies. We agree.

Pursuant to 28 U.S.C. § 2254(b)(1), before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies in order to give the state the opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *Holland v. Florida,* —— U.S. ——, 130 S.Ct. 2549, 2562, 177 L.Ed.2d 130 (2010). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese,* 541 U.S. 27, 29, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004) (internal citations and quotations omitted). A claim is not "fairly presented" to a state court "if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Id.* at 32; *see also Bierenbaum v. Graham,* 607 F.3d 36, 47 (2d Cir.2010).

The petitioner has not "fairly present[ed]" either the third or fifth claims in his petition to the appropriate state court. The third claim contends that Ortiz's Fourth Amendment rights were violated because he was arrested without probable cause. This claim was first made in the omnibus motion filed in the trial court on January 5, 2005 and argued at the *Huntley/Dunaway* hearing. (See 3/8/05 Tr. at 161.) However, the claim was not pursued on direct appeal. The fifth claim contends that Ortiz's Sixth Amendment rights were violated because he was denied counsel during his interrogation. This claim has simply never been raised in a state court proceeding. Thus, the petitioner has brought a "mixed petition"—one with both exhausted and unexhausted claims and which, as a result, we would ordinarily be unable to review. *Rose v. Lundy,* 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). However, where, as here, a petitioner failed to assert a claim in state court but is now barred from doing so by state procedural rules, [5] his claim is "deemed" exhausted. *McKethan v. Mantello,* 292 F.3d 119, 120 (2d Cir.2002); *Hayward v. Brown,* 09 Civ. 6495(LAK)(AJP), 2010 WL 2629037, at \*26 (S.D.N.Y. July 1, 2010). Procedural default bars federal habeas review unless the petitioner can either: (1) show cause for the default and actual prejudice as a result of the constitutional violation, or (2) demonstrate that failure to consider the federal claim will result in a "fundamental miscarriage of justice." *King v. Artus,* 259 Fed. Appx. 346, 347 (2d Cir.2008) (quoting *Coleman v. Thompson,* 501

U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)). Neither exception to the procedural default rule applies to this petition.

**\*6** To show cause under the "cause and prejudice" exception, the petitioner must show that some objective, external factor impeded his efforts to comply with the state procedural rule. *Coleman,* 501 U.S. at 753. Mere "[i]gnorance or inadvertence will not constitute 'cause.' " *James,* 996 F.2d at 1447 (quoting *Murray v. Carrier,* 477 U.S. 478, 491 (1986)). Ortiz has offered no meaningful explanation whatsoever for his failure to present these claims.

Nor does Ortiz's case fall within the second exception to the procedural default rule, since he has not suffered a fundamental miscarriage of justice. A "fundamental miscarriage of justice" occurs " 'in the extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent.' " *James,* 996 F.2d at 1447 (quoting *Murray,* 477 U.S. at 495–96). Ortiz has offered no evidence in support of his innocence.

Thus, the petitioner is not entitled to federal habeas review of the third and fifth claims in his petition.

**C. Merits of Ortiz's Claims**
The only claim in the petition that is exhausted and reviewable on habeas is the first claim, which concerns the delay between the petitioner's crime and his indictment. We nevertheless explain why all of the petitioner's claims, even those that are procedurally barred, are meritless or otherwise uncognizable on habeas review.

**1. The Pre–Indictment Delay**
Ortiz alleges that the police had the ability to connect him to Vasquez's murder earlier than 2004 and that there was no legitimate basis for the pre-indictment delay. (Opp.Br., Ex. L.) This claim, however, was denied on its merits in state court as part of the ruling on the January 5, 2005 omnibus motion, and we find that the ruling was neither contrary to, nor an unreasonable application of, clearly established federal law.

Ortiz's motion in state court was framed as a challenge to an untimely prosecution. In denying that motion, the trial court credited "a detailed response to defendant's motion" from the respondent and concluded that the delay was "occasioned by several factors." (Opp.Br., Ex. D.) In particular, the

court cited the lack of witnesses to the crime and the less sophisticated forensic technology that existed at the time of its commission. (*Id.*) The court also noted that the delay was not the result of an attempt to gain a tactical advantage and that Ortiz had not been incarcerated in the intervening years. (*Id.*) The court further held that any potential prejudice was minimal and that Ortiz had "not been deprived of his due process rights." (*Id.*)

The trial court's decision was subsequently affirmed by the Appellate Division, which held that Ortiz had "not established any prejudice from the 11 year delay" and that the reasons for the delay provided by the respondent were persuasive. *People v. Ortiz,* 49 A.D.3d 279, 854 N.Y.S.2d 2 (1st Dep't 2008).

The state courts' decisions were consistent with clearly established federal law as determined by the Supreme Court. The Court has held that pre-indictment delay may violate a defendant's due process rights but only in very rare cases. *See United States v. Lovasco,* 431 U.S. 783, 789, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977) ("the due process clause has a limited role to play in protecting against oppressive delay"). In *Lovasco,* the Court explained that "[j]udges are not free, in defining due process, to impose on law enforcement officials our personal and private notions of fairness and to disregard the limits that bind judges in their judicial function." *Id.* at 790 (internal quotations omitted). Rather, pre-indictment delay offends due process only if the delay "violates those fundamental conceptions of justice which lie at the base of our civil and political institutions." *Id.* at 790 (internal quotations omitted). As a threshold requirement, a criminal defendant must show that he suffered some prejudice by the delay. *Id.* If that is the case, courts are to consider the reason for the delay and should look unfavorably upon a delay undertaken to gain a tactical advantage over the accused. *See id.* at 795.

**\*7** Critically, there are non-constitutional safeguards in place—statutes of limitations—that curb prosecutorial abuses stemming from pre-indictment delay. The Supreme Court has explained that statutes of limitations are "the primary guarantee against bringing overly stale criminal charges"; that they balance the competing interests of the state and the defendant; and that they "provide predictability by specifying a limit beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced." *United States v. Marion,* 404 U.S. 307, 323, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971).

Here, as the state courts noted, the pre-indictment delay does not appear to have prejudiced Ortiz, whose detailed statements to the police showed that his memory of the incidents was remarkably clear; the delay was not used to gain a tactical advantage against him; and he was not in jail during the intervening years. (*See* Opp. Br., Ex D.) In short, we concur with the state courts' finding that the pre-indictment delay in this case was the result of a number of legally permissible factors. Accordingly, the state courts' rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law.

## 2 The Refusal to Grant a Continuance at the *Huntley/ Dunaway* Hearing

Similarly, the trial court's denial of Ortiz's request for a continuance at the *Huntley/Dunaway* hearing was neither contrary to, nor an unreasonable application of, clearly established federal law.

It is axiomatic that a criminal defendant has a Sixth Amendment right to compulsory process to obtain witnesses at trial, but the Supreme Court has not definitively decided whether that right extends to presenting witnesses at a pretrial suppression hearing. Indeed, a number of lower courts have held that there is no absolute right to compulsory process —under New York or federal law—at such a hearing. *See, e.g., People v. Chipp,* 75 N.Y.2d 327, 337, 553 N.Y.S.2d 72, 552 N.E.2d 608 (N.Y.1990) (noting the absence of "an absolute right to compulsory process" at a pre-trial suppression hearing); *Duran v. Miller,* 322 F.Supp.2d 251, 257 (2004) (state court's denial of an application to call witness at pre-trial suppression hearing "did not deprive [petitioner] of a federal constitutional right or address a matter of clearly established federal law as required for habeas review"). Accordingly, the petitioner's second claim is meritless.

## 3. The Basis for Ortiz's Detention and Arrest

Ortiz's Fourth Amendment claim is not cognizable on federal habeas corpus review. Where a state has a mechanism for adjudicating a Fourth Amendment claim—such as Ortiz's claim that he was detained and arrested at his apartment without probable cause—habeas corpus review of the claim is precluded. *Joyner v. Leonardo,* No. 99 Civ. 1275(DC), 1999 WL 608774, at *3–4; *Anderson v. Corcoran,* No. 05 Civ. 436(KNF), 2007 WL 12 88539, at *2 (S.D.N.Y. May 2, 2007). The Supreme Court has held that "where the State has provided an opportunity for full and fair litigation of a Fourth

Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell,* 428 U.S. 465, 481–82, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

**\*8** In this circuit, "federal courts can review the Fourth Amendment claims otherwise precluded by *Stone* only '(a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process.' " *Montero v. Sabourin,* No. 02 Civ. 8666(RWS), 2003 WL 21012072, at *5 (S.D.N.Y. May 5, 2003) (quoting *Capellan v. Riley,* 975 F.2d 67, 70 (2d Cir.1992)). New York Criminal Procedure Law §§ 710, *et seq.,* provides a procedure for litigating Fourth Amendment claims. Specifically, Section 710.60 provides for a pretrial hearing, or hearings, to determine whether evidence sought to be used at a trial is inadmissible because an arrest lacked probable cause. *Montero,* 2003 WL 21012072, at *5. Federal courts have repeatedly held that New York's procedure for litigating Fourth Amendment claims is constitutionally sound. *Joyner,* 1999 WL 608774, at *4.

In the case at bar, the trial court provided Ortiz with a full and fair opportunity to litigate the claim that he was arrested without probable cause, when it granted his request for a *Dunaway* hearing. Since Ortiz does not allege that he was precluded from using the procedure New York provides for challenging arrests allegedly made without probable cause, we finds that Ortiz's Fourth Amendment claim is not cognizable in a habeas proceeding.

## 4. The Propriety of the Interrogation under *Miranda*

In his direct appeal, Ortiz claimed that his Fifth Amendment rights were violated because he was not given *Miranda* warnings at the point when he was first confronted by the police at his apartment. This issue was decided on its merits at the *Huntley/Dunaway* hearing, and we find that the decision was neither contrary, to nor an unreasonable application of, clearly established federal law.

*Miranda* warnings are required "when there has been such a restriction on a person's freedom as to render him in custody." *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (internal quotations omitted). A suspect who is not "in custody" can be questioned

without first receiving *Miranda* warnings. *Id.* An individual is "in custody" when he is "deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. at 444. Determining whether a person is "in custody" requires an examination of "all of the circumstances surrounding the interrogation" and "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). Thus, Ortiz's claim, for instance, that he felt outnumbered at his apartment is irrelevant. Simply put, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

**\*9** Due to the fact-specific nature of a *Miranda* claim, "unless the facts clearly establish custody, a state court should be deemed to have made a reasonable application of clearly established Supreme Court law in concluding that custody for *Miranda* purposes was not shown." *Cruz v. Miller,* 255 F.3d 77, 85–86 (2d Cir.2001). Here, the facts developed at the *Huntley/Dunaway* hearing do not "clearly establish custody" at his apartment or any other point in time prior to when Ortiz first received his *Miranda* warnings. Although Ortiz points to the fact that six officers were present at his apartment and claims that they surrounded him, he has previously conceded that the police did not specifically state that he had to travel to the precinct with him. (Opp.Br., Ex. N.) Moreover, as the trial court noted, Ortiz was not handcuffed at the apartment; he was permitted to retrieve clothes prior to leaving; he was allowed to call his common law wife to the scene; and, generally, the testimony indicated that his "mind was at ease at this juncture." (3/8/05 Tr. at 179.) Prior to receiving his *Miranda* warnings at the precinct, Ortiz was unrestrained, questioned in a room with an open door and no officer posted outside, and offered food and a beverage.

Thus, granting the trial court the deference that is required by the law, we see no basis for questioning the court's conclusion that *Miranda* warnings were given at the appropriate time.

**5. The Right to Counsel Under *Miranda***

Finally, Ortiz claims that he requested a lawyer during his interrogation but that questioning continued despite the failure to provide him with one. This claim, like the others in the petition, is meritless.

Although Ortiz and the respondent frame the claim as one premised on the Sixth Amendment, the right to counsel contained in the Sixth Amendment "attaches only at the initiation of adversary criminal proceedings." *Davis v. United States,* 512 U.S. 452, 457, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). Before that point, "a suspect in a criminal investigation has no constitutional right to the assistance of counsel." *Id.*

Nevertheless, in *Miranda,* the Supreme Court held that a suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and that the police must explain this right to him before questioning begins. The right to counsel established in *Miranda* was one of a "series of recommended 'procedural safeguards' ... [that] were not themselves rights protected by the Constitution but were instead measures to insure that the [Fifth Amendment] right against compulsory self-incrimination was protected." *Michigan v. Tucker,* 417 U.S. 433, 443–444, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). If a suspect "effectively waives his right to counsel after receiving the *Miranda* warnings, law enforcement officers are free to question him," but if he "requests counsel at any time during the interview," he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation. *Davis,* 512 U.S. at 458.

**\*10** As explained above, there is no basis to question the trial court's finding that Ortiz was not "in custody" for *Miranda* purposes prior to the point at which he was, in fact, given his *Miranda* warnings. At that point, the record shows that Ortiz was apprised of his right to have an attorney present during his interrogation but that he waived that right both orally and in writing.

Although those waivers did not preclude Ortiz from reconsidering his decision and invoking the right to an attorney, a "suspect must unambiguously request counsel" to invoke his right and cease questioning, *id.* at 459. He must "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.; cf. Berghuis v. Thompkins,* ––––U.S. ––––, 130 S.Ct. 2250, 2260, 176 L.Ed.2d 1098 (2010).

The record does not support Ortiz's claim that he explicitly asked for an attorney. To the contrary, Ortiz's own petition frequently suggests that he never asked for a lawyer but, rather, felt that one should have been provided to him

Case 7:13-cv-02627-CS   Document 50   Filed 04/29/16   Page 122 of 181

automatically. (*See* Pet. at 4, 9, 12.) The law requires nothing of the sort. At one point, the petition suggests in the vaguest and most conclusory terms that Ortiz affirmatively requested a lawyer (*see id.* at 4), but the evidence at the *Huntley/ Dunaway* hearing indicates that a request was never actually made (*see* 3/8/05 Tr. at 36, 180; *see also* Opp. Br., Ex. E (*Miranda* waiver)).

Accordingly, even assuming that this claim could overcome otherwise dispositive procedural barriers to federal habeas review, we would be compelled to reject it on the merits.

### CONCLUSION

For the reasons set forth above, the petition is denied. As the petitioner has not made a substantial showing of denial of a constitutional right, a certificate of appealability will not issue. *See* 28 U.S.C. § 2253; *see also United States v. Perez,* 129 F.3d 255, 259 (2d Cir.1997); *Lozada v. United States,* 107 F.3d 1101, 1016–17 (2d Cir.1997). Pursuant to 28 U.S.C. § 1915(a)(3), it is hereby certified that any appeal from this order would not be taken in good faith. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

### All Citations

Not Reported in F.Supp.2d, 2010 WL 3290962

### Footnotes

1    The following facts are drawn from the Petition ("Pet."), the Respondent's Memorandum of Law in Support of Answer Opposing Petition for a Writ of Habeas Corpus ("Opp.Br."), the petitioner's reply papers ("Rep."), accompanying exhibits to the submissions, and transcripts from the state court proceedings.

2    A pretrial hearing pursuant to *People v. Huntley,* 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965), is held to determine the voluntariness of inculpatory statements made by a criminal defendant to law enforcement officers. A pretrial hearing pursuant to *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), is held to determine whether probable cause existed for a criminal defendant's arrest.

3    In response to the respondent's opposition brief, Ortiz also asserts a claim of ineffective assistance of counsel. This claim is denied because it is raised for the first time in Ortiz's reply papers and was never raised in state court. Furthermore, the claim is meritless. *See Rhines v. Weber,* 544 U.S. 269, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005) (when assessing mixed petition near or following AEDPA' s one-year limitations period, court may deny unexhausted, non-procedurally defaulted claim on the merits if "plainly meritless," rather than staying and holding petition in abeyance pending exhaustion).

     Ortiz focuses on the Court of Appeals's statement, in denying leave to appeal from the Appellate Division, that "there [was] no question of law presented which ought to be reviewed." (Opp.Br., Ex. S.) Because the Court of Appeals exercises discretionary review of appeals from the Appellate Division, *see* N.Y.Crim. Proc. Law § 460.20(4), this statement alone does not indicate any inadequate performance on the part of Ortiz's lawyer—let alone performance so deficient that it would rise to the level of a claim of ineffective assistance of counsel.

4    Ortiz has advanced two arguments to suggest that his plea and the waiver were not made voluntarily. In his July 3, 2008 letter to Judge Kaye, he claimed for the first time that he was on medication and was "heavily sedated" when he signed his plea agreement. (Opp .Br., Ex. T.) This claim was abandoned in the instant petition. However, in his prolix reply papers, Ortiz argues for the first time that he felt he was "Black mail into a plea Deal [*sic* ]." (Rep. at 21.) We do not credit these claims, as they were raised for the first time after Ortiz's direct appeal had ended and are contradicted by the record of the plea. (6/2/05 Tr. at 24 (waiver of right to appeal found by trial court to be knowing and voluntary) .)

5    *See* N.Y.Crim. Proc. Law § 440.10(2)(c) (motion to vacate judgment cannot be premised on grounds that could have been raised in direct appeal); *see also Bossett v. Walker,* 41 F.3d 825, 829 (2d Cir.1994), *cert. denied,* 514 U.S. 1054, 115 S.Ct. 1436, 131 L.Ed.2d 316 (1995) ("failure to raise issues before the Court of Appeals precludes further consideration in the New York, courts").

132 Fed.Appx. 868
This case was not selected for
publication in the Federal Reporter.
United States Court of Appeals,
Second Circuit.

Howard PELLINGTON, Petitioner-Appellant,

v.

Charles GREINER, Superintendent, Green Haven
Correctional Facility, and Eliot Spitzer, New York
State Attorney General, Respondents-Appellees.

No. 04-2131-PR.
|
May 19, 2005.

**Synopsis**
**Background:** Following affirmance of his conviction for
murder, 741 N.Y.S.2d 694, state inmate filed petition for
writ of habeas corpus. The United States District Court for
the Southern District of New York, Victor Marrero, J., 307
F.Supp.2d 601, denied petition, and petitioner appealed.

**Holding:** The Court of Appeals held that finding that
petitioner waived right to be present at trial court's meeting
with jury forewoman was reasonable.

Affirmed.

**\*869**  Appeal from the United States District Court for the
Southern District of New York (Victor Marrero, Judge).

**Attorneys and Law Firms**

Martin M. Lucente, The Legal Aid Society, New York, NY,
for Petitioner.

David S. Weisel, Assistant District Attorney (Robert
T. Johnson, District Attorney of Bronx County, Joseph
N. Ferdenzi and Allen H. Saperstein, Assistant District
Attorneys, on the brief), Bronx, NY, for Respondent.

Present: WALKER, Chief Judge, FEINBERG, and RAGGI,
Circuit Judges.

SUMMARY ORDER

**\*\*1  UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED AND DECREED** that the
judgment of the district court be and it hereby is
**AFFIRMED.**

Petitioner-appellant Howard Pellington appeals from a
decision of the United States District Court for the Southern
District of New York (Victor Marrero, *Judge* ), denying his
petition for a writ of habeas corpus. *Pellington v. Greiner,*
307 F.Supp.2d 601 (S.D.N.Y.2004). Familiarity with the facts
and procedural background is assumed. We affirm on the
basis that Pellington cannot demonstrate that the state courts
acted contrary to or unreasonably applied clearly established
federal law, as determined by the Supreme Court. 28 U.S.C.
§ 2254(d).

Even if Pellington had a right to be present at the robing
room conference with the jury foreperson, he waived that
right. Pellington was present when the court announced that
it would meet with the juror and with counsel, and neither
Pellington nor his counsel raised any objection. *See United
States v. Gagnon,* 470 U.S. 522, 527-28, 105 S.Ct. 1482,
84 L.Ed.2d 486 (1985) (jurors almost always have to confer
with the "trial judge about something, whether it relates
to a matter of personal comfort or to some aspect of the
trial"; a defendant who knows of such a discussion "must
assert whatever right he may have ... to be present" (internal
quotation marks and citation omitted)); *see also Clark v.
Stinson,* 214 F.3d 315, 323 (2d Cir.2000) ("[F]ailure to
readily object at the time the decision is made to proceed
without the accused can constitute a waiver."). Pellington
knew that the conference would take place in his absence
and raised no objections before the fact, nor any queries as
to its subject matter **\*870**  after the fact, even when the
trial judge explicitly referred to the conference at the start of
proceedings the following morning. Moreover, Pellington's
counsel was present throughout the proceedings. *See id.* at
324 (finding implied waiver where there was no evidence of
purposeful exclusion by trial judge and where "judge could
have reasonably concluded that if the defendant's rights were
being violated, he or his counsel would have said so"). In
light of these facts, it was not unreasonable for the Appellate
Division to conclude that Pellington waived any right he may
have had to be present.

We have carefully reviewed Pellington's remaining contentions and find them to be without merit. For the reasons set forth above, the judgment of the district court is hereby **AFFIRMED.**

**All Citations**

132 Fed.Appx. 868, 2005 WL 1182169

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

---

2014 WL 4954660
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court,
E.D. New York.

Jamel ROBINSON, Petitioner,
v.
P. HEATH, Respondent.

No. 11–CV–03489.
|
Signed Oct. 2, 2014.

**Attorneys and Law Firms**

Jamel Robinson, Ossining, NY, pro se.

Anthea Hemery Bruffee, Kings County DA's Office, Brooklyn, NY, for Respondent.

### *MEMORANDUM & ORDER*

KORMAN, Senior District Judge.

**\*1** I assume familiarity with the underlying history of this case. Briefly, petitioner was convicted of Murder in the Second Degree after a trial by jury, and was sentenced to a prison term of fifteen years to life. Petitioner, a minor at the time, and a co-defendant, who pled guilty to second-degree murder, acted together to attack a homeless man they discovered drunk and asleep in an abandoned car. Resp't's Br. to the Appellate Division 2, ECF No. 3–1 (Page ID # 66). The petitioner and his co-defendant pursued the victim for several blocks to the front of a church. Trial Tr. 220, Apr. 7, 2005, ECF No. 4–2 (Page ID # 557). There, they attacked the victim by throwing bricks at him while he lay on the ground. Trial Tr. 105–06, Apr. 6, 2005, ECF No. 4–1 (Page ID # 442–43). The victim died due to the blunt impact of between fourteen and twenty-one blows to his head and chest. Trial Tr. 284, 295, Apr. 11, 2005, ECF No. 4–2 (Page ID # 621, 632). In his written statement to the police, petitioner alleged that he was merely a detached observer of the attack, claiming that he threw only a "couple of bricks" and that none of them hit the victim. *Id.* at 220 (Page ID # 557). The evidence, however, suggests otherwise.

A priest, who witnessed the attack, testified at trial that two men, who matched the defendants' physical descriptions, were throwing bricks at a person lying on the ground. Trial Tr. 105, Apr. 6, 2005, ECF No. 4–1 (Page ID # 442). He could not say which man was throwing with more intensity. *Id.* at 144 (Page ID # 481). Moreover, the blood stains found on petitioner's pants matched the DNA profile of the victim. Trial Tr., 262–64 Apr. 11, 2005, ECF No. 4–2 (Page ID # 599–601). A forensics expert testified at trial that petitioner would have to have been positioned "very close" to the victim for the victim's blood to have splattered on his clothing. *Id.* at 293 (Page ID # 630).

Petitioner seeks relief pursuant to 28 U.S.C. § 2254 on two grounds.

1. Petitioner challenges the denial of his motion to suppress the statement that he made to the police. Petitioner alleges that, as a minor, the statement he made to police should have been suppressed because "the prosecution failed to demonstrate that the police brought in an appropriate adult to be present during his interrogation." Pet. for a Writ of Habeas Corpus 7, ECF No. 1 (Page ID # 7). On appeal, the Appellate Division held that "[t]he statement was obtained in compliance with [N.Y.] CPL 140.20(6) since the police immediately notified the [petitioner's] foster mother, the person legally responsible for his care, of his arrest and place of detention. The mandates of the Family Court Act regarding parental notification do not apply here because the defendant was arrested as a 'juvenile offender.' " *People v. Robinson,* 70 A.D.3d 728, 892 N.Y.S.2d 882 (N.Y. A pp. D iv.2d Dep't 2010). Here, petitioner's claim fails because it involves purely a matter of New York State law. *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

**\*2** 2. Petitioner also asserts that the trial court erred in denying his request to appoint a DNA expert pursuant to N.Y. County Law § 722–c. During trial, petitioner sought to have a DNA expert appointed to re-test the blood stains on his pants. Trial Tr., 235–36 Apr. 7, 2005, ECF No. 4–2 (Page ID # 572–73). A forensics expert from the Biology Lab of the Office of the Chief Medical Examiner (OCME) testified that the blood on petitioner's pants matched the DNA profile of the victim. Trial Tr., 262–64 Apr. 11, 2005, ECF No. 4–2 (Page ID # 599–601). On appeal, petitioner argued that the trial court's ruling constituted a violation of County Law § 722–c. Br. for Def.-Appellant 26, ECF No. 3–1 (Page ID #

54). While his argument focused principally on the alleged violation of County Law § 722–c, petitioner's brief also invoked the argument that the trial court's ruling constituted a violation of his right to due process because "[d]ue process requires that the State fund appropriate expert services for the preparation of an indigent criminal defendant's case." Br. for Def.-Appellant 26, ECF No. 3–1 (Page ID # 54). The Appellate Division held that, because petitioner "failed to demonstrate the necessity for the appointment of a DNA expert on his behalf pursuant to County Law § 722–c, the trial court providently exercised its discretion in denying the defendant's request to appoint and retain such an expert." *Robinson,* 70 A.D.3d at 728, 892 N.Y.S.2d 882.

Petitioner's claim here fails for two reasons. First, to the extent that this claim involves a state court's application of state law, the claim is not cognizable. *McGuire,* 502 U.S. at 67–68. Thus, the Appellate Division's decision regarding County Law § 722–c may not be reviewed here. The Appellate Division did not, however, address petitioner's argument that the failure to grant his application for the appointment of a DNA expert violated the Due Process Clause. Specifically, he argued on appeal for the first time that "[d]ue process requires that the State fund appropriate expert services for the preparation of an indigent criminal defendant's case." Pet'r's Br. to the Appellate Division 26, ECF No. 3–1 (Page ID # 54).

The failure of the Appellate Division to address the Due Process Clause claim raises a threshold question of the extent to which its holding is entitled to deference under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). In *Harrington v. Richter,* 562 U.S. 86, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), the Supreme Court held that a reviewing federal court should presume that the last reasoned decision of the state court adjudicated all raised claims on the merits and is entitled to AEDPA deference. *See* 28 U.S.C. § 2254. Subsequently, in *Johnson v. Williams,* —— U.S. ——, 133 S.Ct. 1088, 185 L.Ed.2d 105 (2013), it held that one exception to this presumption was a case in which "a defendant claimed in state court that something that occurred at trial violated both a provision of the Federal Constitution and a related provision of state law" and where the state court, "in denying relief, made no reference to federal law." *Id.* at 1096. Nevertheless, even in this circumstance, *Johnson* acknowledged that the *Richter* presumption could hold "if the state-law rule subsumes the federal standard-that is, if it is at least as protective as the federal standard [.]" *Id.* This holding is consistent with the rule that the application of AEDPA deference "does not require citation of [Supreme

Court] cases-indeed, it does not even require *awareness* of [the] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam).

**\*3** The state law standard in the present context is at least as protective as the federal constitutional standard. The New York Court of Appeals has held that a "defendant always has the constitutional right 'to present a complete defense.' " *People v. Spencer,* 20 N.Y.3d 954, 956, 959 N.Y.S.2d 112, 982 N.E.2d 1245 (N.Y.2012); *see also People v. Taylor,* 40 A.D.3d 782, 783–84, 835 N.Y.S.2d 442 (N.Y.App. Div.2d Dep't 2007) ("Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense."). Moreover, the New York County Law § 722–c provides for the appointment of "investigative, expert, or other services" where they are necessary and where the defendant is financially unable to obtain them. N.Y. County Law § 722–c; *see also Tyson v. Keane,* 159 F.3d 732, 739 (2d Cir.1998) (citing *People v. Jones,* 210 A.D.2d 904, 620 N.Y.S.2d 656 (N.Y.App. Div. 4th Dep't 1994); *People v. Vale,* 133 A.D.2d 297, 519 N.Y.S.2d 4 (N.Y.App. Div. 1st Dep't 1987)). Indeed, in *Ake v. Oklahoma,* upon which the petitioner relied in the Appellate Division, the Supreme Court cited § 722–c for the proposition that many states "currently make psychiatric assistance available to indigent defendants, and they have not found the financial burden so great as to preclude this assistance." 470 U.S. 68, 78, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). More specifically, *Ake* held that "when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." *Id.* at 74.

Nevertheless, there are a number of issues going beyond the precise holding in *Ake* that are the subject of conflicting lower court decisions that have not been resolved by the Supreme Court. *See* Wayne R. LaFave et al., *Criminal Procedure* § 11.2(e) 644 (3d ed.2007). Among those issues are: "whether the *Ake* ruling is limited to capital cases," *Id.* at 645; the varying application of "*Ake*'s threshold requirement that the defendant make a preliminary showing that his mental condition at the time of the offense is 'likely to be a significant factor' at trial," *Id.* at 646; and whether the defendant is entitled to an "independent expert," *Id.* at 649, although LaFave et al. observe that "courts agree that such an expert

can be a state employee from the public health service, provided the person is not part of the 'prosecution team.' " *Id.* at 650 n. 175. Moreover, it is unclear whether the *Ake* holding applies to other experts beyond psychiatrists. *Id.* at 654.

While I am prepared to assume that the holding in *Ake* can reasonably be read as going beyond the appointment of a psychiatric expert and that it applies to a non-capital case, *see Tyson v. Keane,* 159 F.3d 732 (2d Ci r.1998), I am unable to conclude that the denial of the application for the appointment of an expert in this case constitutes an unreasonable application of *Ake.* First, the motion for the appointment of an expert was made orally and off the record prior to trial. *See* Trial Tr., 235–36 Apr. 7, 2005, ECF No. 4–2 (Page ID # 572–73). As the trial judge observed during the course of trial, "Before the trial Mr. Pepe [petitioner's trial attorney] approached me and asked me to sign an order appointing an expert in DNA testing." *Id.* Mr. Pepe explained during the trial that he had requested a DNA expert be "appointed for purposes of examining alleged blood stains on the defendant's trousers." *Id.* at 236 (Page ID # 573).

 **\*4** There is, however, nothing in the record to indicate why there was any reason to believe the Office of the Chief Medical Examiner had wrongly concluded that the blood on petitioner's clothing matched that of the victim. More specifically, while petitioner states in the unsworn memorandum he submitted in support of his petition that "the probability was that [the blood] belonged to the petitioner," Notice Dated 11/15/11 from Jamel Robinson 8, ECF No. 6 (Page ID # 751), the record does not reflect that such an argument was made to the trial judge. Nor was it made in petitioner's brief in the Appellate Division. Even here petitioner does not explain how that blood, assuming it was his, actually got on his pants. *Caldwell v. Mississippi,* 472 U.S. 320, 323 n. 1, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) ("Given that petitioner offered little more than undeveloped assertions that the requested assistance would be beneficial, we find no deprivation of due process in the trial judge's decision."); *see also Whittaker v. Meachum,* 123 F.3d 714, 716 (2d Cir.1997) ("It is well-settled that on federal collateral review, the petitioner bears the burden of proving that his constitutional rights were violated."); *Caver v. Straub,* 349 F.3d 340, 351 (6th Cir.2003) (same).

Further fleshing out the nature of the showing that a defendant must make, LaFave et al. observe:

> Where the expert is desired to contest evidence offered by the prosecution

with the assistance of its forensic experts, the defendant ordinarily must offer some basis for believing that the state's scientific testimony could readily be challenged. As to some types of evidence, the very nature of the expert testimony suggests ground for challenge, as the scientific field is one filled with controversy and disputes over methodology. Where, however, the scientific methodology is well established and its application is viewed as largely mechanical (as is true of typical fingerprint analysis), the defense often must show specific reason (e.g., the prosecution expert's bias or incompetence) for concluding that a defense expert might assist in a successful challenge to the prosecution's evidence.

LaFave et al., *Criminal Procedure* § 11(e) at 656–57. The expert testimony in this case is of the kind that requires the showing suggested above. As the Supreme Court of Indiana observed:

> Psychiatry is an extremely uncertain field dealing with the mysteries of the human mind where expert opinions can be expected to and do differ widely. In contrast, the neutral [DNA] experts here were testifying to the results of a test "involving precise, physical measurements and chemical testing." Under these circumstances, the trial court did not abuse its discretion by denying appointment of defendant's requested expert.

*Harrison v. State,* 644 N.E.2d 1243, 1253 (Ind.1995) (internal citation omitted). Similarly, my colleague Judge Gleeson observed that "[t]he results of modern DNA testing are of essentially unimpeachable reliability. .... While laboratory error can never be wholly eliminated, samples can be retested if there is any real doubt about test results. In all, unlike previous methods of DNA testing, modern STR analysis (known as PCR–STR testing due to its use of polymerase chain reaction to multiply the sample DNA and enable testing of smaller samples of biological material) provides identification evidence of essentially unimpeachable reliability." *McKithen v. Brown,* 565 F.Supp.2d 440, 481–82 (E.D.N.Y.2008) rev'd on other grounds, 626 F.3d 143 (2d Cir.2010). The modern STR analysis to which Judge Gleeson

referred was the kind performed here. *See* Trial Tr. 245, 252, Apr. 11, 2005, ECF No. 4–2 (Page ID # 582, 589).

 **\*5** Finally, the DNA test that was admitted in this case was conducted by what can fairly be described as "an employee from the public health sector [who] is not a part of the prosecution team." LaFave et al., *Criminal Procedure* § 11(e) at 650 n. 175. OCME's mandate is "to provide an impartial determination of the cause of death." *People v. Washington,* 86 N.Y.2d 189, 192–93, 630 N.Y.S.2d 693, 654 N.E.2d 967 (N.Y.1995). Indeed, OCME "ha[s] no authority to gather evidence with an eye toward prosecuting a perpetrator." *Id.* OCM E concluded that there was only a one in one trillion chance that the blood on petitioner's pants belonged to someone other than the victim. Trial Tr., 262–64 Apr. 11, 2005, ECF No. 4–2 (Page ID # 599–601). This conclusion was corroborated by the eyewitness testimony and the admission of the petitioner in his confession that he was actually involved in throwing bricks, although he claimed that none of them hit the victim. Trial Tr., 220 Apr. 7, 2005, ECF No. 4–1 (Page ID # 557). Under these circumstances and again in the absence of any reason offered by the petitioner to believe that the probability was that the blood on his pants came from him rather than the victim, I am unable to say that the denial of the application for a second DNA expert involved an unreasonable application of the Supreme Court's holding in *Ake v. Oklahoma.*

I add these brief words in conclusion. *Ake* did not clearly hold, at least outside the context of psychiatric testimony, that a defendant is entitled to a second expert. *See Miller v. Colson,* 694 F.3d 691, 695–99 (6th Ci r.2012). As Judge Julia Smith Gibbons concluded her discussion in *Miller:*

> The limited inquiry by the *Ake* Court, the subsequent circuit split that developed in the wake of *Ake,* the Supreme Court's decision not to resolve the circuit split, and our own conflicted jurisprudence about the constitutional right to independent psychiatric assistance all guide us to one inevitable conclusion: even if *Ake* were relevant, *Ake* did not represent 'clearly established federal law' requiring the provision of independent, non-neutral psychiatric assistance.

*Id.* at 699.

## CONCLUSION

Because the holding of the Appellate Division did not involve an unreasonable application of clearly established Supreme Court law, *see Harrington v. Richter,* 562 U.S. 86, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), the petition for a writ of habeas corpus is denied. I also decline to issue a certificate of appealability.

**SO ORDERED.**

**All Citations**

Slip Copy, 2014 WL 4954660

---

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Blue Flag – Appeal Notification

**Appeal Filed by**     RODRIGUEZ v. SMITH,     2nd Cir.,     December 2, 2015

2015 WL 6509153
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Rafael RODRIGUEZ, Petitioner,
v.
Joseph SMITH, Superintendent, Shawangunk
Correctional Facility, Respondent.

No. 10–CV–8306 (KMK)(LMS).
|
Signed Oct. 28, 2015.

**Attorneys and Law Firms**

Rafael Rodriguez, Wallkill, NY, pro se.

Carrie Anne Ciganek, Esq., District Attorney of Rockland County, New City, NY, for Respondent.

*ORDER ADOPTING REPORT & RECOMMENDATION*

KENNETH M. KARAS, District Judge.

**\*1** Petitioner Rafael Rodriguez ("Petitioner"), proceeding pro se, files this Petition for a Writ of Habeas Corpus (the "Petition") pursuant to 28 U.S.C. § 2254, challenging his conviction for attempted rape in the first degree in violation of N.Y. Penal Law §§ 110.00, 130.35(1), two counts of sexual abuse in the first degree, in violation of N.Y. Penal Law § 130.65(1), and two counts of unlawful imprisonment in the second degree, in violation of N.Y. Penal Law § 135.05. (*See* Pet. Under 28 U.S.C. § 2254 For Writ of Habeas Corpus By A Person in State Custody ("Pet.") ¶ 5 (Dkt. No. 3).) Petitioner was sentenced to 13 years' imprisonment and five years' post-release supervision for the attempted rape conviction, five years' imprisonment for each of the sexual abuse convictions, and one year imprisonment for each of the unlawful imprisonment convictions, all of which were to run concurrently. (*See* Aff. of Carrie A. Ciganek in Opp'n ("Ciganek Aff.") ¶ 6 (Dkt. No. 9); *see also* September 18, 2007 Sentence Tr. ("Sentence Tr.") 22–23 (Dkt. No. 26).) Petitioner seeks habeas relief on the following grounds: (1) Petitioner's trial counsel was ineffective for failing to argue

that certain statements should be suppressed because he did not understand the *Miranda* warnings given to him; (2) the sexual abuse counts in the Indictment were not sufficiently detailed to provide Petitioner with fair notice of the charges against him; (3) the trial court failed to meaningfully respond to the jury's questions regarding the sexual abuse charges, which deprived Petitioner of a fair trial; (4) there was insufficient evidence to support the conviction of attempted rape in the first degree; and (5) Petitioner's sentence was harsh and excessive, in violation of the Eighth Amendment. (Pet. ¶ 12 & Attachment A.) The case was referred to Magistrate Judge Lisa Margaret Smith, who issued a Report and Recommendation (the "R & R"), recommending that the Court deny the Petition. (*See* R & R (Dkt. No. 35).) Petitioner filed timely objections to the R & R (the "Objections"), pressing the arguments listed above. (*See* Pet'r's Obj's to R & R ("Pet'r's Obj's") (Dkt. No. 37).) For the reasons stated herein, the Court adopts the R & R in substantial part, modifies it in part, and denies Petitioner's request for habeas relief.

*I. BACKGROUND*

The factual and procedural background of this case is set forth in the R & R and the Court assumes the Parties' familiarity therewith. (*See* R & R 2–5.) The Court nevertheless summarizes the pertinent facts. As relevant to Petitioner's request for habeas relief, Petitioner was convicted for events in connection with the sexual assault of Rosa Cabezas ("Cabezas") in Spring Valley, New York on January 2, 2007. (*See* Mem. of Law in Opp'n to Pet. For a Writ of Habeas Corpus ("Resp't's Habeas Mem.") 2 (Dkt. No. 9); Ciganek Aff. Ex. A ("Indictment").)[1] Petitioner kept Cabezas in her bedroom for over two hours while he forcibly removed her clothing, restrained her, touched her breasts and vagina with his hands and penis, and penetrated her vagina with his penis, all against her will. (Resp't's Habeas Mem. 2.) Cabezas eventually locked herself in the bathroom, called for help from the window, and, after the neighbors called the police, the police arrived and used a ladder to rescue Cabezas from the window. (*Id.*) When the police arrived at the scene, Petitioner was gone. (*Id.*) Petitioner was arrested later that day and gave written and videotaped statements that were consistent with the victim's account of events. (*Id.*)

**\*2** On January 16, 2007, by Indictment No. 2007–7, a Rockland County grand jury charged Petitioner with one count of rape in the first degree, in violation of N.Y. Penal

Law § 130.35(1), one count of rape in the third degree, in violation of N.Y. Penal Law § 130.25(3), two counts of sexual abuse in the first degree, in violation of N.Y. Penal Law § 130.65(1), two counts of unlawful imprisonment in the second degree, in violation of N.Y. Penal Law § 135.05, and two counts of assault in the third degree, in violation of N.Y. Penal Law § 120.00(1). (Indictment; *see also* Resp't's Habeas Mem. 2.) After a jury trial before Judge Catherine M. Bartlett of the County Court of Rockland County, Petitioner was convicted of attempted rape in the first degree in violation of N.Y. Penal Law §§ 110.00, 130.35(1), two counts of sexual abuse in the first degree, in violation of N.Y. Penal Law § 130.65(1), and two counts of unlawful imprisonment in the second degree, in violation of N.Y. Penal Law § 135.05. (*See* July 27, 2007 Trial Tr. ("July 27 Tr.") 464–66 (Dkt. No. 12); *see also* Resp't's Habeas Mem. 1.)

On direct appeal, Petitioner, represented by counsel, argued that: (1) the two counts of the Indictment charging sexual abuse in the first degree were jurisdictionally defective and should have been dismissed and the bill of particulars did not cure the defect; (2) the trial court's failure to meaningfully respond to the jury's questions regarding the sexual abuse charges seriously prejudiced Petitioner and deprived him of his due process rights to a fair trial; (3) the prosecution failed to prove Petitioner's guilt of attempted rape in the first degree beyond a reasonable doubt because the evidence was legally insufficient; and (4) Petitioner's sentence was harsh and excessive. (*See* Ciganek Aff. ¶ 7; *id.* Ex. B (Appellant's Brief ("Appellant's Br.")) i-iii.) The Respondent filed a brief in opposition, (Ciganek Aff. Ex. C (Brief for Resp't ("Appellee's Br."))), and Petitioner filed a reply, (Ciganek Aff. Ex. D (Appellant's Reply Brief ("Appellant's Reply"))). The Appellate Division affirmed Petitioner's conviction on May 5, 2009. *People v. Rodriguez,* 880 N.Y.S.2d 89 (App.Div.2009). The New York Court of Appeals denied Petitioner leave to appeal on August 13, 2009. *People v. Rodriguez,* 914 N.E.2d 1020 (N.Y.2009).

On or about July 5, 2009, Petitioner filed a petition, pursuant to New York Criminal Procedure Law ("CPL") § 440.10, seeking to vacate the judgment of conviction on the ground that he was denied effective assistance of counsel when his trial counsel failed to: (1) elicit important facts and make the necessary argument to obtain suppression because the proof at the *Huntley* hearing did not establish that Petitioner understood his *Miranda* warnings; and (2) research and apply the law regarding unnecessary delay of arraignments in violation of Petitioner's federal and state constitutional right

to counsel. (*See* Ciganek Aff. ¶ 10 & Ex. G (Defendant's CPL § 440.10 Motion ("Def.'s § 440.10 Motion")).) The Rockland County Court denied Petitioner's motion to vacate on September 17, 2009. (*See* Ciganek Aff. ¶ 11 & Ex. J ("Rockland County September 17 Order").)

**\*3** As noted above, on November 3, 2010, Petitioner filed the Petition. (*See* Dkt. No. 3.) Magistrate Judge Smith issued the R & R, recommending that the Court deny Petitioner's request for relief and dismiss the Petition in its entirety. (*See* R & R 2.) Petitioner subsequently filed his Objections. (*See* Dkt. No. 37.)

## II. DISCUSSION

### A. Applicable Law

#### 1. Standard of Review of a Magistrate Judge's R & R

A district court reviewing a report and recommendation addressing a dispositive motion "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). Under 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b), a party may submit objections to the magistrate judge's report and recommendation. The objections must be "specific" and "written," Fed.R.Civ.P. 72(b)(2), and must be made "[w]ithin 14 days after being served with a copy of the recommended disposition," *id.; see also* 28 U.S.C. § 636(b) (1), plus an additional three days when service is made pursuant to Federal Rules of Civil Procedure 5(b)(2) (C)-(F), *see* Fed.R.Civ.P. 6(d), for a total of seventeen days, *see* Fed.R.Civ.P. 6(a)(1).

Where a party timely submits objections to a report and recommendation, as Petitioner has done here, the district court reviews de novo the parts of the report and recommendation to which the party objected. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b)(3). In contrast, "[a] district court evaluating a magistrate judge's report may adopt those portions of the report [and recommendation] to which no 'specific, written objection' is made, as long as the factual and legal bases supporting the findings and conclusions set forth in those sections are not clearly erroneous or contrary to law." *Adams v. N.Y.S. Dep't of Educ.,* 855 F.Supp.2d 205, 206 (S.D.N.Y.2012) (quoting Fed.R.Civ.P. 72(b)).

Finally, pleadings submitted by pro se litigants are held to a less strict standard than those drafted by attorneys. *See*

*Fed. Express Corp. v. Holowecki,* 552 U.S. 389, 402 (2008) ("Even in the formal litigation context, pro se litigants are held to a lesser pleading standard than other parties." (italics omitted)). Because Petitioner is proceeding pro se, the Court construes his pleadings to raise the strongest arguments that they suggest. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474–75 (2d Cir.2006) (per curiam).

*2. Habeas Corpus*

Petitions for a writ of habeas corpus are governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which provides that "[t]he writ may not issue for any claim adjudicated on the merits by a state court unless the state court's decision was 'contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States,' or was 'based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.' " *Epps v. Poole,* 687 F.3d 46, 50 (2d Cir.2012) (citing 28 U.S.C. § 2254(d)(1)-(2)). In this context, "it is the habeas applicant's burden to show that the state court applied [federal law] to the facts of his case in an objectively unreasonable manner." *Woodford v. Visciotti,* 537 U.S. 19, 25 (2002) (per curiam). "[A]n unreasonable application is different from an incorrect one." *Bell v. Cone,* 535 U.S. 685, 694 (2002); *see also Schriro v. Landrigan,* 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.").

**\*4** Section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter,* 562 U.S. 86, 102–03 (2011) (internal quotation marks omitted). Consequently, a federal court must deny a habeas petition in some circumstances even if the court would have reached a conclusion different than the one reached by the state court, because "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102; *see also Cullen v. Pinholster,* 131 S.Ct. 1388, 1411 (2011) ("Even if the [federal] Court of Appeals might have reached a different conclusion as an initial matter, it was not an unreasonable application of our precedent for the California Supreme Court to conclude that [the petitioner] did not establish prejudice."); *Hawthorne v. Schneiderman,* 695 F.3d 192, 197 (2d Cir.2012) ( "Although we might not have decided the issue in the way that the [New York State]

Appellate Division did—and indeed we are *troubled by the outcome we are constrained to reach*—we .... must defer to the determination made by the state court ...." (emphasis added) (citation omitted)).

Additionally, under AEDPA, the factual findings of state courts are presumed to be correct. *See* 28 U.S.C. § 2254(e) (1); *Nelson v. Walker,* 121 F.3d 828, 833 (2d Cir.1997). The petitioner must rebut this presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Cotto v. Herbert,* 331 F.3d 217, 233 (2d Cir.2003) (same). Finally, only federal law claims are cognizable in habeas proceedings. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire,* 502 U.S. 62, 67–68 (1991); *see also* 28 U . S.C. § 2254(a) ("The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.").

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available remedies, thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese,* 541 U.S. 27, 29 (2004) (citation and internal quotation marks omitted); *see also* 28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that ... the applicant has exhausted the remedies available in the courts of the State...."). Accordingly, "the prisoner must fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin,* 541 U .S. at 29 (internal quotation marks omitted); *see also* 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented."). This requirement reflects important "notions of comity between the federal and State judicial systems." *Strogov v. Att'y Gen. of N.Y.,* 191 F.3d 188, 191 (2d Cir.1999).

**\*5** There are two components to the exhaustion requirement. *See McCray v. Bennet,* No. 02–CV–839, 2005 WL 3182051, at \*7 (S.D.N.Y. Nov. 22, 2005) ("A two-step analysis is used to determine whether a claim has been exhausted...."). "First, the petitioner must have fairly presented to an appropriate state court the same federal constitutional claim that he now urges upon the federal courts." *Klein v. Harris,* 667 F.2d 274, 282 (2d Cir.1981), *overruled on other grounds, Daye v. Att'y Gen. of N.Y.,* 696 F.2d 186, 195 (2d Cir.1982) (en banc); *see also Turner v. Artuz,* 262 F.3d 118, 123 (2d Cir.2001) (same); *Oliver v. Kirkpatrick,* No. 06–CV–6050, 2012 WL 3113146, at \*5 (E.D.N.Y. July 31, 2012) (same). This requirement is satisfied if the claim is presented in a way that is "likely to alert the court to the claim's federal nature," *Daye,* 696 F.2d at 192, and the state courts are "apprised of both the factual and the legal premises of the claim [the petitioner] asserts in federal court," *Jones v. Vacco,* 126 F.3d 408, 413 (2d Cir.1997) (alteration in original) (internal quotation marks omitted); *see also Bermudez v. Conway,* No. 09–CV–1515, 2012 WL 3779211, at \*8 (E.D.N.Y. Aug. 30, 2012) (same). In other words, a state prisoner need not cite "chapter and verse of the Constitution" to satisfy this requirement. Daye, 696 F.2d at 194. However, it is "not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless,* 459 U.S. 4, 6 (1982) (citation omitted). Rather, the claims must be made in such a way so as to give the state courts a "fair opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim." *Id.* (internal quotation marks omitted).

"Second, having presented his federal constitutional claim to an appropriate state court, and having been denied relief, the petitioner must have utilized all available mechanisms to secure [state] appellate review of the denial of that claim." *Klein,* 667 F.2d at 282; *see also Pettaway v. Brown,* No. 09–CV–3587, 2010 WL 7800939, at \*9 (S.D.N.Y. May 3, 2010) (same), *adopted by* 2011 WL 5104623 (S.D.N.Y. Oct. 26, 2011). In New York, "a criminal defendant must first appeal his or her conviction to the Appellate Division, and then must seek further review of that conviction by applying to the Court of Appeals for a certificate granting leave to appeal." *Galdamez v. Keane,* 394 F.3d 68, 74 (2d Cir.2005). If the petitioner fails to exhaust his or her state remedies through this entire appeal process, he or she may still fulfill the exhaustion requirement by collaterally attacking the conviction via available state methods. *See Klein,* 667 F.2d at 282–83; *West v. Sheahan,* No. 12–CV–8270, 2014 WL 5088101, at \*3 (S.D.N.Y. Sept. 18, 2014); *Sparks v.*

*Burge,* No. 06–CV–6965, 2012 WL 4479250, at \*4 (S.D.N.Y. Sept. 28, 2012); *Torres v. McGrath,* 407 F.Supp.2d 551, 557 (S.D.N.Y.2006); *Rivera v. Conway,* 350 F.Supp.2d 536, 544 (S.D.N.Y.2004). For example, in New York a defendant may challenge the conviction based on matters not in the record that could not have been raised on direct appeal, *see* N.Y. C.P.L. § 440.10, but a defendant may not seek collateral review of claims that could have been raised on direct appeal and were not, *see id.* § 440.10(2)(c); *see also O'Kane v. Kirkpatrick,* No. 09–CV–5167, 2011 WL 3809945, at \*7 (S.D.N.Y. Feb. 15, 2011) ("Under New York law, all claims that are record-based must be raised in a direct appeal.... It is only when a defendant's claim hinges upon facts outside the trial record, that he may collaterally attack his conviction by bringing a claim under CPL § 440.10."), *adopted by* 2011 WL 3918158 (S.D.N.Y. Aug. 25, 2011).

**\*6** In addition, New York permits only one application for direct review. *See* N.Y. Court Rules § 500.20(a)(2); *Jimenez v. Walker,* 458 F.3d 130, 149 (2d Cir.2006) ("[The petitioner] has already taken his one direct appeal [under New York law]...."). New York procedural rules bar its state courts from hearing either claims that could have been raised on direct appeal but were not, or claims that were initially raised on appeal but were not presented to the Court of Appeals. *See Sparks,* 2012 WL 4479250, at \*4. Accordingly, in those situations a petitioner no longer has any available state court remedy, and the unexhausted claims are therefore deemed exhausted, but procedurally barred. *See Carvajal v. Artus,* 633 F.3d 95, 104 (2d Cir.2011) ("If a habeas applicant fails to exhaust state remedies by failing to adequately present his federal claim to the state courts so that the state courts would deem the claim procedurally barred, we must deem the claim procedurally defaulted." (alteration and internal quotation marks omitted)); *see also Aparicio v. Artuz,* 269 F.3d 78, 90 (2d Cir.2001) (noting the reality that deeming an unpresented claim to be exhausted is "cold comfort"). A dismissal of a habeas petition on such grounds is a "disposition ... on the merits." *Aparicio,* 269 F.3d at 90. "An applicant seeking habeas relief may escape dismissal on the merits of a procedurally defaulted claim only by demonstrating 'cause for the default and prejudice' or by showing that he is 'actually innocent' of the crime for which he was convicted." *Carvajal,* 633 F.3d at 104 (quoting *Aparicio,* 269 F.3d at 90); *see also Dretke v. Haley,* 541 U.S. 386, 388 (2004) ("[A] federal court will not entertain a procedurally defaulted constitutional claim in a petition for habeas corpus absent a showing of cause and prejudice

to excuse the default," or a showing that the petitioner "is actually innocent of the underlying offense ....").

*B. Application*

*1. Jurisdictionally Defective Indictment*

First, Petitioner objects to Magistrate Judge Smith's conclusion that "the [I]ndictment gave Petitioner fair notice of the charges against him within the meaning of the Constitution, enabling him to respond to the counts as well as defend against double jeopardy." (R & R 8–9; *see* Pet'r's Obj's 1, 4–8.) As an initial matter, Petitioner raised the claim that the Indictment provided insufficient notice in the trial court, (*see* July 26, 2007 Trial Tr. ("July 26 Tr.") 440–44), and on direct appeal, *see Rodriguez,* 880 N.Y.S.2d at 89. In particular, Petitioner argued that the two counts charging sexual abuse in the first degree were jurisdictionally defective because they did not specify the type of sexual contact Petitioner allegedly had with the victim. (*See* Appellant's Br. 29–36.) Moreover, as noted above, the New York Court of Appeals denied Petitioner leave to appeal on August 13, 2009. *See Rodriguez,* 914 N.E.2d at 1020. Accordingly, as Magistrate Judge Smith found, this claim is exhausted and not procedurally barred. (*See* R & R 7.) [2]

 **\*7** It is worth noting that "[c]hallenges to the sufficiency of a state indictment are generally not cognizable on habeas review." *Roman v. Napoli,* No. 08–CV–6561, 2010 WL 4922627, at \*8 (W.D.N.Y. Dec. 2, 2010) (internal quotation marks omitted) (collecting cases). For example, if an indictment's only defect is compliance with a state statutory requirement, it is no grounds for habeas relief. *See, e.g., O'Halloran v. Gonyea,* No. 11–CV–346, 2015 WL 93716, at \*20 (N.D.N.Y. Jan. 7, 2015) (holding that petitioner's claim that amendment of an indictment violated New York Criminal Procedure Law was not cognizable on habeas review); *Velazquez v. Poole,* 614 F.Supp.2d 284, 330–31 (E.D.N.Y.2007) (rejecting habeas petitioner's claim that he was denied due process where the indictment failed to satisfy certain state statutory requirements because a claim based on state procedural law is not cognizable on federal habeas review). "Rather, claims based on a defective indictment are only reviewable by a habeas court if the indictment fails to satisfy the basic due process requirements: notice of the time, place, and essential elements of the crime." *Napoli,* 2010 WL 4922627, at \*8 (internal quotation marks omitted); *see also Voymas v. Unger,* No. 10–CV–6045, 2011 WL 2670023, at \*4 (W.D.N.Y. July 7, 2011) ("Challenges to state indictments will merit habeas corpus relief only in the exceptional case

where the indictment fails to satisfy the basic due process requirements: notice of the time, place, and essential elements of the crime.").

The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to ... be informed of the nature and cause of the accusation." U.S. Const. amend. VI. "An indictment is sufficient when it charges a crime [1] with sufficient precision to inform the defendant of the charges he must meet and [2] with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." *DeVonish v. Keane,* 19 F.3d 107, 108 (2d Cir.1994) (per curiam) (internal quotation marks omitted); *see also Rosen v. United States,* 161 U.S. 29, 34 (1896) (same); *Jones v. Walsh,* No. 08–CV–915, 2008 WL 2064555, at \*5 (E.D.N.Y. May 12, 2008) (same). Generally, an indictment satisfies these requirements if it "set [s] forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished.' " *DeVonish,* 19 F.3d at 108–09 (quoting *Hamling v. United States,* 418 U.S. 87, 117 (1974)); *see also United States v. Walsh,* 194 F.3d 37, 44 (2d Cir.1999) (noting that the Second Circuit has "consistently upheld indictments that do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime" (internal quotation marks omitted)); *United States v. Tramunti,* 513 F.2d 1087, 1113 (2d Cir.1975) (explaining that "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime").

 **\*8** "Recognizing that particular facts needed in particular cases are obtainable by bills of particulars or discovery," the Second Circuit has "repeatedly refused, in the absence of any showing of prejudice, to dismiss ... charges for lack of specificity." *United States v. McLean,* 528 F.2d 1250, 1257 (2d Cir.1976) (citation and internal quotation marks omitted); *see also Walsh,* 194 F.3d at 45. Thus, while discovery cannot resuscitate a defective indictment, "where the indictment has been found even minimally sufficient, a court may look to the record as a whole in determining whether the defendant is protected from double jeopardy in a subsequent prosecution and whether the defendant has had an adequate opportunity to prepare his defense." *Id.*

In light of these standards, the Indictment charging Petitioner with two counts of sexual abuse was sufficient. Under New

York law, "[a] person is guilty of sexual abuse in the first degree when he or she subjects another person to sexual contact[ ] ... [b]y forcible compulsion." N.Y. Penal Law § 130.65(1). As to each of the two counts of sexual abuse in the first degree, the Indictment states:

> AND THE GRAND JURY AFORESAID, by this indictment, ... accuses the defendant of the crime of SEXUAL ABUSE IN THE FIRST DEGREE (Sec.130.65(1) Penal Law), committed as follows:

> The defendant, in the County of Rockland, in the State of New York, on or about the 2nd day of January, 2007, subjected another person identified by the initials "R.C.", whose identity is fully known to the Grand Jury, to sexual contact by forcible compulsion.

(Indictment at unnumbered 2.) Petitioner has argued that these counts are defective because they do not describe with "sufficient precision" the actions of Petitioner that violated § 130.65. (Appellant's Br. 31.) In other words, there is no language in the two counts that differentiates them. (*Id.;* Pet'r's Obj's 5.) This claim fails. As noted above, it is usually "sufficient that the indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished .' " *DeVonish,* 19 F.3d at 108–09 (quoting *Hamling,* 418 U.S. at 117). Here, there is no doubt that the language of the Indictment tracks the language of N.Y. Penal Law § 130.65. Moreover, it provides the identifying initials of the person that Petitioner abused and the approximate date of and location in which the abuse occurred. Nothing more is constitutionally required. *See Voymas,* 2011 WL 2670023, at *4–5 (rejecting claim that the indictment was constitutionally flawed because it did not identify what specific acts satisfied the "forcible compulsion" element of the rape charge); *see also Best v. Kelly,* No. 88–CV–530, 1988 WL 76621, at *2 (E.D.N.Y. July 7, 1988) (same).

**\*9** To support his claim of insufficient notice, Petitioner cites *People v. Keindl,* 502 N.E.2d 577 (N.Y.1986), in which the New York Court of Appeals held that an indictment charging several "criminal sexual acts occurring over periods of time extending for as many as 10, 12[,] and 16 months" was defective insofar as "there [were] such a multiplicity of acts encompassed in single counts as to make it virtually impossible to determine the particular act of sodomy or sexual abuse as to which the jury reached a unanimous verdict." *Id.*

at 580, 582. The New York Court of Appeals explained that each count of an indictment may charge only one offense and "where one count alleges the commission of a particular offense occurring repeatedly during a designated period of time, that count encompasses more than one offense and is duplicitous." *Id.* at 580; *see also People v. Levandowski,* 780 N.Y.S.2d 384, 385 (App.Div.2004) (citing *Keindl* to hold that the trial court erred in failing to dismiss "a 44–count indictment with rape, course of sexual conduct against a child, endangering the welfare of a child[,] and criminal contempt, all arising out of [the] defendant's continued sexual contact with his infant daughter over a six-year period" for duplicitousness). Here, however, the Indictment did not allege that Petitioner sexually abused Cabezas repeatedly during an extended period of time, but rather alleged sexual acts that occurred on or around a single day-January 2, 2007. Accordingly, the Indictment is not deficient under *Keindl. See People v. Lopez,* 572 N.Y.S.2d 378, 379–80 (App.Div.1991) (holding that indictment alleging defendant with sexual assault claims was sufficient even though indictment included a date range of 31 days). Likewise, none of the other cases that Petitioner cites supports a conclusion that the Indictment was constitutionally insufficient. *See, e.g., People v. Raymo,* 796 N.Y.S.2d 448, 450 (App.Div.2005) (holding that the defendant did not raise the issue of whether a count of the indictment was "facially defective in that it [did] not specify where or when the crime occurred ... by way of pretrial motion and ha[d]," thus, failed to preserve the issue for appellate review").

To the extent that Petitioner argues the Indictment fails to provide sufficient notice because it does not identify which part or parts of the victim's body that Petitioner touched, or otherwise made contact with, (Pet'r's Obj's 6–7), this claim fails. As noted above, "[a] person is guilty of sexual abuse in the first degree when he or she subjects another person to sexual contact ... [b]y forcible compulsion." N.Y. Penal Law § 130.65(1). "Sexual contact," in turn, is defined as "any touching of the sexual or other intimate parts of a person for the purpose of gratifying sexual desire." *Id.* § 130.00(3); *see also People v. Hoffert,* 2 N.Y.S.3d 717, 718 (App.Div.2015). Petitioner has not pointed to any case that remains good law, nor has the Court found any such case, where an indictment has been dismissed as defective on notice grounds for failing to specify which part or parts of the victim's body was or were the object of the alleged sexual contact. Indeed, in *People v. Jackson,* 385 N.E.2d 1296 (N.Y.1978), the New York Court of Appeals reversed the Appellate Division, which had held that an indictment charging sodomy was legally insufficient

because it "fail[ed] to state the exact nature of the deviate sexual intercourse with which defendant [was] charged." *See People v. Jackson,* 401 N.Y.S.2d 526, 527 (App.Div.), *rev'd,* 385 N.E.2d 1296 (N.Y.1978). In reversing the Appellate Division, the Court of Appeals held that the indictment was not defective because it "contain[ed] all the elements of the crime" and noted that the "precise nature of the deviate sexual intercourse ... could be, and was ..., clarified by a bill of particulars." *Jackson,* 385 N.E.2d at 1297.

**\*10** Here, the discovery in the case, including Petitioner's own confessions, plainly notified Petitioner how the prosecution intended to prove that Petitioner subjected the victim to "sexual contact" by "forcible compulsion." In particular, the prosecution intended to establish, and did offer evidence at trial, that Petitioner had sexual contact with the victim's breasts and vagina. (*See* Resp't's Habeas Mem. 2, 10, 23–25.) Thus, Petitioner was on notice of the prosecution's theory as to which intimate parts of the victim that Petitioner had sexual contact. *See, e.g., Chandler v. Moscicki,* 253 F.Supp.2d 478, 487–88 (W.D.N.Y.2003) (holding that petitioner received adequate notice of his potential liability as an accomplice under the indictment where petitioner was notified early in the proceedings that he faced criminal liability as an accomplice and police officer's testimony at a pre-trial hearing also further supplied notice of potential accomplice liability); *Alston v. Donnelly,* 461 F.Supp.2d 112, 129–30 (W.D.N.Y.2006) (finding that petitioner's receipt of a copy of the victim's pre-trial statement detailing alleged rape provided petitioner with sufficient actual notice of rape count to satisfy due process).

In his objection, Petitioner also suggests that the two sexual abuse counts are defective because they are duplicitous. (Pet'r's Obj's 5 (arguing that the "generic description" of the criminal conduct alleged in the two sexual abuse counts fell "short" of the "requirements needed to ... keep the indictment from being [d]uplici[t]ous").) An indictment is duplicitous "if it joins two or more distinct crimes in a single count." *Walsh,* 194 F.3d at 46 (internal quotation marks omitted). However, this is the very first time that Petitioner has raised such a challenge to these counts in the Indictment. As noted above, Petitioner's *only* challenge to these two counts in state court was that they were "jurisdictionally defective" because they failed to "specify the type of sexual contact" Petitioner allegedly made with the victim. (Appellant's Br. 29.) Indeed, as noted below, Petitioner explicitly disclaimed any challenge to these counts as multiplicitous, and made no mention that he was, instead, claiming that these counts were duplicitous.

(Appellant's Reply 1.) Not surprisingly, therefore, the only claim considered by the Appellate Division was whether the counts were jurisdictionally defective because they failed to provide sufficient notice of the criminal conduct giving rise to the charges. *See Rodriguez,* 880 N.Y.S.2d at 89 ("[T]hose counts of the indictment cited the applicable sections of the Penal Law and sufficiently tracked the language thereof to afford the defendant fair notice of the charge against him and, thus, were not jurisdictionally defective.") Because Petitioner never raised, or even hinted at, a duplicitous challenge to these counts, let alone one based on the federal constitution, his claim is unexhausted, but procedurally barred. *See Weber v. Haggett,* Nos. 09–CV–174, 09–CV–221, 2010 WL 8356362, at \*17–19 (N.D.N.Y. July 2, 2010) (considering merits of challenge to sexual abuse count on claim that the count was "overly broad and unduly vague," but holding that the duplicitous challenge to the same count was unexhausted and procedurally barred because petitioner did not move to dismiss that charge before trial), *adopted by* 2012 WL 264170 (N.D.N.Y. Jan. 30, 2012); *accord Olmos v. Ryan,* No. 11–CV–344, 2012 WL 8466125, at \*6 (D.Ariz. Dec. 19, 2012) (rejecting claim that sexual abuse charge was duplicitous because, while the petitioner argued in state court that the charge was duplicitous, "he did not frame his arguments as federal claims"), *adopted in part by* 2013 WL 3199831 (D. Ariz. June 24, 2013).

**\*11** Finally, it is worth noting that Petitioner's Objections could be interpreted as arguing that the Indictment was multiplicitous. "An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *Walsh,* 194 F.3d at 46 (internal quotation marks omitted); *see also Timmons v. Lee,* No. 10–CV–1155, 2010 WL 3813963, at \*9 (E.D.N.Y. Sept. 23, 2010) (applying this definition in review of habeas petition under § 2254); *Castillo v. Walsh,* 443 F.Supp.2d 557, 566 (S.D.N.Y.2006) (in resolving a § 2254 petition, explaining that "[a]n indictment is multiplicitous under New York law when one offense is charged in more than one count"). "The multiplicity doctrine is based upon the double jeopardy clause of the Fifth Amendment, which assures that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." *United States v. Nakashian,* 820 F.2d 549, 552 (2d Cir.1987) (alteration and internal quotation marks omitted); *see also United States v. Regensberg,* 604 F.Supp.2d 625, 629 (S.D.N.Y.2009) (same). "It is not determinative whether the same conduct underlies the counts; rather, it is critical whether the 'offense'—

in the legal sense, as defined by [the relevant legislative body]—complained of in one count is the same as that charged in another." *United States v. Chacko,* 169 F.3d 140, 146 (2d Cir.1999). Where, as here, "the same statutory violation is charged twice ... 'the question is whether the facts underlying each count were intended [by the legislative body] to constitute separate units of prosecution.' " *Regensburg,* 604 F.Supp.2d at 629 (some internal quotation marks omitted) (quoting *United States v. Ansaldi,* 372 F.3d 118, 124 (2d Cir.2004)); *see also Serrano v. Kirkpatrick,* No. 11–CV–2825, 2013 WL 3226849, at *14 (S.D.N.Y. June 25, 2013) (applying this standard on habeas review of a conviction under New York law).

In *People v. Alonzo,* 945 N.E.2d 495 (N.Y.2011), a case decided after Petitioner's trial and appeal, the New York Court of Appeals explained that "[a]s a general rule, ... where a defendant, in an uninterrupted course of conduct directed at a single victim, violates a single provision of the [New York] Penal Law, he commits but a single crime." *Id.* at 496. Accordingly, the New York Court of Appeals held that an indictment was multiplicitous where it charged the defendant with two separate counts of sexual abuse in the first degree, in violation of New York Penal Code § 130.65, based on the allegation that the defendant touched each victim's breasts and also touched each victim's buttocks—in other words, where the indictment charged a separate count for sexual abuse for each instance of sexual contact. *Id.* at 496–97. The court explained that "[t]o hold that each ... movement of the hand may be prosecuted as a separate crime would be contrary to common sense," and the "evidence in [*Alonzo*] clearly show[ed] a single crime of sexual abuse against each victim." *Id.* at 497. The court cautioned, however, that "[o]ther cases may not be so clear" and "[w]here the evidence reasonably permits a grand jury to find that either one or two crimes occurred, an indictment charging two should not be dismissed." *Id.*

**\*12** This Court, however, is procedurally barred from deciding whether the counts of sexual abuse as alleged in the Indictment are multiplicitous. In his reply brief on direct appeal, and in response to the People's suggestion that Petitioner had made an argument that the Indictment should have been dismissed because it was multiplicitous, Petitioner's counsel made clear that "[Petitioner] did not raise an issue of multiplicity," but rather "merely illustrated that both counts in the [I]ndictment were defective because both of them failed to allege any particular facts; that is not an issue of multiplicity and Respondent errs in suggesting

otherwise." (Appellant's Reply 1.) It is far from surprising, then, that the Appellate Division did not address the question of whether the Indictment was multiplicitous in upholding Petitioner's conviction. Because this claim could have been raised on direct appeal but was not, and New York procedural rules bar its state courts from hearing such claims in a second appeal or collateral proceeding, *see Sparks,* 2012 WL 4479250, at *4, Petitioner no longer has any available state court remedy, and the unexhausted claims are therefore deemed exhausted, but procedurally barred, *see Carvajal,* 633 F.3d at 104. Moreover, because a dismissal of a habeas petition on such grounds is a "disposition ... on the merits," *Aparicio,* 269 F.3d at 90, the Court need not address the claim further because Petitioner has not shown " 'cause for the default and prejudice,' " or shown "that he is 'actually innocent' of the crime for which he was convicted," *Carvajal,* 633 F.3d at 104 (quoting *Aparicio,* 269 F.3d at 90). Here, there is nothing in the record that convinces the Court that Petitioner is actually innocent of the crimes for which he was convicted. As the R & R makes clear, the evidence against Petitioner was sufficient, as discussed below. Further, Petitioner does not explain cause for the default. Accordingly, any claim that the Indictment is multiplicitous is procedurally barred. [3]

*2. Ineffective Assistance of Counsel at the Huntley Hearing*
Next, Petitioner objects to Magistrate Judge Smith's conclusion that any challenge to the performance of Petitioner's counsel at the pre-trial suppression hearing conducted pursuant to *People v. Huntley,* 204 N.E.2d 179 (N.Y.1965) is barred on procedural grounds. (*See* R & R 9; Pet'r's Obj's 8–12.)

Petitioner did not raise his ineffective assistance claim on direct appeal. Instead, Petitioner challenged his counsel's performance at the *Huntley* hearing in a motion pursuant to CPL § 444.10, arguing that his conviction should be vacated because "he was denied his rights to effective assistance of counsel when defense counsel failed to ... elicit important supporting facts and to make the necessary argument to obtain suppression because the proof at the *Huntley* hearing did not establish beyond a reasonable doubt that [Petitioner] underst[oo]d the *Miranda* warning in English or in Spanish." (Def.'s § 440.10 Motion (Aff. in Supp.) 1.) In a Decision and Order dated September 17, 2009, the trial court denied Petitioner's § 444.10 Motion because Petitioner was in a position to raise the issues underlying his motion in his appeal to the Appellate Division, but failed to do so, and

the claims that Petitioner raised involved matters of record that should have been litigated on direct appeal, as provided by CPL § 440.10(2)(c). (*See* Rockland County September 17 Order.)

**\*13** In *Coleman v. Thompson,* 501 U.S. 722 (1991), "the Supreme Court reaffirmed the well-settled principle that when a 'state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.' " *Glenn v. Bartlett,* 98 F.3d 721, 724 (2d Cir.1996) (quoting *Coleman,* 501 U.S. at 750). Nevertheless, "procedural default in the state court will only bar federal habeas review when 'the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar,' " and, therefore, a federal habeas court must "determine [ ] whether the state court judgment rests on such an independent and adequate ground." *Id.* (quoting *Harris v. Reed,* 489 U.S. 255, 263 (1989)). "If a state court's disposition of [a] federal claim rests upon a state-law ground that is independent of the federal question and adequate to support the judgment, the [habeas court] will not review that claim." *Fernandez v. Sheahan,* No. 12–CV–2735, 2015 WL 4771958, at \*8 (E.D.N.Y. Aug. 11, 2015) (internal quotation marks omitted). A state-law ground is "adequate only if it is firmly established and regularly followed by the state." *Richardson v. Greene,* 497 F.3d 212, 218 (2d Cir.2007) (alterations and internal quotation marks omitted).

New York Criminal Procedure Law § 440.10 provides grounds for which a court may vacate a judgment of conviction after such a judgment has been entered. However, the statute also provides that a court may deny a § 440 motion where "sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, [and] no such appellate review or determination occurred owing to the defendant's ... unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him." N.Y.Crim. Proc. Law § 440.10(2)(c). "The purpose of this rule 'is to prevent Section 440.10 from being employed as a substitute for direct appeal when the defendant was in a position to raise an issue on appeal or could have readily raised it on appeal but failed to do so.' " *Sweet v. Bennett,* 353 F.3d 135, 139 (2d Cir.2003)

(alterations omitted) (quoting *People v. Cooks,* 491 N.E.2d 676, 678 (N.Y.1986)). Moreover, a court may deny a motion to vacate when "[u]pon a previous motion made pursuant to this section, the defendant was in a position adequately to raise the ground or issue underlying the present motion but did not do so," although the court, "in the interest of justice and for good cause shown ... may in its discretion grant the motion if it is otherwise meritorious." N.Y.Crim. Proc. Law § 440.10(3)(c).

**\*14** Here, the Rockland County Court expressly relied on New York Criminal Procedure Law §§ 440.10(2)(c) and 440.10(3)(c) in denying Petitioner's § 440.10 motion. This "express reliance on a state procedural rule constitutes an independent state law ground for [the state court's] decision." *Gilford v. Racette,* No. 13–CV–5881, 2015 WL 4639975, at \*19 (S.D.N.Y. Aug. 5, 2015) (report and recommendation). Moreover, CPL " § 440.10(2)(c) ... is a 'firmly established and regularly followed' state procedural ground barring federal habeas review." *Id.* (collecting cases); *see also Aparicio,* 269 F.3d at 91 ("New York does not otherwise permit collateral attacks on a conviction when the defendant unjustifiably failed to raise the issue on direct appeal."). This procedural rule includes record-based claims of ineffective assistance of counsel. *See McDowell v. Heath,* No. 09–CV–7887, 2013 WL 2896992, at \*4 (S.D.N.Y. June 13, 2013) ("Record-based ineffective assistance of trial counsel claims, however, may be brought on direct appeal and when a petitioner fails to do so, rejection by a section 440.10 court is an independent and adequate ground precluding the petitioner from bringing the claim in a federal habeas petition."); *see also Spurgeon v. Lee,* No. 11–CV–600, 2015 WL 4610021, at \*11 (E.D.N.Y. July 31, 2015) (explaining that the " § 440.10 court concluded that [the petitioner's] ineffective assistance of counsel claim was procedurally barred under CPL § 440.10(2)(c) because the issues raised appeared in the trial record and, thus, the claim could have been raised on direct appeal").

Petitioner is correct that "New York courts have held that some ineffective assistance claims are 'not demonstrable on the main record' and are more appropriate for collateral or post-conviction attack, which can help develop the necessary evidentiary record." *Sweet,* 353 F.3d at 139 (quoting *People v. Harris,* 491 N.Y.S .2d 678, 687 (App.Div.1985)); *see also Jones v. Bradt,* No. 13–CV–6260, 2015 WL 506485, at \*4 (W.D.N.Y. Feb. 6, 2015) (explaining that "sometimes ineffective assistance claims are based on matters *dehors* the record and properly raised in a collateral motion rather than on direct appeal"); *McCollough v. Bennett,* No. 02–CV–5230,

2010 WL 114253, at *7 (E.D.N.Y. Jan. 12, 2010) (analyzing "whether [a] failure to lay a proper foundation for a business record through a foundation witness is an 'off-record' matter" that would warrant collateral review); *Quinones v. Miller,* No. 01–CV–10752, 2003 WL 21276429, at *21 (S.D.N.Y. June 3, 2003) ("[U]nder New York law, ineffective counsel claims involving matters outside the record—including claims of conflict of interest—must be pursued by way of a CPL 440.10 motion" (internal quotation marks omitted)), *adopted by* 2005 WL 730171 (S.D.N.Y. Mar. 31, 2005). "Claims are record-based when a reviewing court could conclude that defendant's counsel was ineffective simply by reviewing the trial record without the benefit of additional background facts that would need to be developed through a post-conviction motion pursuant to CPL 440.10." *McDowell,* 2013 WL 2896992, at *5 (internal quotation marks omitted).

**\*15** To the extent Petitioner presses the ineffective assistance of counsel claim based on the grounds that he pursued in his § 440.10 Motion—specifically that his trial counsel failed to elicit important supporting facts and make the necessary arguments at the *Huntley* hearing-the Court agrees with Magistrate Judge Smith's conclusion that these claims are record-based and, therefore, as the state court found, procedurally barred. (*See* R & R 13–14.) In his § 440.10 Motion, Petitioner argued that his trial counsel was ineffective for failing to object to the fact that Detective Roxanne Lopez ("Detective Lopez"), who interviewed and recorded statements made by Petitioner, was not a certified translator and, therefore, Petitioner did not understand his *Miranda* rights. (Def.'s § 440 .10 Motion (Mem. of Law) 2–6.) Petitioner also argues that defense counsel was ineffective for not raising the argument that Detective Lopez failed to give Petitioner his *Miranda* rights in a timely manner. (*Id.* at 4–5.) These claims are belied by a review of the transcript of the *Huntley* hearing. During the hearing, Petitioner's counsel argued for suppression of Petitioner's written statement, his oral statement, and a video statement made by Petitioner because Petitioner did not knowingly and intelligently waive his *Miranda* rights before giving these statements. (May 9, 2007 Hearing Tr. ("May 9 Tr.") 147–48 (Dkt. No. 13).) Petitioner's counsel discussed the fact that Petitioner was not provided with a translator or other language assistance despite his difficulty in understanding and speaking English, (*id.* at 147–49), addressed the inconsistencies in Detective Lopez's testimony, (*id.* at 149–50), and pressed the argument that Petitioner was not given his *Miranda* rights explicitly and/or in a timely manner, (*id.* at 149–52). Accordingly, a reviewing court could evaluate Petitioner's claims that his counsel was

ineffective for failing to adequately address whether he was given and/or understood his *Miranda* rights and by examining the transcript of the *Huntley* hearing.

In his § 440.10 Motion, Petitioner also argued that defense counsel failed to object to the conversation that was recorded between himself and Cabezas. (Def.'s § 440.10 Motion (Mem. of Law) 4–5.) Again, this contention is undercut by the transcript of the *Huntley* hearing, during which Petitioner's counsel argued that the conversation between Petitioner and Cabezas should be suppressed because Cabezas was acting as an agent for the police. (May 9 Tr. 8 .) Because a reviewing court could examine the alleged deficiencies on which Petitioner bases his ineffective assistance of counsel claim, the facts underlying this claim—to the extent it is based on these allegations of deficient performance—are not outside of the record or are necessarily record-based and, therefore, procedurally barred. *See McDowell,* 2013 WL 2896992, at *24 (explaining that a claim of ineffective assistance of counsel was record-based because "[t]he purported weakness of [the] suppression motion, which failed to trigger a hearing, was apparent on its face," and "the full record of the trial testimony was adequate to permit a reviewing court to determine whether defense counsel had had a compelling basis to pursue a more pointed, and potentially meritorious, suppression motion"); *Alston,* 461 F.Supp.2d at 124 (explaining that the petitioner's "claims of ineffective assistance of trial counsel all relate[d] to alleged errors by counsel that [were] apparent on the face of the record-namely, a failure to make a pre-trial omnibus motion, a failure to question why counts three and five of the indictment were not dismissed, and a failure to object to the jury's verdict").

**\*16** In his Objections, Petitioner also argues that his ineffective assistance claim is not record-based because his counsel "failed to bother to investigate the facts leading to the creation of the statements by questioning [P]etitioner as to what the officers had done during their questioning of him," (Pet'r's Obj's 9), and that this failure led to the prosecution's withholding of *Rosario* material, (*see id.* at 10). In *People v. Rosario,* 173 N.E.2d 881 (N.Y.1961), "the New York Court of Appeals held that a right sense of justice entitles a defendant to inspect the prior statements of a prosecution witness, prior to cross-examination, whether or not his statements vary from his testimony on the stand." *Flores v. Demskie,* 215 F.3d 293, 300 (2d Cir.2000) (internal quotation marks omitted). As an initial matter, the Court notes that to the extent that Petitioner raises a claim based on

*Rosario,* "[a] *Rosario* violation is an issue of state law that is not cognizable on habeas review." *Pereira v. Superintendent, Wyo. Corr. Facility,* No. 04–CV–3445, 2005 WL 2038618, at *7 (E.D.N.Y. Aug. 22, 2005); *see also Johnson v. Filion,* 232 F.Supp.2d 98, 100 (S.D.N.Y.2002) ("Failure to turn over *Rosario* material is not a basis for habeas relief as the *Rosario* rule is purely one of state law." (internal quotation marks omitted)). Further, although a habeas court can review an ineffective assistance of counsel claim based on a failure to pursue a viable *Rosario* claim, *see, e.g., Flores,* 215 F.3d at 303–04 (analyzing an ineffective assistance of counsel claim based on defense counsel's waiver of a *Rosario* claim), Petitioner raises the claim that his trial counsel was ineffective for failing to question Detective Lopez about possible *Rosario* material for the first time in his Objections, and, accordingly, the claim is unexhausted for purposes of federal habeas review. *See Warren v. Goord,* No. 06–CV–1423, 2013 WL 1310465, at *18 (E.D.N.Y. Mar. 28, 2013) (explaining that because "[t]he ineffectiveness claim ... before th[e] [federal] [c]ourt [was] different in character from petitioner's earlier claim: he [did] not mention his attorney's failure to obtain *Rosario* material, but rather his attorney's refusal to let him testify or communicate with the media," the claim was unexhausted); *Lowman v. New York,* No. 09–CV–58, 2011 WL 90996, at *10 (W.D.N.Y. Jan. 11, 2011) ("Because Petitioner raises [a *Rosario* ] claim for the first time in his habeas petition, it is unexhausted for purposes of federal habeas review."). Moreover, "[n]o purpose would be served by requiring [P]etitioner to return to state court for further proceedings before considering ... [this] claim raised in his habeas petition." *Grey v. Hoke,* 933 F.2d 117, 120 (2d Cir.1991). Here, Petitioner has already made one request for leave to appeal to the New York Court of Appeals, *see id.* (citing N.Y. Court Rule § 500 .10(a)), and he has filed a motion pursuant to CPL § 440.10, in which he failed to raise the claim, and Petitioner offers no justification for that failure, *see Warren,* 2013 WL 1310465, at *19 (explaining that "[a] motion to vacate on ineffectiveness grounds would fall under the mandatory dismissal provision of [CPL § 440.10]" where the petitioner already made motions to vacate his conviction pursuant to that statute). Because Petitioner no longer has a state court forum available to him within which to exhaust the claim, the Court deems the claim exhausted but procedurally defaulted. [4]

**\*17** Accordingly, "Petitioner's ineffective assistance of counsel ... claims are ... procedurally barred and reviewable by this court only if petitioner has shown cause and prejudice or a fundamental miscarriage of justice." *Spurgeon,* 2015

WL 4610021, at *11; *see also Grey,* 933 F.2d at 121 (explaining that as to a claim that the court deemed exhausted but procedurally defaulted, the forfeiture "bar[red] [the petitioner] from litigating the merits of [his] claim[ ] in [the] federal habeas proceeding[ ], absent a showing of cause for the procedural default and prejudice resulting therefrom"); *Pearson v. Rock,* No. 12–CV–3505, 2015 WL 4509610, at *8 (E.D.N.Y. July 24, 2015) ("Because Petitioner's claim is procedurally defaulted, this court can review it on the merits only if Petitioner demonstrates either: (1) cause for and prejudice resulting from the default ... or (2) that he is actually innocent"). Again, there is nothing that convinces the Court that Petitioner is innocent. Moreover, Petitioner does not claim that his appellate counsel was ineffective in failing to raise this claim. Indeed, Petitioner offers no explanation for his failure to pursue his claim of ineffective assistance of counsel based on arguments that his trial counsel made or failed to make during the *Huntley* hearing. Although Petitioner argues that his pro se status in filing his § 440.10 Motion is relevant, (Pet'r's Obj's 11), Petitioner was represented by appellate counsel at the direct review stage. It is also worth noting that Petitioner had different appellate counsel than his trial counsel and, therefore, there was no obvious reason that Petitioner could not pursue an ineffective assistance of counsel claim on direct review. *See Bradt,* 2015 WL 506485, at *4 (explaining that the relevant claim was not outside of the scope of the record because the "trial counsel's ineffectiveness [was] premised on his failure to move to preclude certain testimony, and thus his error ... was reflected within the record, making it an appropriate claim to raise on direct appeal, especially given that [the][p]etitioner had new appellate counsel"); *Alston,* 461 F.Supp.2d at 124 (explaining that the petitioner "had different appellate counsel; he was not represented on appeal by his trial counsel who, understandably, could not be expected to argue his own ineffectiveness"); *DeFeo v. United States,* 153 F.Supp.2d 453, 457 (S.D.N.Y.2001) (explaining that collateral review of an ineffectiveness claim is barred "where (1) the movant was represented by new appellate counsel on direct appeal, and (2) the claim is based solely on evidence in the trial record" because "while trial attorneys cannot be expected to argue their own ineffectiveness on appeal, newly retained attorneys have no such excuse"). The claims that Petitioner's trial counsel was ineffective for failing to make certain arguments, or ask certain questions at the *Huntley* hearing, then, are procedurally barred and unreviewable.

*3. Jury's Questions*

**\*18** Petitioner claims that the trial court's failure to "meaningfully respond" to the jury's questions regarding the sexual abuse counts deprived Petitioner of a fair trial. (Pet. Attachment A at i.) Petitioner objects to Magistrate Judge Smith's conclusion that this claim is procedurally barred. (Pet'r's Obj's 12.)

During its deliberations in Petitioner's case, the jury sent a note to the trial court, asking: "Why are there two counts of sexual abuse in the first degree?" (July 26 Tr. 437.) The trial judge stated that she "anticipated this type of question," and explained why. (*See id.* at 437–38.) In relevant part, the trial judge explained that:

> [T]he Court should not highlight testimony or aspects of testimony. I was afraid this would come up. And the only thing I can do is charge them on sexual abuse again. And the only other thing I can think is that I can tell them that if they believed that sexual abuse took place, either they don't believe it took place at all or they believe it happened more than once. I don't know. That's a difficult thing without specifically telling them it can be hand to vagina and then it can be hand to breast or it can be penis to vagina. I mean, the testimony, the read-back, obviously if they are to believe her testimony, and I only use this for an example, we had two incidences of sexual abuse. She claims his fingers were in her vagina and she claims that his penis rubbed on her vagina prior to, she testified, that it penetrated. So—but I don't like to highlight testimony or—I don't—I don't know other than to re—charge them.

(*Id.* at 438–39.) In response to the trial court's invitation for suggestions from counsel on how to answer the jury's question, Petitioner's counsel stated: "I don't have any particular request other than I'll just rest with the Court's discretion. I think re-reading the charges they'll have to determine from the facts-the facts and the law." (*Id.* at 439.) After the prosecutor suggested that the trial court "say something that [the jury is] to determine ... what, if any, parts of [the victim's] body were touched," (*id.* at 440), Petitioner's

counsel discussed why, in his view, the Indictment was deficient because it did not allege which parts of the body Petitioner touched, (*id.* at 441–43). Ultimately, Petitioner's counsel stated that "the charge itself ... has a definition of sexual contact [that] means 'any,' " and he did not "know why there would be any further explanation [as to what] sexual contact means." (*Id.* at 442.) The trial judge responded "[t]hat's fine," and explained that she would "re-charge them on sexual abuse and tell them they are to consider all the evidence for all the counts in the indictment." (*Id.* at 442–43.) Petitioner's counsel renewed his request that the counts of sexual abuse be dismissed as jurisdictionally defective, which the trial court denied. (*Id.* at 443.) The trial court then charged the jury again on the two counts of sexual abuse in the first degree. (*Id.* at 445–49.)

**\*19** Subsequently, the jury sent a second note asking, "What does it mean when there are two counts of the exact same charge?" (*Id.* at 450.) The trial court noted that the question was the "same question [the jury] asked before, just asked a different way." (*Id.*) Petitioner's counsel stated:

> Notwithstanding my objections, Judge, my suggestion is that [the jury] be advised that the People are alleging more than one count of sexual abuse in the first degree which means that, ... based on the evidence you may determine ... that there was one or more or none or no sexual touching. But the People are alleging because of the existence of two counts they are alleging there were two incidences [sic] of sexual touching as is defined in sexual abuse in the first degree. But this is not a suggestion or an indication that you have to find such, just that the People are alleging some sort of balanced charge like that, Judge.

(*Id.* at 451–52.) The Court agreed to the suggestion. (*Id.* at 452.) Specifically, the Court instructed:

> The People have alleged and have the burden of proof to prove beyond a reasonable doubt that more than one inciden[t] of sexual conduct occurred. As I have previously charged you on sexual abuse in the first degree I have previously given you the definition of

> sexual contact. You must determine ...
> whether or not any sexual contact was
> proven. Again, the People bear the
> burden of proof beyond a reasonable
> doubt that any sexual contact did or
> did not take place, and if more than
> one incident took place you as the
> finders of the fact must make that
> determination by deliberating upon all
> the evidence in this case.

(*Id.* at 453–54.) The Court then re-read the elements of sexual abuse in the first degree. (*See id.* at 454–57.)

Petitioner raised the claim that the trial court failed to meaningfully respond to the jury's notes on direct appeal. (*See* Appellant's Br. 37–39.) In response, the People argued that Petitioner failed to preserve his claim for appellate review because while "counsel ... raised an objection to the legal sufficiency of the sexual abuse charges themselves," he did not raise an objection "to the court's proposed response." (Appellee's Br. 29–31.) Appellate counsel did not respond to the People's argument of procedural default in the reply brief. (*See* Appellant's Reply .) Citing CPL § 470.05(2), the Appellate Division held that "defendant's contention that the trial court did not adequately respond to jury notes requesting clarification is unpreserved for appellate review...." *Rodriguez,* 880 N.Y.S.2d at 89. "The Second Circuit has determined that C.P.L. § 470.05(2) is an independent and adequate state procedural ground." *Moore v. Conway,* No. 08–CV–6390, 2010 WL 4117411, at *7 (W.D.N.Y. Oct. 20, 2010) (citing *Velasquez v. Leonardo,* 898 F.2d 7, 9 (2d Cir.1990)); *see also Ortiz v. Bradt,* No. 13–CV–5420, 2013 WL 5775695, at *2 (E.D.N.Y. Oct. 25, 2013) ("It is well settled that New York's contemporaneous objection rule, codified at N.Y.Crim. Proc. Law § 470.05(2), is an independent and adequate state law ground that ordinarily precludes federal habeas corpus review." (citing *Downs v. Lape,* 657 F.3d 97, 104 (2d Cir.2011))). Because the Appellate Division relied on CPL § 470.05(2), this Court is procedurally barred from addressing the merits of this claim. *See Moore,* 2010 WL 4117411, at *7.

 **\*20** In his Objections, Petitioner argues that his trial counsel did, in fact, object to the trial court's responses to the relevant jury notes. (*See* Pet'r's Obj's 13–14.) In other words, Petitioner claims that the Appellate Division erred in concluding that this claim was procedurally barred. The Court acknowledges that after the first jury note, trial counsel pressed his argument that the Indictment was jurisdictionally

defective and prefaced his suggestion to the second jury note with the phrase "[n]otwithstanding my objections." (July 26 Tr. 451.) Nevertheless, from the transcript it is clear that trial counsel's objections were directed at the sufficiency of the Indictment, not at the substance of the trial court's response to the jury's notes. Indeed, as explained above, the trial court followed the suggestions of Petitioner's trial counsel as to each note. Even assuming it is somewhat ambiguous whether Petitioner's trial counsel objected to this claim, the Appellate Division was squarely presented with the issue of whether the objection was preserved and decided that it was not. In light of this decision and, at most, the ambiguity of trial counsel's response to the jury notes, this Court defers to the Appellate Division's determination that CPL § 470.05(2) bars this claim. *See Downs,* 657 F.3d at 105–06 (explaining that were the court "sitting as judges of the Appellate Division, [it] may well have found [petitioner's] claim preserved[ b]ut it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions" and, therefore, concluding that "[g]iven the ambiguity of counsel's comments and the limited state-court record, the Appellate Division had a legitimate basis to conclude that [the relevant] claim on appeal was not preserved"). Because the "Appellate Division properly relied on a procedural bar, [P]etitioner would have to show that grounds exist for reaching the merits notwithstanding that procedural bar." *Ortiz,* 2013 WL 5775695, at *2. As noted, to overcome this default on state procedural grounds, Petitioner must show " 'cause for the default and prejudice' or ... that he is 'actually innocent' of the crime for which he was convicted." *Carvajal,* 633 F.3d at 104 (quoting *Aparicio,* 269 F.3d at 90). Again, there is nothing in the record that convinces the Court that Petitioner is actually innocent of the crimes for which he was convicted, and Petitioner does not offer cause for the default. The Court, therefore, agrees with Magistrate Judge Smith that this claim is procedurally barred.

**4. Sufficiency of the Evidence**

Petitioner challenges Magistrate Judge Smith's conclusion that his claim of insufficient evidence should be dismissed. (Pet'r's Obj's 15–16.) Petitioner argues that there was insufficient evidence in the record to support a conviction for attempted rape in the first degree. (*Id.* at 15; *see also* Pet'r's Br. in Resp. to Resp't's Br. in Opp'n to Habeas Corpus Pet. 20 (Dkt. No. 33).) Petitioner's trial counsel moved for dismissal with respect to each count of the Indictment upon the grounds that the evidence was legally insufficient to establish each and every element of the crimes, (July 26 Tr. 254), which the trial court denied as to, among other counts, attempted rape in the

first degree, (*id.* at 291). Petitioner also raised this claim on direct appeal. The Appellate Division found that the evidence, viewed in the light most favorable to the prosecution, "was legally sufficient to establish the defendant's guilt beyond a reasonable doubt," and concluded that based on its "independent review pursuant to CPL 470.15(5), [it was] satisfied that the verdict of guilt was not against the weight of the evidence." *Rodriguez,* 880 N.Y.S.2d at 89–90. The Court finds that the Appellate Division's decision was neither contrary to, nor an unreasonable application of clearly established federal law, nor was it "based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." *Epps,* 687 F.3d at 50 (internal quotation marks omitted).

**\*21** "The evidence is sufficient to support a conviction whenever, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Parker v. Matthews,* 132 S.Ct. 2148, 2152 (2012) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)). Moreover, "a state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the decision was objectively unreasonable." *Id.* (internal quotation marks omitted). In other words, a habeas petitioner must overcome "this twice-deferential standard" to prevail on a sufficiency of evidence challenge. *Id.; see also Santone v. Fischer,* 689 F.3d 138, 148 (2d Cir.2012) ("When a federal habeas petition challenges the sufficiency of the evidence to support a state-court conviction, AEDPA establishes a standard that is 'twice-deferential.' " (quoting *Matthews,* 132 S.Ct. at 2152)). In other words, juries have "broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors draw reasonable inferences from basic facts to ultimate facts, ... and on habeas review a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court." *Id.* at 148 (citations, internal quotation marks, and italics omitted).

Here, Petitioner challenges the sufficiency of the evidence to support his conviction of attempted rape in the first degree. Under New York Law, "[a] person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime." N.Y. Penal Law § 110.00. "A person is guilty of rape in the first degree when he or she engages in sexual intercourse with another person [ ] ... [b]y forcible

compulsion." *Id.* § 130.35(1). There is ample evidence based on Cabezas's testimony that supports Petitioner's conviction for attempted rape in the first degree, which Magistrate Judge Smith aptly summarized in the R & R. (*See* R & R 18.) Moreover, as Magistrate Judge Smith explained, the prosecution introduced Petitioner's statement into evidence, which corroborated Cabezas's version of events. (*See id.; see also* July 25, 2007 Trial Tr. ("July 25 Tr.") 118–124.) Petitioner argues that Cabezas's testimony was incredible as a matter of law and that he did not have the requisite level of intent to be found guilty of attempted rape in the first degree. In particular, Petitioner claims that because, among other things, Petitioner and Cabezas had been in a long-term relationship, Petitioner had keys to Cabezas's house, Petitioner made clear that he did not want to rape Cabezas, and Cabezas was calm when she spoke on the phone with her employer during the incident, the evidence was not sufficient to support a conviction of attempted rape in the first degree. (*See* Pet'r's Obj's 15; *see also* Appellant's Br. 41–42.) The jury heard Cabezas testify to the details that Petitioner highlights here and nonetheless credited Cabezas's testimony and found Petitioner guilty. "The law is well established that questions of witness credibility are jury questions and a federal habeas court may not reassess the jury's findings of credibility." *Black v. Conway,* No. 11–CV–480, 2011 WL 2610530, at \*9 (S.D.N.Y. June 30, 2011), *adopted by* 2012 WL 6629050 (S.D.N.Y. Dec. 20, 2012). In light of the ample evidence of Petitioner's guilt, the Court concludes that as the triers of fact, a rational jury could find the essential elements of the crime beyond a reasonable doubt and the state courts' decisions rejecting the sufficiency challenges were not objectively unreasonable. *See Matthews,* 132 S.Ct. at 2152. Accordingly, Petitioner's sufficiency claim fails.

### 5. Petitioner's Sentence

**\*22** Finally, in his Objections, Petitioner argues that although his sentence falls within "its legal bounds," the sentence is, nonetheless, excessive. (Pet'r's Obj's 16–17.) As an initial matter, to the extent that Magistrate Judge Smith found that this claim was, at least in part, procedurally barred, the Court disagrees. (*See* R & R 20–21.) In Petitioner's brief to the Appellate Division, he argued that his sentence was harsh and excessive and should be reduced or modified. (Appellant's Br. 46–48 .) Petitioner stated that he was "protected against cruel and unusual punishment by both the United States and the New York Constitution[s]," and "[t]he power of the Appellate Court to reduce or modify a sentence, which it finds unduly harsh or severe, in the interest of justice and impose a lesser one, has long been recognized by New

York State." (*Id.* at 47.) The Court finds that this language was "likely to alert the court to the claim's federal nature," *Daye,* 696 F.2d at 192, and apprised the Appellate Division "of both the factual and the legal premises of the claim [Petitioner] asserts [here]," *Vacco,* 126 F.3d at 413 (some alterations in original) (internal quotation marks omitted), specifically that Petitioner's sentence was excessive. Indeed, although citing only to New York state case law, the Appellate Division concluded that "[t]he sentence imposed was not excessive." *Rodriguez,* 880 N.Y.S.2d at 90. The Court, therefore, finds that this claim is not procedurally barred for failure to exhaust.

Nonetheless, this claim fails. "It is well-established that an excessive sentence claim will not prevail as a ground for habeas corpus relief if the imposed sentence was within the limits prescribed by state law." *Thompson v. Lord,* 322 F.Supp.2d 300, 301 (E.D.N.Y.2004) (citing *White v. Keane,* 969 F.2d 1381, 1383 (2d Cir.1992)); *see also Pina v. Kuhlmann,* 239 F.Supp.2d 285, 288 (E.D.N.Y.2003) (same). Petitioner was convicted of attempted rape in the first degree, a class C felony, *see* N.Y. Penal Law § 130.35 ("Rape in the first degree is a class B felony."); *id.* § 110.05(4) (explaining that an attempt for a crime is a class C felony when the crime attempted is a class B felony), for which Petitioner faced a determinate sentence of not less than three and one-half and not more than 15 years in state prison, *see id.* § 70.80(4)(a)(ii). For this conviction, the trial court sentenced Petitioner to 13 years in prison. (*See* Sentence Tr. 22.) Petitioner was convicted of two counts of sexual abuse in the first degree, class D felonies, *see* N.Y. Penal Law § 130.65, for which Plaintiff faced a determinate sentence of not less than two years and not more than seven years, *see id.* § 70.80(4)(a)(iii). For these counts, Petitioner received a sentence of five years each, to be served concurrently. (*See* Sentencing Tr. 22.) Finally, Petitioner was convicted of two counts of unlawful imprisonment in the second degree, class A misdemeanors, *see* N.Y. Penal Law § 135.05, for which Petitioner faced a definite sentence not to exceed one year, *see id.* § 70.15(1). The trial court sentenced Petitioner to one year for each

count of unlawful imprisonment, to run concurrently. (*See* Sentencing Tr. 22–23.) Because Petitioner's sentences fell "squarely within the range prescribed by state law," the trial court was within its discretion to impose these sentences and, accordingly, Petitioner's claim is not cognizable on habeas review. *Thompson,* 322 F.Supp.2d at 301; *see also Pina,* 239 F.Supp.2d at 289 (same).

### *III. CONCLUSION*

**\*23** For the reasons stated above, the Court adopts the Report & Recommendation in substantial part and modifies it in part. Petitioner's petition for a writ of habeas corpus is denied.

As Petitioner has not made a substantial showing of the denial of a constitutional right, a Certificate of Appealability shall not be issued, *see* 28 U.S.C. § 2253(c)(2); *Lucidore v. N.Y.S. Div. of Parole,* 209 F.3d 107, 111–12 (2d Cir.2000), and the Court further certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this judgment on the merits would not be taken in good faith, *see Coppedge v. United States,* 369 U.S. 438, 445 (1962) ("We consider a defendant's good faith ... demonstrated when he seeks appellate review of any issue not frivolous."); *Burda Media Inc. v. Blumenberg,* 731 F.Supp.2d 321, 322–23 (S.D.N.Y.2010) (citing *Coppedge* and finding that an appeal may not be taken in forma pauperis if the trial court certifies in writing that it is not taken in good faith).

The Clerk of the Court is respectfully directed to enter a judgment in favor of Respondent and to close the case.

SO ORDERED.

**All Citations**

Slip Copy, 2015 WL 6509153

### Footnotes

1   Petitioner was also convicted of one count of unlawful imprisonment of Cabezas for an incident occurring on December 31, 2006. (*See* Indictment at unnumbered 3.)

2   To be clear, Petitioner's challenge on appeal and in this proceeding is limited to the counts charging him with sexual abuse in the first degree.

3   Even if the Court were to address the merits of a claim that the Indictment was multiplicitous because it charged two counts of sexual abuse in the first degree, this claim fails under the stringent standard applied on habeas review. Petitioner was charged with two counts of sexual abuse in the first degree for conduct that occurred on the same day, and the two counts are identically worded. Accordingly, the question here is whether the facts underlying each count were intended

by the New York legislature to constitute separate units of prosecution. *See Regensberg,* 604 F.Supp.2d at 629. To begin, although the New York Court of Appeals's decision in *Alonzo* is relevant, it is not directly on point. At Petitioner's trial, Cabezas testified not only that Petitioner touched her breasts and vagina with his hands, (*see* July 23, 2007 Trial Tr. ("July 23 Tr.") 167–68, 172 (Dkt. No. 14); *see also* July 26 Tr. 438), but also that he had "plac[ed] his penis to [her] vaginal area," (July 23 Tr. 171), and placed his penis around her vagina a second time "in a rubbing motion," (July 23 Tr. 184–85; *see also* July 26 Tr. 439). Accordingly, it is not clear under *Alonzo* that each sexual contact failed to constitute a separate crime. *Alonzo,* 920 N.Y.S.2d at 304; *see also People v. Hernandez,* No. 10479/2011, 2012 WL 4473125, at *3 (N.Y.Sup.Ct. Sept. 25, 2012) (explaining that "[a]lthough it is clear that where touching by hand is involved, sexual contact in the course of one incident will generally give rise only to one count of sexual abuse, none of the ... cases [citing *Alonzo* ] squarely address whether ... various types of sexual contact, including intercourse, should be treated differently from hand contact," but suggesting in dicta that given the broad definition of sexual contact "it does not appear that every sexual contact during one incident would give rise to separate counts, so long as only one uninterrupted incident is alleged"). It is also worth noting that before considering Petitioner's claim that the Indictment was defective for the second time in this case, the trial court noted that "we had two [incidents] of sexual abuse. [The Victim] claims his fingers were in her vagina and she claims that his penis rubbed on her vagina prior to, she testified, that it penetrated." (July 26 Tr. 439.)

Moreover, as one trial court found relevant in declining to resolve the issue of whether two counts of sexual assault were multiplicitous, "it is not clear [here] that there was in fact only one uninterrupted incident" of sexual abuse in light of Cabezas's testimony. *Hernandez,* 2012 WL 4473125, at *3. Cabezas testified about sexual contact that occurred over a period of time on the day alleged in the Indictment and that was interrupted at least once by a phone call from her place of employment. In light of the New York Court of Appeals's warning that "[w]here the evidence reasonably permits a grand jury to find that either one or two crimes occurred, an indictment charging two should not be dismissed," *Alonzo,* 920 N.Y.S.2d at 304, it is relevant that the trial court, after hearing the testimony, declined to dismiss one or both of the sexual abuse counts, (*see* July 26 Tr. 443). Indeed, whether an incident involved one or two criminal acts under New York Law is "precisely the kind of state court decision to which a federal habeas court must defer." *Serrano,* 2013 WL 3226849, at *14 (italics omitted) (explaining that the federal habeas court would defer to the decisions of the state courts which determined whether the New York legislature intended "different permutations of primary and secondary victims in multiple-homicide cases ... to constitute separate units of prosecution" (internal quotation marks omitted)); *see also Timmons,* 2010 WL 3813963, at *8–9 (same).

In any event, the trial court's decision cannot be said to have been contrary to Supreme Court precedent because there exists no Supreme Court case that has made clear that charging two identical counts of sexual abuse for sexual contact that took place on the same day under New York law is multiplicitous or otherwise violates a defendant's constitutional rights. *See Serrano,* 2013 WL 3226849, at *15 (explaining that "the state court's decision denying th[e] claim cannot be said to have been contrary to, or an unreasonable application of, clearly established federal law," because "[t]here exists no Supreme Court case that has decided a Double Jeopardy question in the context of units of prosecution and primary and secondary victims, such as contemplated by" the applicable penal statute in that case). Accordingly, "in an absence of clearly established federal authority on the interaction between this type of [sexual abuse] statute and the Double Jeopardy Clause, the [trial court's] decision [denying this claim] cannot be deemed objectively unreasonable." *Id.* (some alterations in original) (internal quotation marks omitted) (dismissing claim that the indictment was multiplicitous in violation of the Double Jeopardy Clause); *see also Baptiste v. Ercole,* 766 F.Supp.2d 339, 356 (N.D.N.Y.2011) ("The ultimate question under the AEDPA is whether the Appellate Division unreasonably applied clearly established *Supreme Court* precedent."). For the foregoing reasons, then, Petitioner's challenges to the Indictment, even if exhausted, are insufficient for the writ to issue.

4   In any event, Petitioner fails to explain how, if at all, Detective Lopez's alleged failure to disclose "what she did with the first statement," (Pet'r's Obj's 10), that Petitioner allegedly signed prejudiced Petitioner in any way. *See Rosario v. Ercole,* 601 F.3d 118, 123 (2d Cir.2010) (explaining that "ineffective assistance has two necessary components: the defendant must establish both that his attorney was ineffective and that the attorney's errors resulted in prejudice to the defendant").

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Blue Flag – Appeal Notification
**Appeal Filed by** VISICH v. WALSH, 2nd Cir., August 25, 2015

2013 WL 3388953
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Peter VISICH, Petitioner,

v.

John WALSH, Superintendent, Sullivan
Correctional Facility, Respondent.

No. 10 Civ. 4160(ER)(PED).
|
July 3, 2013.

### ORDER

RAMOS, District Judge.

**\*1** Petitioner Peter Visich, through his counsel, filed this Petition for a Writ of Habeas Corpus (the "Petition") pursuant to 28 U.S.C. § 2254 on May 20, 2010. Doc. 1. The Honorable Kenneth M. Karas, to whom this case was previously assigned, referred the Petition to Magistrate Judge Davison on May 24, 2010. Doc. 3. The case was reassigned to the undersigned on January 23, 2012. Doc. 21.

On August 29, 2012, Judge Davison issued a Report and Recommendation (the "Report"), recommending that the Petition be denied in full. Doc. 24. Objections, if any, are due by September 17, 2012.[1] See 28 U.S.C. § 636(b)(1)(C); Fed.R.Civ.P. 72(b)(2). Petitioner's counsel attempted to file Petitioner's Objections electronically on September 14, 2012, but the filing was rejected for failure to choose the appropriate event type on the Court's CM/ECF system. See Docs. 25, 26. Petitioner was directed to re-file the document on September 14, 2012; however, Petitioner's counsel did not re-file his Objections until December 13, 2012. Pet'r's Objections ("Objections"), Doc. 29.

### I. Background

The factual background and procedural history relevant to the Petition are set forth in Judge Davison's Report, familiarity with which is assumed. See Report 2–10.

Petitioner was convicted, on November 13, 2003, after a jury trial in the Supreme Court of the State of New York, Rockland County, of two counts of murder in the first degree, two counts of murder in the second degree, and one count of robbery in the first degree, in relation to the murder of his wife, Evelyn Visich. Petition ("Pet.") 1–2. He was sentenced to concurrent terms of life without the possibility of parole for each of the first-degree murder convictions, twenty-five years to life for each of the second-degree murder convictions, and twenty-five years for the robbery conviction. Id. at 2.

On May 20, 2010, Petitioner timely filed the instant Petition, claiming: (1) the state court's refusal to strike the direct testimony of Eddie Cassatt and Frank Thon violated Petitioner's Sixth Amendment right to confront witnesses against him because the witnesses' invocation of the Fifth Amendment privilege against self-incrimination denied Petitioner his right to reasonable cross-examination, Pet. 68; Mem. Law Supp. Pet. ("Pet'r's Mem."), 1–10, Doc. 2; (2) the prosecution failed to provide the defense with "critical information" indicating that Petitioner sought to have his wife assaulted, but not murdered, and the state court's refusal to vacate his conviction on the basis of the alleged *Brady* violation was contrary to, or involved an unreasonable application of, the Supreme Court's decisions in *Brady v. Maryland,* 337 U.S. 83 (1963) and *United States v. Bagley,* 473 U.S. 667 (1985), Pet. 68; Pet'r's Mem. 11–25, Doc. 2; and (3) the state court's refusal to suppress evidence seized from Petitioner's vehicle pursuant to his purported consent to search violated *Miranda v. Arizona,* 384 U.S. 436 (1966), because Petitioner's consent was the result of a custodial interrogation, and any such consent was subsequently revoked by the appearance of counsel on his behalf. Pet. 69; Pet'r's Mem. 26–36.

**\*2** On August 29, 2012, Judge Davison issued a Report concluding that: (1) the state court's refusal to strike the direct testimony of Cassatt and Thon did not violate Petitioner's Sixth Amendment right to confront witnesses against him because, even assuming *arguendo* that the matters about which Petitioner sought to cross-examine the witnesses were not collateral, Petitioner's inability to conduct such cross-examination did not preclude him from testing the truth of their direct testimony, Report 21–24; (2) Petitioner failed to establish that any alleged *Brady* material actually existed at the time of his prosecution, or that such evidence was withheld by the prosecution, Report 24–27; and (3) Petitioner's Fourth Amendment suppression claim was not cognizable on habeas review pursuant to *Stone v. Powell,*

428 U.S. 465 (1976), because Petitioner had a full and fair opportunity to litigate the claim during an eight-day suppression hearing in state court. Report 27–30.

## II. Standard of Review

### A. AEDPA Review of the State Court Proceedings

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214, habeas petitions under 28 U.S.C. § 2254 may not be granted unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."28 U.S.C. § 2254(d)(1), (d)(2). This deference is required under the AEDPA if, as here, the petitioner's claim "was adjudicated on the merits in State court proceedings."28 U.S.C. § 2254(d); see Bell v. Miller, 500 F.3d 149, 154–155 (2d Cir.2007).

"Th[e] statutory phrase ['clearly established Federal law as established by the Supreme Court of the United States,'] refers to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision."Williams v. Taylor, 529 U.S. 362, 412 (2000). In order for a federal court to find that the state court's application of Supreme Court precedent was unreasonable, the decision must be objectively unreasonable rather than simply incorrect or erroneous. Lockyer v. Andrade, 538 U.S. 63, 75 (2003). The factual findings made by state courts are presumed to be correct under the second prong of the AEDPA, and petitioner has the burden to rebut this presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see Nelson v. Walker, 121 F.3d 828, 833 (2d Cir.1997).

### B. Review of the Magistrate Judge's Report

A district court reviewing a magistrate judge's report and recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."28 U.S.C. § 636(b)(1)(C). Parties may raise "specific," "written" objections to the report and recommendation "[w]ithin fourteen days after being served with a copy."Id.; see alsoFed.R.Civ.P. 72(b)(2). A district court reviews de novo those portions of the report and recommendation to which timely and specific objections are made. 28 U.S.C. § 636(b)(1)(C); see also United States v. Male Juvenile, 121 F.3d 34, 38 (2d Cir.1997). The

district court may adopt those parts of the report and recommendation to which no party has timely objected, provided no clear error is apparent from the face of the record. Lewis v. Zon, 573 F.Supp.2d 804, 811 (S.D.N.Y.2008). The clearly erroneous standard also applies where a party's objections are conclusory, general or "merely perfunctory responses, argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original petition."Ortiz v. Barkley, 558 F.Supp.2d 444, 451 (S.D.N.Y.2008) (citations and internal quotation marks omitted)."Objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate judge's proposal."IndyMac Bank, F.S.B. v. Nat'l Settlement Agency, Inc., No. 07 Civ. 6865(LTS) (GWG), 2008 WL 4810043, at *1 (S.D.N.Y. Nov. 3, 2008) (citing Camardo v. Gen. Motors Hourly–Rate Emps. Pension Plan, 806 F.Supp. 380, 382 (W.D.N.Y.1992)).

## III. Petitioner's Objections

**\*3** Petitioner has made a general objection to Judge Davison's findings of fact, claiming that Judge Davison failed to consider all of the evidence in the record, and particularly evidence favorable to Petitioner's claims. Objections 8. "An objection to a report and recommendation in its entirety does not constitute a specific written objection within the meaning of Rule 72(b)."DiPilato v. 7–Eleven, Inc., 662 F.Supp.2d 333, 340 (S.D.N.Y.2009).

Plaintiff also asserts four specific objections to the Report, which are essentially disagreements with Judge Davison's summary of the facts relevant to Petitioner's first and third claims. Objections 8–18. Petitioner did not raise any objections to the portions of Judge Davison's Report addressing his *Brady* claim, and, after carefully reviewing that portion of the Report, the Court finds no error, clear or otherwise. Accordingly, the Court adopts Judge Davison's recommendation to dismiss Petitioner's *Brady* claim for the reasons stated in the Report. *See* Report 24–27.

### A. Confrontation Clause Claim

In support of his first specific objection, Petitioner argues that Judge Davison failed to address the "overwhelming evidence that Cassatt lied and the People knew it," and that Judge Davison's findings are not based on the entire record because he "ignor[ed] this perjury." Objections 11. Petitioner's first objection merely reiterates facts and arguments that were presented to, and considered by, Judge Davison, *see, e.g.,* Pet'r's Mem. 4, 6, and therefore this objection does not

warrant *de novo* review of the Report. *Kirk v. Burge,* 646 F.Supp.2d 534, 538 (S.D.N.Y.2009) (citations omitted). Moreover, contrary to Petitioner's assertions, the facts he alleges Judge Davison "ignored" were explicitly referenced in the Report. *See* Report 7, 18. The Court has carefully reviewed Judge Davison's Report relating to Petitioner's Confrontation Clause claim and finds no error, clear or otherwise. Accordingly, the Court adopts Judge Davison's recommendation that Petitioner's Confrontation Clause claim be dismissed for the reasons stated in the Report. *Id.* at 21–24.

### B. Fourth Amendment Claim

The balance of Petitioner's specific objections relate to facts that he contends are vital to his Fourth Amendment claim, and which he asserts Judge Davison misconstrued or ignored. Objections 12–18. The facts set forth in Petitioner's Objections were all presented to Judge Davison, *see, e.g.,* Pet. 9–31; Pet'r's Mem. 22, 26–36, and there is no indication that Judge Davison ignored any of Petitioner's arguments or assertions. Because Petitioner's second, third and fourth objections are "merely perfunctory responses, argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original petition," the clearly erroneous standard applies. *Ortiz v. Barkley,* 558 F.Supp.2d 444, 451 (S.D.N.Y.2008) (citations and internal quotation marks omitted).

**\*4** This Court has carefully reviewed Judge Davison's Report relating to Petitioner's Fourth Amendment claim and finds it to be clear, thorough and a well-reasoned application of the law. *See* Report 27–30. Additionally, the Court notes that Petitioner did not address Judge Davison's conclusion that Petitioner's Fourth Amendment claim is not cognizable on habeas review under *Stone v. Powell,* 428 U.S. 465, 481–82 (1976), because he had a fair and full opportunity to litigate the claim in state court. Report 27–30. Therefore, the Court adopts Judge Davison's recommendation that Petitioner's Fourth Amendment claim be dismissed for the reasons stated therein. *Id.*

### IV. Conclusion

For the reasons set forth above, the Court adopts Judge Davison's Report in its entirety. Petitioner's petition for a writ of habeas corpus is DENIED. As Petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. *Love v. McCray,* 413 F.3d 192, 195 (2d Cir.2005); 28 U.S.C. § 2253. The Clerk of the Court is respectfully directed to close this case.

It is SO ORDERED.

### *REPORT AND RECOMMENDATION*

### TO: THE HONORABLE EDGARDO RAMOS, UNITED STATES DISTRICT JUDGE

## I. *INTRODUCTION*

PAUL E. DAVISON, United States Magistrate Judge.

Petitioner Peter Visich, through his counsel, seeks a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. Petitioner was convicted on November 13, 2003, after a trial by jury, of two counts of murder in the first degree, two counts of murder in the second degree, and one count of robbery in the first degree in Rockland County Court (Kelly, J.). He was sentenced to concurrent terms of (1) life without the possibility of parole for each of the first-degree murder convictions, (2) twenty-five years to life for each of the second-degree murder convictions, and (3) twenty-five years for the robbery conviction.

This Petition is before me pursuant to an Order of Reference dated May 24, 2010. See Dkt. No. 3. For the reasons set forth below, I respectfully recommend that the Petition be **DENIED.**

## II. *BACKGROUND* [1]

### A. *The Crime*

On January 7, 2003, Evelyn Visich, Petitioner's estranged wife, was murdered in the Visich family home in Chestnut Ridge, New York by Frank Thon, who had been hired by Petitioner to kill his wife. In November 2002, Petitioner had been introduced to Thon over the telephone by a mutual acquaintance, Eddie Cassatt. Following their initial conversation, Petitioner and Thon spoke and met several times between November 2002 and January 2003 regarding arrangements for Mrs. Visich's murder.

On January 7, 2003, Petitioner and his young son left their home for the day to visit Petitioner's family and friends. Mrs. Visich also left the home some time that day. Early that evening, while no one was at home, Thon entered the house through a back door that Petitioner had left unlocked

for him and waited for Mrs. Visich to return. After Mrs. Visich arrived home later that evening, Thon stabbed her several times and slashed her neck down to the bone, nearly decapitating her. Thon left the knife that he had used to commit the murder in Mrs. Visich's chest, removed some jewelry from her body, and then fled the scene. Petitioner returned home some time later with his son and "discovered" Mrs. Visich's body. Petitioner then ran to a neighbor's house to report what he had "found," and the neighbor called the police to report the crime.

### B. *The Police Investigation, Indictment and Arrest*

**\*5**  Petitioner left the scene of the crime with officers from the Ramapo Police Department and accompanied them to the police station where he was interviewed. Petitioner cooperated with the police, provided the officers with a detailed account of his whereabouts on January 7, and denied any involvement in Mrs. Visich's murder. After questioning Petitioner for approximately three hours, the police asked him to sign a consent form permitting them to search his home and van but advised him that he had the right to refuse such consent. Petitioner signed the consent form and agreed to the searches. Petitioner remained at the police station for several more hours until he was "released on recognizance" and picked up from the station by his brother on the afternoon of January 8. Before leaving the station, Petitioner, who had already been questioned for approximately sixteen hours, agreed to return to the station the next day for further questioning. Shortly after Petitioner left the station, however, the police received a letter of representation via facsimile from Petitioner's newly retained defense attorney indicating that the police should have no further direct contact with Petitioner. Petitioner did not return to the police station on January 9 as he had previously agreed. The police subsequently applied for and obtained a warrant to search Petitioner's home and van.

Petitioner's van was searched over the course of several days. During this search, the police recovered, among other items, several pre-paid calling cards and a bank envelope containing $3700 in cash. Based on records for the calling cards that were recovered from Petitioner's van, the police were able to trace forty-seven telephone calls that Petitioner had made to Thon between November 2002 and January 2003.

The Rockland County Grand Jury returned an indictment charging Petitioner with two counts of murder in the first degree, in violation of New York Penal Law §§ 125.27(1)(a)

(vi) and (b) [2] and §§ 125.27(1)(a)(vii) and (b); [3] two counts of murder in the second degree, in violation of New York Penal Law §§ 125.25(1) [4] and 125.25(3); [5] one count of robbery in the first degree, in violation of New York Penal Law § 160.15(3); [6] and one count of endangering the welfare of a child, in violation of New York Penal Law § 260.10(1). [7] *See* Ciganek Aff., Ex. A (Indictment). Petitioner was arrested on February 14, 2003.

### C. *The Suppression Hearing, Trial and Sentencing*

Before Petitioner's trial commenced, the court held an eight-day suppression hearing at which Petitioner challenged the admissibility of evidence that had been seized from his van. Petitioner argued that his consent was involuntary because it was the product of custodial interrogation and, alternatively, that his counsel's subsequent appearance on his behalf effectively revoked the consent that he had given earlier that day. Petitioner further argued that the items seized from the van exceeded the scope of the search warrant that the police had subsequently obtained. The trial court determined that Petitioner's consent was voluntary, that the search of his van exceeded neither the scope nor the duration contemplated by this consent, and that Petitioner had not revoked this consent. Alternatively, the trial court found that the search and seizure were within the scope of the warrant. Accordingly, the court denied Petitioner's motion to suppress the evidence that had been recovered from his van. *See* Ciganek Aff., Ex. S (October 21, 2003 Order).

**\*6**  Petitioner's case was tried from late October through early November 2003. Pursuant to a cooperation agreement with the prosecution, [8] Thon testified that Petitioner had hired him to kill Mrs. Visich for $10,000, with some of the fee having been paid in advance of the murder and some to be paid after Thon had completed his assignment. Thon also described to the jury the plans for the murder that he and Petitioner had formulated together. In addition to Thon's testimony, the prosecution also presented the testimony of Cassatt, through whom Petitioner had met Thon. Cassatt testified that he had introduced Petitioner to Thon over the telephone in November 2002. According to Cassatt, Petitioner had asked him to call Thon to make the introduction but Cassatt did not know about the murder arrangements. On cross-examination, Petitioner's trial counsel questioned both Thon and Cassatt regarding their prior relationship and potential criminal activity in which they had engaged together in the past in jurisdictions outside New York. Both Thon and

Cassatt invoked the Fifth Amendment privilege against self-incrimination in response to those questions and refused to answer.

Because the prosecution had indicated to Petitioner's trial counsel in advance that Thon and Cassatt likely would invoke the privilege if asked about these prior activities, trial counsel had asked the court to preclude these witnesses from testifying altogether on the ground that Petitioner's right to reasonable cross-examination would be violated by the witnesses' invocation of the privilege. Petitioner later renewed this request by moving to strike the direct testimony of each of the witnesses after they did in fact invoke the privilege on these issues during cross-examination. According to Petitioner, the witnesses' responses to questions about their prior relationship—specifically, their prior contractual arrangements pursuant to which Cassatt had hired Thon to assault people—would have established that Cassatt actually knew details about the arrangement between Petitioner and Thon and, therefore, was an accomplice as a matter of law whose testimony would be barred under New York law from corroborating Thon's testimony. Petitioner's trial counsel also argued that the witnesses' invocation of the privilege on this issue would prevent Petitioner from establishing that Thon had a history of assaulting—not murdering—people which would have supported Petitioner's alternative theory that Thon had been hired only to assault Mrs. Visich, not to kill her. Petitioner's counsel further claimed that, because both Cassatt and Thon testified about the nature of their prior relationship during direct examination, Petitioner's questions on cross-examination about their prior relationship were not collateral.

The trial court denied Petitioner's requests, finding that it was unnecessary to preclude or strike the direct testimony of these witnesses given that they would be invoking the privilege only in response to questions that related to collateral matters—specifically, their credibility—and that such responses would not otherwise be probative of any material facts at issue in the case. Instead, the trial court allowed Thon and Cassatt to testify and instructed the jury that they were permitted to consider the witnesses' invocation of the privilege against self-incrimination when determining credibility. *See* Dkt. No. 15 (Trial Tr.) at 1589–1602, 1652–53; Dkt. No. 16 (Trial Tr.) at 1863–75; Dkt. No. 17 (Trial Tr.) at 2344; Dkt. No. 17 (Trial Tr.) at 2491–92. The trial court ultimately instructed the jury that Thon was an accomplice as a matter of law and, therefore, his testimony had to be corroborated by other evidence. The court, however, determined that

whether Cassatt was an accomplice was a question of fact and instructed the jury that they were to decide this issue and, if they determined that Cassatt was in fact an accomplice, then both Thon's and Cassatt's testimony would need to be corroborated by other independent evidence. *See* Dkt. No. 17 (Trial Tr.) at 2496–2503. In addition to the testimony of Thon and Cassatt, the evidence introduced by the prosecution at Petitioner's trial included the testimony of the police officers who had investigated the crime, as well as telephone records documenting forty-seven calls between Petitioner and Thon from November 2002 to January 2003.

**\*7** The jury returned a verdict of guilty on all charges on November 13, 2003.[9] During Petitioner's sentencing hearing, Petitioner's trial counsel argued that the prosecution had withheld exculpatory evidence in violation of Petitioner's due process rights under *Brady v. Maryland,* 373 U.S. 83 (1963), and, relatedly, had elicited false testimony from Cassatt at trial. Petitioner based these arguments on the following statement that was set forth in the presentence investigative report that had been prepared by the Rockland County Probation Department: "Visich asked Cassatt if he (Cassatt) knew anyone he could hire to assault someone. Cassatt gave him the telephone number of Frank Thon." According to Petitioner's trial counsel, this statement suggested that the prosecution was in possession of evidence indicating that Petitioner had approached Cassatt seeking someone to *assault* his wife and that this evidence would have supported Petitioner's theories that Cassatt was an accomplice and that Petitioner did not hire Thon to murder his wife. The trial court heard testimony from the probation officer who wrote the report and determined that the statement set forth in the presentence report did not itself suggest a *Brady* violation. *See* Dkt. No. 17 (Trial Tr.) at 2566–2601.

Petitioner was sentenced on January 6, 2004 to concurrent terms of (1) life without the possibility of parole for each of the first-degree murder convictions, (2) twenty-five years to life for each of the second-degree murder convictions, and (3) twenty-five years for the robbery conviction.

### D. *The Direct Appeal*
Petitioner appealed his convictions to the New York State Appellate Division, Second Department, and raised the following claims:

(1) the trial court violated Petitioner's Sixth Amendment right to confront adverse witnesses by denying his motion to strike the testimony of Cassatt and Thon after

these witnesses invoked the Fifth Amendment privilege against self-incrimination during cross-examination, *see* Pet'r's Appeal Br. at 1732;

(2) the trial court should have suppressed the evidence seized from Petitioner's van because Petitioner's consent was involuntary or, alternatively, had been effectively revoked by the appearance of his counsel and because the search and seizure also exceeded the scope of the warrant obtained by the police, see Pet'r's Appeal Br. at 3241;

(3) the trial court erred by failing to instruct the jury that Cassatt was an accomplice as a matter of law and that his testimony therefore required corroboration and could not corroborate Thon's testimony, *see* Pet'r's Appeal Br. at 4249; and

(4) prosecutorial misconduct-specifically, the prosecution's having failed to disclose exculpatory *Brady* material and having elicited related false testimony from Cassatt—deprived Petitioner of his constitutional right to a fair trial, see Pet'r's Appeal Br. at 49–59.

On December 16, 2008, the Appellate Division affirmed Petitioner's conviction. *See People v. Visich,* 870 N.Y.S.2d 376 (App.Div.2008). The Appellate Division determined that because Petitioner "was able to cross-examine Thon and Cassatt concerning the crimes at bar, and to argue on summation the inferences to be drawn from their invocation of the privilege against self-incrimination," he "was able to explore each witness's bias and motivation to testify falsely through other evidence" and therefore "it cannot be said that [Petitioner's] ability to test the accuracy of direct testimony of Thon and Cassatt was impaired such as to create a substantial risk of prejudice, or that the corrective response fashioned by the trial court was an improvident exercise of its discretion."*Id. at 379.*The court also found that "the trial court did not err in denying ... [Petitioner's] ... motion ... to suppress evidence found in his vehicle," given that "the record supports the hearing court's determination to credit the testimony of the police witnesses, which established that [Petitioner] voluntarily consented to the search," that "the duration of the search did not exceed the scope of the consent," and that "there is no evidence that the consent was withdrawn or otherwise terminated during the search."*Id.* Additionally, the Appellate Division determined that "the trial court properly instructed the jury that the issue of whether Cassatt was an accomplice was

a question of fact" and that, "assuming arguendo that the jury found Cassatt to be an accomplice, the testimony of both Cassatt and Thon ... was corroborated by independent evidence connecting [Petitioner] to the crimes."*Id.* Finally, the court found that Petitioner's "remaining contentions are without merit." *Id.*

**\*8** Petitioner sought leave from the New York Court of Appeals to appeal the Appellate Division's decision on his claims that (1) Petitioner's right to confront adverse witnesses was violated "by the trial court's ruling permitting [the] direct testimony [of Cassatt and Thon] to stand after they invoked their fifth amendment right against self-incrimination in response to questions about their contract criminal business;" (2) the appearance of Petitioner's counsel shortly after Petitioner purported to consent to the search of his van had effectively revoked any such consent; (3) the "trial court should have instructed the jury that Cassatt was an accomplice as a matter of law; and (4) the "prosecution withheld exculpatory evidence suggesting that Visich wanted Thon to 'assault' rather than murder Evelyn Visich" and thereby deprived Petitioner of a fair trial. [10] Ciganek Aff., Ex. AA (Jan. 26, 2009 Req. for Leave to Appeal) at 13 (unpaginated); Dkt. No. 23 (Jan. 6, 2009 Req. for Leave to Appeal) at 23 (unpaginated). In opposition, Respondent argued that all of Petitioner's claims lacked merit. Ciganek Aff., Ex. BB (Opp'n to Req. for Leave to Appeal) at 2. The Court of Appeals denied Petitioner's request for leave to appeal on February 25, 2009.*People v. Visich,* 12 N.Y.3d 763 (2009) (table opinion). Petitioner's conviction became final on May 26, 2009. [11]

### E. *The Habeas Corpus Proceedings*

On May 20, 2010, Petitioner filed this Petition seeking a writ of *habeas corpus.See* Pet.; Pet'r's Mem. Respondent does not dispute that the Petition was timely filed. *See*28 U.S.C. § 2244(d) (setting forth limitation period for *habeas* petitions). Petitioner raises the following claims in his Petition for *habeas* review:

(1) the state court's refusal to strike the direct testimony of Cassatt and Thon violated Petitioner's Sixth Amendment right to confront witnesses against him because the witnesses' invocation of the Fifth Amendment privilege against self-incrimination denied Petitioner his right to reasonable cross-examination, Pet. at 68, Pet'r's Mem. at 1–10;

(2) the "prosecution violated the rule of *Brady v. Maryland*... by failing to provide defense with critical information they clearly had indicating that Petitioner wanted his wife assaulted but not murdered" and the state court should have vacated Petitioner's conviction based on this *Brady* violation, *see* Pet. at 68, Pet'r's Mem. at 11–25; and

(3) the "state courts [*sic* ] refusal to suppress" evidence seized from Petitioner's van pursuant to Petitioner's "purported 'consent to search' was contrary to the United State [*sic* ] Supreme Court precedent, including but not limited to, *Miranda v. Arizona,* 384 U.S. 436 (1966)," because Petitioner was in the custody of the police when he involuntarily provided this consent and because any such consent was subsequently revoked by the appearance of counsel on his behalf, Pet. at 69, Pet'r's Mem. at 26–36. [12]

### III. *DISCUSSION*

#### A. A *pplicable Law on Habeas Corpus Review*

**\*9** "Habeas review is an extraordinary remedy."*Bousley v. United States,* 523 U.S. 614, 621 (1998) (citing *Reed v. Farley,* 512 U.S. 339, 354 (1994)). Before a federal district court may review the merits of a state criminal judgment in a *habeas corpus* action, the court must first determine whether the petitioner has complied with the procedural requirements set forth in 28 U.S.C. §§ 2244 and 2254. If there has been procedural compliance with these statutes, the court must then determine the appropriate standard of review applicable to the petitioner's claims in accordance with § 2254(d). The procedural and substantive standards applicable to *habeas* review, which were substantially modified by the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1220 (Apr. 24, 1996), are summarized below.

#### 1. *Timeliness Requirement*

A federal *habeas corpus* petition is subject to AEDPA's strict, one-year statute of limitations. *See*28 U.S.C. § 2244(d). The statute provides four different potential starting points for the limitations period, and specifies that the latest of these shall apply. *See id.* § 2244(d)(1). Under the statute, the limitations period is tolled only during the pendency of a properly filed application for State post-conviction relief, or other collateral

review, with respect to the judgment to be challenged by the petition. *See id.* § 2244(d)(2). The statute reads as follows:

(d) (1) A 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(d) (2) The time during which a properly filed application for State postconviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

*Id.* § 2244(d).

The one-year limitation period is subject to equitable tolling, which is warranted when a petitioner has shown ' "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing."*Holland v. Florida.* 130 S.Ct. 2549, 2562 (2010) (quoting *Pace v. DiGuglielmo,* 544 U.S. 408,418 (2005)). In the Second Circuit, equitable tolling is confined to "rare and exceptional circumstance [s]," *Smith v. McGinnis,* 208 F.3d 13, 17 (2d Cir.2000) (per curiam) (internal quotation marks omitted), which have "prevented [the petitioner] from filing his petition on time,"*Valverde v. Stinson.* 224 F.3d 129, 134 (2d Cir.2000) (internal quotation marks and emphasis omitted). The applicant for equitable tolling must "demonstrate a causal relationship between the extraordinary circumstances on which the claim for equitable

tolling rests and the lateness of his filing, a demonstration that cannot be made if the petitioner, acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances."*Id.*

**2.** *Exhaustion Requirement*

**\*10** A federal court may not grant *habeas* relief unless the petitioner has first exhausted his claims in state court. *O'Sullivan v. Boerckel,* 526 U.S. 838, 842 (1999); *see* 28 U.S.C. § 2254(b)(1) ("[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—(A) the applicant has exhausted the remedies available in the courts of the State; or (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant") *id.* § 2254(c) (the petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State ... if he has the right under the law of the State to raise, by any available procedure, the question presented"). The exhaustion requirement promotes interests in comity and federalism by demanding that state courts have the first opportunity to decide a petitioner's claim. *See Rose v. Lundy,* 455 U.S. 509, 518–19(1982).

To exhaust a federal claim, the petitioner must have "fairly present[ed] his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim," and thus "giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights."*Baldwin v. Reese,* 541 U.S. 27, 29 (2004) (internal quotation marks omitted)."Because non-constitutional claims are not cognizable in federal habeas corpus proceedings, a habeas petition must put state courts on notice that they are to decide federal constitutional claims."*Petrucelli v. Coombe,* 735 F.2d 684, 687 (2d Cir.1984) (internal citation omitted) (citing *Smith v. Phillips,* 455 U.S. 209, 221 (1982)). Such notice requires that the petitioner "apprise the highest court of both the factual and legal premises of the federal claims ultimately asserted in the habeas petition."*Galdamez v. Keane,* 394 F.3d 68, 73 (2d Cir.2005). A claim may be "fairly presented" to the state courts, therefore, even if the petitioner has not cited "chapter and verse of the Constitution," in one of several ways:

> (a) [R]eliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Dave v. Attorney Gen. of State of N.Y.,* 696 F.2d 186, 194 (2d Cir.1982). A *habeas* petitioner who fails to meet a state's requirements to exhaust a claim will be barred from asserting that claim in federal court. *Edwards v. Carpenter,* 529 U.S. 446, 451 (2000).

However, "[f]or exhaustion purposes, a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred."*Reyes v. Keane,* 118 F.3d 136, 139 (2d Cir.1997) (internal quotation marks omitted)."In such a case, a petitioner no longer has remedies available in the courts of the State within the meaning of 28 U.S.C. § 2254(b)."*Grey v. Hoke,* 933 F.2d 117, 120 (2d Cir.1991) (internal quotation marks omitted). Such a procedurally barred claim may be deemed exhausted by a federal *habeas* court. *See, e.g., Reyes,* 118 F.3d at 139. However, absent a showing of either "cause for the procedural default and prejudice attributable thereto,"*Harris v. Reed,* 489 U.S. 255, 262 (1989), or "actual innocence," *Schlup v. Delo,* 513 U.S. 298 (1995), the petitioner's claim will remain unreviewable by a federal court.

**\*11** Finally, notwithstanding the procedure described above, a federal court may yet exercise its discretion to review and deny a mixed petition containing both exhausted and unexhausted claims, if those unexhausted claims are "plainly meritless." *Rhines v. Weber.* 544 U.S. 269, 277 (2005); *see* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *see also, e.g., Padilla v. Keane,* 331 F.Supp.2d 209, 216 (S.D.N.Y.2004) (interests in judicial economy warrant the dismissal of meritless, unexhausted claims).

**3.** *Procedural Default*

Even where an exhausted and timely *habeas* claim is raised, comity and federalism demand that a federal court abstain from its review when the last-reasoned state court opinion to

address the claim relied upon "an adequate and independent finding of a procedural default" to deny it. *Harris,* 489 U.S. at 262;*see also Coleman v. Thompson,* 501 U.S. 722, 730 (1991); Ylst *v. Nunnemaker,* 501 U.S. 797, 803 (1991); *Levine v. Comm'r of Corr. Servs.,* 44 F.3d 121, 126 (2d Cir.1995).

A state court decision will be "independent" when it "fairly appears" to rest primarily on state law. *Jimenez v. Walker,* 458 F.3d 130, 138 (2d Cir.2006) (citing *Coleman,* 501 U.S. at 740). A decision will be "adequate" if it is ' "firmly established and regularly followed' by the state in question."*Garcia v. Lewis,* 188 F.3d 71, 77 (2d Cir.1999) (quoting *Ford v. Georgia.* 498 U.S. 411, 423–24 (1991)).

### 4. *AEDPA Standard of Review*
Before a federal court can determine whether a petitioner is entitled to federal *habeas* relief, the court must determine the proper standard of review under AEDPA for each of the petitioner's claims. 28 U.S.C. § 2254(d)(1)-(2). This statute "modifie[d] the role of federal habeas courts in reviewing petitions filed by state prisoners," and imposed a more exacting standard of review. *Williams v. Taylor.* 529 U.S. 362, 402 (2000). For petitions filed after AEDPA became effective, federal courts must apply the following standard to cases in which the state court adjudicated on the merits of the claim:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d)(l)-(2). The deferential AEDPA standard of review will be triggered when the state court has both adjudicated the federal claim "on the merits," and reduced its disposition to judgment. *Sellan v. Kuhlman,* 261 F.3d 303, 312 (2d Cir.2001). Where the state court "did not reach the merits" of the federal claim, however, "federal habeas review is not subject to the deferential standard that applies under

AEDPA .... Instead, the claim is reviewed *de novo." Cone v. Bell,* 556 U.S. 449, 472 (2009); *see*§ 2254(d).

**\*12**  Under the first prong of the AEDPA deferential standard, a state court decision is contrary to federal law only if it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if [it] decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."*Williams,* 529 U.S. at 413. A decision involves an "unreasonable application" of Supreme Court precedent if the state court "identifies the correct governing legal rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case," or if it "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."*Id.* at 407.

Under the second prong of AEDPA, the factual findings of state courts are presumed to be correct. 28 U.S.C. § 2254(e) (1); *see Nelson v. Walker,* 121 F.3d 828, 833 (2d Cir.1997). The petitioner must rebut this presumption by "clear and convincing evidence." § 2254(e)(1).

### B. *Analysis of Petitioner's Claims*

### 1. *Confrontation Clause Claim (Claim 1)*
Petitioner argues that the state courts' determination that Cassatt and Thon invoked the Fifth Amendment privilege against self-incrimination in response to questions that concerned only "collateral impeachment issues" was "incorrect" and that this decision "denied Petitioner his federally guaranteed Sixth Amendment confrontation rights and right to reasonable cross-examination." [13] Pet'r's Mem. at 1. According to Petitioner, the cross-examination inquiry at issue "could have established a criminal relationship between" Cassatt and Thon "which would have shown the jury that ... Cassatt knew ... Thon to assault people but not kill them."*Id.* at 4. Petitioner also argues that the inquiry "would have shown that ... Cassatt was lying at Petitioner's trial when asked if he knew why Petitioner wanted to speak with ... Thon" and that "[a]ttempting to show that a witness is lying at the actual trial they are testifying in is certainly not a collateral issue of credibility."*Id.* According to Petitioner, because Cassatt and Thon testified on direct that they had known each other for several years through the car-racing circuit, his cross-examination inquiry regarding Cassatt's having retained Thon to assault people in the past related specifically to the truthfulness of the witnesses' direct testimony on the issue of

their prior relationship. *See id.* at 5–7;*see also* Pet'r's Reply at 5–7. Petitioner further argues that the inquiry would have discredited Cassatt's direct testimony that he did not know the nature of the telephone conversation between Petitioner and Thon and thereby would have established that Cassatt was an accomplice as a matter of law, which, importantly, would have resulted in a state court ruling that his testimony could not be used to corroborate Thon's testimony. See Pet'r's Mem. at 7–10; Pet'r's Reply at 7–10. In Petitioner's words, "[t]he violation of Petitioner's federally protected confrontation rights was interwoven with New York State accomplice corroboration requirements."Pet'r's Mem. at 7.

**\*13**  In opposition, Respondent argues that Petitioner "extensively cross-examined Cassatt, Thon, and Detective Lee Youngman," who had interviewed Thon during the police investigation, "about Cassatt's prior relationship with Thon and probed the extent of Cassatt's alleged participation in the plot to kill Mrs. Visich."Resp't's Mem. at 5. Respondent also argues that "any testimony that Cassatt and Thon may have given regarding their prior bad acts had no relevance with respect to the jurors' resolution of the key question before them—whether or not petitioner hired Thon to kill his wife."*Id.* at 6. According to Respondent, because "the unanswered questions were collateral," Petitioner's right to confront adverse witnesses was not violated by the trial court's decision to "allow[ ] Cassatt and Thon to refrain from answering their" without striking their direct testimony. *Id.* at 7. Respondent also contends that the evidence against Petitioner—including thirty-one witnesses and "incriminating telephone records"—was "overwhelming" and that "the court preserved petitioner's right to confront Cassatt and Thon by giving him the opportunity to advance his theory that Cassatt was a coconspirator" and that Petitioner "only meant to assault" Mrs. Visich, "not kill her." *Id.* at 7–8.

As noted above, in ruling on this claim on direct appeal, the Appellate Division determined that, because Petitioner "was able to cross-examine Thon and Cassatt concerning the crimes at bar," "to argue on summation the inferences to be drawn from their invocation of the privilege against self-incrimination," and "to explore each witness's bias and motivation to testify falsely through other evidence," Petitioner's "ability to test the accuracy of direct testimony of Thon and Cassatt" was not "impaired such as to create a substantial risk of prejudice" and "the corrective response fashioned by the trial court" was not "an improvident exercise of its discretion."*Visich,* 870 N.Y.S.2d at 379. Respondent

argues that the Appellate Division's decision was neither contrary to, nor constituted an unreasonable application of, clearly established federal law. *See* Resp't's Mem. at 3, 5–6, 9. Respondent does not dispute that Petitioner presented this claim to the state's highest court in his letter requesting leave to appeal. Because the state court adjudicated Claim 1 on the merits, the Court will assess the merits of this claim using the deferential AEDPA standard of review. *See*28 U.S.C. § 2254(d)(1)-(2).

The Confrontation Clause of the Sixth Amendment guarantees the right of a criminal defendant "to be confronted with the witnesses against him."U.S. Const. amend. VI. This right of confrontation embodies the right of the defendant to "a meaningful opportunity to present a complete defense."*Crane v. Kentucky,* 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta,* 467 U.S. 479, 485 (1984)) (internal quotation marks omitted). This right also "means more than being allowed to confront the witness physically."*Delaware v. Van Arsdall,* 475 U.S. 673, 678 (1986) (quoting *Davis v. Alaska,* 415 U.S. 308, 315 (1974)) (internal quotation marks omitted). Specifically, it "includes the right to conduct reasonable cross-examination."*Olden v. Kentucky,* 488 U.S. 227, 231 (1988) (citing *Davis,* 415 U.S. at 315–16)."Although the Sixth Amendment guarantees 'an *opportunity* for effective cross-examination,' it does not guarantee 'cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " *United States v. Brooks,* 82 F.3d 50, 54–55 (2d Cir.) (quoting *Delaware v. Fensterer,* 474 U.S. 15, 20 (1985)), *cert. denied,*519 U.S. 907 (1996). Indeed, the right to reasonable cross-examination "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Michigan v. Lucas,* 500 U.S. 145, 149 (1991) (quoting *Rock v. Arkansas,* 483 U.S. 44, 55 (1987)) (internal quotation marks omitted); *see also. e.g., Hawkins v. Costello,* 460 F.3d 238, 243 (2d Cir.2006). Specifically, "a witness' testimony may, in some cases, be used against a defendant, even though the witness invokes his privilege against self-incrimination during cross-examination." *United States v. Cardillo,* 316 F.2d 606, 611 (2d Cir.), *cert. denied,*375 U.S. 822 (1963).

> **\*14**  To reconcile a defendant's rights under the confrontation clause with a witness's assertion of the fifth amendment privilege, a court must initially consider: (1) whether the matter about which the witness refuses to testify is collateral to his or her

direct testimony, and (2) whether the assertion of the privilege precludes inquiry into the details of his or her direct testimony. If the court determines that the privilege has been invoked with respect to a collateral matter, or that the invocation does not preclude inquiry into the witness' direct testimony, then the defendant's right to cross-examine has not been impinged and no corrective action is necessary. Conversely, the sixth amendment is violated when a witness asserts the privilege with respect to a non-collateral matter *and* the defendant is deprived of a meaningful opportunity to test the truth of the witness' direct testimony. To remedy such a violation, ... if the privilege has not been waived, or if the witness simply refuses to testify, the witness' direct testimony should be stricken in whole or in part.

*Bagby v. Kuhlman,* 932 F.2d 131, 135 (2d Cir.) (internal citations omitted), *cert. denied,*502 U.S. 926 (1991); *see also United States v. Treacy,* 639 F.3d 32, 45 (2d Cir.2011); *Cardillo,* 316 F.2d at 611. "[A] distinction must be drawn between cases in which the assertion of the privilege merely precludes inquiry into collateral matters which bear only on the credibility of the witness and those cases in which the assertion of the privilege prevents inquiry into matters about which the witness testified on direct examination."*Cardillo,* 316 F.2d at 611. Moreover, the key "question is whether the defendant's inability to examine the witness precludes defendant from testing the truth of the witness's direct testimony or whether the 'answers solicited might have established untruthfulness with respect to specific events of the crime charged.' " *Dunbar v. Harris,* 612 F.2d 690, 693 (2d Cir.1979) (internal citation omitted) (quoting *Cardillo,* 316 F.2d at 613;*see also Avincola v. Stinson,* 60 F.Supp.2d 133, 155 (S.D.N.Y.) ("The Sixth Amendment is violated ... only where assertion of the witness's privilege 'undermines the defendant's opportunity to test the truth of the witness' direct testimony.' ") (quoting *Bagby,* 932 F.2d at 135) (Report and Recommendation), *adopted by* 60 F.Supp.2d 133 (S.D.N.Y.1999). As noted above, the Sixth Amendment is only "violated when a witness asserts the privilege with respect to a non-collateral matter *and* the defendant is

deprived of a meaningful opportunity to test the truth of the witness' direct testimony." *Bagby,* 932 F.2d at 135.

Petitioner does not dispute that he had a full opportunity to cross-examine Cassatt and Thon about each of their roles in the plot to murder Mrs. Visich. Additionally, Petitioner elicited testimony from Cassatt, Thon, and Detective Youngman that served to test the truthfulness of the direct testimony provided by Cassatt and Thon about their prior relationship and about Cassatt's role in Mrs. Visich's murder, specifically including: (1) Thon's admission that he expected to obtain the remainder of the fee that Petitioner owed him from Cassatt after the murder; (2) Thon's admission that he telephoned Cassatt several times in the days following the murder to inquire about the fee; (3) Cassatt's admission that Thon called him several times in the days following the murder; (4) Cassatt's admission that he failed to tell the police about his having referred Petitioner to Thon; and (5) Detective Youngman's testimony that Thon told Youngman that Thon "had beaten and scared people at the behest of Cassatt," had been "enlisted [by Cassatt] to go to Chicago and ... scare somebody for $1800," and "had done strong-arm work for Cassatt in the past." [14] *See*Dkt. No. 15 (Trial Tr.) at 163438; Dkt. No. 16 (Trial Tr.) at 204247; Dkt. No. 17 (Trial Tr.) at 2327–28. Accordingly, even assuming *arguendo* that Cassatt and Thon invoked the privilege as to non-collateral matters, the Court cannot conclude that Petitioner was deprived of a meaningful opportunity to test the truth of the direct testimony offered by these witnesses. *See Brooks,* 82 F.3d at 54–55 (determining that counsel was not ineffective for failing to move to strike witness's direct testimony where witness "was fully cross-examined about his involvement with" defendant and third party in crimes at issue in case and "only declined to answer whether he had purchased drugs from" third party "on occasions" because court was "unpersuaded by [defendant's] argument that any testimony by [witness] about prior drug deals with [third party] would have tended to disprove [witness's] direct testimony" and witness's "assertion of the privilege in these circumstances did not 'preclude[ ] inquiry into the details of his direct testimony' nor 'deprive [defendant] of the right to test the truth of his direct testimony' ") (quoting *Cardillo,* 316 F.2d at 611); *Dunbar,* 612 F.2d at 694 (finding that matters were collateral where "[i]nformation ... related neither to the crimes for which appellant was charged nor to [witness's] direct testimony" and that, where "asserted purpose of [defendant's] questions had been accomplished in open court without an infringement of [witness's] fifth amendment rights," defendant "was not precluded from

Visich v. Walsh, Not Reported in F.Supp.2d (2013)
Case 7:13-cv-02627-CS   Document 50   Filed 04/29/16   Page 156 of 181
2013 WL 3388953

testing on cross-examination the truth of [witness's] direct testimony"); *see also Ayala v. Ercole,* No. 06–CV–1747 (JFB), 2007 WL 1135560, at *1314 (E.D.N.Y. Apr. 17, 2007) (finding that "witnesses' assertion of their Fifth Amendment right pertained to collateral matters about other unrelated crimes and did not prohibit petitioner from inquiring into their direct testimony identifying him as the shooter"); *Avincola,* 60 F.Supp.2d at 15657 (finding that "no Confrontation Clause violation exists with regard to [witness's] invocation of her Fifth Amendment privilege" where "questions related solely to [her] prior criminal activities, unrelated to [crime at issue]" and therefore were "collateral"). The state courts' refusal to strike the direct testimony of Thon and Cassatt was neither contrary to, nor constituted an unreasonable application of, clearly established federal law. Claim 1, therefore, must be denied.

**2. *Brady* Claim (Claim 2)**

 **\*15** Petitioner claims that the prosecution violated his due process rights under *Brady v. Maryland* by withholding exculpatory evidence regarding Petitioner's having approached Cassatt about hiring someone to assault —not murder—his wife and that this evidence would have enabled Petitioner to more effectively cross-examine Cassatt and Thon and support his theories that Cassatt was an accomplice as a matter of law and that Petitioner did not have the requisite intent to murder his wife. *See* Pet'r's Mem. at 11–25; *see also* Pet'r's Reply at 10–15. Petitioner bases this claim on a statement in the pre-sentence investigation report that was attributed to the prosecutor and, according to Petitioner, suggests that the prosecution was in possession of evidence that Petitioner asked Cassatt to refer him to someone whom he could hire to assault his wife. *See* Pet'r's Mem. at 11. Petitioner contends that there is a reasonable probability that the outcome of his trial would have been different had the prosecution disclosed this material. *See* Pet'r's Mem. at 15–18. Petitioner further claims that the prosecution engaged in misconduct by (1) eliciting false testimony from Cassatt, specifically testimony that Cassatt did not know the purpose of Petitioner's initial telephone conversation with Thon, and (2) referring to Petitioner's intent to murder his wife during summation, despite allegedly having been in possession of exculpatory evidence indicating otherwise. *See* Pet'r's Mem. at 2125. Petitioner argues that "[t]he *Brady* violation must be analyzed in conjunction with the above discussed confrontation violation" and that "[c]ollectively these two errors must result in Petitioner's conviction being vacated."*Id.* at 16;*see also* Pet'r's Reply at 17–18.

Respondent argues in opposition that Petitioner's *Brady* claim is without merit because the statement set forth in the pre-sentence report was not itself evidence but rather reflects the drafting probation officer's "understanding and interpretation of the evidence" and therefore was "simply ... an assumption made by an uninvolved third party whose job was to summarize the evidence in a report to assist the court in meting out an appropriate sentence for petitioner."Resp't's Mem. at 10; *see also id.* at 911.According to Respondent, the Appellate Division's rejection of Petitioner's *Brady* claim on the merits was neither contrary to, nor involved an unreasonable application of, clearly established federal law. *See id.* at 11;*see also Visich,* 870 N.Y.S.2d at 379 (noting that Petitioner's "remaining contentions," including his *Brady* claim, "are without merit"). Respondent does not dispute that Petitioner presented this claim to the Court of Appeals in his request for leave to appeal. Because the state court adjudicated Claim 2 on the merits, the Court will assess the merits of this claim using the deferential AEDPA standard of review. *See*28 U.S.C. § 2254(d)(l)-(2).

 **\*16** *Brady* charges prosecutors with a continuing duty to disclose exculpatory and impeachment evidence where that evidence is "material either to guilt or punishment."*Brady,* 373 U.S. at 87;*see also United States v. Bagley,* 473 U.S. 667, 676 (1985) (noting that duty encompasses both impeachment and exculpatory evidence). The evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."*Bagley,* 473 U.S. at 682. However,

> [t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles v. Whitley,* 514 U.S. 419, 434 (1995) (quoting *Bagley,* 473 U.S. at 678). Thus, "[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."*Strickler v. Greene.* 527 U.S. 263, 281–82 (1999).

In this case, Petitioner has failed even to establish that any alleged *Brady* material actually existed at the time of his prosecution or was withheld by the state. Petitioner claims that the existence of exculpatory evidence is established merely by a statement in a pre-sentence report that was drafted by a probation officer who was characterizing the prosecution's summary of the evidence against Petitioner. Petitioner has no personal knowledge regarding the potential source or specific nature of the alleged *Brady* material underlying this statement. Without more, Petitioner's unsupported assertion that the prosecution failed to disclose exculpatory or impeaching information at the time of trial regarding Petitioner's initial request for a referral from Cassatt is insufficient to warrant *habeas* relief. *See Beard v. Unger,* No. 06–CV–0405 (MAT), 2009 WL 5042696, at *7 (W.D.N.Y. Dec. 15, 2009) ("As a matter of law, mere speculation by a defendant that the government has not fulfilled its obligations under *Brady* ... is not enough to establish that the government has, in fact, failed to honor its discovery obligations.") (internal citation omitted) (quoting *United States v. Upton,* 856 F.Supp. 727, 746 (E.D.N.Y.1994)) (internal quotation marks omitted); *Martinez v. Phillips,* No. 04 Civ. 8617(RPP), 2009 WL 1108515, at *26 (S.D.N.Y. Apr. 24, 2009) ("[I]t is [petitioner's] burden to prove that the government failed to disclose evidence favorable to [petitioner]. Conclusory allegations that the government 'suppressed' or 'concealed' evidence do not entitle [petitioner] to relief") (quoting *Harris v. United States,* 9 F.Supp.2d 246, 275 (S.D.N.Y.1998)); *McKinney v. Burge,* No. 9:04–CV–1150 (GTS/DEP), 2009 WL 666396, at *23 (N.D.N.Y. Mar. 10, 2009) (collecting cases rejecting speculative *Brady* claims). Because Petitioner's *Brady* and related prosecutorial misconduct claims are speculative and therefore lack merit, Claim 2 must be denied.

### 3. *Suppression of Evidence Claim (Claim 3)*

*\*17* Finally, Petitioner argues that the trial court erred by failing to suppress evidence that was seized from his van because his consent to the search was involuntary and because the appearance of counsel on his behalf effectively revoked any consent that he had previously given. *See* Pet'r's Mem. at 26–36. Petitioner's claim rests on his argument that his consent was involuntary because it was the product of custodial interrogation and because he signed the consent form without first being given *Miranda* warnings. *See id.* at 26; *see also* Pet'r's Reply at 16. Although Petitioner couches his suppression claim in terms of whether he was in custody within the meaning of *Miranda v. Arizona,* he acknowledges

that this claim actually sounds in the Fourth Amendment. *See* Pet'r's Mem. at 34 (arguing that "[i]t is clearly established fourth amendment law that an individual has a right to be free from unreasonable searches and seizures" and that, while consent may be an exception to the Fourth Amendment probable cause and warrant requirements, such consent must be "voluntarily given, and not the product of duress or coercion") (citing *Schneckloth v. Bustamonte* . 412 U.S. 218, 219, 226–27 (1973)). He argues that his consent was not voluntary under the factors to be considered when "determining voluntariness under this fourth amendment test." *Id* . (citing *Schneckloth,* 412 U.S. at 22627, 24748, 248 n. 37). Petitioner further argues that, even if his consent was voluntarily given, it was effectively revoked hours later by the appearance of counsel on his behalf. *See id.* at 36. Finally, Petitioner claims that "the phone cards and currency found in the van cannot be supported by the search warrant as said items were beyond the scope of said warrant." *Id.*

In opposition, Respondent argues that the question of whether Petitioner's consent was voluntary is merely "academic," given the state court's determination that "the evidence was lawfully seized pursuant to a valid search warrant." Resp't's Mem. at 12. Moreover, Respondent argues that Petitioner's claim is without merit because (1) his consent was voluntary, (2) the search performed was within the scope of his consent, and (3) "[t]his issue was fully and fairly litigated at the pretrial suppression hearing," which was "proper in all respects." *Id.* at 12; *see also id.* at 14–22. Accordingly, Respondent argues that "the state court's denial of this claim on the merits was correct and fully comports with federal law" and, therefore, "the petition should be denied." *Id.* at 14; *see also id.* at 22.

While "[i]t is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable ... subject only to a few specifically established ... exceptions [,]' .... [i]t is equally well settled that one of [those] ... exceptions ... is a search that is conducted pursuant to consent." *Schneckloth,* 412 U.S. at 219. In order to be valid, consent must have been "voluntarily given" and not the product of duress or coercion when considered based on the totality of the circumstances. *See id.* at 223–234. One factor to be considered in making this determination is the "setting in which the consent is obtained," *United States v. Moreno.* No. 08–CR–605 (CPS), 2009 WL 454548, at *7 (E.D.N.Y. Feb. 24, 2009), including whether the person was in police custody and whether the police advised the person of his right to refuse consent. *See Brewster v. People of State of N.Y.,* No. 08–CV–4653

(JFB), 2010 WL 92884, at *56 (E.D.N.Y. Jan. 6, 2010). While "a consent to search that is obtained from a person in custody does require very careful scrutiny," the "absence of *Miranda* warnings does not make consent to a search invalid *per se.*" *United States v. Memoli,* 333 F.Supp.2d 233, 237 (S.D.N.Y.2004) (citing *United States v. Moreno,* 897 F.2d 26, 33 (2d Cir.1990); *United States v. Puglisi,* 790 F.2d 240, 240, 24344 (2d Cir.1986); *United States v. Faruolo,* 506 F.2d 490, 495 (2d Cir.1974)).

**\*18** Although Petitioner challenges the trial court's denial of his motion to suppress the evidence obtained from his van by arguing that his consent was involuntary, this Fourth Amendment claim is not cognizable on *habeas* review pursuant to *Stone v. Powell* 428 U.S. 465 (1976). In *Stone,* the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone,* 428 U.S. at 482; *see also, e.g., Graham v. Costello,* 299 F.3d 129, 134 (2d Cir.2002) ("[O]nce it is established that a petitioner has had an opportunity to litigate his or her Fourth Amendment claim ..., the court's denial of the claim is a conclusive determination that the claim will never present a valid basis for federal habeas relief .... [T]he bar to federal habeas review of Fourth Amendment claims is permanent and incurable absent a showing that the state failed to provide a full and fair opportunity to litigate the claim ...."). Indeed, courts in the Second Circuit, citing *Stone,* routinely deny *habeas* petitions seeking review of Fourth Amendment suppression claims challenging the voluntariness or adequacy of a consent to search where petitioners had a full and fair opportunity to litigate these claims in the state courts. *See, e.g., Wynter v. New York,* No. 09 CV 3023(RJD), 2010 WL 2539694, at *34 (E.D.N.Y. June 16, 2010); *Brewster,* 2010 WL 92884, at *4–5; *Egan v. Spitzer,* No. 04–CV–6544 (MAT), 2009 WL 2151310, at *78 (W.D.N.Y. July 16, 2009); *Garcia v. Burge,* No. 07 Civ. 2974(HB)(FM), 2009 WL 102142, at *56 (S.D.N.Y. Jan. 15, 2009); *Davis v. Warden, Clinton Corr. Facility,* No. 99–CV–4675 (JBW), 03–MISC–0066 (JBW), 2003 WL 23185752, at * 1213 (E.D.N.Y. Oct. 30, 2003); *Irons v. Ricks,* No. 02 Civ. 4806(RWS), 2003 WL 21203409, at *1112 (S.D.N.Y. May 22, 2003).

Fourth Amendment claims may only be reviewed by *a habeas* court if one of two narrow exceptions applies: "(a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan v. Riley,* 975 F.2d 67, 70 (2d Cir.1992). Petitioner does not—nor could he—contend that New York failed to provide corrective procedures to redress his alleged Fourth Amendment claim. Indeed, as the Second Circuit has noted, "the federal courts have approved New York's procedure for litigating Fourth Amendment claims, embodied in N.Y.Crim. Proc. Law § 710.10 *et seq.,* as being facially adequate." *Id.* at 70 n. 1 (internal citation omitted) (internal quotation marks omitted). Additionally, Petitioner does not suggest that an unconscionable breakdown of the state process occurred. Indeed, the trial court conducted an eight-day pretrial suppression hearing, and the Appellate Division affirmed the trial court's determinations based on that hearing.

**\*19** Because Petitioner's Fourth Amendment claim is not cognizable on federal *habeas* review, Claim 3 must be denied.

## IV. *CONCLUSION*

For the reasons set forth above, I conclude—and respectfully recommend that Your Honor should conclude—that the Petition should be **DENIED.** Further, because reasonable jurists would not find it debatable that Petitioner has failed to demonstrate by a substantial showing that he was denied a constitutional right, I recommend that no certificate of appealability be issued. *See* 28 U.S.C. § 2253(c); *Slack v. McDaniel,* 529 U.S. 473, 483–84 (2000).

## V. *NOTICE*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days, plus an additional three (3) days, or a total of seventeen (17) days, from service of this Report and Recommendation to serve and file written objections. *See also* Fed.R.Civ.P. 6(a), (b), (d). Such objections, if any, along with any responses to the objections, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of the Hon. Edgardo Ramos, at the Hon. Charles L. Brieant, Jr. Federal Building and United States Courthouse, 300 Quarropas Street, White Plains, New York 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Ramos.

**All Citations**

Slip Copy, 2013 WL 3388953

Footnotes

1    Pursuant to 28 U.S.C. § 636(b)(1)(C), parties are required to serve and file any specific, written objections to a magistrate judge's report and recommendation within fourteen days after being served with the report. Rule 6(d) provides that "[w]hen a party may or must act within a specified time after service, and service is made under Rule 5(b)(2)(C), (D), (E), or (F), 3 days are added after the period would otherwise expire ...." Fed.R.Civ.P. 6(d). Here, service was made on Petitioner's attorney under Rule 5(b)(1), and thus the three-day extension did not apply. However, Judge Davison directed the parties to file their objections within seventeen days, Report 31; therefore, this Court will apply the deadline set forth in the Report. The Court has also excused Petitioner's counsel's failure to properly file the Objections on the Court's CM/ECF system by the September 17, 2012 deadline. *See supra* at 1–2.

1    Unless otherwise indicated, the information within this section is taken from a review of the Petition ("Pet."), Dkt. No. 1, and supporting memoranda of law ("Pet'r's Mem." and "Pet'r's Reply"), Dkt. Nos. 2, 20; Respondent's affirmation in answer ("Ciganek Aff.") and supporting memorandum of law ("Resp't's Mem."), Dkt. No. 8; Petitioner's direct appeal brief ("Pet'r's Appeal Br."), Ciganek Aff, Ex. W; and Respondent's direct appeal brief, Ciganek Aff, Ex. X ("Resp't's Appeal Br.").

2    "A person is guilty of murder in the first degree when ... [w]ith intent to cause the death of another person, he causes the death of such person" and "the defendant ... procured commission of the killing pursuant to an agreement with a person ... to commit the same for the receipt, or in expectation of the receipt, of anything of pecuniary value from a party to the agreement" and "[t]he defendant was more than eighteen years old at the time of the commission of the crime."N.Y. Penal Law §§ 125 .27(1)(a)(vi) and (b).

3    "A person is guilty of murder in the first degree when ... [w]ith intent to cause the death of another person, he causes the death of such person" and "the victim was killed while the defendant was in the course of committing or attempting to commit and in furtherance of robbery ... or in the course of and furtherance of immediate flight after committing or attempting to commit [robbery]" and "[t]he defendant was more than eighteen years old at the time of the commission of the crime."N.Y. Penal Law §§ 125.27(l)(a)(vii) and (b).

4    "A person is guilty of murder in the second degree when ... [w]ith intent to cause the death of another person, he causes the death of such person or of a third person ...." N.Y. Penal Law § 125.25(1).

5    "A person is guilty of murder in the second degree when ... [a]cting either alone or with one or more other persons, he commits or attempts to commit robbery ... and, in the course of and in furtherance of such crime ..., he, or another participant, ... causes the death of a person ...." N.Y. Penal Law § 125.25(3).

6    "A person is guilty of robbery in the first degree when he forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime ... [u]ses or threatens the immediate use of a dangerous instrument."N.Y. Penal Law § 160.15(3).

7    "A person is guilty of endangering the welfare of a child when ... [h]e or she knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old ...." N.Y. Penal Law § 260.10(1).

8    Thon agreed to plead guilty to murder in the first degree and testify against Petitioner in exchange for the prosecution's recommendation that he receive a sentence of twenty years to life, which Thon did in fact later receive from the court.

9    The child endangerment charge was not submitted to the jury.

10   The Court notes that Petitioner submitted two letters requesting leave to appeal to the Court of Appeals, only one of which was appended to Respondent's affirmation in answer. *See* Ciganek Aff., Ex. AA (Jan. 26, 2009 Req. for Leave to Appeal). This letter, dated January 26, 2009, only presented Petitioner's claims regarding his right to confront adverse witnesses and the alleged revocation of his consent to search. *See id.*Because this letter referenced a previous letter to the Court of Appeals, however, the Court directed Respondent to file "an additional appendix containing the 'letter of January 6, 2009, to the Clerk of the Court, Mr. Stuart M. Cohen, and the enclosures therewith' to which reference was made in Petitioner's supplementary leave application dated January 26, 2009."Dkt. No. 22.Respondent thereafter filed an additional appendix containing Petitioner's January 6, 2009 letter to the Court of Appeals. Dkt. No. 23.In this letter,

Petitioner presented all four of his direct appeal claims, *see id.,* and thereby exhausted each of the three claims that he now presents for *habeas* review.

11    A judgment of conviction becomes final when the time to file a petition for a writ of *certiorari* to the United States Supreme Court has expired, or ninety days after the New York Court of Appeals denies leave to appeal. *See* 28 U.S.C. § 2101(d); *see, e.g., Brown v. Greiner,* 409 F.3d 523, 534 n. 3 (2d Cir.2005). In this case, the Court of Appeals denied Petitioner leave to appeal on February 25, 2009. Ninety days thereafter fell on May 26, 2009.

12    The Petition also claims that the "state courts [*sic* ] refusal to suppress Petitioner's statements" to the police violated *Miranda.* Pet. at 69. Despite this statement, however, Petitioner has not actually argued—either in his Petition or on direct appeal—that any statements that he made to the police should have been suppressed. *See* Pet'r's Mem. at 26 (arguing in heading that "the evidence seized from Petitioner's van should have been suppressed") (typeface altered from original); Ciganek Aff, Ex. AA (Jan. 26, 2009 Req. for Leave to Appeal) at 2 (noting in letter requesting leave to appeal that Petitioner actually "made no incriminating statements to the police, even though he was held in their custody for more than sixteen hours"); *see also* Pet'r's Mem. at 26–36; Pet'r's Appeal Br. at 32–41.

13    Petitioner also argues that the trial court erred in permitting Cassatt and Thon to invoke the Fifth Amendment on cross-examination without first inquiring as to whether the witnesses faced a real threat of prosecution for the prior crimes at issue. *See* Pet'r's Mem. at 2–4; Pet'r's Reply at 2 4. Petitioner, however, did not raise this argument before the state courts. *See* Pet'r's Appeal Br. at 1732 (arguing that trial court erred by denying Petitioner's motion to strike but not arguing that trial court erred by permitting witnesses to invoke privilege); Ciganek Aff., Ex. Y ("Pet'r's Appeal Reply") at 1–5 (same); Ciganek Aff., Ex. AA (Jan. 26, 2009 Req. for Leave to Appeal) at 1–2 (same); Dkt. No. 23 (Jan. 6, 2009 Req. for Leave to Appeal) at 2 (same). Because Petitioner did not raise this record-based argument in state court, it may be deemed exhausted, because Petitioner may not now raise it in state court through collateral motion, and procedurally defaulted, because Petitioner has not alleged cause and prejudice or a fundamental miscarriage of justice to circumvent this procedural default. *See* N.Y.Crim. Proc. Law § 440.10(2)(c) (claims adequately based in the record but not argued on direct appeal must be denied when raised in post-conviction motion); *Reese v. Alexander,* 37 F. App'x 5, 8 (2d Cir.2002) (noting that petitioner's claim may be deemed exhausted because he is barred from raising claim under N.Y. Criminal Procedure Law § 440.10(2)(c) and claim "is thus procedurally defaulted and may not be reviewed by this court absent a showing of cause for the default and prejudice, or a manifest miscarriage of justice"). The Court, therefore, need not consider this argument.

14    The trial court specifically permitted Detective Youngman's testimony about Thon's statements because this testimony was not "being offered ... for a hearsay purpose" and was "essential to prevent a prejudice enuring to [Petitioner's] defense" as a result of Cassatt and Thon having invoked the Fifth Amendment in response to Petitioner's questions on this issue. Dkt. No. 17 (Trial Tr.) at 2322–24.

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.    16

348 Fed.Appx. 612
This case was not selected for
publication in the Federal Reporter.
United States Court of Appeals,
Second Circuit.

Anthony J. WRIGHT, Petitioner-Appellant,

v.

Joseph SMITH, Superintendent, Shawangunk
Correctional Facility, Respondent-Appellee.

No. 07-4004-pr.

|

Oct. 5, 2009.

**Synopsis**

**Background:** Petitioner appealed from decision and order of the United States District Court for the Northern District of New York, Hurd, J., denying his petition for writ of habeas corpus based upon report and recommendation, of George H. Lowe, United States Magistrate Judge.

**Holdings:** The Court of Appeals held that:

[1] defense counsel's prior representation of prosecution witness did not prejudice petitioner, and

[2] Sixth Amendment did not require petitioner's presence when trial court examined juror about her encounter with co-defendant's wife.

Affirmed.

**\*612 ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the decision of the district court is **AFFIRMED.**

**Attorneys and Law Firms**

Glenn A. Garber, Daniel R. Williams, and Angharad Vaughan, New York, NY, for Petitioner.

Hannah Stith Long, Asst. New York State Attorney General, New York, NY, for Respondent.

Present: PIERRE N. LEVAL, ROSEMARY S. POOLER and B.D. PARKER, Circuit Judges.

**SUMMARY ORDER**

**\*\*1** Anthony Wright appeals from the decision and order, dated August 21, 2007, of the United States District Court for the Northern District of New York (Hurd, *J.* ), which denied Wright's petition, brought pursuant to 28 U.S.C. Section 2254, for the issuance of a writ of habeas corpus. Judge Hurd's decision was based upon the report and recommendation, dated March 16, 2007, of United States Magistrate Judge George H. Lowe, which recommended **\*613** that Wright's request for relief be denied. *See Wright v. Smith,* 2007 WL 2412248 (N.D.N.Y. Aug.21, 2007). The facts are fully set forth in Magistrate Judge Lowe's comprehensive report and recommendation. We assume the parties' familiarity with the facts of this case, its procedural history, and the issues presented on appeal.

We review the district court's denial of habeas relief *de novo.* *Hawkins v. Costello,* 460 F.3d 238, 242 (2d Cir.2006).

[1] **A. The Conflict Issue.** Wright's briefs are replete with assertions that Martuscello's prior representation of Hall severely prejudiced him at trial because the prior attorney-client relationship precluded the conduct of an aggressive, or at least an adequate, cross-examination of Hall. Thus, we are told that "Martuscello backed away from attacking his former client," that Martuscello conducted "a lackluster cross-examination," even one that "proved to be catastrophic," presumably because it was "timid, unfocused, and anemic."

In order to demonstrate that he suffered cognizable injury as a result of Martuscello's prior representation of Hill, Wright must show that "some plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *U.S. v. Schwarz,* 283 F.3d 76, 92 (2d Cir.2002) (internal quotation marks omitted). Beyond conclusory speculation, Wright utterly fails to do this. Martuscello conducted an effective, uninhibited cross-examination, which elicited the fact of Hill's numerous prior convictions and focused on the benefits he hoped to receive from testifying against Wright. Moreover, Harris's counsel, who was not conflicted, pursued a similar strategy. In sum, the record does not support the contention that counsel failed to represent Wright to the best of his ability because of any prior representation.

**[2]   B. The Tainted Juror Issue.** Wright asserts that his right under the Sixth Amendment to be present during all stages of his trial was violated because he was not present at the trial judge's examination of Lamb. We find, however, that Magistrate Judge Lowe's holding that the trial judge's examination of Lamb was the sort of ancillary proceeding at which Wright's presence was not constitutionally required is plainly correct. *See United States v. Gagnon,* 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985). Wright makes no serious argument to the contrary, but rather asserts that in this specific instance, because of his presence during Lamb's second encounter with his co-defendant's wife, his presence at the examination of Lamb was required because it "would have been particularly useful" if "[h]e could have told his counsel if [Lamb's] recounting of the incident was untruthful, incomplete, or otherwise inaccurate or misleading." However, neither in the trial court nor subsequently has Wright made any demonstration that any aspect of Lamb's recounting of the second encounter with Harris's wife was in any way untruthful or incomplete. Furthermore, Wright forfeited this federal constitutional claim because in state court he raised only a question of New York statutory law, not a federal constitutional claim.

**All Citations**

348 Fed.Appx. 612, 2009 WL 3172746

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 2412248
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Anthony J. WRIGHT, Petitioner,

v.

Joseph SMITH, Superintendent,
Shawgunk Corr. Facility, Respondent.

No. 9:03-CV-806.
|
Aug. 21, 2007.

**Attorneys and Law Firms**

Kuby & Perez LLP, Ronald L. Kuby, Esq., of Counsel, New York, NY, for Petitioner.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Ashlyn H. Dankly, Esq., Asst. Attorney General, of Counsel, New York, NY, for Respondent.

Hon. Andrew M. Cuomo, Office of Attorney General, G. Lawrence Dillon, Esq., Assistant Attorney General, of Counsel, Utica, NY, for Respondent.

### *DECISION and ORDER*

Hon. DAVID N. HURD, United States District Judge.

**\*1** Petitioner, Anthony J. Wright, brought a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. By Report-Recommendation dated March 16, 2007, the Honorable George H. Lowe, United States Magistrate Judge, recommended that the petition for a writ of habeas corpus be denied and dismissed. The petitioner has filed objections to the Report-Recommendation.

Accordingly, it is

ORDERED that the petition for a writ of habeas corpus is DENIED and DISMISSED in its entirety.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

### *REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

### I. *BACKGROUND*

#### A. *State Court Proceedings*

According to the testimony adduced at trial, between January 1996 and April 1996, petitioner Anthony Wright and his co-defendant Lawrence Harris [1] engaged in the sale of crack cocaine at the home of James Hill and Hill's fiancee, Sharon Cannizzo, in the Town of Caroga, Fulton County. *See* Transcript of Trial of Anthony Wright (7/3/97) ("Trial Tr.") at pp. 1022-31. In early 1996, Hill and Cannizzo, admitted crack cocaine addicts, agreed to allow Wright and Harris to sell cocaine out of their house in exchange for drugs for their own personal use. Trial Tr. at pp. 849, 1024-29. Pursuant to the arrangement, Wright and Harris went to Hill's residence at least once per week in order to supply the crack cocaine. Trial Tr. at pp. 759-60, 1031-32. Wright and Harris drove an Isuzu Trooper with Virginia license plates and sometimes stayed at the house for several days. Trial Tr. at pp. 737, 759-60, 1031-32. Hill took money directly from the customers, went to a designated closed bedroom, turned the money over to Wright and Harris in exchange for the drugs, and returned to the customer with the drugs. Trial Tr. at pp. 743-48, 786-87, 1032-39. Cannizzo assisted by letting customers into the house as well as by receiving and placing phone calls to Wright and Harris. Trial Tr. at pp. 789-91, 795-98. Hill and Cannizzo contacted Wright and Harris by beeper if they were not in the house when a customer arrived. Trial Tr. at pp. 791-94, 798-803, 1041-47. In March 1996 alone, hundreds of these drug transactions occurred. Trial Tr. at p. 787. According to both Hill and Cannizzo, they never sold cocaine in their residence during this time period without the assistance of either Wright or Harris. Trial Tr. at p. 1041.

On March 9, 1996, local drug addict Robert Warner informed a member of the Fulton County Drug Task Force that drug sales were occurring at the Hill/Cannizzo residence. Trial Tr. at pp. 410-14, 970-74. Warner agreed to act as a confidential informant and thereafter participated in three controlled purchases of cocaine from the house. Trial Tr. at pp. 412-414, 977. Warner testified that during the buys, he entered the residence and gave money to Hill. Trial Tr. at pp. 979-82. Hill then left the room and returned with the crack cocaine, which Warner turned over to the police waiting outside. Trial Tr. at pp. 979-84. Warner admitted he purchased cocaine at the

residence on other occasions for his own personal use. Trial Tr. at p. 996. On one occasion, Warner observed "two black guys" at the house in addition to Hill and Cannizzo. Trial Tr. at pp. 1008-09.

**\*2** Two other customers not involved in the controlled buys also testified at trial on behalf of the prosecution. Dan Thum testified that he went to the Hill/Cannizzo residence twenty to thirty times between January and April 1996 to purchase cocaine. Trial Tr. at p. 1155. During one purchase in January 1996, he observed the Isuzu Trooper in the driveway of the house and observed two well-dressed black men in the living room watching television. Trial Tr. at pp. 1161-63. At trial, Thum identified Harris as one of those men. *See* Trial Tr. at pp. 1164-68. [2] Todd Heroth stated he went to the residence approximately twenty times between January and April 1996 to purchase cocaine. Trial Tr. at p. 1097. He also saw a maroon four-wheel drive vehicle in the driveway on these occasions. Trial Tr. at p. 1104. When he purchased cocaine from Hill on April 2, 1996, Hill, Cannizzo and Harris were at the house. Trial Tr. at pp. 1098-1103. [3]

On April 3, 1996, Hill, Cannizzo, Wright and Harris were arrested at the residence. Trial Tr. at pp. 811-15, 1022. A search disclosed 5.6 ounces of cocaine, an electronic scale, razor blades, plastic bags and duct tape in the bedroom from which Wright and Harris operated. Trial Tr. at pp. 1283, 1321-22, 1494-95. The police also seized $3646 and a pager from Wright. RA24-26.

Warner testified before a Fulton County grand jury pursuant to a cooperation agreement wherein the prosecution agreed not to bring felony charges for certain conduct he engaged in prior to the controlled buys. Trial Tr. at pp. 1013-15. Hill and Cannizzo also entered into cooperation agreements and testified before the grand jury. Trial Tr. at pp. 811, 1072-73, 1089. Cannizzo pleaded guilty to attempted criminal facilitation and received six months in jail and five years felony probation in exchange for testimony against Wright and Harris. Trial Tr. at pp. 809-11, 926. Hill pleaded guilty to possession of a controlled substance in the second degree and was sentenced to six years to life in exchange for his testimony. Trial Tr. at pp. 1021-22.

On July 24, 1996, a Fulton County grand jury returned a nine count indictment against Wright and Harris. In that accusatory instrument, petitioner and Harris were charged with three counts of criminal sale of a controlled substance in the third degree, three counts of criminal facilitation

in the fourth degree, criminal possession of a controlled substance in the first degree, criminal facilitation in the second degree, and conspiracy in the second degree. *See* Indictment at RA1-11. Wright and Harris [4] pleaded not guilty on all charges and proceeded to trial. Arraignment at RA47. Wright subsequently moved for a severance of his trial from that of Harris, which the County Court denied. Trial Tr. at pp. 4-8, 51.

The trial commenced on June 27, 1997 in Fulton County Court with County Court Judge Angelo D. Lomanto presiding. While Harris testified in his own defense, Wright did not. Trial Tr. at pp. 1547-1609. Harris testified he visited the Caroga Lake house on only three occasions, and he made no statements directly implicating himself or Wright in the drug sales. Trial Tr. at pp. 1571, 1550-1608.

**\*3** Several days into the trial, sworn juror Carol Lamb requested to speak with Judge Lomanto. Trial Tr. at p. 631. Accordingly, Judge Lomanto conducted an *in camera* questioning of Ms. Lamb in the presence of both defense counsel, the District Attorney, and the Court Clerk. Trial Tr. at p. 631. Ms. Lamb stated that before she was sworn as a juror, a woman with four children sat next to her in the courtroom. [5] Trial Tr. at pp. 631-32. The woman informed Ms. Lamb that she needed a place to stay, and Ms. Lamb responded by providing her with names of local hotels. Trial Tr. at pp. 632-33. In that list, Ms. Lamb included the name and phone number of a lodging facility where her husband was the manager. Trial Tr. at p. 633. Ms. Lamb informed the court that, after she was selected as a juror,

> it clicked in my head what I had done and if that was not maybe a good idea. Really though the only thought that came to me at that point was if they lost the case, would there be any thought of retaliation against me now that I've given her my phone number and address and name. But I just thought well I'll just have to live with that, there's nothing I can do.
>
> Trial Tr. at p. 634.

A couple of days later, Ms. Lamb saw the woman in the hall with petitioner. Trial Tr. at pp. 634-35. The woman smiled at Ms. Lamb, and although Ms. Lamb felt awkward, she returned the smile and politely asked whether she found a place to say, to which the woman responded she had. Trial Tr. at pp. 634-35. Ms. Lamb noted she did not look at petitioner. Trial Tr. at p. 635. Ms. Lamb informed the court that the "only impact" she felt was to "have a little bit of concern." Trial Tr.

at p. 636. She further stated that "it wouldn't change the way I would vote or my impartiality at all. The only thing it could possibly do is make me feel a little more concerned for my safety in the future. But I don't think that's a valid thing to base decisions on." Trial Tr. at p. 636.

William Martuscello, defense counsel for Wright, also questioned Ms. Lamb, as did William Lorman, counsel for Harris. Trial Tr. at pp. 639-50. In addition, Fulton County District Attorney Polly Hoye ("DA Hoye") examined Ms. Lamb. Trial Tr. at pp. 650-51. Neither Martuscello nor Lorman objected to conducting the hearing *in camera* or in the absence of the defendants. Trial Tr. at pp. 630-82. Ms. Lamb repeatedly assured the court and counsel that while she had a "teeny bit" of concern for her safety, she would be fair and impartial in rendering a verdict. Trial Tr. at pp. 636-37, 642, 647-51.

Ms. Lamb further mentioned she shared her concern regarding the incident with juror Sharon Benson in the presence of a male juror, whom she did not know by name. Trial Tr. at pp. 637-41. At the request of Attorneys Martuscello and Lorman, Judge Lomanto conducted further inquiry of several other jurors, including Ms. Benson, to determine whether Ms. Lamb's sharing the incident with them affected their ability to remain fair and impartial. Trial Tr. at pp. 653-54. Ms. Benson indicated she had no concerns for her personal safety, and her knowledge of Ms. Lamb's contact with the woman would not affect her own ability to be fair and impartial. Trial Tr. at p. 656. When asked by Judge Lomanto whether anyone overheard a conversation between Ms. Lamb and Ms. Benson, no juror responded in the affirmative and the court was unable to determine which male juror, if any, had been present when Ms. Lamb initially informed Ms. Benson of the incident. Trial Tr. at pp. 671-682.

**\*4** It appears that Wright and Harris were brought into chambers following the inquiries of the jurors. Trial Tr. at p. 682. Counsel then recounted the circumstances of the hearing in the presence of Wright and Harris as well as made motions for a mistrial and disqualification of Ms. Lamb and Ms. Benson. Trial Tr. at pp. 682-89. Wright and Harris expressed assent to their counsel's motions for a mistrial. Trial Tr. at p. 689. The trial court denied the mistrial motions and refused to disqualify any jurors. Trial Tr. at pp. 690-91.

After the hearing, the trial proceeded. However, three days before the verdict, Wright, who was free on bail, absconded. Trial Tr. at pp. 1120-30. After efforts to locate Wright failed,

the trial continued in his absence. Trial Tr. at pp. 1135-44. At the conclusion of trial, Wright and Harris were found guilty on all nine counts. Trial Tr. at pp. 1791-95. On July 30, 1997, Harris was sentenced as a second felony offender to various terms of imprisonment amounting to sixty-two and a half years to life. RA584-87. On August 6, 1997, Wright was sentenced *in abstentia* to an aggregate term totaling fifty years to life. *See* Sentencing Transcript ("Sentencing Tr.") at pp. 32-35. [6]

Wright and Harris successfully moved to consolidate the appeals of their convictions and sentences to the New York Supreme Court, Appellate Division, Third Department. *See* Decision and Order dated January 5, 2001. On November 15, 2001, that court affirmed the convictions in all respects. *People v. Harris,* 288 A.D.2d 610 (3d Dept.2001). However, in the interests of justice, the Appellate Division mandated their sentences run concurrently, reducing the terms to twenty-five years to life. *Id.* at 618-20. The New York Court of Appeals granted Wright and Harris's request for leave to appeal on January 22, 2002. *See* Order Granting Leave dated January 22, 2002. On November 21, 2002, the Court of Appeals affirmed the order of the Appellate Division in all respects. *People v. Harris,* 99 N.Y.2d 202 (2002).

**B. *Proceedings in this Court***
Wright commenced this action, through counsel, on June 30, 2003 in the Northern District of New York. *See* Petition and Supporting Memorandum of Law ("Pet.Mem.") (Dkt. No. 1). [7]

In his petition, Wright asserts four separate grounds in support of his request for federal habeas intervention. Specifically, Wright argues that: (i) he received ineffective assistance of trial counsel because his court-appointed attorney labored under a conflict of interest; (ii) the trial court improperly excluded him from a portion of his trial when it conducted a fact-finding hearing into the potential tainting of a sworn juror; (iii) the trial court improperly permitted that tainted juror to remain on the jury; and (iv) he was unfairly prejudiced by the admission of testimony of two prosecution witnesses and by the prosecutor's comments during summation. *See* Petition, Grounds One through Four. [8] Then-United States Magistrate Judge Gary L. Sharpe directed the respondent to file a response to the petition, Dkt. No. 2, and on December 15, 2003, the Office of the Attorney General for the State of New York, acting on respondent's behalf, filed an answer and memorandum of law, together with pertinent state court

records, in opposition to Wright's pleading. Dkt. No. 6. In opposing Wright's petition, respondent argues that petitioner's claims under grounds one through four lack merit, and additionally, ground four is not cognizable for review in a habeas proceeding. *See* Dkt. No. 6 ("Resp.Mem."). Through counsel, Wright thereafter submitted a traverse in further support of his application. *See* Dkt. No. 7. By Order dated February 13, 2004, the Hon. Frederick Scullin, Jr., Chief Judge, re-assigned this matter to this Court for the issuance of a report and recommendation, *see* Dkt. No. 8, which this Court now issues pursuant to 28 U.S.C. § 636(b) and Northern District of New York Local Rule 72.3(c). [9]

## II. *DISCUSSION*

### A. *Applicable Standard of Review*

**\*5** In *Hawkins v. Costello,* 460 F.3d 238 (2d Cir.2006), the Second Circuit observed that under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

> a federal court may grant a writ of habeas corpus if the state court's adjudication on the merits "was contrary to, or involved an unreasonable application of, clearly established, Federal law, as determined by the Supreme Court of the United States" ... [or] if the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

*Hawkins,* 460 F.3d at 242, 242 n. 1 (quoting 28 U.S.C. § 2254(d)); *see also DeBerry v. Portuondo,* 403 F.3d 57, 66 (2d Cir.2005); *Miranda v. Bennett,* 322 F.3d 171, 177-78 (2d Cir.2003). The AEDPA also requires that in any such proceeding "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also DeBerry,* 403 F.3d at 66; *Boyette v. LeFevre,* 246 F.3d 76, 88 (2d Cir.2001).

"A state court adjudication is 'contrary to' federal law if it 'arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if it decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.' " *Hawkins,* 460 F.3d at 242 (quoting *Williams v. Taylor,* 529 U.S. 362, 413 (2000)). Under the "unreasonable application" clause of the AEDPA, a federal habeas court may grant the writ only where the state court's decision "identifies the correct governing legal principle from

[the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams,* 529 U.S. at 413. A federal court engaged in habeas review is not charged with determining whether the state court's determination was merely incorrect or erroneous, but instead whether such determination was "objectively unreasonable." *Williams,* 529 U.S. at 409; *see also Sellan v. Kuhlman,* 261 F.3d 303, 315 (2d Cir.2001). The *Hawkins* court noted that although " '[s]ome increment of incorrectness beyond error' " is required in order to grant a federal habeas application, that increment " 'need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.' " *Hawkins,* 460 F.3d at 243 (quoting *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000)).

### B. *Ineffective Assistance of Counsel*

In the first ground of his habeas petition, Wright alleges that he received ineffective assistance of counsel because his court-appointed attorney, William Martuscello, labored under a conflict of interest which adversely affected his legal representation. *See* Petition, Ground One. Specifically, petitioner asserts that Martuscello previously represented prosecution witness James Hill on unrelated parole violations, thereby creating a conflict of interest. *Id.* According to petitioner, the fact that Hill consented to cross-examination by Martuscello did not cure the conflict. *Id.* Moreover, Wright claims that the trial court's failure to probe the extent of Martuscello's attorney-client relationship with Hill, and to inquire whether Wright was aware of this past representation, adversely affected the defense. *Id.*

**\*6** Both the Appellate Division, Third Department and the New York Court of Appeals rejected Wright's conflict of interest claim. *Harris,* 99 N.Y.2d at 210-12; *Harris,* 288 A.D.2d at 614-15. These courts reasoned that Martuscello's past representation of Hill was merely a potential conflict alleviated by Hill expressly consenting to Martuscello's use of privileged information obtained during the course of their attorney-client relationship. *Harris,* 99 N.Y.2d at 210-12; *Harris,* 288 A.D.2d at 614-15. The Court of Appeals, in the last reasoned state court decision in this case, [10] affirmed the intermediate appellate court's determination on this issue as follows:

> Wright has demonstrated the existence of a potential conflict of interest since his trial attorney, Martuscello, previously represented an important prosecution witness.

However, the record supports the conclusion that the potential conflict did not operate on the defense. Here, Hill expressly consented to cross-examination by his former attorney, who questioned Hill concerning his prior felony convictions and his motivation for testifying. His waiver of the attorney-client privilege terminated any duty of confidentiality owed to him by Martuscello and Hill's consent to cross-examination obviated any potential conflict. Hill had also been fully cross-examined by codefendant Harris's attorney, William Lorman.

Defendant Wright further contends that County Court erred by not conducting an inquiry into Martuscello's previous representation of Hill. A trial judge who is aware of a situation where a conflict may exist has an obligation "to conduct a record inquiry of each defendant whose representation is potentially conflict-ridden in order to ascertain whether he or she 'has an awareness of the potential risks involved in that course and has knowingly chosen it.' " However, the failure to make such an inquiry is reversible error only when defendant has established the existence, or probable existence, of a conflict of interest, "which bears a substantial relation to 'the conduct of the defense.' " Since there is no indication here that the potential conflict bore a "substantial relation" to the representation, the trial court did not commit reversible error, although the better practice would have been to conduct a hearing.

In short, ... defendant Wright was [not] denied effective assistance of counsel given that ... the alleged conflict[ ] of interest did not impact adversely on the defense. Defendant[ ], thus, did not suffer a Federal Sixth Amendment violation or a state constitutional violation based on ineffective assistance of counsel.

*Harris,* 99 N.Y.2d at 211-12 (citations omitted).

## 1. *Clearly Established Supreme Court Precedent*

The Sixth Amendment to the United States Constitution provides that: "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. A defendant's Sixth Amendment right to counsel guarantees the right to conflict-free representation. *See Wood v. Georgia,* 450 U.S. 261, 271 (1981) ("Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest."); *Cuyler v. Sullivan,* 446 U.S. 335, 345 (1980). Three types of conflicts of interest may arise in the course of legal representation: (1)

a *per se* conflict; [11] (2) an actual conflict; or (3) a potential conflict. *Armienti v. United States,* 234 F.3d 820, 823-24 (2d Cir.2000). [12]

**\*7** In *Cuyler v. Sullivan,* the Supreme Court asserted that to establish a violation of the Sixth Amendment, "a defendant who raised no objection at trial must demonstrate that an *actual* conflict of interest adversely affected his lawyer's performance." *Sullivan,* 446 U.S. at 348-49 (emphasis added). This standard "is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect." *Mickens v. Taylor,* 535 U.S. 162, 172 n. 5 (2002). Rather, an " 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." *Id.* An actual conflict of interest may not be "a mere theoretical division of loyalties," *id.* at 170, but must amount to an "actual lapse in representation" and result from an attorney "actively represent[ing] conflicting interests," *Sullivan,* 446 U.S. at 349. [13]

According to the Second Circuit's interpretation of this Supreme Court precedent, a defendant may demonstrate that an actual conflict of interest adversely affected his counsel's performance by showing that " 'during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action.' " *United States v. Feyrer,* 333 F.3d 110, 116 (2d Cir.2003) (quoting *United States v. Schwarz,* 283 F.3d 76, 91 (2d Cir.2002)). [14] To establish how his interests and those of his attorney diverge, a defendant need only demonstrate that " 'some plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.' " *Id.* at 116 (quoting *Schwarz,* 283 F.3d at 92); *see also Eisemann v. Herbert,* 401 F.3d 102, 107 (2d Cir.2005); *United States v. Blau,* 159 F.3d 68, 75 (2d Cir.1998). [15] A plausible alternative defense strategy need not be successful or even reasonable, but simply must possess "sufficient substance to be a viable alternative." *Winkler v. Keane,* 7 F.3d 304, 309 (2d Cir.1993); *see also Eisemann,* 401 F.3d at 107. While the line between an actual and a potential conflict of interest is not always apparent, *see United States v. Cruz,* 982 F.Supp. 946, 948 n. 6 (S.D.N.Y.1997), a potential conflict exists "if the interests of the defendant *could* place the attorney under inconsistent duties in the future," *United States v. Jones,* 381 F.3d 114, 119 (2d Cir.2004) (emphasis in original) (citation omitted).

Typically, a defendant alleging ineffective assistance of counsel is required to show both: (1) that counsel's representation fell below an objective standard of reasonableness, measured in the light of prevailing professional norms; and (2) resulting prejudice, that is, a reasonable probability that, but for counsel's unprofessional performance, the outcome of the proceeding would have been different. *Strickland v. Washington,* 46 U.S. 668, 688-90 (1984); *see also Wiggins v. Smith,* 539 U.S. 510, 521 (2003). However, a defendant who proves that an actual conflict of interest affected the adequacy of his representation need not demonstrate prejudice. *Sullivan,* 446 U.S. at 350.[16] On the other hand, a defendant who has established a potential conflict of interest is required to demonstrate prejudice in accordance with *Strickland* in order to prove that the conflict violated his right to effective assistance of counsel. *Winkler,* 7 F.3d at 307 (citing *Strickland,* 466 U.S. at 688-90); *see also Sullivan,* 446 U.S. at 350 ("[T]he possibility of conflict is insufficient to impugn a criminal conviction.").

 **\*8**  The Supreme Court further has established that a trial court's failure to conduct an inquiry to determine whether the defendant is aware of a possible conflict of interest does not by itself result in a constitutional violation requiring automatic reversal of the conviction. *See Mickens,* 535 U.S. at 173-74. Rather, even in the absence of a trial court inquiry, a defendant still must establish that the conflict adversely affected counsel's performance to obtain reversal of his conviction. *Id.* ("[T]he trial court's failure to make the ... inquiry does not reduce the [defendant's] burden of proof; it [i]s at least necessary, to void the conviction, for [the defendant] to establish that the conflict of interest adversely affected his counsel's performance."). In *Mickens,* Justice Kennedy emphasized:

> The constitutional question must turn on whether trial counsel had a conflict of interest that hampered the representation, not on whether the trial judge should have been more assiduous in taking prophylactic measures ... As the Sixth Amendment guarantees the defendant the assistance of counsel, the infringement of that right must depend on a deficiency of the lawyer, not of the trial judge. There is no reason to presume this guarantee

> unfulfilled when the purported conflict has had no effect on the representation.

*Id.* at 179 (Kennedy, J., concurring).

## 2. *Contrary To, or Unreasonable Application Of, Supreme Court Precedent*

The facts surrounding petitioner's conflict of interest claim emerged during Hill's trial testimony. Specifically, following the cross-examination conducted by Attorney Lorman, *see* Trial Tr. at pp. 1065-91, 1093-94, Martuscello commenced his cross-examination of Hill as follows:

Q: Mr. Hill, do you recognize me?

A: I know you.

Q: Did I ever represent you?

A: Sure you have.

Q: When was that?

A: I believe on two parole violations in the 90's sometime.

Trial Tr. at pp. 1081-82. Martuscello then asked to approach the bench, and during an off-the-record sidebar, Judge Lomanto apparently suggested that Martuscello's cross-examination of Hill was not problematic as long as Hill waived attorney-client privilege. Trial Tr. at p. 1149.[17] Martuscello then continued his cross-examination, inquiring:

> Q: Mr. Hill, the canons of the New York State Bar prohibit a lawyer from using any confidences or privileged information against a client and that continues with a former client. So my question to you is do you have a problem if I cross-examine you and use any information that I may have had from prior representation of you?

> A: I have no problem with that.

Trial Tr. at p. 1082.

### (i) *Potential Conflict of Interest*

As a preliminary matter, it is doubtful that Martuscello's prior representation of Hill created anything more than a potential conflict which was averted by Hill's consent to cross-examination. A defense attorney's prior representation of a testifying government witness creates the potential for a conflict of interest because the attorney's duties of loyalty and confidentiality to his clients persist even after termination

of the representation. *See United States v. Yannotti,* 358 F.Supp.2d 289, 295 (S.D.N.Y.2004); *see also United States v. Leslie,* 103 F.3d 1093, 1098-99 (2d Cir.1997); *United States v. Lussier,* 71 F.3d 456, 462 (2d Cir.1995). The Second Circuit has acknowledged that "[w]hen a defense attorney cross-examines a former client who is a witness against the defendant, a conflict of interest may exist." *Lussier,* 71 F.3d at 462. Three potential areas of conflict may arise: (1) "the attorney's pecuniary interest in furthering his business relationship with the government witness may impair his ability to cross-examine the witness zealously"; (2) "the attorney may misuse confidential information obtained from the [witness], or may fail to fully cross-examine for fear of misusing confidential information"; or (3) "the attorney may be required to testify about material aspects of the witness' testimony, or otherwise place his own credibility at issue in cross-examining the witness or in attacking the witness' testimony in summation." *Anwar v. United States,* 648 F.Supp. 820, 826-27 (N.D.N.Y.1986) (citations and quotations omitted) (Munson, C.J.), *aff'd,* 823 F.2d 544 (2d Cir.1987).

**\*9** However, where the former client waives the attorney-client privilege on cross-examination, the risk of a conflict is "significantly diminished," and at worst, results only in a potential conflict of interest. *Lussier,* 71 F.3d at 461-62 (stating that conflict was at worst potential where former client, who was a witness against the defendant, waived his attorney-client privilege as to his prior communications with former counsel); *see also United States v. Thomas,* Nos. 98-1051, 98-1052, 98-1116, 2000 WL 236481, at \*3 (2d Cir. Feb. 14, 2000) (slip opinion) (finding no actual or potential conflict where defense counsel previously represented at least three government witnesses in unrelated cases and the witnesses had waived their attorney-client privileges with defense counsel for cross-examination purposes); *Leslie,* 103 F.3d at 1098-99 (finding no actual or potential conflict where defense counsel previously represented client's co-defendant in an unrelated investigation but co-defendant waived attorney-client privilege on cross-examination, and stating that if a conflict was assumed, it "could only be regarded as potential"); *cf. United States v. Pizzonia,* 415 F.Supp.2d 168, 178-79 (E.D.N.Y.2006) ( "Limited representation of a government witness unrelated to representation of the defendant is not likely to present a disabling conflict.") (citing *United States v. Paone,* 782 F.2d 386, 393 (2d Cir.1986)).

By consenting to cross-examination, Hill waived any attorney-client privilege that could have hampered Martuscello's cross-examination. Upon receiving Hill's consent, Martuscello was free to conduct an uninhibited inquiry of Hill, and to use privileged secrets and confidences obtained in the course of their attorney-client relationship. As such, Martuscello did not confront conflicting loyalties. Martuscello appeared to face no conflict at all upon receiving Hill's consent, or at worst, merely a potential conflict. *See Lussier,* 1 F.3d at 461-62; *see also Thomas,* 2000 WL 236481, at \*3; *Leslie,* 103 F.3d at 1098-99. Wright therefore bears the burden of proving that he was prejudiced by this potential conflict, or that the alleged conflict was actual because it adversely affected his representation. However, Wright has failed to satisfy his burden under either standard.

**(ii)** *Allegations of Actual Conflict of Interest*
Wright contends that in confronting his former client on cross-examination, Martuscello operated under an actual conflict of interest because he was "torn between two loyalties." Pet. Mem. at p. 10. According to petitioner, Martuscello did not cross-examine Hill regarding his criminal history because his loyalty to Hill conflicted with his representation of Wright, thereby foregoing the plausible defense theory that Hill "could not be trusted to testify truthfully." *Id.* at pp. 12-14. Wright therefore maintains a "lapse in representation" occurred that adversely affected his defense. *Id.* at p. 14.

**\*10** Absent evidence to the contrary, it is possible to infer that Martuscello did not probe Hill regarding the extent of his criminal history because he previously represented Hill on past parole violations. However, the testimony adduced at trial suggests otherwise. A careful review of the record reveals that Martuscello conducted a pointed cross-examination in accordance with the defense theory that Hill "could not be trusted to testify truthfully," *see* Pet. Mem. at p. 15, and nothing suggests that a conflict of interest caused Martuscello to forgo any plausible defense strategy during his cross-examination.

Specifically, on direct examination, DA Hoye questioned Hill in detail regarding his past criminal history and prior convictions. Trial Tr. at pp. 1055-57. Thereafter, Attorney Lorman cross-examined Hill by drawing out the details of his plea bargain, including his more lenient sentence. Trial Tr. at pp. 1065-79. Attorney Martuscello then commenced cross-examination by questioning Hill regarding the number of his prior felonies and his parole violations. Trial Tr. at pp. 1082-83. Rather than focus on his past criminal history, Martuscello, like Lorman, also emphasized the benefits of

Hill's plea bargain. *See* Trial Tr. at pp. 1086-90. Martuscello elicited the consequences that Hill faced if he failed to testify against Wright and highlighted Hill's belief that his indebtedness to the prosecution survived trial. *See* Trial Tr. at pp. 1086-88. Hill agreed that part of his motivation for testifying was his concern that his failure to do so could affect him in the future because he would be under the supervision of the Division of Parole for the rest of his life. Trial Tr. at p. 1086. Hill also considered the fact that Sharon Cannizzo, his pregnant fiancée, remained on probation, and any violation could result in her re-sentencing. Trial Tr. at pp. 1086-87.

By attacking Hill's motives for testifying against Wright, Martuscello suggested to the jury that Hill's credibility was dubious and depended solely on his obtaining a more favorable deal for himself and Cannizzo. Both Martuscello and Lorman clearly focused on discrediting Hill by probing his motivation to testify, rather than his unreliability as a repeat felony offender. During his cross-examination, Martuscello obviously was seeking to advance the very defense theory that petitioner now advocates-to prove that Hill was unable to testify truthfully. *See* Pet. Mem. at p. 15. Although Martuscello and Lorman could have questioned Hill more rigorously on his criminal history, it appears that counsel considered it a more effective trial strategy to attack Hill's motives for cooperating, especially given that DA Hoye had pursued thoroughly Hill's criminal past on direct examination. *See Feyrer,* 333 F.3d at 119 (considering counsel's refusal to subpoena a peripheral and reluctant witness as motivated by trial strategy rather than a conflict of interest). Wright's attempt to establish an adverse effect on his representation by faulting Martuscello's method of cross-examining Hill is nothing more than a criticism of counsel's trial strategy, which cannot be second-guessed by a petitioner on habeas review. *See, e.g., Mills v. Scully,* 826 F.2d 1192, 1197 (2d Cir.1987) (finding that failure to elicit a witness's prior conflicting grand jury testimony on cross-examination was sound trial strategy); *United States v. Nersesian,* 824 F.2d 1294, 1320-22 (2d Cir.1987) (holding that decisions whether to call any witnesses on behalf of defendant, whom to call as witnesses, whether to engage in cross-examination, and to what extent to cross-examine are all strategic in nature). Indeed, given that DA Hoye questioned Hill regarding his past crimes, and Attorney Lorman reminded the jury during summation that Hill's criminal record dated back to 1976, *see* Trial Tr. at pp. 1055-57, 1683, the jury was well-aware of Hill's criminal past. As such, Martuscello's cross-examination of Hill in no way prevented the jury from considering Hill's criminal history, in conjunction with his

motives for testifying, in making its credibility determination. *See, e.g., United States v. Roldan-Zapata,* 916 F .2d 795, 806 (2d Cir.1990) ("Cross-examination is not improperly curtailed if the jury is in possession of facts sufficient to make a 'discriminating appraisal' of the particular witness's credibility.") (quoting *United States v. Singh,* 628 F.2d 758, 763 (2d Cir.1980), *cert. denied,* 449 U.S. 1034 (1980)). Accordingly, there is nothing in the record to suggest that a conflict of interest caused Martuscello to refrain from pursuing a plausible defense theory, and thereby adversely affected Wright's defense.

**\*11** Wright further claims he was adversely affected by the alleged conflict of interest because Martuscello was forced to "turn on" his former client and appeared to the jury as a "hired gun" lacking any credibility. Pet. Mem. at pp. 13, 15-18. Wright cites to an exchange between Martuscello and Hill, which he claims was highly prejudicial:

> Q: How easy is it, Mr. Hill, based upon your experience, for your parole to be violated?
>
> A: Real easy.
>
> Q: Real easy, isn't it?
>
> A: Just have to have a lawyer like you.

Pet. Mem. at p. 16 (citing Trial Tr. at pp. 1083-84). Immediately following this exchange, the trial court denied Martuscello's motion for a mistrial. Trial Tr. at p. 1084. The record belies Wright's contentions that this remark destroyed any trust the jury had in Martuscello and crippled the course of cross-examination despite Hill's consent. *See* Pet. Mem. at pp. 15-18. To the contrary, Martuscello appeared before the jury as an aggressive advocate for Wright, making countless objections, initiating motions, and conducting thorough examinations of prosecution and defense witnesses. *See, e.g.,* Trial Tr. at pp. 759-776, 1083-84, 1181-94, 1206-10, 1570-73. In light of Martuscello's apparent advocacy, Hill's sarcastic comment arguably served to negatively influence his own credibility before the jury rather than that of Martuscello.

Finally, Wright asserts that the trial court's failure to conduct an inquiry to determine whether a conflict actually or potentially existed and whether he was aware of the conflict was a constitutional error mandating habeas relief. Pet. Mem. at pp. 8-12. Wright also alleges that he is not required to show the conflict actually harmed his representation because the trial court's lack of inquiry mandates reversal. *Id.* Relying on the Southern District of New York's decision in *Sutton*

*v. Strack,* No. 98-CIV-6391, 2001 WL 114316 (S.D.N.Y. Feb. 8, 2001), Wright contends that Hill's consent to cross-examination did not obviate the conflict because the trial court was still required to conduct an inquiry into the conflict. *Id.* at pp. 10-12. However, Wright's characterization of the governing law on this issue is blatantly incorrect.

Prior to the Supreme Court's decision in *Mickens v. Taylor,* 535 U.S. 162 (2002), the Second Circuit generally held that a trial court's failure to conduct an inquiry, where it knows or reasonably should know of a conflict, warranted automatic vacatur of the conviction. *See United States v. Blount,* 291 F.3d 201, 211 (2d Cir.2002), *cert. denied,* 537 U.S. 1141 (2003). Indeed, in *Sutton,* a pre-*Mickens* decision, the Southern District of New York mandated reversal of the petitioner's conviction where a witness consented to cross-examination by his former counsel and the trial court failed to engage in any inquiry regarding the potential conflict. *Sutton,* 2001 WL 114316, at *2. However, *Mickens* has since clarified that a trial court's failure to inquire does not amount to a constitutional violation unless the defendant establishes the alleged conflict adversely affected counsel's performance. *Mickens,* 535 U.S. at 173-74; *see also Blount,* 291 F.3d at 211-12 ("In *Mickens v. Taylor,* the Supreme Court held that the trial court's failure to inquire into a potential conflict of interest on the part of the defendant's attorney, about which the court knew or reasonably should have known, does not automatically require reversal of the conviction."). Wright's failure to demonstrate such an adverse affect, as noted above, prevents the Court from finding any constitutional merit to his claim that the trial court's lack of inquiry mandates habeas relief.

**\*12** The record demonstrates that Martuscello's cross-examination of Hill was conducted in accordance with a strategy seemingly employed by both defense counsel, and did not compromise any other plausible defense theory. The Court perceives no basis on which to conclude that Martuscello's prior representation of Hill had any adverse effect on his representation of Wright. Wright thus has failed to establish that an actual conflict of interest adversely affected the legal representation provided by Martuscello, as required by *Sullivan* and *Mickens.* At most, Martuscello faced a non-severe, potential conflict of interest that was diminished or even eliminated by Hill's consent to cross-examination, and Wright has not demonstrated any prejudice resulting from the possible conflict. Accordingly, the Court of Appeals' determination that Martuscello faced a possible conflict, which was cured by Hill's consent to cross-examination, was

not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. The Court therefore recommends Wright's ineffective assistance of counsel claim based on conflict of interest be denied.

**C.** *Claimed Errors of the County Court*

**1.** *Applicable Standard of Review*
In his remaining claims, Wright alleges that the trial court (1) deprived him of his federal due process right to be present at all material stages of his trial; (2) improperly failed to disqualify a tainted juror; and (3) permitted the admission of prejudicial testimony. Petition, Grounds Two through Four.

When evaluating convictions on collateral habeas challenges alleging error on the part of a trial court, habeas courts historically have inquired whether the trial court's error had a " 'substantial and injurious effect or influence in determining the jury's verdict.' " *DeVivo v. Superintendent, Auburn Corr. Facility,* No. 02-CV-0840, 2006 WL 581145, at *18 (N.D.N.Y. March 8, 2006) (Kahn, D.J. and Peebles, M.J.) (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 637-38 (1993)) (other citation omitted). However, following the enactment of the AEDPA, it became an "open question" in the Second Circuit whether the applicable test on federal habeas review of an alleged state trial court error remains the standard articulated in *Brecht* or an analysis of whether the state court's decision was contrary to, or an unreasonable application of *Chapman v. California,* 386 U.S. 18 (1967). [18] *DeVivo,* 2006 WL 581145, at *18 (citing *Benn v. Greiner,* 402 F.2d 100, 105 (2d Cir.2005) (citation omitted)); *see also Brinson v. Walker,* 407 F.Supp.2d 456, 480-81 (W.D.N.Y.2006); *Moore v. Herbert,* No. 02 CV 0999, 2005 WL 3591815, at *3-4 (N.D.N.Y. Dec. 30, 2005) (Mordue, D.J.).

The Second Circuit resolved part of this question in *Gutierrez v. McGinnis,* 389 F.3d 300 (2d Cir.2004), by holding that when a state court explicitly conducts harmless error review of a constitutional error, a habeas court must evaluate whether the state unreasonably applied *Chapman. DeVivo,* 2006 WL 581145, at *18 (citing *Gutierrez,* 389 F.3d at 306 and *Zappulla v. New York,* 391 F.3d 462, 467 (2d Cir.2004)). The Second Circuit has not yet decided whether the *Chapman* or *Brecht* test is to be applied where the state court did not perform a harmless error analysis. *See DeVivo,* 2006 WL 581145, at *18; *see also Howard v. Walker,* 406 F.3d 114, 123 (2d Cir.2005) (citing Gutierrez) (other citations omitted); *Brinson,* 407 F.Supp.2d at 480-81; *Crispino v. Allard,* 378 F.Supp.2d 393, 405-06 (S.D.N.Y.2005) (citations omitted);

Wright v. Smith, Not Reported in F.Supp.2d (2007)
Case 7:13-cv-02627-CS   Document 50   Filed 04/29/16   Page 172 of 181
2007 WL 2412248

*Ellis v. Phillips,* No. 04-CIV-7988, 2005 WL 1637826, at *24 n. 45 (S.D.N.Y. July 13, 2005) (Peck, M.J.) (collecting cases), *adopted,* No. 04-7988, Dkt. No. 33 (S.D.N.Y. Aug. 5, 2005) (Stein, D.J.).

 **\*13**  In the present case, the Court of Appeals did not engage in harmless error analysis in reviewing petitioner's claims alleging trial court error. *Harris,* 99 N.Y.2d at 212-13. Instead, the Court of Appeals determined that petitioner's claims lacked merit, and therefore the trial court had not erred in any of the challenged rulings. *Id.* In view of the uncertainty within this circuit, this Court will examine the issues now raised by petitioner regarding these claims utilizing both standards.

### 2. *Consideration of Wright's Claims in Light of Chapman and Brecht*

#### (i) *Right to Be Present at All Material Stages of Trial*
In his second ground for relief, Wright argues that the County Court deprived him of his federal due process right to be present at all material stages of his trial when it conducted a fact-finding hearing outside his presence into the possible taint of sworn juror Carol Lamb. Petition, Ground Two. Wright claims he had first and secondhand knowledge of facts related to the possible taint of the juror, and could have assisted his counsel, who was present at the inquiry, in eliciting information to prove Ms. Lamb's unfitness to serve. *Id.* The Court of Appeals affirmed the Appellate Division's rejection of this claim, reasoning that an *in camera* hearing to determine the fitness of a sworn juror is merely an ancillary proceeding where the defendant's presence is only necessary if he has a valuable contribution to his defense. *Harris,* 99 N.Y.2d at 212 (affirming *Harris,* 288 A.D.2d at 615-16). According to the Court of Appeals, the presence of both Harris and Wright's defense counsel at the inquiry was sufficient to ensure that the defendants received a "fair and just hearing." *Id.* (citation omitted).

A criminal defendant's constitutional right to be present at all stages of his trial is rooted in the Confrontation Clause of the Sixth Amendment, and is protected by the Due Process Clause where the defendant does not actually confront the witness against him. *United States v. Gagnon,* 470 U.S. 522, 526 (1985) (citing *Illinois v. Allen,* 397 U.S. 337 (1970)). However, the right is not absolute and is triggered only when the defendant's "presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charges." *Snyder v. Massachusetts,* 291 U.S. 97, 105-06

(1934), *overruled on other grounds, Malloy v. Hogan,* 378 U.S. 1 (1964); *see also Kentucky v.. Stincer,* 482 U.S. 730, 745 (1987) (stating that the due process clause guarantees a criminal defendant "the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure"). Where the defendant's absence during a proceeding does not defeat the fundamental fairness of the trial or his ability to defend against the charges, his right to attend the proceeding is not implicated under the due process clause. *Snyder,* 291 U.S. at 105-06; *see also Gagnon,* 470 U.S. at 526-27. Further, there is no constitutional right to be present "when presence would be useless, or the benefit but a shadow." *Snyder,* 291 U.S. at 106-07. The right to be present during critical stages of trial is circumscribed by harmless error analysis. *Rushen v. Spain,* 464 U.S. 114, 119 n. 2 (1983). In specifically addressing *in camera* discussions with jurors held outside the presence of a defendant, the Supreme Court has emphasized that " '[t]he defense has no constitutional right to be present at every interaction between a judge and a juror.' " *Gagnon,* 470 U.S. at 526 (quoting *Rushen,* 464 U.S. at 125-26 (Stevens, J., concurring in judgment)).

 **\*14**  Wright complains that, because he was present when Ms. Lamb encountered the female spectator in the hallway several days after Ms. Lamb provided the woman with a list of places to stay, he could have been useful during his defense counsel's inquiry of Ms. Lamb by: (1) informing counsel whether Ms. Lamb's version of the encounter was false, inaccurate or misleading and (2) recounting Ms. Lamb's "gestures, facial expressions, or other surrounding circumstances concerning the encounter." Petition, Ground Two; *see also* Pet. Mem. at pp. 22-25.

Wright's argument is unpersuasive for several reasons. First, the inquiry conducted by the County Court was not necessarily a material stage of the trial at which petitioner had a right to be present. The Second Circuit has urged that the standard requiring a defendant's presence at all stages of trial should be applied in a flexible, "common sense" manner. *Clark v. Stinson,* 214 F.3d 315, 322-23 (2d Cir.2000), *cert. denied,* 531 U.S. 1116 (2001). When the proceeding is a "short interlude in a complex trial," it is not considered material under the due process clause. *Gagnon,* 470 U.S. at 527. In fact, the Second Circuit has cited with approval the holding of the New York Court of Appeals that the questioning of a juror outside the defendant's presence does not constitute a material stage of trial. *See Clark,* 214 F.3d at 322-23 (citing *People v. Mullen,* 44 N.Y.2d 1, 5-6 (1978));

Wright v. Smith, Not Reported in F.Supp.2d (2007)
2007 WL 2412248
Case 7:13-cv-02627-CS   Document 50   Filed 04/29/16   Page 173 of 181

*see also Cruz v. Artuz,* No. 97-CV-2508, 2002 WL 1359386, at *12 (E.D.N .Y. June 24, 2002) (rejecting petitioner's claim he was denied a fair trial because he was not present at trial court's *in camera* inquiry of three jurors following their encounter with petitioner's eight-year-old son outside the courtroom because proceeding was not a material stage of the trial).[19]

Moreover, even if the hearing was a material stage of Wright's trial, petitioner has not demonstrated that his absence from the inquiry bore a reasonable relationship to his opportunity to defend. Although Wright claims he could have assisted Martuscello in questioning Ms. Lamb regarding her second encounter with the female spectator, it is clear that the focus of the hearing was not this second meeting. Judge Lomanto and all counsel focused on Ms. Lamb's first encounter with the spectator as well as her ability to proceed as a fair and impartial juror. *See* Trial Tr. at pp. 631-53. Wright's personal observations of Ms. Lamb's second interaction with the spectator would not have offered any meaningful insight into Ms. Lamb's concerns regarding the incident. Indeed, given that Ms. Lamb expressed some unease regarding her safety, Wright's presence at the hearing could have hindered the fact-finding process and prevented Ms. Lamb from speaking freely. *See Gagnon,* 470 U.S. at 526 (finding that presence of defendants and their counsel "could have been counterproductive" where court held *in camera, ex parte* inquiry of a sworn juror who expressed concern about the defendant's sketching the jury during the proceedings); *United States v. Peterson,* 385 F.3d 127, 138 (2d Cir.2004) (indicating that *in camera, ex parte* conversation between trial judge and sworn juror who informed other jurors, during deliberations, that she believed she had known the defendants in the past, did not require defendants' attendance because, *inter alia,* their "presence may have prevented juror number three from speaking openly"). Moreover, the continuous presence of Wright's counsel during the hearing, and his active participation in the questioning, served to *facilitate* the fundamental fairness of Wright's trial. *See Pellington v. Greiner,* 307 F.Supp.2d 601, 606 (S.D.N.Y.2004), *aff'd,* 132 Fed.Appx. 868 (2d Cir.2005) ("[C]ourts have repeatedly indicated that in most instances, the presence of defense counsel at a conference between a judge and juror adequately protects the defendant's interests.") (citing *United States v. Smith,* 230 F.3d 300 (7th Cir.2000) and *United States v. Rhodes,* 32 F.3d 867 (4th Cir.1994)). Accordingly, Wright has failed to establish that his trial was "thwarted" by his absence from much of the hearing, and that he therefore

suffered a deprivation of his due process rights. *See Gagnon,* 470 U.S. at 526.

**\*15** In any event, even assuming his absence from the hearing somehow implicated his constitutional right to be present, petitioner waived that right. "Although trial courts must vigorously safeguard a criminal defendant's right to be present, a defendant may expressly or effectively waive the right." *United States v. Fontanez,* 878 F.2d 33, 36 (2d Cir.1989). A defendant may waive his right to be present as long as the waiver is made knowingly and voluntarily. *See Clark,* 214 F.3d at 323. However, a waiver may be implied by the defendant's conduct. *See id.; see also Cohen v. Senkowski,* 290 F.3d 485, 491 (2d Cir.2002). " '[O]nly minimal knowledge on the part of the accused is required when waiver is implied from conduct.' " *Cohen,* 290 F.3d at 491 (quoting *United States v. Nichols,* 56 F.3d 403, 416 (2d Cir.1995)). To determine whether an implied waiver was made knowingly, the proper inquiry is "whether the trial court's actions in open court gave [the defendant] sufficient 'minimal' knowledge of the nature and purpose of the [proceeding] to conclude that he waived his right to be present when he did not attend." *Id.* In addition, "failure to readily object at the time the decision is made to proceed without the accused can constitute a waiver." *Clark,* 214 F.3d at 323-34 (citing *Gagnon,* 470 U.S. at 528-29 (finding that defendant waived his right to be present at *in camera* hearing when no objection was made at trial)). As the Second Circuit summarized, "when a defendant is fully apprised of the nature of the ... procedure, makes no objection to the procedure, and has counsel present for the duration of the [procedure], a knowing waiver of the right to be present occurs." *Cohen,* 290 F.3d at 492.

In the instant case, Wright ignores the fact that he was present for at least part of the hearing wherein counsel recounted the questioning of Ms. Lamb and the other jurors, and argued their mistrial motions. *See* Trial Tr. at pp. 682-690. At that point, Wright wholly failed to lodge any objections, to assert the need for further questioning, or to supplement the fact-finding process. *See United States v. Jones,* 381 F.3d 114, 122 (2d Cir.2004) (holding that defendant waived his right to be present when he "never objected to his absence from the in-chambers hearing, even though he was present during the subsequent hearing in open court when the court made its ruling"); *Pounce v. McLaughlin,* No. 04 CV 668, 2004 WL 2360037, at *8 (E.D.N.Y. Oct. 20, 2004) (finding that defendant's presence in the court when the trial judge announced juror would remain was a "sufficient opportunity"

for him to object to his absence during articulation of "for cause" and peremptory challenges). There is no evidence in the record that Wright was precluded from offering such insight to his counsel, or that he was prohibited from directly addressing the court, prior to the court's decision regarding the mistrial motions. Moreover, defense counsel did not object at any point to the absence of the defendants during the meeting conducted by Judge Lomanto. *See* Trial Tr. at p. 631. The silence of both Martuscello and petitioner accordingly resulted in an implicit waiver of any right to be present. *See Gagnon,* 470 U.S. at 529; *see also Peterson,* 385 F.3d at 138-39 (holding that defendants waived any right they may have had to attend *in camera* inquiry of potentially tainted juror where counsel agreed to judge's suggestion to conduct questioning absent counsel and defendants, and stating that "[a] rule allowing the defendants, as well as their trial counsel, to stay silent at trial and then claim ... that their absence constitutes reversible error will only encourage 'sandbagging' "); *Jones,* 381 F.3d at 122 (finding waiver of right to be present where defendant and his counsel had an opportunity to raise an objection to the *in camera* conferences, but failed to raise the issue until appeal); *Pellington,* 307 F.Supp.2d at 605-06 (finding implicit waiver although petitioner "did not expressly or personally waive his right to attend juror conference" where he was aware of the conference and "neither [petitioner] nor his counsel objected to [petitioner's] absence").

*16 Wright's failure to participate in the hearing indicates to this Court that, contrary to his contentions, he had nothing to offer that would have affected the outcome. *See Clark,* 214 F.3d at 327 (stating that "the absence of any contemporaneous objection is strongly suggestive that the absence was acceptable to [defendant] at the time"). As such, Wright's current argument appears to be nothing more than speculative assertions set forth in a contrived effort to establish that his presence would have affected the course of the trial. *See, e.g., Pellington,* 307 F.Supp.2d at 606-07 (rejecting petitioner's argument that his absence from meeting between court, defense attorneys, and juror denied him due process where petitioner had opportunity to speak with his counsel and the court prior to the court's determination of the issue).

Petitioner has failed to establish that his exclusion from the trial court's *in camera* inquiry of jury members deprived him of any constitutional due process right. Accordingly, he is unable to demonstrate that his exclusion from the conference was an error that had a substantial and

injurious effect or influence in determining the jury's verdict, or alternatively, constituted an error that was not harmless beyond a reasonable doubt. [20] The Court therefore recommends dismissal of ground two of Wright's petition.

### (ii) *Juror Disqualification*

In the third ground of his petition, Wright alleges that the County Court erred in refusing to disqualify juror Carol Lamb. Petition, Ground Three; Pet. Mem. at pp. 25-27. Wright further claims that Judge Lomanto failed to engage in a thorough inquiry to determine whether other members of the jury pool had been tainted by Ms. Lamb's concerns. Pet. Mem. at pp. 26-27. According to petitioner, the trial court error resulted in the denial of his right to a fair and impartial jury. Petition, Ground Three; Pet. Mem. at p. 25. The New York Court of Appeals affirmed the Appellate Division's rejection of this claim. *Harris,* 99 N.Y.2d at 212-13; *see also Harris,* 288 A.D.2d at 616. The Court of Appeals held that:

> In this case, there is no indication that the juror's concern for her personal safety rendered her grossly unqualified to serve. While the juror felt a "teeny bit of concern for safety" based on a discrete incident that occurred before she was sworn, she assured the court that she would not allow her concern to play any part in her verdict. The court inquired if she could convince the attorneys, "that this situation that you've described has no impact on you and that you can absolutely sit in the jury box and keep an open mind and listen to the evidence and base your verdict solely on the evidence." The juror unequivocally responded, "Yes." The court made a probing and tactful inquiry into the juror's concerns and correctly determined that the juror was not grossly unqualified to serve.

*Harris,* 99 N.Y.2d at 213.

*17 The Sixth Amendment of the United States Constitution guarantees individuals the right to a trial by an impartial jury. *Duncan v. Louisiana,* 391 U.S. 145, 159 (1968). "The right to a fair trial ... has been called 'the most fundamental of all freedoms.' " *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 586 (1976) (Brennan, J., concurring) (quoting *Estes v. Texas,* 382 U.S. 532, 540 (1965)). "It is a right essential to the preservation and enjoyment of all other rights, providing a necessary means of safeguarding personal liberties against government oppression." *Id.* at 586 (citing *Rideau v. Louisiana,* 373 U.S. 723, 726-27 (1963)); *see also United States v. Alvarez-Machain,* 504 U .S. 655, 661-62 (1992) (stating that due process of law is satisfied "when

one present in court is convicted of crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards") (citation omitted); *Taylor v. Hayes,* 418 U.S. 488, 501-02 (1974). A trial court's finding of juror impartiality may be overturned only for "manifest error." *Patton v. Yount,* 467 U.S. 1025, 1031 (1984). Indeed, a trial court's conclusion that a jury was impartial is subject to a "presumption of correctness." [21] *Id.* at 1037-38 (citing *Rushen,* 464 U.S. at 120); *see also Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 813 (2d Cir.2000) ("On § 2254 review, the state trial court is entitled to a presumption of correctness with respect to its conclusion that the jury was impartial."); *Knapp v. Leonardo,* 46 F.3d 170, 176 (2d Cir.1995), *cert. denied,* 515 U.S. 1136 (1995) (citation omitted).

Accordingly, a petitioner claiming that his right to a fair trial was violated due to misconduct on the part of a juror bears a heavy burden. He must establish not only that the juror possessed a preconceived notion about the petitioner's guilt, but also that the juror could not "lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd,* 366 U.S. 717, 723 (1961). Whether a juror is impartial is a matter "of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Patton,* 467 U.S. at 1036-37; *see also Thompson v. Keohane,* 516 U.S. 99, 111 (1995) (asserting that trial judge's determination regarding a juror's impartiality is a factual determination by the trial court) (citation omitted). This "determination is essentially one of credibility, and therefore largely one of demeanor [,] ... the trial court's resolution of such questions is entitled ... to 'special deference.' " *Patton,* 467 U.S. at 1038 (quoting *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 500 (1984)); *see also Black v.. Goord,* 419 F.Supp.2d 365, 375 (W.D.N.Y.2006) ("[A] federal court sitting in habeas review is not permitted to redetermine the state trial court's factual findings regarding the credibility of jurors whose demeanor has been observed by the trial court-and not by the habeas court-and must more than simply disagree with the state court in order to reach a different result.") (citing *Patton,* 467 U.S. at 1037). Thus, the question for the habeas court is "whether there is fair support in the record" for the state court's determination that the challenged juror would be impartial. *Patton,* 467 U.S. at 1038.

**\*18** Based on the relevant law and the *in camera* inquiry of Ms. Lamb, juror Sharon Benson, and others, the trial

court concluded that no juror misconduct occurred and disqualification of Ms. Lamb was not warranted. Trial Tr. at pp. 690-91. In making this determination, Judge Lomanto followed New York Criminal Procedure Law § 270.35(1), which allows a trial court to dismiss a juror from service prior to a verdict if the "juror is grossly unqualified to serve in the case or has engaged in misconduct of a substantial nature." N.Y.Crim. Proc. Law § 270.35(1). To make such a finding, the trial court must engage in a " 'probing and tactful inquiry' " on the record where it " 'carefully consider[s] the juror's answers and demeanor to ascertain whether her state of mind will affect her deliberations.' " *Booker v. Girdich,* 262 F.Supp.2d 264, 268 (S.D.N.Y.2003) (quoting *People v. Buford,* 69 N.Y.2d 290, 299 (1987)). Petitioner's claim that Judge Lomanto conducted a "truncated" inquiry simply is belied by the record. Pet. Mem. at p. 27. Judge Lomanto engaged in a rigorous examination of Ms. Lamb, Ms. Benson, and several male jurors in order to determine that Ms. Lamb would remain impartial. *See* Trial Tr. at pp. 631-82.

Namely, Ms. Lamb informed the court and counsel that her encounter with a woman apparently acquainted with the defendants "wouldn't change the way I would vote or my impartiality at all." Trial Tr. at p. 636. She further stated that the incident "could possibly ... make me feel a little more concerned for safety in the future. But I don't think that's a valid thing to base decisions on." Trial Tr. at p. 636. As noted by the New York Court of Appeals, *see Harris,* 99 N.Y.2d at 213, when asked by Judge Lomanto whether she could "reassure the District Attorney and [defense counsel] that this situation that you've described has no impact on you and you can absolutely sit in the jury box and keep an open mind and listen to the evidence and base your verdict solely on the evidence," Ms. Lamb clearly responded "Yes." Trial Tr. at p. 637. Moreover, when questioned by Attorney Lorman regarding whether the encounter "in any way compromise[d] your feeling as sitting as a juror in this case," Ms. Lamb replied "No." Trial Tr. at p. 642. Ms. Lamb assured Attorney Martuscello that "[t]he only thing that will be on my mind a little bit is the safety.... And I'm not going to make a decision to step off this because of that. That's not valid in my mind to do that." Trial Tr. at p. 648. Further, when asked by DA Hoye of her ability to remain on the jury in light of her small amount of her concern for safety, Ms. Lamb responded "Yes. I can promise you that." Trial Tr. at pp. 650-51. Ms. Lamb then agreed with DA Hoye's statement that sitting as a juror in any criminal case would cause her to have some concern for her safety. Trial Tr. at p. 651. Ms. Benson also stated that she was able to remain impartial despite discussing the encounter

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Wright v. Smith, Not Reported in F.Supp.2d (2007)
Case 7:13-cv-02627-CS   Document 50   Filed 04/29/16   Page 176 of 181
2007 WL 2412248

with Ms. Lamb. Trial Tr. at p. 656. After questioning several male jurors *in camera* and polling all male jurors, the court was satisfied that the jury, including Ms. Lamb, remained impartial and no juror misconduct occurred. *See* Trial Tr. at pp. 672-82, 690-91.

**\*19** The record amply supports the trial court's finding, and the Court finds nothing to indicate that Judge Lomanto committed manifest error in concluding that Ms. Lamb was qualified to remain on the jury. Judge Lomanto was within his discretion to determine that Ms. Lamb was credible in her unequivocal assertions that she could remain impartial. Judge Lomanto further exercised his discretion in concluding that Ms. Benson and the other questioned jurors were credible in their representations. *See, e.g., Thomas v. Fischer,* No. 03 Civ. 5388, 2004 WL 725636, at \*7-8 (S.D.N.Y. Apr. 5, 2004) (finding that the trial court acted within its "wide discretion" in determining the jury was impartial given its "unique ability to personally observe the jurors in question") (citation omitted). Moreover, the inquiry conducted by Judge Lomanto was sufficiently probing and tactful to determine the potential for bias and prejudice. Wright has failed to set forth any evidence, let alone clear and convincing, to rebut the presumption of correctness afforded the trial court decision. Since petitioner has not established by clear and convincing evidence that the trial court's determination constituted error, *a fortiori* he has failed to demonstrate that this alleged trial court error had a substantial and injurious effect or influence in determining the jury's verdict, or, alternatively, that the claimed error was not harmless beyond a reasonable doubt.[22] Accordingly, this Court recommends that ground three of Wright's petition be denied.

### (iii) *Evidentiary Errors*

In his fourth ground for relief, Wright alleges that erroneously admitted evidence violated his constitutional right to a fair trial. Petition, Ground Four; Pet. Mem. at pp. 27-31. Specifically, petitioner claims that the testimony of Sharon Cannizzo and James Hill, wherein they stated that their appearance at trial jeopardized their safety, "poisoned" the trial. Pet. Mem. at pp. 27-28. Wright contends that this testimony prejudiced him because it allowed the jury to infer that Wright "posed a threat" to the witnesses. Pet. Mem. at p. 28. According to Wright, the prejudice was compounded by the prosecutor's reference in summation to Wright and Harris as "professional" drug dealers, which implied that they were capable of inflicting harm on others. Pet. Mem. at pp. 30-31. Further, Wright claims the trial court failed to minimize the

prejudice by providing the jury with a limiting instruction. Pet. Mem. at pp. 30-31. The Court of Appeals found these contentions "without merit." *Harris,* 99 N.Y.2d at 213.

First, Wright claims that Cannizzo's testimony regarding her reluctance to divulge her place of employment was unduly prejudicial and should not have been admitted at trial. In this regard, Martuscello asked Cannizzo where she was employed, to which Cannizzo responded "I'd rather not disclose that. I don't feel I need to. Why do I need to disclose where I'm working at this time?" Trial Tr. at p. 883. An off-the-record sidebar was then held. Trial Tr. at pp. 883-84. After the conference, Judge Lomanto asked Cannizzo, "[I]s there a reason why you do not want to answer the question as to where you're working?" Trial Tr. at p. 884. Judge Lomanto overruled Martuscello's objection to his question, and Cannizzo responded "[f]or my own personal safety." Trial Tr. at p. 884. Martuscello's subsequent motion for a mistrial was denied. Trial Tr. at p. 884.

**\*20** Second, Wright objects to Hill's testimony wherein he stated he "could get killed" for testifying. *See* Trial Tr. at p. 1091. Specifically, Hill testified that he entered into a cooperation agreement with the prosecution in which he agreed to testify against Wright and Harris and to plead guilty to narcotics charges relating to the drug activities with the co-defendants and Cannizzo. Trial Tr. at pp. 1065-68. Hill stated that he was currently incarcerated in accordance with his guilty plea. Trial Tr. at pp. 1066-68. In an apparent effort to cast doubt on the credibility of his testimony, Martuscello and Lorman extensively cross-examined Hill regarding the plea deal and his motives for testifying. *See* Trial Tr. at pp. 1065-1090. Accordingly, on redirect, DA Hoye asked Hill whether he had considered the consequences of testifying, to which he replied there was "a whole bunch of consequences ... I could get killed. This isn't a favorable act where I live." Trial Tr. at p. 1091. Notably, Wright did not object to this testimony. *See* Trial Tr. at p. 1091.

While the introduction of prejudicial evidence against a defendant in a criminal trial may be contrary to state or federal law, such admissions warrant habeas relief only in limited circumstances. *See Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir.1998). In order to prevail on a habeas claim that an evidentiary error resulted in a constitutional violation, a petitioner must establish the evidence was "so extremely unfair that its admission violates 'fundamental conceptions of justice.' " *Dowling v. United States,* 493 U.S. 342, 352-53 (1990) (quoting *United States v. Lovasco,*

Wright v. Smith, Not Reported in F.Supp.2d (2007)
Case 7:13-cv-02627-CS   Document 50   Filed 04/29/16   Page 177 of 181
2007 WL 2412248

431 U.S. 783, 790 (1977)); *see also Collins v.. Scully,* 755 F.2d 16, 18 (2d Cir.1985) (stating that improperly admitted evidence results in a due process violation only if "the error was so pervasive as to have denied [the petitioner] a fundamentally fair trial"). The erroneously admitted evidence must have been " 'sufficiently material to provide the basis for conviction or to remove reasonable doubt that would have existed on the record without it.' " *Dunnigan,* 137 F.3d at 125 (quoting *Johnson v. Ross,* 955 F.2d 178, 181 (2d Cir.1992)); *see also Collins,* 755 F.2d at 19 (stating that the evidence must be "crucial, critical, highly significant") (quotation omitted). When assessing the materiality of the evidence, a habeas court should consider "the importance of the witness's wrongly admitted testimony, and the overall strength of the prosecution's case." *Wray v. Johnson,* 202 F.3d 515, 526 (2d Cir.2000); *Bohan v. Kuhlmann,* 234 F.Supp.2d 231, 268 (S.D.N.Y.2002), *aff'd,* 66 Fed.Appx. 277 (2d Cir.2003). A court should review the evidence in light of the entire record presented to the jury. *Dunnigan,* 137 F.3d at 125.

Nothwithstanding the failure of Judge Lomanto to provide a limiting instruction regarding the testimony of Hill and Cannizzo, it is doubtful that the admission of this testimony can be deemed erroneous. Neither Hill nor Cannizzo testified that they were "afraid of testifying" against petitioner, linked their concerns with either of the defendants, or stated that they had received threats from the defendants. *See* Pet. Mem. at p. 28. In fact, Hill testified on direct examination that he resided in a New York State Correctional Facility, and his reference to his testimony not being looked upon favorably "where [he] live[d]" likely referenced the disdain of prison inmates toward "snitches," rather than any fear of reprisal by petitioner. *See* Trial Tr. at p. 1091; *see also People v. Edwards,* 261 A.D.2d 260, 261 (1st Dept.1999) (finding that trial court properly permitted testimony from an incarcerated prosecution witness that fellow inmates had called him a "snitch" because of his cooperation with the government and that witness feared reprisals); *Harris,* 288 A.D.2d at 617 (noting that "Hill's remarks did not imply a fear of retaliation by defendants and was clearly a reference to his inmate status"). Moreover, the challenged testimony of Hill and Cannizzo was relevant to their state of mind and their motivation for entering into a plea deal. *See id.*[23] "Since a major theme of [petitioner's] attack on [the witnesses'] credibility was that [they were] testifying out of self-interest, in an effort to obtain lenient treatment," the trial court properly exercised its discretion in receiving specific testimony that "such cooperation was also against the [witnesses'] interest to a significant extent." *Edwards,* 261 A.D.2d at 261. In addition, while Attorney Martuscello

objected to Cannizzo's testimony and his subsequent motion for a mistrial was denied, *see* Trial Tr. at p. 884, his failure to object to Hill's testimony or even to request a curative instruction seriously undermines petitioner's prejudice claim. *See, e.g., Rojas v. Senkowski,* No. 95-CV-1866, 1996 WL 449321, at *4 (E.D.N.Y. July 29, 1996) (citation omitted) (stating that defense counsel's failure to object to the allegedly improper remark of the prosecutor "undermines the seriousness of petitioner's claim of error").

**\*21** Even assuming, *arguendo,* that the challenged testimony of Hill and Cannizzo was erroneously admitted at trial without a proper limiting instruction, Wright has failed to establish that the evidence was sufficiently material to his conviction and thereby resulted in a fundamentally unfair trial. The testimony provided by Hill and Cannizzo was not "crucial, critical, or highly significant" and certainly was not probative of Wright's guilt or innocence. *See Collins,* 755 F.2d at 19. Based on a review of the trial record, Hill and Cannizzo's testimony neither provided the basis for Wright's conviction nor would reasonable doubt have existed on the record without it. *See Dunnigan,* 137 F.3d at 125.

Rather, the evidence adduced at trial implicating Wright in the drug ring was overwhelming. In addition to the compelling testimony of Hill and Cannizzo regarding petitioner's involvement in the drug sales, several other witnesses placed two African American men at the residence during drug purchases and identified an Isuzu Trooper, which was linked to Harris and Wright, in the driveway at those times. Trial Tr. at pp. 11008-09, 104, 1161-63, 1230-33, 1602. Moreover, when law enforcement raided the residence on April 3, 1996, Wright was found on the premises in possession of $3646 and a pager, which served to corroborate the testimony of Hill and Cannizzo that they contacted Wright and Harris by beeper when customers arrived at the residence in the two men's absence. RA24-26; Trial Tr. at pp. 791-94, 798-803, 1041-44. At that time, a search of the residence revealed 5.6 ounces of cocaine, an electronic scale, razor blades, plastic bags and duct tape in the bedroom from which Wright and Harris allegedly operated. Trial Tr. at pp. 1283, 1321-22, 1494-95. The strength of the prosecution's case is readily apparent, and petitioner has failed to demonstrate that this alleged trial court error had a substantial and injurious effect or influence in determining the jury's verdict, or, alternatively, that the claimed error was not harmless beyond a reasonable doubt. *See Wray,* 202 F.3d at 526 ("[T]he strength of the prosecution's case 'is probably the single most critical factor in determining whether error was harmless.'

") (quoting *Latine v. Mann,* 25 F.3d 1162, 1167-68 (2d Cir.1994) (internal quotations omitted), *cert. denied,* 514 U.S. 1006 (1995)). Accordingly, the Court cannot conclude that this testimony so infected petitioner's trial with unfairness as to make his conviction on the charges in the Indictment a denial of his right to a fair trial.

Wright's claim that DA Hoye exacerbated the alleged prejudice by characterizing the defendants as "professionals" in her summation likewise is insufficient to warrant habeas relief. [24] *See* Trial Tr. at pp. 1720-21. Prosecutorial misconduct violates a petitioner's due process rights when the misconduct alleged is so severe and is of sufficient significance to infect the trial, resulting in the denial of the petitioner's right to a fair trial. *Greer v. Miller,* 483 U.S. 756, 765 (1987) (citing *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974)); *Blissett v. LeFevre,* 924 F.2d 434, 440 (2d Cir.1991). To prevail on a claim of prosecutorial misconduct based on an allegedly improper summation, a petitioner must demonstrate that " 'he suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict.' " *Tankleff v. Senkowski,* 135 F.3d 235, 252 (2d Cir.1998) (quoting *Bentley v. Scully,* 41 F.3d 818, 823 (2d Cir.1994), *cert. denied,* 516 U.S. 1152 (1996)); *see also Suriel v. Burge,* No. 04 CV 3451, 2006 WL 2583203, at *6 (E.D.N.Y. Sept. 6, 2006) (noting that for a prosecutor to violate constitutional due process during summation, his conduct must be egregious); *Ramirez v. Poole,* No. 03-CV-5202, 2005 WL 1123775, at *9 (E.D.N.Y. May 9, 2005) (quoting *Bentley* ). "Under New York law, statements during summation are permissible if they constitute a 'fair comment on the evidence' at trial and reasonable inference therefrom, or a 'fair response to remarks made by the defense counsel during summation.' " *Roman v. Filion,* No. 04 Civ. 8022, 2005 WL 1383167, at *18 (S.D.N.Y. June 10, 2005) (Peck, C.M.J.) (quotation and citation omitted), *adopted,* No. 04-8022, Dkt. No. 16 (S.D.N.Y. Dec. 20, 2005) (Wood, D.J.); *see also Tolliver v. Greiner,* No. 02 CV 0570, 2005 WL 2179298, at *13 (N.D.N.Y. Sept. 8, 2005) (Treece, M.J.), *adopted,* 2005 WL 2437021 (N.D.N.Y. Sept. 30, 2005) (Kahn, D.J.).

**\*22** By characterizing petitioner as a "professional," DA Hoye simply challenged defense counsel's theory, as articulated in his summation, that since no testimony definitively placed Wright at Hill's residence during the relevant time period, he was never involved in any drug transactions. *See* Trial Tr. at pp. 1660-61, 1664-69. In a fair response to this defense theory, DA Hoye used the term "professional" to argue that Wright and Harris knew exactly what they were doing by conducting their drug business anonymously, using Hill and Cannizzo as the visible faces of the business. *See* Trial Tr. at pp. 1698-99, 1720-21. Contrary to petitioner's rather theatrical assertions, the prosecutor's comments, examined in their proper context, in no way connote that Wright and Harris had "the wherewithal and willingness to inflict mayhem and death upon their enemies." *See* Pet. Mem. at p. 30. This Court therefore cannot conclude that the prosecutor's remarks were so prejudicial as to deprive Wright of a fair trial.

Accordingly, the Court recommends that ground four of Wright's petition be denied in its entirety.

**WHEREFORE,** based upon the foregoing, it is hereby

**RECOMMENDED,** that the petition for a writ of habeas corpus (Dkt. No. 1) be **DENIED** and **DISMISSED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)).

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2412248

Footnotes

1    Anthony Wright was also known as "Andrew D. Smith" or "C." Lawrence Harris was also known as "Dahu" or "D." *See* Indictment No. 22-96 (reproduced in Respondent's Appendix on Appeal) ("RA") at RA1-11 ("Indictment").

Wright v. Smith, Not Reported in F.Supp.2d (2007)
Case 7:13-cv-02627-CS   Document 50   Filed 04/29/16   Page 179 of 181
2007 WL 2412248

2  Thum was unable to identify Wright in-person because petitioner, who was free on bail, had absconded by that point in the trial. *See* Trial Tr. at pp. 1120-30. However, it appears Thum identified Wright as the second black male in the house from a photograph array. *See* Trial Tr. at pp. 1167-68.

3  The Fulton County Drug Task Force also conducted surveillance of the Hill/Cannizzo residence between January and April 1996. *See* Trial Tr. at pp. 1222, 1225-26. While the surveillance officers did not observe Wright or Harris at the residence during the controlled buys, the Isuzu Trooper was observed in the driveway on the dates of the controlled buys and on other occasions during that time period. *See* Trial Tr. at pp. 413-17, 427, 584, 1233-36. The Isuzu Trooper was directly linked to Lawrence Harris when Harris was pulled over driving the vehicle on February 1, 1996, with James Hill as his passenger. *See* Trial Tr. at pp. 1230-33. However, Harris testified that Wright was the owner of the vehicle. Trial Tr. at p. 1602.

4  Neither the record before this Court nor the record accompanying defendant Harris' habeas petition specifies Harris' plea. However, since Harris proceeded to trial, the Court assumes he pleaded not guilty to the above charges.

5  In his own petition for habeas corpus relief, co-defendant Lawrence Harris claims that the woman Ms. Lamb encountered was his wife. *See Harris v. Smith,* No. 04-CV-1268 (LEK)(GJD), Petition (Dkt. No. 1) at p. 5.

6  Eventually, Wright was located and pleaded guilty to bail jumping in the first degree. *See* Respondent's Appellate Brief ("Resp.App.Br.") at p. 12, n. 5; *see also* Petition, ¶ 17. He was sentenced to an indeterminate term of one to three years imprisonment to run consecutively to the sentence he received *in abstentia. See* Resp.App. Br. at p. 12, n. 5.

7  Wright styles his request for relief as a petition for a writ of habeas corpus pursuant to 28 U.S.C. §§ 2241 and 2254 *et seq. See* Dkt. No. 1. Section 2254 governs petitions filed by "a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). While Section 2241 also may be invoked by prisoners "in custody in violation of the Constitution or laws or treaties of the United States," *see* 28 U.S.C. § 2241(c)(3), that section generally is used to challenge the execution of a ***federal*** sentence, when the underlying conviction is not contested. *See Chambers v. United States,* 106 F.3d 472, 474 (2d Cir.1997) ("A challenge to the *execution* of a sentence ... is properly filed pursuant to Section 2241.") (emphasis in original); *see also James v. Walsh,* 308 F.3d 162, 166-67 (2d Cir.2002); *Carmona v. United States Bureau of Prisons,* 243 F.3d 629, 632 (2d Cir.2001). In his petition, Wright plainly disputes his continuing custody pursuant to a state court conviction. Such a challenge is properly brought under Section 2254, rather than Section 2241. Accordingly, this Court treats Wright's application as arising under Section 2254. *See James,* 308 F.3d at 166 (stating that "it is the substance of the petition, rather than its form" that controls); *cf. Cook v. New York State Div. of Parole,* 321 F.3d 274, 278 (2d Cir.2003) (finding that state prisoner's challenge to parole revocation was properly brought under Section 2254, and noting that "if an application that should be brought under 28 U.S.C. § 2254 is mislabeled as a petition under section 2241, the district court must treat it as a section 2254 application instead").

8  In his petition, Wright lists his four grounds for relief at paragraph 12, A through D. *See* Petition, ¶ 12. For ease of reference, the Court has consecutively numbered Grounds "A through D" as Grounds "One through Four."

9  Of note, on January 27, 2005, Wright filed a notice of appearance/substitution of counsel replacing his original counsel, Daniel R Williams, Esq., with Ronald L. Kuby, Esq. of Kuby & Perez, LLP. Dkt. No. 9.

10  Respondent devotes a significant portion of his brief to reiterating the Appellate Division, Third Department decision and incorrectly states that petitioner's leave application to the New York Court of Appeals was denied. *See* Resp. Mem. at pp. 5-15. Contrary to respondent's representations, this Court must examine the decision of the New York Court of Appeals, as the last state court adjudication of petitioner's claims, to determine whether it was contrary to, or an unreasonable application of, clearly established Supreme Court precedent. *See Coleman v. Thompson,* 501 U.S. 722, 735 (1991) ("In habeas, if the decision of the last state court to which the petitioner presented his federal claims fairly appeared to rest primarily on resolution of those claims, or to be interwoven with those claims ... a federal court may address the petition.").

11  A *per se* conflict of interest exists in only two limited circumstances, and requires automatic reversal of a conviction without a showing of prejudice: (1) where trial counsel is not authorized to practice law or (2) where counsel is implicated in the crime for which his client is on trial. *Armienti,* 234 F.3d at 823. Neither of these circumstances is present in the instant case.

12  Whether a conflict of interest exists is a mixed question of law and fact. *See Sullivan,* 446 U.S. at 342; *see also United States v. Feyrer,* 333 F.3d 110, 115-16 (2d Cir.2003).

13  The meaning of "actively represent[ing] conflicting interests" is not clear under existing Supreme Court precedent. In *Mickens,* the Supreme Court indicated that *Sullivan* "stressed the high probability of prejudice arising from multiple *concurrent* representation." *Mickens,* 535 U.S. at 175 (emphasis added). However, the Court refused to suggest that an attorney's ethical duty in that situation is any "more or less important" than the ethical duty resulting from *successive*

2007 WL 2412248

representation, as present here. *Id.* at 175-76. Based on *Mickens,* it is possible that an actual conflict arises only in cases of concurrent representation of clients with conflicting interests, or in cases of successive representation on related matters. *See, e.g., United States v. Pizzonia,* 415 F.Supp.2d 168, 178 (E.D.N.Y.2006) (noting, in the disqualification context, that "[t]he majority of cases that have found a conflict of interest arising from prior representation of a witness involve substantially related representations") (collecting cases). However, this issue remains unresolved. This Court, therefore, does not consider the fact that this case involves Martuscello's successive representation of Hill on a substantially unrelated matter as determinative on the issue of whether an actual conflict of interest exists.

14    The AEDPA requires federal courts to examine Supreme Court precedent to determine whether a state court decision contravened "clearly established Federal law." *See* 28 U.S.C. § 2254(d) (1). However, federal habeas courts may consider the decisions of lower federal courts as "helpful amplifications of Supreme Court precedent" in "evaluating whether the state court's application of the law was reasonable." *Matteo v. Superintendent,* 171 F.3d 877, 890 (3d Cir.1999) (en banc); *see also Lopez v. Artus,* No. 03 Civ. 7087, 2005 WL 957341, at *6 n. 5 (S.D.N.Y. Apr. 25, 2005); *Bohan v. Kuhlmann,* 234 F.Supp.2d 231, 248 n. 10 (S.D.N.Y.2002), *aff'd,* 66 Fed.Appx. 277 (2d Cir.2003) (indicating that a district court is not "required, or even permitted, to disregard the Circuit's interpretation of 'clearly established Federal Law, as determined by the Supreme Court' "). Therefore, in the absence of significant Supreme Court jurisprudence regarding actual conflicts of interest, it is helpful to examine decisions of inferior federal courts interpreting the pertinent Supreme Court precedent to determine whether the state court's adjudication was unreasonable under 28 U.S.C. § 2254(d)(1).

15    The Second Circuit has noted that the circuits are divided regarding how a defendant can establish that a conflict adversely affected his counsel's performance. *See Eisemann,* 401 F.3d at 107. This circuit applies a more lenient standard, requiring proof that counsel failed to pursue any plausible alternative defense strategy as a result of the conflict. *Id.* In contrast, other circuits employ a stricter approach, requiring a defendant to demonstrate counsel's failure to pursue an "objectively reasonable" alternative defense strategy. *Id.* at 107-08 (citing *Covey v. United States,* 377 F.3d 903, 908 (8th Cir.2004) and *Quince v. Crosby,* 360 F.3d 1259, 1264-65 (11th Cir.2004)).

16    To date, the Supreme Court has applied this presumption of prejudice only in cases involving an attorney's concurrent representation of clients with conflicting interests. *See Mickens,* 535 U.S. at 176 ("In resolving this case on the grounds on which it was presented to us, we do not rule upon the need for the *Sullivan* prophylaxis in cases of successive representation. Whether *Sullivan* should be extended to such cases remains, as far as the jurisprudence of this Court is concerned, an open question."); *see also Eisemann,* 401 F.3d at 108. As previously mentioned, the Supreme Court has stressed the likelihood of prejudice resulting from concurrent representation and the difficulty of proving that prejudice. *See id.* (citing *Sullivan,* 446 U.S. at 348-49 and *Holloway v. Arkansas,* 435 U .S. 475, 490-91 (1978)); *see also supra* at note 13. However, according to the *Mickens* Court, the language of *Sullivan* does not clearly establish or even support an expansive application of the prejudice presumption to, as present here, conflicts involving former clients. *Id.* at 174. This lack of clearly established Supreme Court precedent is not problematic for this Court's analysis, as the Court concludes below that there is no evidence of an actual conflict of interest in the present case.

17    During petitioner's trial, Judge Lomanto indicated that the courtroom was not designed to facilitate the contemporaneous recording of sidebar conferences. *See* Trial Tr. at pp. 842-43. As a result, counsel agreed to place the sidebars on the record after they occurred. Trial Tr. at pp. 843-44. Several days after Martuscello's cross-examination of Hill, counsel placed on the record the sidebar involving the conflict of interest issue. *See* Trial Tr. at pp. 1146-47, 1149. Based on this Court's review of the record, it appears that Judge Lomanto saw no problem with any possible conflict if Hill waived his attorney-client privilege. *See* Trial Tr. at p. 1149.

18    In *Chapman,* the Supreme Court articulated that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828.

19    In contrast, courts generally have held that the impaneling of the jury, including the pre-screening of jurors, is considered a material stage of trial at which a defendant has the right to be present. *See Gomez v. United States,* 490 U.S. 858, 873 (1989); *Tankleff v. Senkowski* 135 F.3d 235, 246 (2d Cir.1998); *see also Cohen v. Senkowski,* 290 F.3d 485, 489 (2d Cir.2002).

20    To the extent that Wright asserts that his federal due process right to be present at all material stages of his trial was violated, as opposed to alleging trial court error for excluding him from the conference, the Court further finds that, for the reasons stated above, the Court of Appeals' decision rejecting this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent as articulated in *Snyder* and its progeny.

21    This presumption of correctness is codified at 28 U.S.C. § 2254(e)(1), which requires that "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

Wright v. Smith, Not Reported in F.Supp.2d (2007)
Case 7:13-cv-02627-CS   Document 50   Filed 04/29/16   Page 181 of 181
2007 WL 2412248

22    To the extent that Wright asserts that his constitutional right to a fair and impartial jury was violated, as opposed to alleging trial court error for failing to disqualify Ms. Lamb, the Court further finds that, for the reasons stated above, the Court of Appeals' decision rejecting this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent as articulated in *Patton* and its progeny.

23    Based on a review of the cross-examinations of both Hill and Cannizzo, it is clear that during the colloquy preceding the challenged testimony, defense counsel were seeking to adduce testimony related to the witnesses' state of mind in order to attack their credibility, as opposed to eliciting facts upon which the jury would base its verdict. *See* Trial Tr. at pp. 880-83, 1065-1079.

24    Wright does not appear to assert this claim of prosecutorial misconduct as an independent ground for habeas relief. Rather, he complains of the prosecutor's comments during summation in order to buttress his claims of evidentiary error. For purposes of completeness, the Court nonetheless will examine this allegation independently.

---

**End of Document**                                                       © 2016 Thomson Reuters. No claim to original U.S. Government Works.